IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JERALD KING, Derivatively on Behalf of CEPHALON, INC., | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | C.A. No. _____ |
| FRANK BALDINO, JR.; WILLIAM P. EGAN, MARTYN D. GREENACRE, VAUGHN M. KAILIAN, KEVIN E. MOLEY, CHARLES A. SANDERS, GAIL R. WILENSKY, and DENNIS L. WINGER, | ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants, | ) ) ) | |
| and | ) ) | |
| CEPHALON, INC., A Delaware Corporation, | ) ) ) | |
| Nominal Defendant. | ) | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff, by his undersigned attorneys, alleges for his Verified Shareholder Derivative Complaint, based upon, inter alia, the investigation made by and through his attorneys, as follows:

## SUMMARY OF ACTION

1.    This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant Cephalon Inc. ("Cephalon" or the "Company") against its Board of Directors for their breaches of fiduciary duty, and other unlawful acts.

2.    As a direct result of defendants' unlawful scheme to market and sell the drugs Actiq, Gabitril and Provigil for non-FDA approved "off-label" uses, the Company has become subject to numerous Federal and state investigations, including the U.S.

Attorney's Office ("USAO") in Philadelphia, the Department of Justice ("DOJ") and the Offices of the Connecticut and Massachusetts Attorney Generals. These investigations have already caused irreparable harm to the Company's goodwill and reputation, $425 million in fines as part of a comprehensive settlement of all federal and related state Medicaid claims, and an agreement that the Company will agree to a federal misdemeanor violation of the Federal Food, Drug and Cosmetic Act and will enter into a corporate integrity agreement with the Office of Inspector General of the U.S. Department of Health and Human Services.

3.     Further, as a result of Defendants' actions, the Company continues to be investigated by the Connecticut and Massachusetts Attorney Generals, and may be subject to additional penalties, fines, requests for information from other state attorneys general, civil and criminal prosecution, resulting in additional pecuniary, as well as intangible, harm. Absent judicial intervention, defendants will not take the actions requested herein, and, in the continued breach of their fiduciary duties, will persist in allowing the wrongdoers to escape justice and Cephalon's injuries to remain uncompensated.

**JURISDICTION AND VENUE**

4.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the dispute is between citizens of different States. This action was not brought collusively to confer jurisdiction on a court of the United States that it would not otherwise have.

5.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Cephalon is a Delaware corporation.

## THE PARTIES

6.    Plaintiff owns and has owned shares of Cephalon at all times relevant herein. Plaintiff is a resident of the State of Iowa.

7.    Defendant Cephalon is a Delaware corporation with its principal executive offices located at 41 Moores Road, Frazer, Pennsylvania 19355.    According the Company's public filings, Cephalon is an international biopharmaceutical company dedicated to the discovery, development and marketing of innovative products to treat human diseases, with the current focus in four core therapeutic areas: central nervous system disorders, pain, oncology and addiction. The Company's most significant product is Provigil, which comprised approximately 48% of its consolidated net sales for the six months ended June 30, 2007.  The Company's second most significant product is Actiq (including the Company's generic version of Actiq), which comprised approximately 23% of the Company's consolidated net sales for the six months ended June 30, 2007. The Company's stock is traded on NASDAQ under the symbol "CEPH."

8.    Defendant Frank Baldino, Jr. ("Baldino"), founder of the Company, has served as its Chief Executive Officer and a director since 1987, and as Chairman of the Board of Directors (the "Board") since 1999.

9.    Defendant William P. Egan ("Egan") has served as a director of Cephalon since 1988.  He is the Presiding Director of the Company.  Egan serves on the Audit Committee of the Board.  He is a director of CRH plc, and is a founder and general partner of Alta Communications.

10.    Defendant Martyn D. Greenacre ("Greenacre") has served as a director of Cephalon since 1992.    Greenacre serves on the Stock Option and Compensation Committee and is Chairman of the Corporate Governance and Nominating Committee of the Board.    Since 2004, Greenacre has served as Chairman of Beijing Med-Pharm Corporation, and since 2002 Chairman of Life Mist Technologies, Inc.

11.    Defendant Vaughn M. Kailian ("Kailian") has served as a director of Cephalon since 2005.  Kailian serves on the Stock Option and Compensation Committee and the Corporate Governance and Nominating Committee of the Board.  He is currently Chairman of the Board of ViaCell, Inc., and serves on the Board of Directors of NicOx, S.A., Memory Pharmaceuticals and BIO Ventures for Global Health.

12.    Defendant Kevin E. Moley ("Moley") has served as a director of Cephalon since 2006.  Moley serves on the Audit Committee of the Board.  Moley currently serves on the Board of Directors of Merge Technologies Inc.

13.    Defendant Charles A. Sanders ("Sanders") has served as a director of Cephalon since 2001.  Sanders is Chairman of the Stock Option and Compensation Committee of the Board.  He currently serves as a director of Genentech, Inc., Icagen, Inc. and Vertex Pharmaceuticals.

14.    Defendant Gail R. Wilensky ("Wilensky") has served as a director of Cephalon since 2002.  Wilensky serves on the Corporate Governance and Nominating Committee of the Board.  Since 2004, Wilensky has served as the Vice Chair of the Maryland Health Care Commission.  He also serves as a director of Gentiva Health Services, ManorCare, Quest Diagnostics, Inc., SRA International, Inc. and UnitedHealth Group.

15.    Defendant Dennis L. Winger ("Winger") has served as a director of Cephalon since 2003. Winger serves as Chairman of the Audit Committee of the Board. He is Senior Vice President and Chief Financial Officer of Applera Corp., and serves as a director of Cell Genesys, Inc.

16.    The defendants, by reason of their status as officers and executives and/or members of the Cephalon Board have and had the power and influence and did in fact control and influence and cause Cephalon to engage in the unlawful acts and conduct complained of herein. Each of the defendants is liable as a direct participant in, and aider and abetter of, the wrongs complained of herein.

17.    By reason of their positions and because of their ability to control the business and corporate affairs of Cephalon at all relevant times, the defendants owe and have owed Cephalon and its shareholders the highest fiduciary obligations of fidelity, trust, loyalty, and due care, and were and are: required to use their utmost ability to control and manage Cephalon in a fair, just, and equitable manner; act in furtherance of the best interests of Cephalon and its shareholders so as to benefit all shareholders and not in furtherance of their personal interest or to benefit themselves; and act with complete candor toward the public shareholders. In addition, each director of Cephalon owes and has owed to Cephalon and its shareholders the fiduciary duties to exercise due care and diligence in the administration of the affairs of Cephalon and in the use and preservation of its property and assets, and the highest obligations of good faith and fair dealing.

18.    The defendants, as members of the Board of Cephalon, are charged with numerous responsibilities in managing the Company's everyday business and affairs.

Specifically, those responsibilities include ensuring that management develops sound business strategies, the Company's systems of financial reporting and internal controls are adequate and properly implemented, and the Company's businesses are conducted in conformity with applicable laws and regulations.

19.    As set forth in the Company's Proxy Statement, filed with the SEC on April 9, 2007 (the "2007 Proxy"), the defendants serving on the Company's Audit Committee, including defendants Winger (Chairman), Baldino and Moley, are charged with specific oversight responsibilities. Those responsibilities include monitoring and overseeing the processes of preparation of the Company's financial statements, accounting and financial reporting principles, internal controls and procedures designed to ensure compliance with accounting standards, applicable laws and regulations, and the selection of, and the preparation of the audit by, the Company's independent registered public accountants.

20.    Cephalon's non-employee directors receive lucrative compensation for their service on the Board. The Company's non-management directors receive an annual retainer of $35,000, in addition to $3,000 for each Board meeting attended in person or $2,000 for each telephonic Board meeting. Moreover, defendant Winger receives an additional Audit Committee Chair retainer of $12,000, and all Committee members receive a retainer of $10,000. Defendant Egan receives additional compensation of $20,000 for his role as the Presiding Director of the Company. In addition, each director receives stock option grants of 15,000 shares upon his first election or appointment to the Board and an annual grant of 10,000 shares upon the date of each annual meeting of the Board.

21.     The defendants, because of their positions of control and authority as executive officers and/or directors of Cephalon, were able to and did, directly and indirectly, control the matters and transactions complained of herein. These defendants have and have had the duty to exercise reasonable control and supervision over the officers, employees, agents, business and operations of the Company; to be and remain informed as to how the Company was operating and, upon receiving notice or information of an imprudent, questionable or unsound decision, condition, or practice, make reasonable inquiry and, if necessary, make all reasonable remedial efforts; and to conduct the affairs of the Company to strictly comply with all applicable laws and regulations, provide the highest quality services, and maximize the profitability of the Company, for the benefit of its shareholders.

## SUBSTANTIVE ALLEGATIONS

22.     Drug companies must apply to the United States Food and Drug Administration ("FDA") for approval to sell a new drug. In that approval process, the manufacturer often seeks FDA approval for many different purposes. Often, the FDA approves the drug for a narrower use than sought. Doctors are frequently lobbied by manufacturers to prescribe a drug for a non-approved or "off-label" use. Indeed, drug companies spend billions of dollars each year trying to persuade doctors to prescribe their drugs. The market for off-label use often vastly exceeds the approved FDA use.

23.     There are strict federal regulations about what form that promotion can take and, in particular, promoting "off-label" use. These regulations are meant to ensure that drug companies provide doctors trustworthy information, so that medications are prescribed appropriately.

24.     The Food and Drug Administration Act of 1997 ("FDAMA"), 21 U.S.C. §

360aaa *et seq.*, specifically authorizes a manufacturer to disseminate "written information

concerning the safety, effectiveness, or benefit of a use not described in the approved

labeling of a drug or device," 21 U.S.C. § 360aaa(a), if it complies with several

requirements: the manufacturer must submit an application to the FDA seeking approval

of the drug for the "off-label" use; the manufacturer must provide the materials to the

FDA prior to dissemination; the materials themselves must be in unabridged form; and

the manufacturer must include disclosures that the materials pertain to an unapproved use

of the drug, and, if the FDA deems it appropriate, "additional objective and scientifically

sound information ... necessary to provide objectivity and balance." 21 U.S.C. §

360aaa(b)(1)-(6); *id.* at § 360aaa(c); *id.* at § 360aaa-1. Importantly, FDAMA amends the

Food, Drug, and Cosmetic Act to prohibit "the dissemination of information *in violation*"

of these provisions.   21 U.S.C. § 331(z) (emphasis added); *see also id.* at §

360aaa-4(b)(1).

25.     Thus, although FDAMA permits pharmaceutical manufacturers to

disseminate to health care practitioners qualified forms of   "written information

concerning the safety, effectiveness, or benefit of a use not described in the approved

labeling of a drug," 21 U.S.C. § 360aaa(a), manufacturers are permitted to provide only

"authorized information" in the form of unabridged peer-reviewed articles or qualified

reference publications. *Id.* at § 360aaa-1.

26.     Actiq is a lollipop with an active ingredient fentanyl, a highly-addictive

substance 80 times more potent than morphine.  Actiq was formulated so that patients

suffering from severe pain associated with their malignant cancer can quickly ingest and

absorb a sufficient dose of fentanyl to lessen their suffering. The Drug Enforcement Administration classifies fentanyl as a Schedule II controlled substance, putting it in the same category as cocaine and methamphetamine. Schedule II drugs are inherently dangerous because they have the highest potential for abuse and an associated risk of fatal overdose.

27.    In November 1998, recognizing the obvious risks associated with Actiq use, the FDA restricted its grant of marketing approval for Actiq to the treatment of breakthrough cancer pain in patients with malignancies who had developed a tolerance to less dangerous therapies. Consistent with its desire to limit the use of Actiq to a small group of patients who most needed it and to whom the risk of addiction was not particularly relevant, the FDA specifically required Cephalon to accept a series of limitations on the use of Actiq, including that: it was "contraindicated in the management of acute or postoperative pain;" "must not be used in opioid non-tolerant patients;" "is intended to be used only in the care of cancer patients;" and "is intended to be used... only by oncologists and pain specialists who are knowledgeable of and skilled in the use of Schedule II opioids to treat cancer pain." Moreover, the FDA specifically limited the marketing of Actiq to oncologists and pain specialists knowledgeable of, and skilled in, the use of Schedule II opioids to treat cancer pain.

28.    Cephalon knew that the market potential for Actiq for its approved use for the treatment of breakthrough cancer pain in opioid-tolerant patients with malignancies was limited.

29.    In its Form 10-Q filed with the SEC for the period ending June 30, 2002, the Defendants attributed a sales increase of 92% for Actiq to "a dedicated sales force"

9

and "ongoing changes to our marketing approach." This statement was misleading when made because the change in approach was to focus on off-label marketing in violation of FDA and FDAMA mandates.

30.     On November 3, 2006, *The Wall Street Journal* reported that there are thousands of Americans who are prescribed Actiq for ailments that have "nothing to do with its intended use. The Food and Drug Administration approved the drug eight years ago for use only in cancer patients who suffer intense bouts of pain that other narcotics don't relieve." The article further reported:

> In the first half of this year, oncologists, or cancer doctors, accounted for only 1% of the 187,076 Actiq prescriptions filled at retail pharmacies in the U.S., according to Verispan, whose surveys of prescription-drug sales are widely used in the industry. Data gathered from a network of doctors by research firm ImpactRx between June 2005 and October 2006 suggest that more than 80% of patients who use the drug don't have cancer. Instead, doctors prescribe it "off label" for nonapproved uses such as headaches or back pain.

> Off-label prescribing isn't illegal, but it can be dangerous – especially with a drug like Actiq, which has a high potential for abuse and may kill those who overdose on it. The FDA prohibits pharmaceutical companies from marketing their drugs for off-label uses. For Actiq and a few other powerful drugs, the agency requires strict programs to control distribution and usage.

> *        *        *

> The U.S. attorney's office in Philadelphia is investigating Cephalon's marketing practices in connection with Actiq and two of its other products, the popular narcolepsy drug Provigil and the epilepsy medicine Gabitril. No charges have been filed.

> *        *        *

> Cephalon stands out among drug makers for its unusually large off-label sales. Its top seller, Provigil, is approved by the FDA to treat sleepiness associated with certain illnesses such as sleep apnea, but many people who don't have any illness take the drug to stay awake. Analysts estimate about 80% of Provigil prescriptions are off-label. Gabitril is also widely

10

used off-label for anxiety, pain and other conditions. Under FDA pressure, Cephalon last year curtailed its marketing of the epilepsy drug because it was causing seizures in patients without the disease, and sales dropped 23%.

\*     \*     \*

Actiq had sales of $15 million in 2000, when Cephalon acquired it. By last year, sales had grown to $412 million, making it Cephalon's No. 2 drug. In the first nine months of this year, sales jumped to $471 million. Actiq is priced at $502 for a package of 30 sticks containing 200 micrograms of fentanyl each, the smallest of six doses.

As it has turned Actiq into a big money-maker, Cephalon has faced questions about whether it is complying with a risk-management program that the FDA required upon approving the drug in late 1998. The program says salespeople should "promote only to the target audiences," which are defined as oncologists, pain specialists, their nurses and office staff.

In 2003, a Cephalon auditor, David Brennan, concluded that the company was failing to comply with the FDA program, according to a lawsuit later filed against the company in New Jersey state court for wrongful termination.

An important provision of the program says Actiq's maker should report to the FDA every quarter whether "groups of physicians (such as a particular specialty)" who represent "potential off-label usage greater than 15%" are prescribing the drug. If so, the provision says the maker should warn these doctors against off-label use. Mr. Brennan's lawsuit says that means Cephalon must act if all noncancer medical specialties together account for more than 15% of prescriptions.

\*     \*     \*

According to Verispan data for the first half of 2006, two specialties exceed 15% of Actiq prescriptions: anesthesiologists at 29.5% and physical medicine and rehabilitation specialists at 16%. The data show oncologists and pain specialists account for less than 3% of prescriptions. Cephalon does not dispute the data.

\*     \*     \*

After Mr. Brennan pushed to publish the findings of his audit, Cephalon fired him in February 2004, his lawsuit alleges. Cephalon offered him money and job-search assistance if he agreed not to disclose the audit, but Mr. Brennan refused, the suit says.

11

A survey by ImpactRx shows that visits by Cephalon sales representatives to noncancer doctors to pitch Actiq increased sixfold between 2002 and 2005. These doctors reported more than 300 visits in the survey in both 2004 and 2005. Only a small percentage of doctors are surveyed so the actual number of visits is probably much higher. Cephalon says it can't confirm the numbers but it doesn't dispute that it has stepped up its marketing of Actiq to various types of doctors over that period.

31.    On November 21, 2006, *The Wall Street Journal* published an article titled

"Cephalon Used Improper Tactics to Sell Drugs, Probe Finds." The article disclosed the

following findings:

FROM SETTING unrealistically high sales quotas to pushing larger prescriptions at higher doses, drug maker Cephalon Inc. engaged in questionable practices to expand sales of Actiq, a powerful narcotic lollipop approved only treat cancer pain, according to a two-year investigation by the Connecticut attorney general.

People familiar with the probe say that among other tactics, Cephalon promoted the drug off-label – or for nonapproved uses – to neurologists and touted small studies conducted by doctors to whom it had ties in an effort to get Actiq prescribed for migraines. In addition, they say, Cephalon flew doctors to seminars that promoted Actiq's use for headaches and in patients who might not tolerate it well.

*        *        *

Mr. Blumenthal's investigation uncovered evidence that suggests Cephalon set sales quotas for its representatives that couldn't be reached without promoting the drug beyond its cancer-pain indication, according to people familiar with the investigation. Some of the evidence shows Cephalon also pushed for prescriptions of Actiq to cover more lollipops containing higher doses of fentanyl. Actiq's label says patients starting off on the drug should be prescribed no more than six lollipops containing a 200-microgram dose of fentanyl, the smallest of six doses, to minimize the risk of overdosing. Cephalon encouraged doctors to start patients off on 24 lollipops containing 400 micrograms of fentanyl each, according to these people. The higher dose costs more and brings in more revenue.

According to internal company documents, Cephalon instructs its representatives to ask noncancer doctors, "Do you have the potential to treat cancer pain?" Even if the answer is no, a decision tree instructs the representatives to give the doctors free Actiq coupons that they can pass

on to patients. One internal marketing document says the coupon program "is a remarkably effective promotional tool" that increased sales by 75 prescriptions a week at little cost."

Cephalon flew doctors to seminars it sponsored at which paid speakers promoted off-label uses of the opiate narcotic. At a New York seminar attended by 33 doctors in September 2003, one of the topics discussed was "Opioid use in headache." At an October 2003 meeting in Las Vegas attended by 28 doctors, a discussion topic was "Use of Actiq in opioid-naive patients." Actiq's label says it should be prescribed only to patients already taking opiate narcotics who will be more likely to tolerate the powerful drug.

\*        \*        \*

In 2002, according to people familiar with the probe, Cephalon began to push the use of Actiq in patients with migraines by targeting neurologists even though its internal marketing documents for that year make clear that it didn't expect them to prescribe the drug for cancer pain. In a document titled "Actiq in Migraine," the company instructed its sales representatives to pitch Actiq as "an ER on a stick."

\*        \*        \*

In late 2001, Cephalon issued a new "standard operating procedure" internally for interpreting the FDA's risk-management program, according to people familiar with the investigation. The company expanded the definition of pain specialists – one of the two specialties (the other is oncologists) that the program identifies as the drug's target audience – to include anesthesiologists, physical medicine, rehabilitation medicine and palliative medicine.

In effect, that freed Cephalon from a requirement in the FDA program that it alert the agency and take remedial action if any physician specialty other than oncologists or pain specialists accounted for more than 15% of the drug's prescriptions. Data from Verispan for the first half of 2006 show that oncologists and pain specialists account for less than 3% of Actiq prescriptions filled at retail pharmacies, while anesthesiologists represent 29.5% of prescriptions.

32.     On November 9, 2007, Cephalon filed with the SEC its Form 10-Q for its

Third Quarter ended September 30, 2007. In the Form 10-Q, the Company reported that:

In early November 2007, we announced that we had reached an agreement in principle with the U.S. Attorney's Office ("USAO") in Philadelphia and

the DOJ with respect to the USAO investigation that began in September 2004. The investigation has focused on our sales and promotional practices with respect to ACTIQ, GABITRIL® (tiagabine hydrochloride) and PROVIGIL. Under this agreement, we now expect to pay $425.0 million as part of a comprehensive settlement of all Federal and related state Medicaid claims. During the third quarter of 2007, we increased our existing reserve by $369.0 million to $425.0 million in contemplation of this payment. In addition, the Company will agree to a single federal misdemeanor violation of the Federal Food, Drug and Cosmetic Act and will enter into a corporate integrity agreement with the Office of Inspector General of the U.S. Department of Health and Human Services. The terms described above are subject to negotiation and the execution of the final settlement and corporate integrity agreements. There can be no assurance that the settlement will be finalized on the terms outlined above.

In September 2004, we announced that we had received a voluntary request for information from the Office of the Connecticut Attorney General that also appears to be focused on our sales and promotional practices with respect to ACTIQ, GABITRIL and PROVIGIL. We are cooperating with this Office, are providing documents and other information in response to theses and additional requests and are engaged in ongoing discussions with them. In late October 2007, we also received a civil demand for information from the Office of the Massachusetts Attorney General that is focused on sales and promotional practices with respect to ACTIQ, FENTORA® (fentanyl buccal tablet) [C-II] and certain of our other products. We intend to cooperate with this request as well. Both of these matters may involve civil penalties and/or fines. The payment of any settlement or judgment amount and/or fines could have a material adverse effect on our financial position, liquidity and results of operations. Furthermore, it is reasonably likely that we will face future additional requests for information from other state attorneys general focused on historical sales and promotional practices for our U.S. products. If civil penalties and/or fines were to result from such investigations, it could materially and adversely effect our financial position, liquidity and results of operations.

In November 2007, we were served with a putative class action complaint filed on behalf of entities that claim to have purchased ACTIQ for use in non-cancer patients. The complaint alleges violations of various state consumer protection laws, as well as the violation of the common law of unjust enrichment, and seeks an unspecified amount of money in actual, punitive and/or treble damages, with interest, and/or disgorgement of profits. We believe the allegations in the complaint are without merit, and we intend to vigorously defend ourselves in this matter and in any similar actions that may be filed in the future.

In March 2007, we received a letter requesting information related to ACTIQ and FENTORA from Congressman Henry A. Waxman in his capacity as Chairman of the House Committee on Oversight and Government Reform. The letter cites two articles concerning ACTIQ published in *The Wall Street Journal* in November 2006 and requests information concerning our sales and marketing practices for ACTIQ and FENTORA, among other things. We are cooperating with this request and are continuing to provide documents and other information to the Committee.

## DERIVATIVE ALLEGATIONS

33.    Plaintiff brings this complaint derivatively in the right and for the benefit of Cephalon to redress injuries suffered and to be suffered by Cephalon as a direct result of the violations of fiduciary and other common law duties owed by the defendants to Cephalon and its public shareholders. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

34.    Plaintiff will adequately and fairly represent the interests of Cephalon and its public shareholders in enforcing and prosecuting their rights.

35.    Plaintiff has not made any demand on the Board of Directors of Cephalon to institute this action because such demand would be a futile and useless act for the following reasons:

(a)    The Cephalon Board has proven itself to be unwilling to bring remedial action against wrongdoers that have caused the Company substantial harm regarding conduct of which the Board was aware. As a result of this improper conduct, Cephalon was forced to pay a fine of over $425 million stemming from the Federal investigations. The Cephalon Board made no effort to recover any of these damages from the known wrongdoers.

15

(b)     There was a sustained and systematic failure of the Board to exercise oversight, in that the directors knew of the violations of law, took no steps in an effort to prevent or remedy the situation, and that failure to take any action for such an inordinate amount of time resulted in substantial corporate losses. The directors' decision to not act was not made in good faith and was contrary to the best interests of the Company;

(c)     The acts or reckless failure to act complained of herein constitute violations of fiduciary and common law duties owed by the Board and these acts are incapable of ratification;

(d)     The defendants intentionally breached and/or recklessly and/or with gross negligence disregarded their fiduciary duties, choosing to implement a marketing scheme that completely ignored FDA mandates, including the requirement that Cephalon advise physicians that Actiq is not medically necessary for the treatment of general aches and pains and is inappropriate other than to manage persistent cancer pain in certain opioid-tolerant terminal cancer patients;

(e)     The Board has failed to commence any action against the principal wrongdoers despite the lengthy passage of time since their unlawful acts were revealed;

(f)     The known principal wrongdoers are in a position to, and do, dominate and control the Cephalon Board, paying them high annual and monthly fees to assure their compliance. Thus, the Board could not exercise independent objective judgment in deciding whether to bring this action nor vigorously prosecute this action;

(g)     In order to bring this action for breach of fiduciary and common law duties, the members of the Board would have been required to sue themselves and/or

their fellow directors and allies in the top ranks of the Company, with whom they are well acquainted and with whom they have entangling alliances, interests, and dependencies, which they would not do. They therefore would not be able to vigorously prosecute any such actions; and

(h)    The members of the Cephalon Board, including each of the defendants herein, receive substantial benefits, and other emoluments by virtue of their membership on the Board and their control of Cephalon. Bringing an action or even adequately investigating other directors, who have the power to terminate a director's employment, would not likely occur. The defendants are incapable of exercising independent objective judgment in deciding whether to bring this action.

## COUNT I

### (Breach of Fiduciary Duties)

36.    Plaintiff incorporates by reference and realleges each and every allegation as set forth above as if fully set forth herein.

37.    Each defendant owed Cephalon and its public shareholders the highest duties of loyalty and honesty in conducting their affairs.

38.    At a minimum, to discharge these duties, each defendant should have exercised reasonable and prudent supervision over the management, policies, practices, controls and financial affairs of Cephalon. By virtue of these obligations, each defendant was required, inter alia:

a.    to exercise reasonable control and supervision over the officers, employees, agents, business, and operations of Cephalon;

b.      to be and remain informed as to how Cephalon was operating and, upon receiving notice or information of an imprudent, questionable, or unlawful decision, condition, or practice, make reasonable inquiry and, if necessary, make all reasonable remedial efforts; and

c.      to conduct the affairs of Cephalon in a lawful manner and in compliance with government rules and regulations.

39.     The defendants knowingly, intentionally, or recklessly breached their fiduciary duties and, thereby, caused the Company to commit illegal acts and impair its reputation and credibility for no legitimate business purpose, as a result of which Cephalon has been and continues to be substantially damaged.

40.     Accordingly, plaintiff seeks on behalf of Cephalon monetary damages, injunctive remedies, and other forms of equitable relief.

## COUNT II

### (Indemnification)

41.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

42.     As alleged herein, the defendants, acting as officers and/or directors of Cephalon and, therefore, as its agents, breached their fiduciary duties to Cephalon and its public shareholders.

43.     Cephalon has suffered significant and substantial injury as a direct result of the defendants' knowing, intentional, or reckless breaches of their fiduciary duties as alleged herein.  Plaintiff, on behalf of the Company, seeks relief from the defendants on the theory of indemnity for all such damages.

**WHEREFORE**, plaintiff prays for judgment as follows:

A.     Declaring that the defendants have breached their fiduciary duties as alleged herein;

B.     Directing defendants, jointly and severally, to account for all losses and/or damages sustained by Cephalon by reason of the acts and omissions complained of herein and remit those sums to Cephalon;

C.     Requiring defendants to remit to Cephalon all of their salaries, fees, stock awards, and other compensation received for the periods when they breached their duties;

D.     Ordering that defendants and those under their supervision and control refrain from further violations as are alleged herein and to implement corrective measures that will rectify all such wrongs as have been committee and prevent their recurrence;

E.     Awarding pre-judgment and post-judgment interest as allowed by law;

F.     Awarding plaintiff's attorneys' fees, expert fees, consultant fees, and other costs and expenses; and

G.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:   January 25, 2008

RIGRODSKY & LONG, P.A.

By: _____
Seth D. Rigrodsky  (#3147)
Brian D. Long  (#4347)
919 North Market Street, Suite 980
Wilmington, Delaware  19801
Tel.:  (302) 295-5310
Fax:  (302) 654-7530

*Attorneys for Plaintiff*

**OF COUNSEL:**

**WEISS & LURIE**
Joseph H. Weiss
David C. Katz
Ilya Nuzov
551 Fifth Avenue
New York, New York  10176
Tel.:  (212) 682-3025
Fax:  (212) 682-3010

**STULL STULL & BRODY**
Jules Brody
6 East 45th Street
New York, New York  10017
Tel.:  (212) 687-7230
Fax:  (212) 490-2022

## **VERIFICATION**

I, Jerald King, under penalty of perjury under the laws of the United States of America, declare as follows:

1.     I am the named plaintiff in the action herein.

2.     I have read the foregoing Verified Shareholder Derivative Complaint, know its contents thereof and the same are true and accurate to the best of my personal knowledge, information and belief based upon the investigation conducted by my counsel.

Executed this 15th day of January, 2008.

_____
JERALD KING

%JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Jerald King | Frank Baldino, Jr. |

**(b)** County of Residence of First Listed Plaintiff  Marion County, Iowa
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)  (302) 295-5310
Seth D. Rigrodsky   919 N. Market St., Suite 980
Rigrodsky + Long, P.A.   Wilmington, DE 19801

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff
☒ 3  Federal Question (U.S. Government Not a Party)
☐ 2  U.S. Government Defendant
☒ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☒ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | Alien Detainee | | ☐ 950 Constitutionality of |
| | Other | | ☐ 465 Other Immigration | | State Statutes |
| | ☐ 440 Other Civil Rights | | Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. § 1332

Brief description of cause:
Shareholder Derivative Action for Breach of Fiduciary Duty

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):  JUDGE _____  DOCKET NUMBER _____

DATE  1/24/08

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

0 8 - 5 4

Civil Action No. _____

# ACKNOWLEDGMENT
# OF RECEIPT FOR AO FORM 85

## *NOTICE OF AVAILABILITY OF A*
## *UNITED STATES MAGISTRATE JUDGE*
## *TO EXERCISE JURISDICTION*

2008 JAN 25 PM 2: 35

CLERK, U.S. DISTRICT COURT
DISTRICT OF DELAWARE
FILED

I HEREBY ACKNOWLEDGE RECEIPT OF _____ COPIES OF AO FORM 85.

JAN 2 5 2008

_____
(Date forms issued)

_____
(Signature of Party or their Representative)

NOAH R. WORTMAN
_____
(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action