IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JERALD KING, Derivatively on Behalf of CEPHALON, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 1:08-cv-00054-GMS |
| FRANK BALDINO, JR., WILLIAM P. EGAN, MARTYN D. GREENACRE, VAUGHN M. KAILIAN, KEVIN E. MOLEY, CHARLES A. SANDERS, GAIL R. WILENSKY, and DENNIS L. WINGER, | ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants, | ) ) | |
| and | ) ) | |
| CEPHALON, INC., A Delaware Corporation, | ) ) | |
| Nominal Defendant. | ) | |

**MEMORANDUM IN SUPPORT OF MOTION OF
DEFENDANTS FOR JUDGMENT ON THE PLEADINGS**

Michael P. Kelly
Daniel M. Silver
McCarter & English, LLP
Renaissance Centre
405 N King Street, 8th Floor
Wilmington, DE 19801
Phone:  302.984.6301
Fax:  302.984.2493

ME1 7253481v.1

Steven B. Feirson
Michael L. Kichline
Michael J. Newman
Dechert LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
Phone:  215.994.4000
Fax:  215.994.2222

March 31, 2008                          Attorneys for Defendants

# TABLE OF CONTENTS

**Page**

INTRODUCTION .............................................................................................................. 1

FACTUAL BACKGROUND ............................................................................................ 5

I.  PARTIES ................................................................................................................ 5

II.  CEPHALON'S PRODUCTS ................................................................................. 5

    A.  Actiq's history and uses ............................................................................ 5

    B.  Gabitril's history and uses ....................................................................... 6

    C.  Provigil's history and uses ....................................................................... 7

III.  CEPHALON COOPERATES WITH GOVERNMENT INVESTIGATIONS ................. 7

    A.  Cephalon reaches an agreement in principle to settle with the Department of Justice ................................................................................................. 7

    B.  Cephalon faces ongoing investigations .................................................... 8

ARGUMENT .................................................................................................................... 9

I.  PLAINTIFF FAILED TO MAKE PROPER DEMAND ON CEPHALON'S BOARD AND HAS FAILED TO PROPERLY ALLEGE DEMAND FUTILITY ........ 10

    A.  In all but the rarest circumstances, the Board retains the right to decide whether to initiate litigation ................................................................ 10

    B.  Plaintiff fails to meet the particularized pleading requirements of Rule 23.1 ........................................................................................................ 11

    C.  Plaintiff fails to meet the substantive requirements necessary to show demand futility ...................................................................................... 13

        1.  A majority of the Cephalon Board is not interested ................................. 14

            a.  Compensation does not amount to a disabling "interest." ........... 14

            b.  Merely naming directors as defendants does not create a disabling "interest." .................................................................. 15

        2.  A majority of the Cephalon Board is not dominated or controlled by allegedly interested members ............................................................ 16

        3.  A majority of the Cephalon Board's does not face a substantial likelihood of personal liability ................................................................ 17

# TABLE OF CONTENTS
(continued)

**Page**

II.   PLAINTIFF FAILS TO ADEQUATELY ALLEGE THAT CEPHALON'S
      BOARD BREACHED ITS FIDUCIARY DUTY ........................................................... 19

   A.   Plaintiff's pleadings as to the breach of fiduciary duty claim are
           insufficient to meet the Rule 8 pleading requirements articulated in
           *Twombly* ............................................................................................................ 20

      1.   *Twombly* updates the notice pleading standards mandated by the
                Federal Rules of Civil Procedure ............................................................ 20

         a.   Plaintiff must make factual allegations showing "the
                     grounds of his entitlement to relief." ........................................... 21

         b.   Plaintiff is required to meet a "plausibility" threshold ............... 22

      2.   Plaintiff fails to give Defendants fair notice of his claim and the
                grounds upon which it rests ..................................................................... 22

         a.   Plaintiff's conclusory and speculative allegations are
                     insufficient to give Defendants fair notice .................................. 23

         b.   Cephalon's proposed settlement with the DOJ is
                     insufficient to show grounds for Plaintiff's entitlement to
                     relief ............................................................................................ 24

         c.   Plaintiff offers no other factual allegations to show the
                     grounds for his entitlement to relief ............................................ 25

            (1)   The Complaint does not inform Defendants
                          how their behavior was wrongful ..........................26

            (2)   The Complaint does not inform Defendants
                          when their "wrongful" behavior occurred ...........26

   B.   Plaintiff does not adequately allege a *Caremark* claim ...................................... 27

      1.   Plaintiff fails to show the Cephalon Board lacked any oversight
                mechanisms over the marketing of its pharmaceuticals ......................... 28

      2.   Plaintiff fails to show Cephalon Board consciously ignored "red
                flags." ...................................................................................................... 29

CONCLUSION ................................................................................................................... 32

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Allstate Transp. Co., Inc. v. Southeastern Pa. Transp. Auth.*,
   Civ. A. No. 97-1482, 1998 U.S. Dist. LEXIS 1740
   (E.D. Pa. Feb. 13, 1998) ..................................................................................9

*Amalgamated Bank v. Yost*,
   No. Civ. A. 04-0972, 2005 U.S. Dist LEXIS 1280 (E.D. Pa. Jan. 31, 2005) ...................17

*Bell Atl. Corp. v. Twombly*,
   127 S. Ct. 1955 (U.S. 2007) ................................................................... *passim*

*Blasband v. Rales*,
   971 F.2d 1034 (3d Cir. 1992) ..........................................................................11

*Brennan v. Cephalon, Inc.*,
   Civ. A. No. 04-3241 (NLH), 2007 U.S. Dist. LEXIS 33991
   (D.N.J. May 8, 2007) .....................................................................................31

*In re Burlington Coat Factory Sec. Litig.*,
   114 F.3d 1410 (3d Cir. 1997) ..........................................................................22

*Daily Income Fund, Inc. v. Fox*,
   464 U.S. 523 (1984) .................................................................................10, 11

*Garr v. U.S. Healthcare, Inc.*,
   22 F.3d 1274 (3d Cir. 1994) ..........................................................................31

*Kamen v. Kemper Fin. Servs. Inc.*,
   500 U.S. 90 (1991) ........................................................................................11

*Kanter v. Barella*,
   388 F. Supp. 2d 474 (D.N.J. 2005) ...................................................................12

*Kanter v. Barella*,
   489 F.3d 170 (3d Cir. 2007) .......................................................................11, 12

*Morse v. Lower Merion Sch. Dist.*,
   132 F.3d 902 (3d Cir. 1997) ..........................................................................22

*Phillips v. County of Allegheny*,
   No. 06-2869, 2008 U.S. App. LEXIS 2513 (3d Cir. Feb. 5, 2008) ...................20, 21, 22

13116937.6.LITIGATION
ME1 7253481v.1

*Spruill v. Gillis*,
    372 F.3d 218 (3d Cir. 2004)..................................................................................9

*United Copper Sec. Co. v. Amalgamated Copper Co.*,
    244 U.S. 261 (1917)......................................................................................10, 11

## STATE CASES

*Aronson v. Lewis*,
    473 A.2d 805 (Del. 1984) ...................................................................10, 13, 16, 28

*Ash v. McCall*,
    C.A. No. 17132, 2000 Del. Ch. LEXIS 144 (Del. Ch. Sept. 15, 2000) ......................23, 26

*In re Baxter Int'l, Inc. S'holders Litig.*,
    654 A.2 1268 (Del. Ch. 1995).......................................................................17, 18, 28, 29

*Beam v. Stewart*,
    833 A.2d 961 (Del. Ch. 2003).............................................................................14

*Beam v. Stewart*,
    845 A.2d 1040 (Del. 2004) .................................................................................16

*Braddock v. Zimmerman*,
    906 A.2d 776 (Del. 2006) ...................................................................................13

*Brehm v. Eisner*,
    746 A.2d 244 (Del. 2000) ............................................................................. *passim*

*Canadian Commer. Workers Indus. Pension Plan v. Alden*,
    C.A. No. 1184-N, 2006 Del. Ch. LEXIS 42 (Del. Ch. Feb. 22, 2006) .................23, 27, 28

*In re Caremark Int'l Derivative Litig.*,
    698 A.2d 959 (Del. Ch. 1996).................................................................... *passim*

*In re Citigroup, Inc. S'holders Litig.*,
    Cons. Civ. A. No. 198272003 Del. Ch. LEXIS 61
    (Del. Ch. June 5, 2003) ...........................................................................25, 29, 30

*David B. Shaev Profit Sharing Account v. Armstrong*,
    C.A. No. 1449-N, 2006 Del. Ch. LEXIS 33 (Del. Ch. Feb. 13, 2006) .................28, 29, 31

*Grimes v. Donald*,
    673 A.2d 1207 (Del. 1996) .........................................................................13, 14, 22, 23

*Grobow v. Perot*,
  539 A.2d 180 (Del. 1988) ...............................................................................14, 17

*Guttman v. Jen-Hsun Huang*,
  823 A.2d 492 (Del. Ch. 2003).......................................................13, 19, 28, 29

*Jacobs v. Yang*,
  C.A. No. 206-N, 2004 Del. Ch. LEXIS 117 (Del. Ch. Aug. 2, 2004) .............................15

*Pogostin v. Rice*,
  480 A.2d 619 (Del. 1984) ...............................................................................15

*Poland v. Caldwell*,
  Nos. 89-645, 89-1255, 1990 WL 158479 (E.D. Pa. Oct. 12, 1990) ...................15

*In re Prudential Ins. Co. Derivative Lit.*,
  282 N.J. Super. 256, 659 A.2d 961 (1995) .....................................................12

*Rales v. Blasband*,
  634 A.2d 927 (Del. 1993) .................................................................10, 11, 13

*Seminaris v. Landa*,
  662 A.2d 1350 (Del. Ch. 1995).....................................................................16, 17

*Stone v. Ritter*,
  911 A.2d 362 (Del. 2006) ........................................................................ *passim*

*In re Walt Disney Co. Derivative Litig.*,
  906 A.2d 27 (Del. 2007) ..................................................................................27

## STATUTES AND FEDERAL RULES

8 Del. C. § 102(b)(7)..............................................................................................19

Fed. Rule Civ. Pro. Rule 8 ............................................................................ *passim*

Fed. Rules of Civ. Pro 11 .............................................................................. *passim*

Fed. Rules of Civ. Pro. 12..........................................................................5, 9, 20

Fed. Rule of Civ. Pro. 23.1 ........................................................................... *passim*

## MISCELLANEOUS

1 William Meade Fletcher et al., *Fletcher Cyclopedia of the Law of Private Corporations*
  § 4226.0..............................................................................................................10

# INTRODUCTION

In this stockholder derivative suit, Plaintiff has brought a claim on behalf of Cephalon without first asking the Company to bring those claims, i.e., without making a "demand" on the Board of Directors.  A stockholder may bring a claim on behalf of a company *only* by pleading specific facts which show that such a demand would be futile because it would be impossible for the directors to impartially consider the demand.  Here, Plaintiff does not really attempt to meet his burden of showing demand futility and thus fails to clear this fundamental, threshold hurdle establishing his ability to proceed with this litigation.  This failing is hardly surprising given that seven of the eight directors are outside, independent directors who are completely capable of disinterestedly evaluating whether this corporate litigation claim should be brought.  For this reason alone, this Court should enter judgment in favor of Defendants.  Moreover, even a cursory review of the underlying claim which Plaintiff tries to bring here makes clear that this Complaint is utterly without merit.  Plaintiff attempts to hold the Board liable not for what it actually did, but for what Plaintiff now claims the Board should have done.  This type of claim about Board inaction, known as a "*Caremark* claim," is notoriously difficult to bring.  Plaintiff's Complaint fails at the most fundamental level to make out a *Caremark* claim and thus provides an additional separate and independent basis for judgment to be entered for Defendants.

Both the Federal Rules of Civil Procedure and Delaware substantive law contain exacting demand requirements because it is undisputed that the right to litigate corporate injuries belongs solely to the corporation.  Individual stockholders, and their lawyers, are not permitted to wrest away control over this basic corporate decision from the company in order to pursue their personal goals.  Only when a court finds, on the basis of detailed and specific allegations in the

Complaint, that it is impossible for a Board of Directors – either in whole, in part, or represented by a special litigation committee – to independently and impartially consider a demand can a stockholder be granted leave to bring a lawsuit on the company's behalf.

Here, to excuse demand, Plaintiff offers nothing more than a half-hearted recitation of the boilerplate legal elements of demand futility. Plaintiff conclusorily pleads that making demand on the Cephalon Board would be futile because: (1) directors will not sue themselves; (2) directors have financial interests that would prevent them from bringing the claims; and (3) directors lack independence to consider a demand. These are the very types of conclusory allegations that courts have repeatedly deemed insufficient under both Federal Rule of Civil Procedure 23.1 and Delaware substantive law. There is simply no reason here to depart from the long standing and well recognized rule that the Board, not individual stockholders, determine what litigation the company should initiate.

Moreover, even if it were necessary to look beyond Plaintiff's failure to make demand in order to enter judgment for Defendants, and it is not, the nature of the breach of fiduciary duty claim set forth in the Complaint only serves to demonstrate that Plaintiff's claim should not proceed. In his Complaint, Plaintiff does not allege that the directors affirmatively did anything wrong. Rather, he argues that because of their inaction, the directors somehow breached their fiduciary duty to the Company. However, stockholder derivative actions alleging director inaction are notoriously difficult to bring. Indeed, the Delaware Chancery Court has observed that this is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *In re Caremark Int'l Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch.

1996). The pleading hurdles of *Caremark* claims are insurmountable except in the rarest of cases.

In large companies like Cephalon, hundreds, if not thousands, of decisions are made each day by employees at levels far beneath the Board of Directors. However, Boards are involved "only . . . [in] the most significant corporate acts or transactions." *Id.* at 968. Nevertheless, "ordinary business decisions that are made by officers and employees deeper in the interior of the organization can . . . vitally affect the welfare of the corporation and its ability to achieve its various strategic and financial goals." *Id.* Thus, even a company with informed directors, who act diligently and exercise their duties in good faith, nonetheless may still face problems because of employee conduct. If a Board were held liable each time such problems arose, it would be virtually impossible to find qualified people to become directors. Therefore, a high standard for director liability has been erected to protect stockholders by encouraging Board service by capable individuals. *Id.* at 971.

This breach of fiduciary duty case rests almost exclusively on the notion that the director's alleged bad faith is somehow established by the mere existence of a Government investigation into the promotional activities of some employees which exceeded the scope of product indications. In 2004, Cephalon publicly announced that the U.S. Attorney's Office in Philadelphia had issued subpoenas for documents related to the Company's marketing activity for three of Cephalon's products: ACTIQ®, GABRITRIL® and PROVIGIL®. This investigation focused on whether any Cephalon employees improperly promoted its products for use outside of the indication. Recently, Cephalon announced that it reached an agreement in principal for a comprehensive settlement with the Department of Justice and the U.S. Attorney's

-3-

Office in Philadelphia, under which it will, if consummated, pay $425 million and plead guilty to a federal misdemeanor violation of the Federal Food, Drug and Cosmetic Act.

　　　To the Plaintiff, the Government investigations and the proposed settlement – without more – seem to equate to liability for each of the director defendants.  But, not surprisingly, the law squarely forecloses this approach.  *See*, *e.g.*, *Stone v. Ritter*, 911 A.2d 362, 372 (Del. 2006) (derivative claim dismissed despite $50 million fine).  In a derivative action like this one, the key question is whether the directors acted in good faith, not whether someone else in the company did something wrong.  As the Delaware Supreme Court noted in a similar case, the plaintiff who, without more, "seeks to equate a bad outcome with bad faith" will not succeed in his *Caremark* claim.  *Id*. at 973.

　　　For the past four years, the Board, with its seven independent, outside directors, has affirmatively dealt with the complex set of problems which have arisen surrounding the Company's promotional activities.  The directors have overseen a large investigation, addressed employee issues, updated corporate policies and overseen the negotiation of a settlement with the Government, all while tending to their other duties to Cephalon and its stockholders.  The problems raised by Plaintiff in his one lawsuit are intertwined with all the other, myriad issues now being overseen by the Cephalon Board.  At this stage, it would be imprudent, to say the least, to segregate the matters alleged by Plaintiff and carve them off to be handled by Plaintiff and his counsel without regard to the Board's overall approach to advancing the best interests of the Company.  This, however, is exactly what Plaintiff seeks to do by bringing a derivative suit without first making a demand on the Board.  Ultimately, the Cephalon Board remains the proper place for such a significant corporate decision.  Therefore, pursuant to Federal Rules of Civil

Procedure 8, 12(c) and 23.1, judgment should be entered in favor Defendants and against Plaintiff.

## FACTUAL BACKGROUND

### I. PARTIES.

Cephalon, Inc. ("Cephalon" or "the Company"), a Delaware corporation with its principal place of business in Frazer, Pennsylvania, is "dedicated to the discovery, development, and marketing of innovative products to treat human diseases, with the current focus in four core therapeutic areas: central nervous system disorders, pain, oncology and addiction." (Compl. ¶7.)

There are eight members of the Cephalon Board of Directors ("Cephalon Board"). Defendant Dr. Frank Baldino, Jr., is Cephalon's CEO and Chairman of the Board of Directors. (Compl. ¶ 8.) Defendants William P. Egan, Martyn D. Greenacre, Gail R. Wilensky, Vaughn M. Kailian, Charles A. Sanders, Dennis L. Winger and Kevin E. Moley are all independent, outside directors of Cephalon. (Compl. ¶¶ 9-15.)

According to the Complaint, Plaintiff Jerald King is a citizen of Iowa who was "at all times relevant" an owner of Cephalon stock. (Compl. ¶ 6.)

### II. CEPHALON'S PRODUCTS.

#### A. Actiq's history and uses.

Actiq is a prescription drug used to treat "breakthrough cancer pain" – one of the most challenging and debilitating components of cancer pain management. Cephalon, Inc., Annual Report on Form 10-K for Fiscal Year Ended Dec. 31, 2007, at 8 (filed on February 28, 2007) (Exhibit A to the Silver Decl.). The term "breakthrough pain" describes the onset of moderate to severe pain that "breaks through" the regular medication used by patients for persistent around-

-5-

the-clock pain. *Id.* This type of pain develops quickly, reaches maximum intensity within three to five minutes, and lasts anywhere from minutes to several hours. *Id.* Those who suffer breakthrough pain can experience several episodes each day. *Id.* Medication with a rapid onset, which can be adjusted to the intensity and duration of the breakthrough pain, such as Actiq, is best suited to treat this type of pain. *Id.* Actiq works by delivering fentanyl citrate, a powerful opioid analgesic, through the lining of the mouth. *Id.* at 9. Fentanyl is a product which had a long history on the market before Actiq was developed, and it is well known to the physician community. Actiq's differentiating factor was its delivery system, i.e., through the lining of the mouth. This proprietary delivery system consists of a drug matrix attached to a handle, and allows the medication to enter the bloodstream rapidly and provide pain relief quickly, often within fifteen minutes. *Id.* at 9.

The Food and Drug Administration approved Actiq in 1998, and Anesta Corp. launched it in the United States in 1999. *Id.* at 8. Cephalon acquired Anesta Corp. in October 2000 and relaunched Actiq in February 2001. *Id.* at 9.

**B.     Gabitril's history and uses**.

Gabitril is a "selective GABA (gamma-aminobutyric acid) reuptake inhibitor approved for use as adjunctive therapy in the treatment of partial seizures in epileptic patients." *Id.* at 7. Epilepsy is a chronic disease that is characterized by "seizures that cause sudden, involuntary, time-limited alteration in behavior, including changes in motor activities, autonomic functions, consciousness or sensations, and accompanied by an abnormal electrical discharge to the brain." *Id.*

-6-

### C.     Provigil's history and uses.

Provigil, a prescription drug used to improve "wakefulness in patients with excessive daytime sleepiness associated with narcolepsy, obstructive sleep apnea/hyponea syndrome ('OSA/HS') and shift work sleep disorder ('SWDS')." *Id*. at 3.  Narcolepsy is a "debilitating, lifelong sleep disorder . . . [whose] most common symptom is an uncontrollable propensity to fall asleep during the day." *Id*. at 5.  Individuals with OSA/HS experience constant awakenings during the night, caused by a blockage of the airway passage while asleep.  *Id*.  SWSD is a "persistant or recurrent pattern of sleep disruption that leads to excessive sleepiness or insomnia" caused by a person's environment.  *Id*. at 5.  Provigil acts in selective areas of the brain "believed to regulate normal sleep and wakefulness." *Id*. at 3.  Provigil was launched in the United States in February 1999 with an indication for people diagnosed with excessive daytime sleepiness associated with narcolepsy.  *Id*.  In January 2004, this indication was expanded by the FDA to include OSA/HS and SWSD.  *Id*.

## III.    CEPHALON COOPERATES WITH GOVERNMENT INVESTIGATIONS.

### A.     Cephalon reaches an agreement in principal to settle with the Department of Justice.

Approximately four years ago, in September 2004, Cephalon announced that it had received a subpoena from the U.S. Attorney's Office in Philadelphia.  *Id*. at 46.  This subpoena, and the ones that followed, focused on certain prior promotional activities of Cephalon's workforce as it related to the off-label prescribing of Actiq, Gabitril and Provigil by physicians. *Id*.  "Off-label" refers to any use of a drug for which it is not specifically approved by the FDA. For example, Provigil is currently used by the United States military to keep soldiers awake and vigilant in Iraq.  This is not an approved use for the drug, so it is off-label.  There is nothing

illegal about doctors prescribing drugs for off-label use. However, the ability of pharmaceutical companies to promote off-label use is a regulated activity.

From the beginning, Cephalon informed investors that it planned to cooperate with the Government's requests. Cephalon, Inc., Sept. 7, 2004 Press Release (Exhibit B to the Silver Decl.). In November 2007, Cephalon announced that it had reached an agreement in principal with the U.S. Attorney's Office in Philadelphia and the Department of Justice to settle the matter being investigated. Cephalon, Inc., Quarterly Report (Form 10-Q), at 11 (filed on November 9, 2007) (Exhibit C to the Silver Decl.). The Company expects to pay $425 million to settle all federal and related state Medicaid claims, an amount for which Cephalon has adequately reserved in its financial statements. *Id*. Also, the release reported that Cephalon will "agree to a single federal misdemeanor violation of the Federal Food, Drug and Cosmetic Act and will enter into a corporate integrity agreement with the Office of Inspector General of the U.S. Department of Health and Human Services." *Id*.

**B.    Cephalon faces ongoing investigations**.

In September 2004, the Connecticut Attorney General's Office sent the Company a voluntary request for information that also appeared to focus on promotional practices regarding Actiq, Gabitril, and Provigil, including the extent of off-label prescribing of the drugs by physicians. *Id*. Cephalon promptly disclosed the Connecticut Investigation to investors, *see* Cephalon, Inc., Quarterly Report (Form 10-Q), at 28-30 (filed on Nov. 9, 2004) (Exhibit D to the Silver Decl.), and reference to the Connecticut Investigation also was made in all subsequent Company quarterly and annual filings with the SEC. Cephalon is cooperating with the Connecticut Attorney General's Office.

ME1 7253481v.1

In October 2007, Cephalon received a civil demand for information from the Massachusetts Attorney General's office.  Ex. C, Cephalon, 10-Q, Nov. 9, 2007 at 11.  This civil demand focused on "sales and promotional practices with respect to Actiq" and several other products.  *Id*.  Cephalon intends to cooperate fully with the Massachusetts Attorney General's Office.

## ARGUMENT

A motion for judgment on the pleadings under Rule 12(c) is treated in the same manner as a Rule 12(b)(6) motion to dismiss.  *Spruill v. Gillis*, 372 F.3d 218, 223 n.2 (3d Cir. 2004).  To survive a motion for judgment on the pleadings, "the plaintiff must set forth facts, and not mere conclusions, that state a claim as a matter of law."  *Allstate Transp. Co., Inc. v. Southeastern Pa. Transp. Auth.*, Civ. A. No. 97-1482, 1998 U.S. Dist. LEXIS 1740, at *4 (E.D. Pa. Feb. 13, 1998).

Under the standard set forth above, judgment should be entered for Defendants with respect to this derivative Complaint on either or both of two grounds.  First, Plaintiff has failed to make the required pre-suit demand on Cephalon's Board and has failed to allege facts demonstrating why demand would have been futile.  The Board is the appropriate body to determine whether there is a reason to pursue this litigation on Cephalon's behalf.  Thus, at a minimum, the Court should enter judgment for Defendants and give the Board the opportunity to exercise its prerogatives as provided by Delaware law.  Second, even if the Court were to ignore Plaintiff's failure to make demand, and it should not, judgment should still be entered for Defendants because Plaintiff has not alleged any set of facts on which he can prevail on his *Caremark* claim – the only claim he makes in this case.

-9-

I.    **PLAINTIFF FAILED TO MAKE PROPER DEMAND ON CEPHALON'S BOARD AND HAS FAILED TO PROPERLY ALLEGE DEMAND FUTILITY**.

To overcome the strong presumption that the Board of Directors is the proper body to manage the business of a corporation, a plaintiff must meet the high standards created by the Federal Rules of Civil Procedure and Delaware law to prove that making a demand on the Board is excused.  To show "demand futility," a plaintiff must make a particularized showing, with factual specificity, that "as of the time the complaint is filed, the board of directors could [not] have properly exercised its independent and disinterested business judgment in responding to a demand." *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993).  Here, Plaintiff fails to come even remotely close to meeting that burden.  Therefore, judgment should be entered for Defendants.

A.    **In all but the rarest circumstances, the Board retains the right to decide whether to initiate litigation.**

The right to sue to redress injuries to the corporation belongs solely to the corporation.  It is hornbook law that the "power to sue and be sued is one of the inherent powers of a corporation, and is among the incidental or implied powers which have been attributed to corporations from the earliest period."  1 William Meade Fletcher et al., *Fletcher Cyclopedia of the Law of Private Corporations* § 4226.0 (perm. ed. rev. vol. 1999).

Accordingly, it is a "cardinal precept" of Delaware corporate law "that directors, rather than shareholders, manage the business and affairs of the corporation." *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244, 253-54 (Del. 2000); *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 540 (1984) ("Whether or not a corporation shall seek to enforce in the courts a cause of action for damages is, like other business questions, ordinarily a matter of internal management and is left to the discretion of the

-10-

directors . . . .") (quoting *United Copper Sec. Co. v. Amalgamated Copper Co.*, 244 U.S. 261, 263 (1917)).

As the Supreme Court has made clear, "the decisions of a corporation -- including the decision to initiate litigation -- should be made by the board of directors or by the majority of shareholders." *Kamen v. Kemper Fin. Servs. Inc.*, 500 U.S. 90, 101 (1991) (quoting *Daily Income*, 464 U.S. at 530). Therefore, it will be a rare case where anyone other than the board of directors will be permitted to pursue a corporation's claim. *Rales v. Blasband*, 634 A.2d 927, 930, 934 (Del. 1993).

**B.     Plaintiff fails to meet the particularized pleading requirements of Rule 23.1.**

To adequately plead demand futility, plaintiffs must, among other things, meet the particularized pleading requirements mandated by the Federal Rules of Civil Procedure.[1]  Rule 23.1(b)(3) states that a derivative plaintiff must "state with particularity:  any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and the reasons for not obtaining the action or not making the effort."  The Third Circuit has held that "Rule 23.1 requires a plaintiff to plead with particularity . . . the reasons why no effort was made to demand action from the board."  Although it is possible for a court to excuse the demand requirement in the case of futility, the Third Circuit has emphasized that "a plaintiff is obliged to plead, with particularity, facts that establish demand futility."  *Kanter v. Barella*, 489 F.3d 170,176 (3d Cir. 2007).

---

[1]     Rule 23.1's demand requirement is purely procedural.  *See Kamen,* 500 U.S. at 96. Therefore, federal courts must combine federal procedural law with state substantive law to analyze demand futility.  *See Blasband v. Rales*, 971 F.2d 1034, 1047 (3d Cir. 1992).

-11-

Here, Plaintiff does not even begin to meet the heightened pleading standards of Rule 23.1. Plaintiff's pleadings are not at all specific. For example, the Complaint fails to allege any specific actions or knowledge by the directors that would excuse demand as futile. Although Plaintiff mentions "principal wrongdoers" more than once, (Compl. ¶¶35e, 35f), he never identifies who these principal wrongdoers are. In addition, the Complaint fails to differentiate between directors. Plaintiff makes the boilerplate accusation that some (unnamed) directors on the Cephalon Board dominate other (also unnamed) directors, but he never differentiates between the dominators and the dominated. (Compl. ¶35f.) Moreover, Plaintiff never offers any details as to how this supposed domination occurs. The Court, and Defendants, are left to guess which are which and how the domination takes place.

In *Kanter*, the Third Circuit affirmed the dismissal of a derivative suit because the plaintiffs' pleadings were "non-specific," and "fail[ed] to allege specific actions by any of the defendants, [or] assert knowledge of alleged wrongdoings." *Kanter*, 489 F.3d at 180. *Id*. As the District Court in the case noted:

> [T]he Complaint "does not single out, among current or past directors, which directors participated in the alleged wrongdoing . . . . No individual directors or group of directors are set apart; in fact, many allegations do not differentiate among the directors and the other defendants. Nor does the . . . complaint plead any facts showing that past directors had actual knowledge of the alleged wrongdoings at the time they were committed."

*Kanter v. Barella*, 388 F. Supp. 2d 474, 480 (D.N.J. 2005) (quoting *In re Prudential Ins. Co. Derivative Lit*., 282 N.J. Super. 256, 277, 659 A.2d 961 (1995)). Thus, the Third Circuit affirmed that "these conclusory allegations [were] insufficient to satisfy the heightened pleading requirements of Rule 23.1." *Kanter*, 489 F.3d at 180.

-12-

Plaintiff has failed to meet the threshold benchmark of pleading particularized facts sufficient to show demand futility. Therefore, the pleading deficiencies in this case, like in *Kanter*, command that judgment be entered for Defendants.

### C.    Plaintiff fails to meet the substantive requirements necessary to show demand futility.

Delaware law also requires specific and particularized pleadings. To show demand futility under Delaware law, a plaintiff must make "particularized factual allegations" that "the board of directors could [not] have properly exercised its independent and disinterested business judgment in responding to a demand." *Rales*, 634 A.2d at 934.[2] A court applying the *Rales* analysis first questions "whether the underlying conduct complained of in the complaint renders any of the board members 'interested.'" *Guttman v. Jen-Hsun Huang*, 823 A.2d 492, 501-02 (Del. Ch. 2003). Then, the court should ask "whether any of the other members of the board are compromised in their ability to act independently of the directors found to be interested." *Id.* Finally, the court must question whether there is a substantial threat of liability that would "strip away [the directors'] first-blush veneer of impartiality." *Id.* at 502. In other words, a court questions whether the Board of Directors could have considered a demand fairly, had one been made.

---

[2]    The *Rales* test applies to complaints, like this one, which allege demand futility in the absence of board action. Where a plaintiff pleads demand futility relating to a specific board action, a court must apply the *Aronson* test, which states that "demand will be excused if the derivative complaint pleads particularized facts creating a reasonable doubt that '(1) the directors are disinterested and independent or (2) the challenged transaction was otherwise the product of a valid exercise of business judgment.'" *Braddock v. Zimmerman*, 906 A.2d 776, 785 (Del. 2006) (citing *Aronson*, 473 A.2d 805).

A plaintiff must meet this substantive test by putting forth *specific facts*. Allegations based upon "mere suspicions or stated solely in conclusory terms" will not suffice. *Grimes v. Donald*, 673 A.2d 1207, 1217 (Del. 1996), *overruled on other grounds by Brehm*, 746 A.2d at 253-54. As detailed below, because Plaintiff did not set forth specific facts necessary to meet any of the required elements of the applicable test, judgment should be entered for the Defendants for failure to make a demand on the Cephalon Board.

**1.     A majority of the Cephalon Board is not interested**.

**a.     Compensation does not amount to a disabling "interest."**

Plaintiff alleges, in conclusory fashion, that demand should be excused because the directors receive financial benefits for their service on the Board. These "significant benefits[] and other emoluments" are received "by virtue of [the defendants'] membership on the Board and their control of Cephalon" (Compl. ¶ 35h). Plaintiff does not allege, however, that these "significant benefits" are unusual in kind or in degree from those received by directors of other corporations. In short, Plaintiff points to nothing more than the usual financial incentives offered to secure qualified directors and officers.

However, Delaware courts recognize that a director is not legally "interested" in a corporate decision by virtue of being compensated for serving on the board. *Grobow v. Perot*, 539 A.2d 180, 188 (Del. 1988) (holding that allegations that payment to directors for their services, "without more, do[es] not establish any financial interest"), *overruled on other grounds by Brehm*, 746 A.2d at 253-54. This also holds true for compensation to inside directors, such as Dr. Baldino, the only management director. *Beam v. Stewart*, 833 A.2d 961, 978 n.55 (Del. Ch.

-14-

2003) (allegations regarding inside director's compensation did "not call into question [the director's] disinterest with respect to demand").

The reason for this rule is self-evident.  If such typical compensation for board service constituted a disabling conflict, then virtually every director of every corporation would be disqualified from evaluating a demand, rendering the demand requirement meaningless.  *See Poland v. Caldwell*, Nos. 89-645, 89-1255, 1990 WL 158479, at *4 (E.D. Pa. Oct. 12, 1990). Accordingly, Plaintiff has failed to plead a disabling financial interest.

### b. Merely naming directors as defendants does not create a disabling "interest."

Plaintiff also attempts to claim a disabling conflict of interest by alleging the directors would have to "sue themselves and/or their fellow directors and allies in the top ranks of the Company."  (Compl. ¶35g).  This "discredited refrain" is clearly insufficient as a matter of law. *Brehm*, 746 A.2d at 257 n.34 ("It is no answer to say that demand is necessarily futile because . . . the directors 'would have to sue themselves.'").  If "bootstrap allegations of futility, based on claims of directorial participation in and liability for the wrongs alleged, coupled with a reluctance by directors to sue themselves" were enough to establish director interest, demand would be excused in every case.  *Pogostin v. Rice*, 480 A.2d 619, 625 (Del. 1984), *overruled on other grounds by Brehm*, 746, A.2d at 253-54; *Jacobs v. Yang*, C.A. No. 206-N, 2004 Del. Ch. LEXIS 117, at *25 n.31 (Del. Ch. Aug. 2, 2004) (Demand is not futile "merely because directors would be suing themselves. . . .  To so hold would eviscerate the demand requirement of Rule 23.1.").  Thus, this attempt to bypass the demand requirement also fails.

## 2.    A majority of the Cephalon Board is not dominated or controlled by allegedly interested members.

Plaintiff's conclusory allegation that members of the Cephalon Board are dominated and controlled also fails to support the claim of demand futility. When a court questions the independence of directors, it must ask "independent from whom and independent for what purpose?" *Beam v. Stewart*, 845 A.2d 1040, 1049-50 (Del. 2004). A director is "independent" when he or she is able to base a decision on "the corporate merits of the subject before the board rather than extraneous considerations or influences." *Seminaris v. Landa*, 662 A.2d 1350, 1353 (Del. Ch. 1995). Rather than address these questions, Plaintiff simply claims, without more, that "the known principal wrongdoers are in a position to, and do, dominate and control the Cephalon Board, paying them high annual and monthly fees to assure their compliance." (Compl. at ¶35f). This failure is particularly notable here, where seven of the eight members of the Cephalon Board are outside, independent directors.

Perhaps most importantly, Plaintiff has failed to sufficiently allege, as he is legally required, that these directors would succumb to the control of the "principal wrongdoers" and improperly refuse a demand had one been made. As the Delaware Supreme Court previously held:

> [I]n the demand-futile context a plaintiff charging domination and control of one or more directors must allege particularized facts manifesting "a direction of corporate conduct in such a way as to comport with the wishes or interests of the [person] doing the controlling." The shorthand shibboleth of "dominated and controlled directors" is insufficient.

*Aronson*, 473 A.2d at 816 (internal citations omitted). The most Plaintiff has alleged is that the directors' compliance is assured by their "fees." Just as salaries do not make directors

-16-

"interested," they likewise fail to make them "dominated and controlled."  Salaries and emoluments are a normal benefit of the job of director, and if they disqualified directors from considering a stockholder demand, no Board would be qualified to do so.  Accordingly, Plaintiff's completely unsupported conclusion that the principal wrongdoers "dominated and controlled" the entire Cephalon Board fails to excuse demand.

> **3.    A majority of the Cephalon Board does not face a substantial likelihood of personal liability**.

Finally, Plaintiff's claims fail to create the substantial likelihood of director liability.  To do so, Plaintiff must meet his pleading requirements by providing specific facts – not conclusory allegations.  *Brehm*, 746 A.2d at 254 ("A prolix complaint larded with conclusory language . . . does not comply with these fundamental pleading mandates."); *Grobow*, 539 A.2d at 187 n.6 ("[N]either inferences nor conclusions of fact unsupported by allegations of specific facts upon which the inferences or conclusions rest are accepted as true.").

Moreover, the "mere threat" of liability is not enough to succeed.  *Seminaris*, 662 A.2d at 1354.  Rather, the threat must be substantial:  Defendants' actions must be "so egregious that a substantial likelihood of director liability exists."  *Id*.  Plaintiff's burden to establish Defendants' liability is even higher in the present case because Cephalon's stockholders have adopted, pursuant to Delaware law, a provision in the Company's certificate of incorporation that protects the directors from liability for money damages resulting from breach of certain fiduciary duties.[3] 8 Del. C. § 102(b)(7); Article Sixth, Restated Certificate of Incorporation of Cephalon, Inc.

---

[3]    The Court can take judicial notice of a corporation's certificate of incorporation when reviewing a motion to dismiss.  *Amalgamated Bank v. Yost*, No. Civ. A. 04-0972, 2005 U.S. Dist LEXIS 1280, at *16 (E.D. Pa. Jan. 31, 2005).

(Exhibit E to Silver Decl.).[4]   This provision immunizes the directors for gross negligence and reckless or negligent breach of the duty of care, and any claims for non-intentional conduct must be dismissed.  *In re Baxter Int'l, Inc. S'holders Litig.*, 654 A.2 1268, 1270 (Del. Ch. 1995) (holding no substantial likelihood of success because §102(b)(7) would protect directors from liability for failure to prevent pharmaceutical sales representatives from making misrepresentations).

Therefore, Plaintiff's burden in this regard is monumentally heavy, since the directors cannot face liability for anything but deliberate and intentional misconduct.  Plaintiff, offering little other than the parroting of legal boilerplate and conclusory allegations, fails to meet this burden.

$$*\qquad*\qquad*\qquad*\qquad*$$

In summary, the Complaint's allegations of demand futility fail to meet the rigorous standards of Rule 23.1 and Delaware corporate law.  The Cephalon Board is independent and disinterested.  Further, it is the body which has been actively overseeing and coordinating the Company's interdependent response to the issues raised by off-label promotional activities. Therefore, under Delaware law, it is the proper body to consider demand and decide whether or

---

[4]     The Article states, in relevant part:

A Director of the corporation shall not be personally liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a Director, except for liability (i) for any breach of the Director's duty of loyalty to the corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the Delaware General Corporation Law, or (iv) for any transaction from which the Director derived any improper personal benefit.

-18-

not to pursue litigation.  Accordingly, demand is not excused and judgment should be entered in favor of Defendants.

## II.    PLAINTIFF FAILS TO ADEQUATELY ALLEGE THAT CEPHALON'S BOARD BREACHED ITS FIDUCIARY DUTY.

In his Complaint, Plaintiff alleges that Defendants breached their fiduciary duty to Cephalon, causing harm to the Company.  Plaintiff appears to base this claim on Defendants' alleged failure to exercise proper oversight of the Company, which is most often referred to as a "*Caremark* claim."  *In re Caremark*, 698 A.2d at 967.  *Caremark* claims are difficult to show: "where a claim of directorial liability for corporate loss is predicated upon ignorance of liability creating activities within the corporation . . . only a sustained or systematic failure of the board to exercise oversight – such as an utter failure to attempt to assure a reasonable information and reporting system exists – will establish the lack of good faith that is a necessary condition to liability."  *Guttman*, 823 A.2d at 506 (quoting *Caremark*, 698 A.2d at 971).  Moreover, a "conscious disregard for their responsibilities" is a necessary prerequisite for director liability under *Caremark*.  *Stone*, 911 A.2d at 370 (dismissing a purported *Caremark* claim).

Here, Plaintiff fails, on multiple levels, to adequately plead a *Caremark* claim.  At a threshold level, Plaintiff's Complaint does not have the required factual allegations to meet the notice pleading standards of Rule 8.  In addition, even if Plaintiff's pleadings were not fundamentally deficient, he has not shown any set of facts necessary to support a *Caremark* claim.  Therefore, judgment should be entered for Defendants and against Plaintiff.

ME1 7253481v.1

**A.   Plaintiff's pleadings as to the breach of fiduciary duty claim are insufficient to meet the Rule 8 pleading requirements articulated in *Twombly*.**

**1.   *Twombly* updates the notice pleading standards mandated by the Federal Rules of Civil Procedure.**

In *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955 (U.S. 2007), the Supreme Court revisited the meaning of Rule 8, assessing the notice pleading standards a plaintiff must meet to move past the pleading stage. In this significant decision, the Court reconsidered old precedents and found some of them wanting. As the Third Circuit recently observed:

> In reaching this decision, the Supreme Court rejected language that long had formed part of the Rule 12(b)(6) standard, namely the statement in *Conley v. Gibson* . . . that a complaint may not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."

*Phillips v. County of Allegheny*, No. 06-2869, 2008 U.S. App. LEXIS 2513, at *8 (3d Cir. Feb. 5, 2008). Although *Twombly* concerns §1 of the Sherman Act, the Third Circuit determined that its application should not be limited to antitrust litigation. *Id.* at *19. Thus, courts must reassess their pleading standards in light of *Twombly* in a variety of contexts.

This reassessment is particularly important in the stockholder derivative context, where the same concern animating the *Twombly* opinion is present. There, the burdens of expensive discovery factored into the Court's rationale for interpreting a meaningfully firm notice pleading standard. Noting that discovery in antitrust cases is a very costly process, the Court stated that "[i]t is no answer to say that a claim just shy of plausible entitlement to relief can, if groundless, be weeded out early in the discovery process through careful case management, given the common lament that the success of judicial supervision in checking discovery abuse has been on the modest side." *Twombly*, 127 S. Ct. 1955 at *1967. This consideration is even more

-20-

persuasive in the stockholder derivative context, where corporations face not only expensive

discovery, but also the usurpation of a basic corporate right.

> a.  **Plaintiff must make factual allegations showing "the grounds of his entitlement to relief."**

Fed. Rule Civ. Pro. Rule 8(a)(2) requires that "a pleading which sets forth a claim for

relief . . . shall contain a short and plain statement of the claim showing that the pleader is

entitled to relief."  Thus, Rule 8(a)(2) has a "threshold requirement" that "the 'plain statement'

possess enough heft to 'sho[w] that the pleader is entitled to relief."  *Twombly*, 127 S. Ct. 1955

(U.S. 2007).  The Court noted that to achieve this "heft," a plaintiff must plead more than the

legal elements of his claim:  "[A] plaintiff's obligation to provide the 'grounds' of his

'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of

the elements of a cause of action will not do."  *Id.*

Thus, adequate notice pleading must include an adequate factual foundation, which

functions to provide the defendant with an understanding of why he is being sued:  "[W]ithout

some factual allegation in the complaint, a claimant cannot satisfy the requirement that he or she

provide not only 'fair notice,' but also the 'grounds' on which the claim rests."  *Phillips*, 2008

U.S. App. LEXIS 2513 at *14.  Moreover, "context matters in notice pleading."  *Id.* at *13.  The

facts presented in the pleadings must be sufficiently developed to actually provide information to

the defendant.  *Id.* at *14 ("[W]e understand the Court to instruct that a situation may arise

where, at some point, the factual detail in a complaint is so undeveloped that it does not provide

a defendant the type of notice of claim which is contemplated by Rule 8.")

**b.       Plaintiff is required to meet a "plausibility" threshold**.

*Twombly* also establishes a "plausibility" threshold that a plaintiff's pleadings must meet to survive the pleading stage.  *Twombly*, 127 S. Ct. 1955 at *1974 (holding that claims must be nudged "across the line from conceivable to plausible" to avoid being dismissed); *see also Phillips*, 2008 U.S. App. LEXIS 2513 at *19 ("Numerous references to 'plausibility' in *Twombly* seem to counsel reliance on the concept as a standard for notice pleading.").  To meet this standard, a pleading must rise above conclusory allegations and neutral facts that could (or just as likely, could not) support the claim.  In other words, a plaintiff's pleadings must not only be factual rather than conclusory, but also must be factually suggestive rather than factually neutral.  *Id*. at *1966, n.5.  Ultimately, "a complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.'"  *Phillips*, 2008 U.S. App. LEXIS 2513 at *19 (quoting Twombly, 127 S.Ct. 1955 at *1965, n.3).

**2.       Plaintiff fails to give Defendants fair notice of his claim and the grounds upon which it rests**.

Plaintiff fails to meet the threshold requirements of Rule 8 and *Twombly*, and his Complaint should not move beyond the pleading stage.  Instead of creating a factual foundation for his claim, Plaintiff fills his Complaint with conclusory and speculative allegations, and the facts that Plaintiff does present are "factually neutral" rather than "factually suggestive."  Thus, Plaintiff's Complaint lacks the basic factual support necessary to rise above the plausibility threshold with regard to his breach of fiduciary duty claim, and judgment should be entered against Plaintiff for failure to comply with Rule 8.

a.    **Plaintiff's conclusory and speculative allegations are insufficient to give Defendants fair notice**.

The Third Circuit has long held that factual conclusions and speculation are insufficient to support a legal claim. *In re Burlington Coat Factory Sec. Litig.* 114 F.3d 1410, 1429-30 (3d Cir. 1997) (A court "need not credit a complaint's 'bald assertions' or 'legal conclusions.'"); *Morse v. Lower Merion Sch. Dist*., 132 F.3d 902, 906 (3d Cir. 1997) (same). In the derivative context, Delaware courts have been equally dismissive of conclusory pleading. *See Grimes*, 673 A.2d at 1217 (allegations based upon "mere suspicions or stated solely in conclusory terms" will not suffice. For example, when considering a *Caremark* claim that alleged nothing more than the averment that "[d]efendants ignored their duties to the Company," the Delaware Chancery Court held that "[a]bsent supporting facts, such bald conclusions need not and will not be accepted as sufficient to survive a motion to dismiss." *Canadian Commer. Workers Indus. Pension Plan v. Alden*, C.A. No. 1184-N, 2006 Del. Ch. LEXIS 42 (Del. Ch. Feb. 22, 2006).

Plaintiff's Complaint is rife with such conclusory pleading. (*See, e.g.*, Compl. ¶35b ("directors knew of the violations of law, took no steps in an effort to prevent or remedy the situation, and that failure to take any action for such an inordinate amount of time resulted in substantial corporate losses")); (Compl. ¶35d ("The defendants intentionally breached and/or recklessly and/or with gross negligence disregarded their fiduciary duties, choosing to implement a marketing scheme that completely ignored FDA mandates.").) Without facts showing that these conclusions have some basis in reality, Plaintiff's conclusory "fact" pleading is unavailing and does not support his legal claims.

Speculative pleading is equally useless for the purposes of supporting a legal claim. *See Ash v. McCall*, C.A. No. 17132, 2000 Del. Ch. LEXIS 144 (Del. Ch. Sept. 15, 2000) ("Although

one may speculate as to the reasons behind McKesson's disinclination to take legal action against HBOC and its officers and directors, such speculation is completely idle absent nonconclusory allegations of fact.").  Plaintiff emphasizes that Cephalon has not legally pursued the supposed "wrongdoers" who caused the harm to Cephalon, speculating that this is evidence of bad faith by the Cephalon Board and even a reason to excuse demand as futile.  (*See* Compl. ¶35e ("The Board has failed to commence any action against the principal wrongdoers despite the lengthy passage of time since their unlawful acts were revealed.").)  Again, the Plaintiff fails to identify the "principal wrongdoers" or identify the specific conduct that caused them to be labeled "wrongdoers."  Without this and other information, it is impossible to determine whether and to what extent the Board should have acted differently than it did.  This type of "idle speculation" proves nothing and fails to make out Plaintiff's legal claim.

        **b.**    **Cephalon's proposed settlement with the DOJ is insufficient to show grounds for Plaintiff's entitlement to relief**.

Plaintiff indisputably pleads one fact in his Complaint – that Cephalon has reached an agreement in principle with the Department of Justice to settle the matters being investigated and "expects to pay $425.0 million as part of a comprehensive settlement of all Federal and related state Medicaid claims . . . and will agree to a single federal misdemeanor violation of the Federal Food, Drug and Cosmetic Act and will enter into a corporate integrity agreement with the Office of Inspector General of the U.S. Department of Health and Human Services."  (Compl. ¶32).  However, this factual allegation is "neutral" rather than "suggestive," and fails to support Plaintiff's *Caremark* claim.

The proposed settlement, if ultimately entered into by Cephalon, can lead to only one inference:  Cephalon – the company – admits that some of its employees may have violated

federal regulatory requirements. However, this derivative case is not about the actions of Cephalon through its employees, but rather the actions of the Cephalon Board. If anything, the fact that the Board cooperated with the Government to address these issues is evidence of the good faith of these directors. Thus, the proposed settlement is an essentially neutral factual allegation that neither confirms nor denies that the Cephalon Board breached its fiduciary duty. Alleged wrongdoing by the Company's employees does not automatically impute guilt to the Board; Plaintiff must make a greater showing than a proposed settlement with the Government to make a *Caremark* claim. Plaintiff does not do so.

> **c.    Plaintiff offers no other factual allegations to show the grounds for his entitlement to relief**.

Plaintiff fails to make any other factual allegations that give proper notice to the eight individual defendants as to why they are being sued. To move beyond the pleading stage, Plaintiff must show facts that raise his claim above the speculative level into plausibility. *Twombly*, 127 S. Ct. 1955 (U.S. 2007). Importantly, Plaintiff must make particularized allegations that tie Defendants to the alleged wrongdoing. *See, e.g., In re Citigroup, Inc. S'holders Litig*., Cons. Civ. A. No. 19827, 2003 Del. Ch. LEXIS 61, *6-7 (Del. Ch. June 5, 2003) (dismissing Amended Complaint because it was "entirely devoid of the particularized allegations of fact needed to tie at least 18 of the 19 named individuals to any of the alleged wrongdoing"). Here, Plaintiff fails to provide the basic factual foundation to tie any of the individual defendants to his *Caremark* claim, and, therefore, fails to meet the basic pleading requirements of Rule 8.

-25-

(1)    **The Complaint does not inform Defendants how their behavior was wrongful**.

Plaintiff's Complaint lacks any factual allegations – as opposed to conclusory allegations – that the Cephalon Board breached their fiduciary duty to Cephalon. Although Plaintiff repeatedly asserts in conclusory fashion that "Defendants . . . breached their fiduciary duties" to Cephalon, (Compl. ¶¶35d, 39 and 42), Plaintiff fails to plead any facts to suggest *how* the Defendants breached these duties. There are no facts supporting a claim that the Cephalon Board had any actual knowledge of wrongdoing by employees of the Company. Without such supporting facts, Plaintiff's Complaint does not meet the pleading requirements of Rule 8 because it does not show "that the pleader is entitled to relief." This pleading failure is both insufficient to meet the *Twombly* plausibility standard and fatal to a *Caremark* claim. *See Ash*, 2000 Del. Ch. LEXIS 144 at *55 (dismissing *Caremark* claim because, in part, "[p]laintiffs have not, however, alleged facts that HBOC's directors had actual knowledge of these events and, therefore, possessed actual knowledge of potential accounting irregularities.").

(2)    **The Complaint does not inform Defendants when their "wrongful" behavior occurred**.

Plaintiff's Complaint fails to define the time period when Defendants allegedly breached their fiduciary duty to Cephalon. Although Plaintiff alleged that he "owns and has owned shares of Cephalon at all times relevant herein," (Compl. ¶6), he fails to define when the relevant time period begins and ends. The substantive allegations in Plaintiff's Complaint extend from 1998, when "the FDA restricted its grant of marketing approval for Actiq," (Compl. ¶27), to 2007, when Cephalon filed a 10-Q announcing its agreement in principal with the Department of

Justice. (Compl. ¶32).[5]  Not only does Plaintiff fail to allege *how* the Cephalon Board

purportedly learned about acts of off-label marketing, but he fails to allege *when* the Board

learned of this off-label promotional activities.  Plaintiff fails to make any specific allegations as

to when the Cephalon Board breached its fiduciary duties during this nine-year period.  Because

Plaintiff points to no specific date, or range of dates, that identify when the Cephalon Board first

allegedly learned of wrongdoing at the company, Plaintiff fails to supply a necessary fact to

support his legal claim.

*    *    *    *    *

Plaintiff's derivative Complaint fails to meet the most basic pleading standards

established by Rule 8 and the Supreme Court's interpreting case law.  For this fundamental

reason, Plaintiff should not be allowed to move this litigation beyond the pleading stage, and the

Court should enter judgment against Plaintiff without even reaching the substantive legal claim

presented in the Complaint.

**B.    Plaintiff does not adequately allege a *Caremark* claim.**

Besides the pleading deficiencies of his Complaint, Plaintiff also completely fails to meet

the substantive requirements of a *Caremark* claim.  As the Delaware Supreme Court has stated,

to make a *Caremark* claim, a plaintiff must show, in addition to all other pleading requirements:

"(a) the directors utterly failed to implement any reporting or information system or controls; or

(b) having implemented such a system or controls, consciously failed to monitor or oversee its

---

[5]    Plaintiff, who claims that he is the best manager of Cephalon's interests, does not even
know that Actiq was not originally a Cephalon product.  Cephalon did not purchase
Anesta Corp., the original owner of Actiq, until October 2000 and did not relaunch Actiq
as a Cephalon product until February 2001.

-27-

operations thus disabling themselves from being informed of risks or problems requiring their attention." *Stone*, 911 A.2d at 370.

To succeed in a *Caremark* claim, there must be specific allegations of bad faith conduct on the part of directors, such as an intentional failure "to act in the face of a known duty to act, demonstrating a *conscious disregard* for [the directors'] duties." *Stone*, 911 A.2d at 369 (quoting *In re Walt Disney Co. Derivative Litig*., 906 A.2d 27 (Del. 2006)) (emphasis added). In other words, "liability is premised on a showing that the directors were conscious of the fact that they were not doing their jobs." *Canadian Commer. Workers Indus*., 2006 Del. Ch. LEXIS 42 at *30. Under this stringent standard, it is "a rare case where the circumstances are so egregious that there is a substantial likelihood of liability" for a duty of care claim based on failure to exercise oversight. *Baxter*, 654 A.2d at 1271 (citing *Aronson*, 473 A.2d at 815). Given the difficulties of showing a *Caremark* claim, it is unsurprising that Plaintiff fails to do so here. Because Plaintiff has not and cannot put forth any facts giving rise to a *Caremark* claim, judgment should be entered for Defendants.

> ### 1. Plaintiff fails to show the Cephalon Board lacked any oversight mechanisms over the marketing of its pharmaceuticals.

Plaintiff's Complaint does not include any pleadings to suggest that the Cephalon Board "utterly failed to implement any reporting or information system or controls" over Cephalon. *Stone*, 911 A.2d at 370. Delaware courts are clear on what a plaintiff must show to properly allege failure to implement a reporting system or internal controls. In *Guttman*, the Chancery Court dismissed the plaintiff's derivative action, noting:

> Their conclusory complaint is empty of the kind of fact pleading
> that is critical to a Caremark claim, such as contentions that the
> company lacked an audit committee, that the company had an audit

> committee that met only sporadically and devoted patently
> inadequate time to its work, or that the audit committee had clear
> notice of serious accounting irregularities and simply chose to
> ignore them or, even worse, to encourage their continuation."

823 A.2d at 506-507.  In a similar case, the Chancery Court again dismissed a derivative action,

holding that "the one thing that is emphatically not a *Caremark* claim is the bald allegation that

directors bear liability where a concededly well-constituted oversight mechanism, having

received no specific indications of misconduct, failed to discover fraud." *David B. Shaev*, 2006

Del. Ch. LEXIS 33 at *15-16.

Here, Plaintiff offers no facts to support the allegation that Cephalon lacked a robust

oversight mechanism.  To the contrary, Plaintiff concedes that Cephalon does have such an

oversight mechanism, noting that Defendants Egan, Moley and Winger serve on the Board's

Audit Committee.  (Compl. ¶¶9, 12 and 15).  Plaintiff further pleads that this Audit Committee

has specific responsibilities "to ensure compliance with . . . applicable laws and regulations."

(Compl. ¶19.)  It is clear from Plaintiff's own pleadings, then, that Cephalon did, in fact, have

systems in place to deal with the problems identified in the Complaint.

> ## 2.     Plaintiff fails to show that the Cephalon Board consciously ignored "red flags."

Plaintiff also fails to show that the Cephalon Board, "having implemented such a system

or controls, consciously failed to monitor or oversee its operations thus disabling themselves

from being informed of risks or problems requiring their attention."  *Stone*, 911 A.2d at 370.  To

show this prong of a *Caremark* claim, plaintiffs are required to "plead the existence of 'red flags'

– 'facts showing that the board ever was aware that [the company's] internal controls were

inadequate, that these inadequacies would result in illegal activity, and that the board chose to do

nothing about problems it allegedly knew existed.'"  *Id.*; *see also In re Baxter*, 654 A.2d at 1270-71 ("Plaintiff has not pled with particularity that the directors ignored obvious danger signs of employee wrongdoing."); *David B. Shaev*, 2006 Del. Ch. LEXIS 33 at *18 ("[T]he complaint includes no allegations that the board or audit committee or any other supervisory mechanism was ever presented with information pointing it towards the suspect relationships.").  A plaintiff must allege facts showing that either the Board was aware of a problem or the problem was so obvious that the Board should have been aware of it:  "'Red flags' are only useful when they are either waived in one's face or displayed so that they are visible to the careful observer."  *In re Citigroup*, 2003 Del. Ch. LEXIS 61 at *8.  Unless Plaintiff shows that a specific problem or issue was consciously ignored by the Cephalon Board, he cannot meet this prong of the *Caremark* standard.

Here, Plaintiff fails to plead the existence of any red flags which were known to the Cephalon Board.  First, Plaintiff has not pled any facts suggesting (1) the Board was informed of off-label marketing practices or (2) when this alleged report took place.  Similarly, Plaintiff fails to show that any red flags were "visible to the careful observer;" facts that show that the Cephalon Board consciously ignored any obvious problems.  In fact, the entire Complaint is devoid of any non-conclusory, factual allegations that show that the Cephalon Board had any knowledge of off-label marketing practices.

Plaintiff attempts to implicate the Cephalon Board by noting that Actiq sales have increased (Compl. ¶29), and quoting two newspaper articles from 2006 which discussed the rise in off-label usage of Actiq, Provigil and Gabitril.  (Compl. ¶¶ 30-31.)  However, the prescribing of pharmaceutical products outside of their approved labeling is a long accepted and perfectly

legal practice among physicians.  That this practice may have contributed to increased sales revenues for Cephalon does not mean that Cephalon engaged in any off-label marketing initiatives.  Plaintiff makes no factual allegation to suggest otherwise.

Plaintiff also relies on a newspaper article that mentions a lawsuit by a former Cephalon auditor, David Brennan, against Cephalon for wrongful termination.  (Compl. ¶30.)  In this lawsuit, Brennan made several allegations about Cephalon's failure to comply with FDA compliance programs for Actiq.  By including this allegation in his Complaint, Plaintiff treads dangerous waters.  There is no indication that Plaintiff or his attorneys made any inquiry into the wrongful termination case beyond reviewing, and quoting, a Wall Street Journal article.  In *Garr v. U.S. Healthcare, Inc.*, 22 F.3d 1274, 1280 (3d Cir. 1994), the Third Circuit imposed Rule 11 sanctions upon two attorneys who filed complaints based only on their reliance on the work of an attorney in a companion case and on their review of a Wall Street Journal article and the complaint in the companion case.  It appears that Plaintiff here made even less of an inquiry, relying solely on the Wall Street Journal's reporting on an allegation in an unrelated complaint to support his own legal claim.

If Plaintiff had made such an inquiry, he would have known that Brennan lost his case in May 2007.  *See Brennan v. Cephalon, Inc.*, Civ. A. No. 04-3241 (NLH), 2007 U.S. Dist. LEXIS 33991 (D.N.J. May 8, 2007).  Moreover, evidence in that case suggested that "Brennan's report was reviewed by his superiors who in turn submitted it to the Director of Quality Assurance." *Id*. at 18.  There is no indication that the Cephalon Board was presented with Brennan's findings. In addition, the court was presented with evidence that Brennan had been fired for incompetence related to a different audit.  *Id*. at 21.  Rather than presenting a red flag, the facts surrounding the

-31-

Brennan lawsuit actually suggest that Cephalon had a functioning compliance program and do not support Plaintiff's *Caremark* claim.

### CONCLUSION

Because it involves taking a fundamental corporate right away from a company, it is exceedingly difficult to succeed in a stockholder derivative lawsuit when demand has not been made on the Board of Directors. There are multiple requirements that a plaintiff must meet to move beyond the pleadings stage of such an action. First, a plaintiff must meet the heightened pleading requirements of Rule 23.1, alleging particularized facts to show demand futility. Second, a plaintiff must meet the substantive requirements of demand futility under Delaware law. Even if a plaintiff meets the pleading and substantive requirements necessary to show demand futility, he must then make an adequate showing of his underlying substantive claim. To do so, he must plead factual allegations adequate to meet the pleading standard of *Twombly* and Rule 8 and support all of the substantive elements of his claim. Only by meeting all of these difficult hurdles can a plaintiff move beyond the pleading stage of a stockholder derivative action.

Here, Plaintiff fails each and every test presented to him. His Complaint – full of conclusory allegations and speculative pleading – fails to show that making demand on the Cephalon Board would be futile. For this reason alone, judgment should be entered for Defendants. In addition, Plaintiff fails to adequately allege a claim upon which relief could be granted. The Complaint lacks the necessary factual allegations to meet the basic standards of notice pleading, and falls far short of adequately alleging a *Caremark* claim. For this independent reason, judgment should be entered for Defendants. Due to the manifold

deficiencies of Plaintiff's Complaint, the Court should grant Defendants' Motion for Judgment

on the Pleadings and dismiss the Complaint in its entirety with prejudice.

ME1 7253481v.1

Dated: Wilmington, DE
      March 31, 2008

Respectfully submitted,

McCARTER & ENGLISH, LLP

/s/ Daniel M. Silver

Michael P. Kelly (#2295)
mkelly@mccarter.com
Daniel M. Silver (#4758)
dsilver@mccarter.com
McCarter & English, LLP
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, DE 19801
Phone: 302.984.6300
Attorneys for Defendants and
Nominal Defendant

Steven B. Feirson
Michael L. Kichline
Michael J. Newman
DECHERT LLP
Cira Centre, 2929 Arch Street
Philadelphia, PA 19104
Phone: 215.994.4000
Fax: 215.994.2222

*Attorneys for the Defendants
Dr. Frank Baldino, Jr., William P. Egan,
Martyn D. Greenacre, Gail R. Wilensky,
Vaughn M. Kailian, Charles A. Sanders,
Dennis L. Winger, Kevin E. Moley, and
Cephalon, Inc.*

-34-

ME1 7253481v.1