IN THE UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JERALD KING, Derivatively on behalf of CEPHALON, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| FRANK BALDINO, JR., *et al.*, | ) ) | CIVIL ACTION NO. 1:08-cv-00054-GMS |
| Defendants, | ) ) | |
| vs. | ) ) | **JURY TRIAL DEMANDED** |
| CEPHALON, INC., a Delaware Corporation, | ) ) ) | |
| Nominal Defendant. | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS**

OF COUNSEL:

WEISS & LURIE
Joseph H. Weiss
David C. Katz
Ilya Nuzov
551 Fifth Avenue
New York, New York 10176

STULL STULL & BRODY
Jules Brody
6 East 45th Street
New York, New York 10017

RIGRODSKY & LONG, P.A.
Seth D. Rigrodsky (#3147)
Brian D. Long (#4347)
919 North Market Street, Suite 980
Wilmington, Delaware 19801

*Attorneys for Plaintiff*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iii

PRELIMINARY STATEMENT ........................................................................................ 1

STATEMENT OF FACTS ................................................................................................. 4

I.      CEPHALON AND ITS PRODUCTS ................................................................... 4

II.     THE REGULATORY REGIME FOR CEPHALON'S PRODUCTS .................. 5

III.    CEPHALON EMBARKS ON A STRATEGY OF "OFF-LABEL" MARKETING ......... 6

IV.     THE COMPANY FACES MULTIPLE INVESTIGATIONS ............................. 8

V.      DEFENDANTS' "OFF-LABEL" MARKETING SCHEME
        CAUSES SUBSTANTIAL DAMAGES TO CEPHALON ................................ 9

ARGUMENT ...................................................................................................................... 10

I.      PLAINTIFF ADEQUATELY PLEADS DEMAND FUTILITY ...................... 10

        A.      The Complaint Satisfies The Rales Standard ...................................... 10

                1.      The Board's Inaction in the Face of "Red Flags"
                        Raises a Substantial Likelihood of Liability ............................ 13

                2.      The Magnitude and Duration of Illegal Activities ................... 16

                3.      The Continuing Investigations Demonstrate the Board's
                        Lack of Disinterest .................................................................... 17

                4.      There is a Substantial Likelihood of Liability for the
                        Defendants that Sat on Cephalon's Audit Committee
                        and Corporate Governance and Nominating Committee ........... 18

                5.      Defendant Baldino Lacks Independent from Cephalon .......... 19

II.     STANDARDS ON A MOTION FOR JUDGMENT ON THE PLEADINGS ..... 19

        A.      The Complaint Sufficiently States A Caremark Claim ....................... 21

CONCLUSION ................................................................................................................... 24

# TABLE OF AUTHORITIES

## FEDERAL CASES

In re Abbott Labs. Deriv. S'holders Litig.,
   325 F.3d 795 (7th Cir. 2003) ............................................................... 11, 16, 17, 18

Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955 (2007) .................................. 19, 20, 21, 22

Brennan v. Cephalon, Inc.,
   No. 04-3241 (NLH), 2007 U.S. Dist. LEXIS 33991 (D.N.J. May 8,
   2007) ....................................................................................................................... 7

Buckley v. O'Hanlon, C.A.,
   No. 04-955 (GMS), 2007 U.S. Dist. LEXIS 22211 (D. Del. March 28, 2007) ........... 11, 21, 23

Conley v. Gibson,
   355 U.S. 41 (U.S. 1957) ..................................................................................... 20

In re First Energy Deriv. Litig.,
   219 F.R.D. 584 (N.D. Ohio 2004) ................................................................. 17-18

Kamen v. Kemper Fin. Servs., Inc.,
   500 U.S. 90 (1991) ......................................................................................... 10, 20

Kanter v. Barella,
   489 F.3d 170 (3d Cir. 2007) ................................................................................... 4

La Sala v. Bordier et Cie,
   519 F.3d 121 (3d Cir. 2007) ................................................................................. 19

Lewis v. Marriott Int'l, Inc.,
   527 F. Supp. 2d 422 (E.D. Pa. 2007) .................................................................... 19

McCall v. Scott,
   239 F.3d 808 (6th Cir. 2001), amended on denial of rehearing by McCall
   v. Scott, 250 F.3d 997 (6th Cir. 2001) ......................................................... 16, 17, 22

In re Merck & Co. Sec. Deriv. & ERISA Litig.,
   493 F.3d 393 (3d Cir. July 18, 2007) ...................................................................... 4

Oran v. Stafford,
   226 F.3d 275 (3d Cir 2000) .................................................................................... 3

In re Oxford Health Plans,
    192 F.R.D. 111 (S.D.N.Y. 2000) ........................................................................16

Phillips v. County of Allegheny,
    515 F.3d 224 (3d Cir. 2008) ...................................................... 19, 20-21

In re SFBC Int'l, Inc. Sec. & Deriv. Litig.,
    495 F. Supp. 2d 477 (D.N.J. 2007)................................................................*passim*

Swierkiewicz v. Sorema N.A.,
    534 U.S. 506 (2002) ...........................................................................................19

In re Tower Air,
    416 F.3d 229 (3d Cir. 2005) .............................................................................12

Turbe v. Gov't of Virgin Islands,
    938 F.2d 427 (3d Cir. 1991) .............................................................................19

In re Veeco Instruments, Inc. Sec. & Deriv. Litig.,
    434 F. Supp. 2d 275 (S.D.N.Y. 2006) ........................................................11, 13, 18

## STATE CASES

Aronson v. Lewis,
    473 A.2d 805 (Del. 1984) .............................................................................10, 11

Ash v. McCall,
    2000 Del. Ch. LEXIS 144 (Del. Ch. Sept. 15, 2000) .............................................15

In re Baxter S'holder Litig.,
    654 A.2d 1268 (Del. Ch. 1995) .......................................................................11

Bergstein v. Texas Int'l, Co.,
    453 A.2d 467 (Del. Ch. 1982) .......................................................................10

Brehm v. Eisner,
    746 A.2d 244 (Del. 2000).............................................................................11

In re Caremark Int'l Inc. Deriv. Litig.,
    698 A.2d 959 (Del. Ch. 1996) ..................................................................4, 13, 21

David B. Shaev Profit Sharing Account v. Armstrong,
    No. 1449-N, 2006 Del. Ch. LEXIS 33 (Del. Ch. February 13, 2006) ....................14

Desimone v. Barrows,
    924 A.2d 908 (Del. Ch. 2007) ...........................................................................................10

Emerald Partners v. Berlin,
    726 A.2d 1215 (Del. 1999) ...............................................................................................11

Graham v. Allis-Chalmers Mfg. Co.,
    188 A.2d 125 (Del. 1963) ............................................................................................ 13-14

Grimes v Donald,
    673 A.2d 1207 (Del. 1996) ...............................................................................................11

Guttman v. Huang,
    823 A.2d 492 (Del. Ch. 2003) .....................................................................................*passim*

Harris v. Carter,
    582 A.2d 222 (Del. Ch. 1999) .........................................................................................10

Rales v. Blasband,
    634 A.2d 927 (Del. 1993) ...........................................................................................*passim*

Stone v. Ritter,
    911 A.2d 362 (Del. 2006) ..................................................................................3, 17, 22

## DOCKETED CASES

Piven v. Loranger,
    No. 07-2878 (CLB) (S.D.N.Y Apr. 10, 2008) ................................................................12, 23

## FEDERAL STATUTES

28 U.S.C. § 2072 ...........................................................................................................20

Fed. R. Civ. P. 8............................................................................................................19, 20

Fed. R. Civ. P. 15...........................................................................................................24

Fed. R. Civ. P. 23.1.........................................................................................................10

The Food and Drug Administration Act of 1997, 21 U.S.C. § 360aaa *et seq* ................................6

Plaintiff Jerald King respectfully submits this Memorandum of Law in opposition to Defendants' Motion for Judgment on the Pleadings. [D.I. 18]

## PRELIMINARY STATEMENT

This shareholder derivative action is brought for the benefit of nominal defendant Cephalon, Inc. ("Cephalon" or the "Company") against members of its Board of Directors[1] and its Chief Executive Officer Frank Baldino, Jr. ("Baldino"). The complaint [D.I. 1] arises from the sustained failure of senior management and the Board to adequately supervise Cephalon's core operations, and permitting the Company to engage in illegal activities in violation of their fiduciary duties over a nearly six year period, culminating in massive damage to the Company and its shareholders when Cephalon agreed to plead guilty to a federal crime, and pay fines and penalties totaling at least $425,000,000.00 in a proposed settlement of the government's investigation of that misconduct (the "Settlement"). Even after the Settlement, the Attorneys General of Connecticut and Massachusetts, as well as a Congressional committee, are continuing their investigations of Cephalon's practices, adding further damage and the potential for even greater harm to Cephalon and its shareholders.

Specifically, the defendants allowed and failed to prevent, halt or remedy the Company's massive illegal "off-label" marketing of inherently dangerous drugs – including the powerful narcotic Actiq, whose active ingredient Fentanyl is a highly-addictive substance 80 times more potent than morphine – to promote uses for which they were not approved by the United States Food and Drug Administration (the "FDA"). The defendants' conduct was especially harmful considering the high potential for abuse and potential lethal overdose of the drug.

---

[1] Members of the Board named as defendants are: Frank Baldino, Jr., William P. Egan, Martyn D. Greenacre, Vaughn M. Kailian, Kevin E. Moley, Charles A. Sanders, Gail R. Wilensky and Dennis L. Winger.

In order to boost sales of its pharmaceutical products, defendants authorized or allowed Cephalon to implement a new, but illegal, "standard operating procedure," which in effect unilaterally relaxed its reporting requirements to the FDA regarding "off-label" prescriptions of Actiq and commenced a marketing campaign encouraging the Company's employees to engage in promotional activities in violation of FDA mandates. Cephalon soon reported a corresponding 92% spike in sales of Actiq – propelled by the illegal marketing scheme to quickly become one of the Company's best-selling drugs, with 80% of the patients using the drug for "off label," non-FDA approved uses – during the time immediately following the implementation of the new "standard operating procedure" and the illegal marketing campaign.

The Board was plainly aware of the new standard operating procedure and illegal marketing campaign or breached its fiduciary duties in failing to implement a reporting system that would have brought that procedure to the Board's attention. Indeed, the corresponding spike in Actiq sales after implementation was a red flag requiring inquiry. Moreover, a former Cephalon internal auditor concluded in his audit findings that the Company was failing to comply with FDA regulations in marketing of "off-label" uses of its drugs[2] and sued Cephalon, alleging that he was wrongfully terminated when he pushed for a response to those findings. Further, Cephalon received subpoenae, issued by the U.S. Attorney's Office in Philadelphia and the Office of the Connecticut Attorney General, for documents relating to the Company's marketing activities for Actiq, Gabitril and Provigil at least three years prior to the Settlement. Clearly, the receipt of such subpoenae and the commencement of a government investigation was known by the defendants since these regulatory

---

[2] Defendants admit that Brennan's audit report was disseminated to a wide audience, including "his superiors, who in turn submitted it to the Director of Quality Assurance." See Def. Mem. at 31.

inquiries were listed in the Company's Securities and Exchange Commission (the "SEC") filings, beginning with the 10-Q filed on or approximately November 9, 2004.[3]

The defendants' ignorance of the illegal and potentially life-threatening conduct in a crucial segment of the Company's business evidences a systematic and sustained lack of oversight by the Board, including a failure to implement meaningful oversight procedures, thereby subjecting Board members to a substantial likelihood of liability for breach of their fiduciary duty of loyalty "by failing to discharge that fiduciary obligation in good faith." Stone v. Ritter, 911 A.2d 362, 370 (Del. 2006). Since the entire Board is faced with a substantial likelihood of liability, rendering each director "personally interested in the outcome of the decision on whether to pursue the claims asserted in the complaint," demand on the Board is demonstrably futile under the standard set by the Delaware Supreme Court in Rales v. Blasband, 634 A.2d 927 (Del. 1993).

In an effort to escape liability, defendants misleadingly argue that plaintiff alleges "the mere existence of a Government investigation into the promotional activities of some employees which exceeded the scope of product indications." Def. Mem. at 3.[4]   The defendants, in making that argument, turn a blind eye to the facts, just as they did in their service as Cephalon executives and Board members. In fact, the Complaint details several Federal and state government investigations, some commencing as early as 2004, well before the proposed Settlement, and a Congressional inquiry, all targeting the same marketing conduct, and all involving the Company's core business. The defendants either knew of or ignored other red flags, including the internal audit, conducted in

---

[3] In deciding a motion for judgment on the pleadings the Court can take judicial notice of properly-authenticated public disclosure documents filed with the SEC. See Oran v. Stafford, 226 F.3d 275, 289 (3d Cir 2000).

[4] References to the Defendants' Memorandum in Support of Motion of Defendants for Judgment on the Pleadings shall be "Def. Mem. at _."

2003, finding rampant violations of FDA mandates by Cephalon employees spawned by the implementation of new internal marketing policies and the corresponding spike in sales of, among other drugs, Actiq.

Defendants' sitting back idly and with unwavering indolence observing and permitting illegal, life-threatening conduct to flourish under their watch over a multi-year period, manifests "an utter failure to . . . assure a reasonable information and reporting system exists." In re Caremark Int'l Inc. Deriv. Litig., 698 A.2d 959, 971 (Del. Ch. 1996). Thus, the Complaint contains the kind of fact pleading that is critical to a Caremark claim, meaning that it shows the directors were conscious of the fact that they were not doing their jobs. Kanter v. Barella, 489 F.3d 170, 181 (3d Cir. 2007).

The conscious disregard of the Board's responsibilities has damaged Cephalon in excess of $425 million dollars and constitutes a case in which the directors have exposed themselves to liability by allegedly ignoring particularly flagrant and reprehensible wrongdoing, which unquestionably resulted in "a potentially life threatening situation." In re SFBC Int'l, Inc. Sec. & Deriv. Litig., 495 F. Supp. 2d 477, 486 (D.N.J. 2007) (quoting In re Merck & Co. Sec. Deriv. & ERISA Litig., 493 F.3d 393 (3d Cir. 2007). Therefore, the Complaint states with sufficient particularity a plausible claim for breach of the fiduciary duty of loyalty under Caremark.

Accordingly, Defendants' Motion for Judgment on the Pleadings should be denied in its entirety.

## STATEMENT OF FACTS

## I.    CEPHALON AND ITS PRODUCTS

Cephalon is an international biopharmaceutical company dedicated to the discovery, development and marketing of innovative products to treat human diseases, focusing on four core

4

therapeutic areas: central nervous system disorders, pain, oncology and addiction. ¶ 7.[5]    The

Company's most significant products in terms of net sales are Provigil and Actiq, which accounted

for approximately 48% and 23%, respectively, of the Company's consolidated net sales for the six

months ended June 30, 2007. Id.

Actiq is a prescription drug used to treat "breakthrough cancer pain." Def. Mem. at 5.  It

works by delivering fentanyl citrate, a powerful opioid analgesic, through the lining of the mouth.

Id. at 6. As a powerful narcotic, Actiq has a high potential for abuse and could prove fatal to those

who do so.  ¶ 30.

Provigil is a prescription drug used to treat sleepiness associated with certain illnesses such as

sleep apnea and narcolepsy. ¶ 30. Provigil is sometimes used "off label" by people who do not have

any sleep-related illness, but take the drug to stay awake. Id.

Gabitril is a prescription drug used to treat seizures in epileptic patients. Def. Mem. at 6.

"Off-label" it is used for anxiety, pain and other conditions. ¶ 30. Gabitril has caused seizures in

some who do not have epilepsy, but use it for "off label" purposes. Id.

## II.    THE REGULATORY REGIME FOR CEPHALON'S PRODUCTS

Cephalon's violations relate to the scope of the FDA's approval for certain of its drugs. Drug

companies often seek FDA approval for many different purposes of their products. Commonly, the

FDA approves the drug for a narrower use than sought by the drug company. Nevertheless, doctors

are frequently lobbied by manufacturers to prescribe a drug for a non-FDA approved or "off-label"

use. Sometimes the market for such off-label use vastly exceeds the approved FDA use.

---

[5]  References to the Verified Shareholder Derivative Complaint (the "Complaint") shall be made
in the form "¶_."

Since the off-label uses are not approved by the FDA, there are strict federal regulations about what form off-label use promotions can take. The Food and Drug Administration Act of 1997 ("FDAMA"), 21 U.S.C. § 360aaa *et seq.*, specifically authorizes a manufacturer to disseminate certain written information to health care practitioners concerning the "safety, effectiveness, or benefit of a use not described in the approved labeling of a drug," manufacturers are permitted to provide only "authorized information" in the form of unabridged peer-reviewed articles or qualified reference publications. ¶¶ 24-25.

In November 1998, the FDA restricted its grant of marketing approval for the drug Actiq to the treatment of breakthrough cancer pain. The FDA expressly required a series of limitations on the use of Actiq and limited the marketing of Actiq to oncologists and pain specialists knowledgeable of, and skilled in, the use of Schedule II opioids to treat cancer pain. ¶ 27.

## III.    CEPHALON EMBARKS ON A STRATEGY OF "OFF-LABEL" MARKETING

In 2000, the year of Cephalon's acquisition of Actiq from Anesta Corp., the drug had sales of $15 million. In late 2001, Cephalon issued a new standard operating procedure "for interpreting the FDA's risk-management program" by expanding the definition of pain specialists to include anesthesiologists, physical medicine, rehabilitation medicine and palliative medicine. ¶ 31. This new procedure was intended to untether Cephalon from the FDA's requirement that the Company alert the agency and take remedial action if any physician specialty other than oncologists or pain specialists accounted for more than 15% of Actiq prescriptions. Id.

In 2002, pursuant to its new standard operating procedure, Cephalon "began to push the use of Actiq to patients with migraines by targeting neurologists even though its internal marketing documents for that year make clear that it didn't expect them to prescribe the drug for cancer pain." Id. In a document titled "Actiq in Migraine," the Company instructed its sales representatives to

6

pitch Actiq as "an ER on a stick." Id. By June 30, 2002, despite the limited market potential for

Actiq for its approved use, Actiq sales increased 92%. Defendants attributed that sales increase to

"ongoing changes to our marketing approach." ¶ 29.

In 2003, a Cephalon internal auditor, David Brennan, concluded that the Company was

failing to comply with the FDA reporting requirements for Actiq. Specifically, pursuant to its new

standard operating procedure, the Company failed to report to the FDA every quarter when groups of

physicians who represent potential off-label usage greater than 15% were prescribing the drug. ¶ 30.

After Mr. Brennan pushed for a response from management and to publish the findings of his audit,

Cephalon fired him in February 2004. Cephalon offered him money and job-search assistance if he

agreed not to disclose the audit, but Mr. Brennan refused.[6] Id.

Between 2002 and 2005, visits by Cephalon sales representatives to non-cancer doctors to

pitch Actiq increased sixfold. Id. These doctors reported more than 300 visits by Cephalon sales

representatives[7] in both 2004 and 2005. Id. During this time, Cephalon also set sales quotas for its

representatives that couldn't be reached without promoting the drug beyond its cancer-pain

indication. ¶ 31. Cephalon also pushed for prescriptions of Actiq to cover more lollipops containing

higher doses of Fentanyl since, despite the added risk, the higher dose of the drug costs more. The

---

[6]  The defendants argue that allegations concerning Mr. Brennan's audit should be disregarded
because he lost his wrongful termination lawsuit. Def. Mem. at 31. However, Mr. Brennan's
complaint for wrongful termination was dismissed because he was an at-will employee and so his
termination did not violate any clear mandate of public policy. Neither the New Jersey District Court
nor the defendants in that action denied the existence of his internal audit report, which concluded,
among other things, that "Cephalon was not in compliance with the FDA approval" of restricted
marketing of Actiq. See Brennan v. Cephalon, Inc., No. 04-3241 (NLH), 2007 U.S. Dist. LEXIS
33991, at *4 (D.N.J. May 8, 2007).

[7]  Only a small percentage of doctors were surveyed so the actual number of visits is probably much
higher. ¶ 30. Cephalon did not confirm the numbers, but also did not dispute that it stepped up its
marketing of Actiq to various types of doctors over that period. Id.

Company also flew doctors to seminars it sponsored at which paid speakers promoted off-label uses of the drug. Id.

By 2005, sales of Actiq had grown to $412 million, making it Cephalon's No. 2 drug. In the first nine months of 2006, sales jumped to $471 million. Between June 2005 and October 2006, over 80% of patients who used Actiq had it prescribed for off label, unapproved uses such as headaches or back pain and in the first half of 2006, oncologists, or cancer doctors, accounted for only 1% of Actiq prescriptions filled at retail pharmacies in the U.S. ¶ 30. In 2006, analysts estimated that approximately 80% of Provigil prescriptions were off-label.

Under FDA pressure, in 2005 Cephalon curtailed its off label marketing of epilepsy drug Gabitril "because it was causing seizures in patients without the disease, and sales dropped 23%." Id.

## IV.    THE COMPANY FACES MULTIPLE INVESTIGATIONS

In September 2004, the U.S. Attorney's Office in Philadelphia commenced an investigation of the Company's sales and promotional practices with respect to Actiq, Gabitril and Provigil. Also in September 2004, the Company received a voluntary request for information from the Office of the Connecticut Attorney General likewise focused on the Company's sales and promotional practices with respect to Actiq, Gabitril and Provigil. With respect to these investigations, the Company publicly stated that "we are cooperating with this Office, are providing documents and other information in response to these and additional requests and are engaged in ongoing discussions with them," and that "[b]oth of these matters may involve civil penalties and/or fines." ¶ 32.

In March 2007, the Company received a letter from Congressman Henry A. Waxman in his capacity as Chairman of the House Committee on Oversight and Government Reform. The letter requested, among other things, information concerning the Company's sales and marketing practices

for Actiq and Fentora.[8] In October 2007, Cephalon received a civil demand for information from the Massachusetts Attorney General's office, which focused on sales and promotional practices with respect to Actiq, Fentora and certain other products. Id. Finally, in November 2007, the Company was served with a "putative class action complaint filed on behalf of entities that claim to have purchased ACTIQ for use in non-cancer patients." Id.

## V.    DEFENDANTS' "OFF-LABEL" MARKETING SCHEME CAUSES SUBSTANTIAL DAMAGES TO CEPHALON

The unlawful scheme to market and sell Actiq, Provigil and Gabitril by promoting "off-label" uses for those products for which they were not approved by the FDA, subjected Cephalon to numerous federal and state investigations, including the U.S. Attorney's Office in Philadelphia (the "USAO"), the U.S. Department of Justice (the "DOJ") and the Offices of the Connecticut and Massachusetts Attorneys General.

In early November, 2007, Cephalon announced that it had agreed to settle the federal and related state Medicaid claims brought by the USAO and DOJ. The Company stated that it would pay $425 million in fines as part of the Settlement, as well as agree to a federal misdemeanor violation of the Federal Food, Drug and Cosmetic Act and enter into a corporate integrity agreement with the Office of Inspector General of the United States Department of Health and Human Services. As a result, Cephalon has been substantially damaged and stands to be further damaged since investigations by the Connecticut and Massachusetts Attorneys General continue.

---

[8] Like Actiq, Fentora – a Fentanyl tablet – is an opioid medicine used to treat breakthrough cancer pain.

## ARGUMENT

## I.    PLAINTIFF ADEQUATELY PLEADS DEMAND FUTILITY

A shareholder may sue derivatively on behalf of a corporation without first making a demand when it would be futile to do so. Fed. R. Civ. P. 23.1. Because Cephalon is a Delaware corporation, Delaware state law governs the issue of whether making a pre-suit demand on the Board is excused. Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 96 (1991). Under Delaware law, Rule 23.1 requires the Court to accept all well-pled allegations of fact as true and draw all reasonable inferences in plaintiff's favor. Desimone v. Barrows, 924 A.2d 908, 928 (Del. Ch. 2007). Each demand futility case must be analyzed and scrutinized according to its own set of unique facts taking into account the totality of the circumstances and the competing interests and considering the allegations collectively, as a whole. Harris v. Carter, 582 A.2d 222, 229 (Del. Ch. 1999) ("Terms like reasonable doubt ... are not scientific. In making the required judgment no single factor -- such as receipt of directorial compensation; family relationships with the corporation ... -- may itself be dispositive in any particular case. Rather the question is whether the accumulation of all factors creates the reasonable doubt to which Aronson refers."); Bergstein v. Texas Int'l, Co., 453 A.2d 467 (Del. Ch. 1982). The standard for determining demand excusal in this case is set forth in Rales v. Blasband, supra.

### A.    The Complaint Satisfies The Rales Standard

Plaintiff respectfully submits that the Complaint satisfies the standard established by the Delaware Supreme Court in Rales for pleading demand futility. In Rales, the court held that where a derivative plaintiff challenges a board's failure to fulfill its fiduciary duties through inaction, as opposed to through the exercise of its business judgment as required by Aronson v. Lewis, 473 A.2d 805 (Del. 1984), the relevant inquiry is whether the plaintiff has alleged with particularity facts which "create a reasonable doubt that ... the board of directors could have properly exercised its

independent and disinterested business judgment in responding to a demand." Rales, 634 A.2d at 934. Under the "reasonable doubt" standard, plaintiffs are not required to prove at the pleading stage that the directors were interested, but, rather, must only allege with particularity facts that would create a reasonable doubt that a majority of the members of the board of directors are independent and disinterested. Brehm v. Eisner, 746 A.2d 244 (Del. 2000); Grimes v Donald, 673 A.2d 1207, 1217 & n.17 (Del. 1996); Rales, 634 A. 2d at 933; Aronson, 473 A.2d at 814. Where potential liability is not a "mere threat," but instead rises to the level of "substantial likelihood," directors' status as defendants may serve as the basis of a finding of demand futility.[9] Aronson, 473 A.2d at 815; Baxter, 654 A.2d at 1270.

Here, the Complaint establishes a "substantial likelihood" that defendants will be held liable for their fiduciary breaches. The Complaint alleges that defendants, through their inaction, allowed serious violations of law to occur over a more than six-year period, that ultimately caused massive damage to the Company thereby. The Directors were required to exercise good faith oversight over the Company regarding its compliance with applicable laws, rules and regulations. Guttman v. Huang, 823 A.2d 492, 506 (Del. Ch. 2003). However, the Board, including the members of the Audit Committee, who were specifically chartered to exercise that oversight, failed to exercise that fiduciary duty. See, e.g., In re Veeco Instruments, Inc. Sec. & Deriv. Litig., 434 F. Supp. 2d 275, 278

---

[9] Defendants claim that Cephalon's so-called exculpatory charter provision would eliminate their liability. Defs. Br. at 17. Not so. Breaches of fiduciary duties other than the duty of care cannot be exempted by way of a charter provision and can still disable the directors from considering a demand fairly despite a so-called exculpatory charter provision. Buckley v. O'Hanlon, C.A., No. 04-955 (GMS), 2007 U.S. Dist. LEXIS 22211, at *18 (D. Del. March 28, 2007); In re Baxter S'holder Litig., 654 A.2d 1268, 1270 (Del. Ch. 1995); Emerald Partners v. Berlin, 726 A.2d 1215, 1223-24 (Del. 1999). "Directors are not protected under [an exculpatory charter provision] when a complaint alleges facts that infer a breach of loyalty or good faith." In re Abbott Labs. Deriv. S'holders Litig., 325 F.3d 795, 810 (7th Cir. 2003), citing Emerald Partners, 787 A.2d at 94.

(S.D.N.Y. 2006) (Audit Committee members' failure to exercise oversight subjected them to a substantial likelihood of liability). Indeed, even though: (a) in 2000 and 2001 new illegal "off-label" marketing and sales strategies were implemented (¶¶ 29-31); (b) in the first six months of 2002, the sales of Actiq increased by 92% (¶ 29); (c) in 2003 an intra-company audit concluded that violations of FDA mandates had taken place over the course of several years (¶ 30), (d) data showed that doctors other than oncologists and pain specialists were writing the vast majority of Actiq prescriptions (id.); (e) several Federal and state regulators launched investigations in 2004 (¶ 32); and (f) in 2005, Cephalon curtailed off label marketing of Gabitril under pressure from the FDA and sales fell 23%, the Board allowed the illegal practices to continue.

Furthermore, the "substantial liability" threshold is easily met where, as here, directors have exposed themselves to liability by allegedly ignoring "particularly flagrant and reprehensible wrongdoing" involving public safety. SFBC, 495 F. Supp. 2d at 486 (demand futility found where the complaint alleged unethical and illegal conduct in clinical trials); In re Tower Air, 416 F.3d 229, 239 (3d Cir. 2005) (reversing district court's dismissal of breach of fiduciary claim against directors who were exposed to liability for inaction in face of misconduct implicating public safety in connection with air travel); Piven v. Loranger, No. 07-2878 (CLB) (S.D.N.Y Apr. 10, 2008) (demand found futile where directors faced substantial liability as a result of conscious disregard of "crimes involving the willful export of United States Defense Military technology to other countries not entitled to receive it."). In this regard, this case is on point with SFBC. There, the shareholder derivative suit was brought on behalf of a company primarily engaged in the business of providing clinical testing of pharmaceutical products. 495 F. Supp. 2d at 480. Plaintiffs alleged that drug trials were routinely conducted unethically, at overcrowded and unsanitary testing facilities, and resulted in deliberate falsification of test data, including unreported findings of adverse effects. Id. at 485.

These violations resulted in citations by the FDA and culminated in the United States Senate Finance Committee's investigation into the company's improper practices. Id. at 481. In light of the egregious, potentially life threatening conduct involving the company's core business, the court found defendants liable for breach of fiduciary duty, holding that "it is inconceivable that a board of directors properly performing its functions would not have known about the wrongdoing." Id. at 487. See also Veeco, 434 F. Supp. 2d at 275 (Finding demand excused where directors continually ignored the corporation's violations of U.S. export control laws subjecting it to possible fines and suspension of export privileges).

Thus, similar to the outcome in SFBC and Veeco, plaintiff respectfully submits that the Court should find that the Board's failure to adequately supervise a sensitive segment of the Company's core operations relating to its most important – and dangerous – products, results in a substantial likelihood of liability. Therefore, demand on the Board is excused as futile.

> 1.    **The Board's Inaction in the Face of "Red Flags"
> Raises a Substantial Likelihood of Liability**

The Board was required to exercise its fiduciary duties in good faith and its failure to do so was in breach of its duty of loyalty to the Company's shareholders. Guttman, 823 A.2d at 506. Defendants' inaction in the face of repeated warning signs of inadequate internal controls, operational deficiencies and violations of laws and regulations is in direct contrast to their fiduciary duties to take appropriate steps to ensure the Company's compliance with applicable laws. Caremark, 698 A.2d at 971 (Board's sustained and systematic failure to exercise oversight, including the failure to ensure that a reasonably informed reporting system is in place, is grounds for director liability). Director liability for such a breach may arise from "an unconsidered failure of the board to act in circumstances in which due attention would, arguably, have prevented the loss." Id.; see also

Graham v. Allis-Chalmers Mfg. Co., 188 A.2d 125, 130 (Del. 1963) ("the question of whether a corporate director has become liable for losses to the corporation through neglect of duty is determined by the circumstances. If he has ... refused or neglected cavalierly to perform his duty as a director, or has ignored either willfully or through inattention obvious danger signs of employee wrongdoing, the law will cast the burden of liability upon him.").

To satisfy its fiduciary duties, the board must implement an information and reporting system which "is in concept and design adequate to assure the board that appropriate information will come to its attention in a timely manner as a matter of ordinary operations, so that it may satisfy its responsibility." Caremark, 698 A.2d at 971. The Board's lack of good faith in establishing a compliance program will be demonstrated if there is "a sustained or systematic failure of the board to exercise oversight." Id. Thus, plaintiff may satisfy his pleading burden by demonstrating that the directors "ignored 'red flags' indicating misconduct in defiance of their duties." David B. Shaev Profit Sharing Account v. Armstrong, No. 1449-N, 2006 Del. Ch. LEXIS 33, at * 15 (Del. Ch. February 13, 2006); see also SFBC, 495 F. Supp. 2d at 486 ("directors have exposed themselves to liability by allegedly ignoring particularly flagrant and reprehensible wrongdoing, which unquestionably resulted in 'a potentially life threatening situation'....").

Contrary to what the defendants assert, Delaware courts have not established a "clear" definition of what type of allegations constitute a sufficient showing by plaintiff of failure to implement a proper reporting system or internal controls. See Def. Mem. at 28; Guttman, 823 A.2d at 507 (listing, as only an example, allegations that an audit committee having clear notice of accounting irregularities and choosing to ignore them constitutes such a shortfall). Courts agree, however, that the absence or inadequacy of internal controls are properly alleged when the board is said to have "knowledge of facts suggesting potential . . . improprieties. . . and took no action to

respond to them." <u>Guttman</u>, 823 A.2d at 507 (citing <u>Ash v. McCall</u>, 2000 Del. Ch. LEXIS 144, at *15 (Del. Ch. Sept. 15, 2000)).

Here, the new marketing scheme, followed by a massive increase in sales, the internal audit report concluding that FDA mandates were being violated,[10] FDA pressure to end "off-label" marketing of Gabitril, data indicating that most prescriptions for Actiq were being written by doctors who were not oncologists or pain specialists, and the news of at least three Federal and state government investigations, some commencing as early as 2004, of "off label" marketing activities involving Cephalon's core business and products, would have alerted the Board of the possibly illegal conduct had a proper oversight mechanism existed.  Instead, the continuation of illegal marketing activities until 2007 – evidenced by: a) sky-rocketing sales of Actiq and other drugs between 2002 and 2006; and b) the institution of new Federal and state investigations in 2007 – indicates the lack of a proper oversight mechanism, which would have timely alerted the Board of potential improprieties.

Defendants make the specious argument that plaintiff's Complaint pleads the existence of a robust financial reporting structure at Cephalon where it describes the Audit Committee and its role. To the contrary, plaintiff pleads that defendants utterly failed to implement a system of internal controls.  ¶ 35.  Moreover, defendants in their Answer to the Complaint flatly deny plaintiff's allegation that the Audit Committee is charged with "specific oversight responsibilities," which include, among other items "monitoring and overseeing the. . .internal controls and procedures designed to ensure compliance with . . . applicable laws and regulations." <u>See</u> Defendants' Answer and Affirmative Defenses at ¶ 19.

---

[10] Defendants themselves readily admit that the internal audit report traveled up the corporate chain to the Director of Quality Assurance. <u>See</u> Def. Mem. at 31.

Defendants' duties to Cephalon required good faith oversight by them of the Company's promotional practices for its products, including, among others, Actiq, a dangerous drug containing a highly-addictive and inherently dangerous controlled substance, but they simply cast aside that obligation, causing the Company to agree to plead guilty to a Federal crime and subjecting it to a $425 million dollar fine, as well as other investigations and lawsuits that have caused damage to Cephalon and pose the prospect of further damage to the Company.

## 2.    The Magnitude and Duration of Illegal Activities

The directors' sustained or systematic failure to exercise oversight may be demonstrated by the magnitude and duration of the illegal activities. McCall v. Scott, 239 F.3d 808, 823 (6th Cir. 2001), amended on denial of rehearing by McCall v. Scott, 250 F.3d 997 (6th Cir. 2001). In such circumstances, when the scheme was undetected by the Board "demand futility is ordinarily found." In re Oxford Health Plans, 192 F.R.D. 111, 117 (S.D.N.Y. 2000). In McCall, the court found that the directors breached their fiduciary duties through their sustained failure to act against the corporation's systematic health care fraud occurring over the course of about two years. The court cast aside defendants' protestations of being unaware of the fraud – echoed by the defendants here – by pointing to certain red flags, including, among others, a federal investigation, audit information, and ongoing practices by the corporation from which their conscious disregard of their duties could be inferred. McCall, 239 F.3d at 819-820.

Likewise, the Seventh Circuit in Abbott found that the "magnitude and duration" of the violations of law were sufficient to establish demand futility stating: "continuing violations of federal regulations over a period of six years cannot be minimized." Abbott, 325 F.3d at 808.

Here, plaintiff's allegations are equally or even more forceful in that several federal and state investigations were commenced, an internal audit finding revealed the illegal activity, the

skyrocketing sales for Actiq posed a red flag to the Board that a new operating procedure was being implemented to promote its sales, the illegal practices took place over a six year period – well beyond the duration of the violations in <u>McCall</u> (two years) and as long as that in <u>Abbott</u> – and resulted in an admission of criminal conduct and a massive $425 million fine.

In the face of these facts, defendants claim that they were entitled to remain blissfully unaware of the illegal marketing scheme, relying upon <u>Stone</u>. However, <u>Stone</u> is entirely inapposite since the Court ruled that plaintiffs there did not allege that the directors "knew or should have known that violations of law were occurring."[11] 911 A.2d at 364. In other words, the complaint in <u>Stone</u> did not identify "red flags" before the defendants. <u>Id.</u> Here, plaintiffs have alleged that the defendants were or should have been aware that the violations of law were occurring due to, among other things, the numerous red flags before them. <u>See, e.g.</u>, <u>SFBC</u>, 495 F. Supp. 2d at 485 (In finding demand futility the court considered that "the Complaint ... alleges endemic mismanagement of the company, raising plenty of red flags concerning the improper and even possibly illegal practices in which the company was engaged.").

### 3.    The Continuing Investigations Demonstrate the Board's Lack of Disinterest

Due to the pendency of regulatory inquiries by the Attorneys General of Massachusetts and Connecticut and a Congressional investigation, an ongoing civil lawsuit arising out of the conduct alleged in the Complaint, and the fact that the Settlement has not yet been finalized, the Board cannot make a decision on this matter with the required level of disinterestedness. <u>See, e.g.</u>, <u>In re First</u>

---

[11] <u>Stone</u> is further inapposite here since in <u>Stone</u> the court was persuaded as to the quality of the corporation's internal control system by the report of an independent consultant, which concluded that the corporation had a reasonable reporting system, devoted significant resources to its compliance program and put into place numerous systems to ensure compliance. There is no such independent report here.

Energy Deriv. Litig., 219 F.R.D. 584, 625-26 (N.D. Ohio 2004) ("FirstEnergy is the subject of pending a criminal investigation and civil lawsuits . . . . Bringing suit could adversely impact the Directors' defenses in these actions. Considering the potential personal liability the Directors face in these pending investigations and lawsuits, Plaintiffs could not reasonably expect the Directors to bring suit against themselves.").

### 4. There Is a Substantial Likelihood of Liability for the Defendants That Sat on Cephalon's Audit Committee and Corporate Governance and Nominating Committee

Further bolstering plaintiff's demand futility claims is the fact that three of Cephalon's seven "outside" directors, namely defendants Egan, Winger and Moley sit on the Audit Committee with a charter requiring oversight for the Company's compliance with applicable laws and the adequacy and compliance with, the Company's internal controls. ¶ 19. Defendants Greenacre, Kailian, and Wilensky sit on the Corporate Governance and Nominating Committee with a charter requiring it to develop and recommend to the Board a set of effective corporate governance principles and policies applicable to the Company. These directors have served on the Board for all or for a good part of the duration of the government investigation while violations of law took place.

These defendants' service on these committees raise a substantial likelihood of their liability and demonstrate their lack of disinterest. See, e.g., Abbott, 325 F.3d at 808 (Audit Committee members responsible for "assessing any risks involved in regulatory compliance"); Veeco, 434 F. Supp. 2d at 278 (Audit Committee members' failure to exercise oversight subjected them to a substantial likelihood of liability).

### 5.    Defendant Baldino Lacks Independence from Cephalon

Defendant Baldino's management position with Cephalon demonstrates that he is not sufficiently independent or disinterested to fairly consider a demand. Rales, 634 A.2d at 937; Guttman, 823 A.2d at 505.

## II.    STANDARDS ON A MOTION FOR JUDGMENT ON THE PLEADINGS

A Rule 12(c) motion for judgment on the pleadings requires the same analysis as a Rule 12(b)(6) motion to dismiss. Turbe v. Gov't of Virgin Islands, 938 F.2d 427, 428 (3d Cir. 1991). A Rule 12(b)(6) motion tests only the legal sufficiency of the claims pleaded. See Desimone, 924 A.2d at 928 ("On a 12(b)(6) motion, particularity in fact pleading is not required."). A pleading need only include "'a short and plain statement of the claim showing that the pleader is entitled to relief.'" Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002) (quoting Fed. R. Civ. P. 8(a)). The facts alleged in the complaint must be taken as true and, construing the complaint in the light most favorable to plaintiff, the Court must determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief. Phillips v. County of Allegheny, 515 F.3d 224 (3d Cir. 2008). A complaint may not be dismissed merely because it appears unlikely that plaintiff can prove those facts or will ultimately prevail on the merits. Phillips, 2008 U.S. App. LEXIS 2513, at *8 (citing Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955 (S. Ct. 2007)).

In Twombly, while elaborating that a plaintiff's Rule 8 obligation is to provide a "showing," rather than a blanket assertion of entitlement to relief that is "plausible"[12] on its face – requiring

---

[12]  Defendants erroneously designate "plausibility" as yet another pleading hurdle for plaintiff to overcome, but there is no support for that proposition. See Lewis v. Marriott Int'l, Inc., 527 F. Supp. 2d 422, 424 n.1 (E.D. Pa. 2007) (Defendant's contention that the Supreme Court's decision in Twombly raised the notice pleading standard under Rule 8(a) is "dubious at best."). Moreover, the substantive law under which plaintiff's claim is pled is supplied by the state of Delaware, where Cephalon is incorporated. La Sala v. Bordier et Cie, 519 F.3d 121, 131 n.13 (3d Cir. 2007). To the

more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action," –

the Supreme Court reaffirmed that this "showing" can be achieved without "detailed factual

allegations." Twombly, 127 S. Ct. 1955 at 1964-1965 (quoting Conley v. Gibson, 355 U.S. 41, 47

(U.S. 1957 )).  Rather, the "showing" requires a complaint with enough factual matter (taken as true)

to suggest the required element of the cause of action. Phillips, 2008 U.S. App. LEXIS 2513, at *20

(quoting Twombly, 127 S. Ct. at 1965 n.3).  This does not impose a probability requirement at the

pleading stage, but instead calls for enough facts, in the context of the particular action,[13] to raise a

reasonable expectation that discovery will reveal evidence of "the necessary element." Id.

As the Third Circuit recently enunciated:

> the Supreme Court never said that it intended a drastic change in the
> law, and indeed strove to convey the opposite impression; even in
> rejection of Conley's 'no set of facts' language, the Court does not
> appear to have believed that it was really changing the Rule 8 or Rule
> 12(b)(6) framework.  It remains an acceptable statement of the
> standard, for example, that courts accept all factual allegations as
> true, construe the complaint in the light most favorable to the
> plaintiff, and determine whether, under any reasonable reading of the
> complaint, the plaintiff may be entitled to relief. . . Thus, under our
> reading, the notice pleading standard of Rule 8(a)(2) remains intact,
> and courts may generally state and apply the Rule 12(b)(6) standard,
> attentive to context and an [sic] showing that 'the pleader is entitled
> to relief, in order to give defendant fair notice of what the . . . claim is
> and the grounds upon which it rests.

---

extent defendants argue that Twombly created a substantive standard under Fed. R. Civ. P. 8 for
pleading a derivative action, they are entirely incorrect. The Rules Enabling Act makes it plain that
the Federal Rules of Civil Procedure do not "abridge, enlarge or modify any substantive right." See
28 U.S.C. § 2072.

[13] Rule 8 pleading requirements depend in large part on the context of each particular case. Phillips,
2008 U.S. App.. LEXIS 2513, at *13.  Though Twombly cited the expense of discovery as an
important, albeit not a guiding, consideration for federal courts in weighing dismissal in an antitrust
action, defendants proffer no authority to shore up their assertion that the same is "even more
persuasive in the stockholder derivative context." Def. Mem. at 20; See Twombly, at 1967. Indeed,
the Supreme Court expressly rejected the notion that federal courts can fashion policy with regard to
derivative actions, which are inherently creatures of state law. Kamen, 500 U.S. 90 at 104-105.

Phillips, 2008 U.S. App. LEXIS 2513, at *17 (quoting Twombly, 127 S. Ct. 1955 at 1964).

In the event a complaint fails to state a claim, the Court should give plaintiff the opportunity to amend his complaint. Phillips, 2008 U.S. App. LEXIS 2513, at *2.

## A.    The Complaint Sufficiently States A Caremark Claim

Since plaintiff's Complaint states with sufficient particularity facts establishing that defendants faced a substantial risk of liability due to the egregious nature of their culpable indolence, a fortiori, it states a plausible cause of action for breach of fiduciary duty of loyalty and gives fair notice to defendants of the claims made against them.

To state a claim for breach of the fiduciary duty of loyalty, a plaintiff may allege that the directors of a company "knew or should have known that violations of the law were occurring, that they took no good faith steps to ameliorate the situation, and that the company suffered losses as a result." Caremark, 698 A.2d 959 at 971; Buckley, 2007 U.S. Dist. LEXIS 22211, at *16 (Holding that directors may not consciously disregard visible "red flags" or otherwise act with gross negligence).

Plaintiff's Complaint for breach of fiduciary duty is premised upon the defendants' sustained and systematic failure to oversee Cephalon's operations, including ignorance of liability creating activities within the corporation, causing damages to the Company; the so-called "oversight" liability or the Caremark claim.[14] In the context of oversight liability, Caremark sets out the predicate for liability: "(a) the directors utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or

---

[14]    Defendants do not dispute that each defendant stands in a fiduciary relationship with the corporation and its shareholders.

oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." Stone, 911 A.2d at 370. The fiduciary duty violated by this conduct is the duty of loyalty. Id.

The Complaint here contains "enough factual matter (taken as true). . . to raise a reasonable expectation that discovery will reveal evidence of" defendants' sustained and systematic failure to exercise oversight in connection with the Company's illegal marketing of "off-label" drug usage in violation of FDA mandates. Twombly, 127 S. Ct. 1955 at 1965. As already indicated above, the Complaint amply details numerous "red flags" that were, or should have been seen by the Board and caused it to identify and eradicate any illegal conduct, including: detailed descriptions of numerous government inquiries into Cephalon's marketing and sale of Actiq, Provigil and Gabitril (¶ 32); an intra-company audit concluding that "the company was failing to comply with the FDA program" (¶ 30); intra-company directives and initiatives aimed at furthering illegal marketing of "off-label" drugs that included the implementation of a new "standard operating procedure" which, in effect "freed Cephalon from a requirement in the FDA program that it alert the agency and take remedial action if any physician specialty other than oncologists or pain specialists accounted for more than 15% of the drug's prescriptions" (¶ 31); ample facts describing the illegal conduct itself, including seminars where "off-label" uses of drugs were discussed and encouraged (id.); FDA pressure to curtail "off label" marketing of Gabitril and other drugs (¶ 31); and facts indicating the resulting increase in sales of Actiq, which the defendants attributed to "ongoing changes to our marketing approach." (¶ 29).

The above facts are specific and suggestive of the Board's conscious disregard of corporate malfeasance. See McCall (Finding that Defendants' failure to react to an audit, *a qui tam* action, an extensive criminal investigation and illegal acts themselves created a strong inference of intentional

or reckless disregard); Abbott, 293 F.3d 378 (FDA inspections, formal letters of caution from

regulators and the prolonged availability of information concerning the violations should have

prompted defendants to act).[15] Thus, defendants' argument that the Complaint is "rife with . . .

conclusory pleading," is wholly misplaced here.

Finally, defendants' argument that plaintiff's failure to specify the "wrongdoers" results in

"idle speculation" is equally unavailing. See Buckley, 2007 U.S. Dist. LEXIS 22211, at *13.

(Holding that "Group Pleading" is sufficient and allowing claims to proceed where defendants were

not mentioned individually but were identified expressly in the introductory paragraphs of the

complaint.)

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

---

[15] The defendants claim that the fact of the proposed Settlement, announced in November 2007, may
be viewed as "neutral." The argument makes no sense. The payment of a $425 million fine and
guilty plea is anything but "neutral." Regardless, defendants cannot and do not argue that the facts of
commencement of investigations in 2004, accompanied by subpoenae, are anything other than
"suggestive" of potential illegality. See Piven, No. 07-2878 (CLB) (S.D.N.Y Apr. 10, 2008) (Court
denied motion to dismiss a derivative complaint alleging breach of fiduciary duty stemming from a
single government investigation which commenced in 2001 and culminated in a $100 million fine in
2007).

## CONCLUSION

For the reasons cited herein, Defendants' Motion for Judgment on the Pleadings should be denied in its entirety. In the alternative, pursuant to Federal Rule of Civil Procedure 15, plaintiff respectfully requests leave to amend.

DATED: May 23, 2008

RIGRODSKY & LONG, P.A.

By: _____
Seth D. Rigrodsky (#3147)
Brian D. Long (#4347)
919 North Market Street, Suite 980
Wilmington, Delaware 19801
Tel: (302) 295-5310
Fax: (302) 654-7530

*Attorneys for Plaintiff*

OF COUNSEL:

**WEISS & LURIE**
Joseph H. Weiss
David C. Katz
Ilya Nuzov
551 Fifth Avenue
New York, New York 10176
Tel: (212) 682-3025
Fax: (212) 682-3010

**STULL STULL & BRODY**
Jules Brody
6 East 45th Street
New York, New York 10017
Tel: (212) 687-7230
Fax: (212) 490-2022

# EXHIBIT A

LEXSEE

**DAVID BRENNAN, Plaintiff, v. CEPHALON, ET AL., Defendants.**

**Civil Action No. 04-3241 (NLH)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY**

**2007 U.S. Dist. LEXIS 33991; 26 I.E.R. Cas. (BNA) 50**

**May 8, 2007, Decided**
**May 8, 2007, Filed**

**PRIOR HISTORY:** Brennan v. Cephalon, Inc., 2005 U.S. Dist. LEXIS 25170 (D.N.J., Oct. 25, 2005)

**CORE TERMS:** audit, summary judgment, inspection, terminated, at-will, public policy, wrongful termination, duty to report, termination, false statement, commit a crime, statutory duties, wrongfully terminated, noncompliance, statutorily, genuine, fired, wrongful discharge, corrective action, moving party, deposition, hired, mock, public policy, nonmoving party's, legitimate reasons, supervisor, reporting, co-worker, nuclear

**COUNSEL:** [*1] Mario A. Iavicoli, Esq., Haddonfield, NJ, Attorney for Plaintiff David Brennan.

Michael J. Eagles, Esq., Morgan, Lewis & Bockius LLP, Philadelphia, PA, Attorney for Defendant Cephalon.

**JUDGES:** NOEL L. HILLMAN, U.S.D.J..

**OPINION BY:** NOEL L. HILLMAN

**OPINION**

**OPINION**

**HILLMAN,** District Judge

This matter comes before the Court upon defendant Cephalon Inc.'s ("Cephalon") motion for summary judgment to dismiss plaintiff's complaint for wrongful termination. Because we find that plaintiff was an at-will employee and his termination did not violate any clear mandate of public policy, we grant defendant's motion.

**I. PROCEDURAL BACKGROUND**

Plaintiff filed his complaint in the Superior Court of New Jersey, Law Division, Camden County on June 3, 2004. He subsequently filed an amended complaint that was removed to this Court upon notice of removal by the defendants on July 8, 2004. On July 15, 2004, defendants filed a motion to dismiss the amended complaint. Following oral argument before Judge Freda L. Wolfson, 1 the Court ruled that Pennsylvania law applied and issued an Order on March 2, 2005, granting defendants' motion in part and denying it in part with leave for plaintiff to [*2] file a second amended complaint. 2 By Order dated March 24, 2005, the Court also dismissed plaintiff's Civil Rights Act claims against all defendants and dismissed plaintiff's claims against defendant Baldino without prejudice.

> 1    This case was originally assigned to Judge Freda L. Wolfson. It was reassigned to this Court on July 5, 2006.
> 2    In that Order: plaintiff's wrongful discharge claim was dismissed without prejudice; plaintiff's claim under the New Jersey Conscientious Employee Act, N.J.S.A. 34:19-1, was dismissed with prejudice; plaintiff's state law breach of contract claim for severance benefits was dismissed without prejudice; and plaintiff's prima facie tort claim was dismissed with prejudice.

Plaintiff filed a second amended complaint on April 7, 2005, and defendants filed a motion to dismiss the second amended complaint shortly thereafter. Before Judge Wolfson ruled on the motion to dismiss the second amended complaint, plaintiff filed a motion for leave to file a third amended complaint. Judge [*3] Wolfson

Page 1

decided both motions by Order and Opinion entered on October 25, 2005. Brennan v. Cephalon, Inc., No. 04-341, 2005 U.S. Dist. LEXIS 25170, 2005 WL 2807195 (D.N.J. Oct. 25, 2005). In that Opinion, the Court held that plaintiff stated a claim against Cephalon for wrongful termination under Pennsylvania's "commit a crime" exception to at-will employment sufficient to withstand a 12(b)(6) motion. 2005 U.S. Dist. LEXIS 25170, [WL] at 12. The Court dismissed plaintiff's claims for wrongful discharge against Cephalon employees, Frank Baldino, Richard Kaplan, Tim Sheehan and Armando Cortez because plaintiff did not allege that any of them acted in their individual capacities as opposed to their corporate capacities. 2005 U.S. Dist. LEXIS 25170, [WL] at 13. In addition, the Court dismissed plaintiff's ERISA claims without prejudice. 2005 U.S. Dist. LEXIS 25170, [WL] at 16. Finally, the Court denied plaintiff's motion for leave to amend his complaint to add a claim for wrongful discharge based on exercising his rights to free speech under the United States and Pennsylvania constitutions since plaintiff did not allege that he was fired based on forced political speech. 2005 U.S. Dist. LEXIS 25170, [WL] at 17.

Following Judge Wolfson's Order, all defendants with the exception of Cephalon have been [*4] dismissed, and all claims against Cephalon have been dismissed except for plaintiff's claim of wrongful termination. Defendant Cephalon has filed a motion for summary judgment on that remaining claim.

## II. FACTUAL BACKGROUND

We adopt the facts as presented in the Court's October 25, 2005, Opinion and either reiterate or supplement the following facts. Brennan was hired by Cephalon, a biotechnology and drug company, in March 2002 as a compliance auditor. Cephalon had received approval from the FDA to market a drug called Actiq. Actiq was described as a narcotic painkiller designed to provide relief from pain to cancer patients. Part of the FDA approval for Actiq included a requirement that Cephalon provide quarterly reports for the first year of marketing. Thereafter, Cephalon and the FDA would determine the requirement for further reporting. Brennan, at the request of Cephalon, conducted an audit of Actiq's Risk Management Program ("RMP") and concluded that Cephalon was not in compliance with the FDA approval. He turned in his report to his supervisor, Tim Sheehan, in October 2003. In November 2003, Brennan, Sheehan,

Armando Cortes, the new Director of Quality Assurance, and [*5] Richard Kaplan, Vice President of Quality, conducted an audit of Orsymonde, a facility owned by Cephalon in France, in which they concluded that the facility was generally in compliance. [3]

> [3]  Brennan testified that Orsymonde manufactures Modafinil which is the active ingredient for Provigil, and that a significant percentage of Cephalon's revenue comes from Provigil. Brennan Dep. at 75-76. The Orsymonde audit is unrelated to the Actiq audit.

After the conclusion of the Orsymonde audit, Brennan noted that it had been six weeks since he submitted his Actiq RMP report but had not received any response. Brennan mentioned this to a co-worker, Lisa Carle, and stated to her that he thought he should report his findings on the Actiq RMP to the FDA. Brennan did not have any conversations with his superiors about turning over his findings directly to the FDA. Within the next day or so after speaking with Ms. Carle, Cortes met with Brennan, Sheehan and Kaplan about the Actiq RMP report. At that meeting, Brennan was told [*6] to set up a meeting with the other participants in the Actiq RMP audit to assure that correct information was provided. Brennan set up the meeting for December 1, 2003. During the meeting, a co-worker, Tracie Parker, who had no authority over Brennan, told Brennan that the Actiq RMP report should not state that Cephlon was noncompliant and to remove her name. Ms. Parker then left the meeting and returned with Kaplan. Kaplan did not ask Brennan to change the report. Brennan did not alter his conclusions and the report was distributed internally. Carol Marchione, Director of Quality Assurance was to respond to the report by December 31, 2003, but it was agreed by Brennan and others that the response date should be moved to January 31, 2004. Brennan did not receive a response to the report by the deadline, and on February 9, 10, 11 and 12, 2004, he approached Sheehan and asked him if he could distribute the Actiq RMP report. Sheehan told him no, that he had to wait for approval from Cortes. Brennan did not contact Cortes.

About the same time period that the response to the Actiq RMP report was pending, a consultant named Debra Bennett had been hired by Cephalon to do a mock FDA inspection [*7] in January 2004 of the Orsymonde facility in anticipation of an official FDA inspection. [4] In her report dated February 6, 2004, Ms. Bennett identified

2007 U.S. Dist. LEXIS 33991, *7; 26 I.E.R. Cas. (BNA) 50

several areas where the Orsymonde facility was in violation and needed corrective action. It also stated that the last audit conducted in November 2003 was inadequate. Brennan testified that prior to his termination he had heard about "... a report that says they're [Cephalon] totally out of compliance in Orsymonde." [5] Brennan Dep. at 114-15. Brennan stated that he had asked Sheehan during the week of February 9-12, 2004 to see Bennett's report but his request was denied. He did not request to see the report from anyone else.

> 4    Brennan testified that Bennett had been hired several times before by Cephalon to conduct similar inspections at their other facilities. Brennan Dep. at 106.
>
> 5    Material submitted by Cephalon state that corrective action was taken at the Orymonde facility based on Bennett's mock inspection.

On February 12, 2004, Brennan and Sheehan [*8] were terminated. Brennan's letter of termination stated that he was terminated because of his performance regarding the audit at the Orsymonde facility in November 2003. During his deposition, Brennan testified that he thought he was fired because "[he] believe[d] that Cephalon was committing some illegal activities, and [] wanted them to stop doing it, or report them appropriately to the FDA." Brennan Dep. at 31. A week or so after his termination, Brennan sent a letter to the FDA regarding Cephalon's noncompliance.

## III. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate where the Court is satisfied that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 330, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); Fed. R. Civ. P. 56(c).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). [*9] A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. In considering a motion

for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." Marino v. Industrial Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id. Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. Anderson, 477 U.S. at 256-57. A party opposing summary judgment must do more than just rest upon [*10] mere allegations, general denials, or vague statements. Saldana v. Kmart Corp., 260 F.3d 228, 232, 43 V.I. 361 (3d Cir. 2001).

### B. Claim for Wrongful Discharge

The parties do not dispute that Brennan was an at-will employee of Cephalon. Under Pennsylvania Law, an at-will employee can be terminated for any reason, good or bad, or for no reason at all. Brennan, 2005 U.S. Dist. LEXIS 25170, 2005 WL 2807195, at *6. (citing Krajsa v. Keypunch, Inc., 424 Pa. Super. 230, 622 A.2d 355, 358 (Pa. Super. 1993)). The exception to this rule is where the termination would threaten clear mandates of public policy. Id. (citing Clay v. Advanced Computer Applications, Inc., 522 Pa. 86, 559 A.2d 917, 918 (Pa. 1989)). The three areas recognized under the public policy exception prohibit an employer from: (1) requiring an employee to commit a crime; (2) preventing an employee from complying with a statutorily imposed duty; and (3) discharging an employee when specifically prohibited from doing so. Id. (citing Hennessy v. Santiago, 708 A.2d 1269, 1273 (Pa. Super. 1998)). Whether the public policy exception applies is determined on a case by case basis. Clark v. Modern Group Ltd., 9 F.3d 321, 327-28 (3rd Cir. 1993). [*11]

The Court, in its October 25, 2005 Opinion, ruled that "the third public policy exception is clearly not applicable here because there is no statute that prohibits Cephalon's termination of Brennan." The Court also ruled

that the second public policy exception did not apply because the statutes that Brennan identified did "not implicate the 'statutorily imposed duty' public policy exception to at will employment." Brennan, 2005 U.S. Dist. LEXIS 25170, 2005 WL 2807195, at *6. The Court found that the four statutes that Brennan identified, 18 U.S.C. § 1001, 18 U.S.C. § 371, 18 Pa. C.S.A. 4911, and 21 U.S.C. § 333 [6] did "... not impose specifically delineated statutory affirmative duties upon Plaintiff, nor [did] they advance the 'one-step removed' argument - that Cephalon had statutory duties and those duties were imputed to plaintiff by virtue of his job and duties as compliance auditor." Id.

6  Specifically, the Court provided:

> The False Statements Act ("FSA"): Section 1001 of Title 18 of the United States Code, makes it a crime to knowingly and willfully make a false statement to the United States or to any department or agency thereof.

> 18 U.S.C. § 371 prohibits conspiracies "to commit any offense against the United States, or to defraud the United States, or any agency thereof.." 18 U.S.C. 371.

> A person violates 18 Pa.C.S.A. § 4911 if he or she:

> (1) knowingly makes a false entry in, or false alteration of, any record, document or thing belonging to, or received or kept by, the government for information or record, or required by law to be kept by others for information of the government; (2) makes, presents or uses any record, document or thing knowing it to be false, and with intent that it be taken as a genuine part of information or records referred to in paragraph (1) of this subsection; or (3) intentionally and unlawfully destroys, conceals, removes or otherwise impairs the verity or

> availability of any such record, document or thing. 18 Pa.C.S.A. § 4911.

> 21 U.S.C. § 333 is a lengthy statute that [imposes] criminal penalties for violations of other FDA statutes, none of which have been cited by Plaintiff or are applicable here.

2005 U.S. Dist. LEXIS 25170, [WL] at *7.

[*12] In his response to the motion for summary judgment, Brennan attempts to resurrect his theory that he had a "statutory duty" to submit the Actiq non-compliance information to the FDA. [7] This argument, again, is without merit. [8] The existence of an affirmative statutory duty is a strict requirement imposed by the Pennsylvania Courts in order to meet the "statutorily imposed duty" exception to at-will employment. Compare Brown v. Hammond, 810 F. Supp. 644, 647 (E.D.Pa. 1993) (termination of employee for reporting employer's improper billing practices did not violate "clearly mandated public policy required to satisfy the very narrow exception to Pennsylvania's rigid at will employment doctrine."); and Spierling v. First American Home Health Services, Inc., 1999 PA Super 222, 737 A.2d 1250, 1254 (Pa. Super. 1999), appeal denied, 567 Pa. 728, 786 A.2d 989 (Pa. 2001) (nurse had no duty to report past Medicare fraud); and Diberardinis-Mason v. Super Fresh, 94 F. Supp.2d 626, 629 (E.D.Pa. 2000) (plaintiff had no statutory duty where language of the statute did not reveal any affirmative reporting duty); with Field v. Phila. Elec. Co., 388 Pa. Super. 400, 565 A.2d 1170 (Pa. Super. 1989) [*13] (federal statute required employee to report violations of nuclear regulations); and Reuther v. Fowler & Williams, Inc., 255 Pa. Super. 28, 386 A.2d 119, 121 (Pa. Super. 1978) (plaintiff had affirmative duty to appear for jury service).

7  In their reply, Cephalon objects to Brennan's response on a number of grounds and requests that this Court impose sanctions upon plaintiff for submitting a statement of facts and declaration that fails to properly cite to the record and contains misrepresentations, and for exceeding the page limit. While do not impose sanctions upon plaintiff, we do seriously caution him that his

submissions must comport with the Federal Rules of Civil Procedure and the Local Rules of this Court. In deciding this motion, we did not give credence to unsupported assertions but relied upon facts supported by the record and the deposition testimony of Brennan. Upon written request by plaintiff submitted to the Court for permission to file an extra six pages beyond the 40 page limit, we grant plaintiff's request, nunc pro tunc.

8   To the extent that plaintiff is trying to argue that he had a duty to report his findings to the FDA under a general sense for protecting the public interest, such theory has been rejected by the Third Circuit. In <u>Clark v. Modern Group Ltd., 9 F.3d 321, 328 (3d Cir. 1993)</u>, the Court concluded that Pennsylvania law does not recognize a clear mandate of public policy absent "a legislative or constitutional endorsement in the form of a specific prohibition, requirement or privilege."

[*14] In Spierling, the federal government had investigated First American Home Health Services, Inc. ("First American") for Medicare fraud and told Spierling, a nurse, and other employees to call the fraud hotline to report suspected Medicare fraud. <u>737 A.2d at 1251</u>. Spierling went through some "old and discarded" files at First American and found evidence of Medicare fraud. Id. She reported it to her supervisor who in turn called the hotline and notified the regional vice president of First American. Three days later Spierling and the supervisor were terminated. Id. Spierling argued that a duty to report Medicare fraud arose from: <u>18 U.S.C. § 1001; 18 U.S.C. § 287; 42 U.S.C. §§ 1320a-7a and 1320a-7b; 31 U.S.C. § 3729</u> or <u>31 U.S.C. § 3730(h)</u>; the Professional Nursing Law, <u>63 P.S. §§ 211-225.5</u>; and Pennsylvania Code sections relating to nursing, 49 Pa.Code § 21.18. Id. The court held that Spierling was "under no statutorily imposed duty to report the suspected past Medicare fraud, Defendant-Appellees did not request [*15] that Spierling commit a crime and there was no specific statutory prohibition against Spierling's discharge." Id. The court concluded that the employer was within its right to discharge her as an at-will employee. [9] Id. In contrast, in Field the court found that Field was wrongfully terminated because he reported violations to the Nuclear Regulatory Commission ("NRC"). <u>565 A.2d at 1180</u>. Under the Energy Reorganization Act, Field had an affirmative duty to report such violations to the NRC. Id.

The ERA "provides that any individual of a firm operating a licensed nuclear facility who obtains information which indicates that the facility has failed to comply with any provision of the NRC regulations is required to notify the NRC of the failure." <u>Id. at 1176</u> (citing <u>42 U.S. § 5846</u>). Individuals who fail to report violations are subject to fines. Id.

9    The court noted that "First American was assessed a substantial fine and its corporate president was sentenced to a term of imprisonment as a result of Medicare fraud." <u>Id. at 1251 n. 3</u>.

[*16] What these cases portray is a requirement under Pennsylvania law that in order for a plaintiff to prevail on a theory of statutory duty, he must point to a clear affirmative duty to report. Even though Brennan was given the responsibility of conducting an internal audit by Cephalon, Brennan did not have an affirmative statutory duty to report the findings from his audit directly to the FDA. The statutes that Brennan identifies only proscribe the filing of false statements.

Affirming that Brennan does not meet the "statutorily imposed duty" exception, we turn to whether plaintiff's claim that he could have been criminally liable had he falsified his reports and potentially "committed a crime" survives summary judgment. Pennsylvania law requires that in order for a plaintiff to present a claim under the "commit a crime" public policy exception to at-will employment, the employee must show that he was terminated by his employer for his refusal to commit a crime as part of his employment. See <u>Woodson v. AMF Leisureland Centers, Inc., 842 F.2d 699, 702 (3d Cir. 1988)</u> (employee wrongfully terminated for refusing to serve visibly intoxicated person in violation of Pennsylvania [*17] law); <u>Dugan v. Bell Telephone of Pennsylvania, 876 F. Supp. 713, 725 (W.D.Pa. 1994)</u> (employee wrongfully terminated if he was fired for refusal to engage in illegal activity of destroying records subpoenaed by the Pennsylvania State legislature); <u>Levito v. Hussman Food Service Co., No. 89-5967, 1990 U.S. Dist. LEXIS 145, 1990 WL 1426, at *3 (E.D.Pa. Jan. 8, 1990)</u> (employee wrongfully terminated for refusing to engage in illegal kick-back scheme); <u>Spriegel v. Kensey Nash Corp., 28 Pa. D. & C.4th 326, 1995 WL 908192, at *3 (Pa.Com.Pl. 1995)</u> (employee wrongfully terminated for refusing to perform animal studies in violation of federal and state law).

2007 U.S. Dist. LEXIS 33991, *17; 26 I.E.R. Cas. (BNA) 50

It seems that Brennan is arguing that had he been forced to change his conclusion in his Actiq RMP report from noncompliance to compliance, he would have been engaging in illegal conduct in violation of the False Statements Act, 18 U.S.C. § 1001, conspiracy to submit false statements, 18 U.S.C. § 371, Pennsylvania statutes prohibiting false statements, 18 Pa. C.S.A. 4911, and criminal penalties for violation of FDA regulations, 21 U.S.C. § 333 [*18] . We agree that if Brennan has evidence that could establish that he was fired for his refusal to change his report, then his claim should go to the jury. The facts, however, do not support this claim. The only individual who told him that the report should be changed was a co-worker who had no supervisory authority over Brennan. In fact, immediately after she made that statement, she left the room to retrieve Kaplan who did have authority over Brennan. Kaplan did not tell Brennan to change his conclusion, or even suggest that he do so. Rather, Brennan's report was reviewed by his superiors who in turn submitted it to the Director of Quality Assurance with Brennan's conclusion that Cephalon was not in compliance. Brennan has not submitted any evidence that could suggest that anyone with authority told him to change the report. There is no evidence that he was told by anyone at Cephalon to submit false information to the FDA.

Brennan's other theory for wrongful termination is that he believed that Cephalon was either not going to take corrective action concerning their noncompliance, or was not going to report the noncompliance to the FDA. The facts support a different conclusion. Brennan's [*19] Actiq RMP report was distributed internally within Cephalon and a discussion was held regarding what actions were necessary. The response to the report, originally due December 31, 2003, was moved by agreement, including agreement by Brennan, to January 31, 2004. Although Brennan alleges the response was delayed, there is no evidence in the record to suggest that Cephalon was not moving forward with actions in response to the Actiq RMP report. Brennan has not presented evidence that anyone at Cephalon told him that Cephalon did not intend to respond appropriately to the Actiq RMP report. In fact, when asked in deposition why he was terminated, Brennan testified that he was terminated based on his *own belief* that Cephalon was not taking appropriate action. An employee's belief that his employer is engaging in illegal conduct is not enough to support a wrongful termination claim. The Third Circuit in its review of Pennsylvania's at-will doctrine remarked

that "... no federal case has permitted a Pennsylvania at-will employee to recover for wrongful discharge when he merely believes that the act he objected to was illegal." Clark, 9 F.3d at 330. Rather, it must be [*20] clear that the "act would be illegal or infringe upon a fundamental private right." Id. (citations omitted). Thus, the evidence does not support plaintiff's claim that he was fired for refusing to change his conclusion regarding the Actiq RMP report, or for insisting that Cephalon take corrective action or inform the FDA of its noncompliance.

Alternatively, the evidence does support the claim that the reason Brennan was terminated was his inadequate performance in connection with the Orsymonde audit. Pennsylvania law provides that "even when an important public policy is involved, an employer may discharge an employee if he has separate, plausible and legitimate reasons for doing so." Cisco v. United Parcel Services, Inc., 328 Pa. Super. 300, 476 A.2d 1340, 1343 (Pa. Super. 1984) (finding employer had legitimate reason for discharging employee who was accused of theft and trespass in the performance of his duties); see Diberardinis-Mason, 94 F. Supp.2d at 629 (finding employer proffered plausible basis for terminating plaintiff and denied wrongful termination claim). Brennan, along with Sheehan and others, conducted an audit of the Orsymonde facility in November [*21] 2003, and concluded, with some exceptions, that the facility was compliant. Cephalon hired an outside consultant to conduct a mock FDA inspection in anticipation of an official FDA inspection. The mock inspection was conducted in late January 2004. The inspection report was presented on or about February 6, 2004, and identified several areas that required corrective action by Cephalon. It also stated that the last audit conducted, in which Brennan participated, was inadequate. Six days after the date of the inspection report Brennan and Sheehan were terminated. Therefore, Cephalon presents a legitimate reason for terminating Brennan.

## IV. CONCLUSION

Brennan's wrongful termination claim fails as a matter of law and, therefore, Cephalon's motion for summary judgment is granted. An Order will be entered consistent with this Opinion.

Dated: May 8, 2007

At Camden, New Jersey

2007 U.S. Dist. LEXIS 33991, *21; 26 I.E.R. Cas. (BNA) 50

s/ NOEL L. HILLMAN, U.S.D.J.

**ORDER**

**HILLMAN,** District Judge

For the reasons expressed in the Court's Opinion filed on this date,

**IT IS HEREBY ORDERED** on this 8th day of May, 2007, that Defendant Cephalon, Inc.'s motion for summary judgment to dismiss plaintiff's complaint is [*22] **GRANTED.**

s/ NOEL L. HILLMAN, U.S.D.J.

At Camden, New Jersey

# EXHIBIT B

LEXSEE

**DENNIS J. BUCKLEY, AS TRUSTEE OF THE DVI LIQUIDATING TRUST, Plaintiff, v. MICHAEL A. O'HANLON, STEVEN R. GARFINKEL, RICHARD E. MILLER, JOHN P. BOYLE, ANTHONY J. TUREK, RAYMOND D. FEAR, WILLIAM S. GOLDBERG, GERALD D. COHN, JOHN E. MCHUGH, HARRY T. J. ROBERTS, and NATHAN SHAPIRO, Defendants.**

**C.A. No. 04-955 (GMS)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

**2007 U.S. Dist. LEXIS 22211**

**March 28, 2007, Decided**

**CORE TERMS:** insolvency, fiduciary duty, deepening, pari delicto, bad faith, good faith, auditor's, fraudulent, imputation, audit, pled, business judgment rule, particularized, misrepresented, delinquent, accounting, lease, lines of credit, exculpatory clause, irregularities, warning, notice, fraud claims, suffered damages, red flags, gross negligence, particularity, indifference, deliberate, wrongdoing

**COUNSEL:** [*1] For Official Committee of Unsecured Creditors of DVI Inc. et al, Plaintiff: Francis A. Monaco, Jr., LEAD ATTORNEY, Joseph J. Bodnar, Monzack & Monaco, P.A., Wilmington, DE.

Dennis J. Buckley, as Trustee of The DVI Liquidating Trust, Plaintiff, Pro se.

For Richard E. Miller, Defendant: David E. Brand, LEAD ATTORNEY, Prickett, Jones & Elliott, P.A., Wilmington, DE.

For Anthony J. Turek, Defendant: David A. Felice, LEAD ATTORNEY, Cozen O'Connor, Wilmington, DE.

For William S. Goldberg, John E. McHugh, Nathan Shapiro, Defendants: Arthur G. Connolly, Jr., LEAD ATTORNEY, Connolly, Bove, Lodge & Hutz, Wilmington, DE.

For Harry T.J. Roberts, Defendant: Joanne Ceballos, LEAD ATTORNEY, Adam Balick, Balick & Balick, LLC, Wilmington, DE; Gregory P. Miller, Michael A. Morse, Miller, Alfano & Raspanti, P.C., Philadelphia, PA.

For Steven R. Garfinkel, Defendant: Martin James Weis, LEAD ATTORNEY, Dilworth Paxson LLP, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gregory M. Sleet

**OPINION**

**MEMORANDUM**

**I. INTRODUCTION**

The Official Committee of Unsecured Creditors of DVI, Inc. (the "Committee") filed this action on August 19, 2004. The [*2] Committee was dissolved, and Dennis J. Buckley was appointed as Trustee for the DVI Liquidating Trust ("Buckley") by order of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on November 24, 2004. Buckley was substituted as plaintiff in this action in this court's Order of April 6, 2006. The complaint states claims for breach of fiduciary duty and deepening insolvency as to the officer defendants (Michael A. O'Hanlon, Steven R. Garfinkel, Richard E. Miller, John P. Boyle, Anthony J. Turek, and Raymond D. Fear) and the director defendants/audit committee members (O'Hanlon, William S. Goldberg, Gerald D. Cohn, John E. McHugh, Harry T.

Page 1

J. Roberts, and Nathan Shapiro). The complaint also includes a claim for fraud as to O'Hanlon, Garfinkel, and Miller. Presently before the court are eight motions to dismiss.

## II. LEGAL STANDARD

Pursuant to the motion of a party, a court may dismiss a complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). In making this determination, the court must accept as true all allegations in the complaint, and must draw all reasonable inferences in the light most favorable [*3] to the plaintiff. *Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc.*, 140 F.3d 478, 483 (3d Cir. 1998). The defendant must show "beyond doubt" that the plaintiff can prove no set of facts which would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957).

## III. BACKGROUND [1]

> [1] This section is a summary of facts, taken from the pleadings, and do not constitute findings of fact.

DVI and its subsidiaries are Delaware corporations with principal places of business in Pennsylvania. (D.I. 1, P 11.) Prior to filing for bankruptcy, DVI extended lease and loan financing to healthcare providers to facilitate the purchase of sophisticated medical equipment, and extended revolving lines of credit that were secured by liens on accounts receivable generated by that provider's operations. (D.I. 1, PP 13-15.) To raise capital and maintain their lines of credit, DVI used a securitization system, through which financial contracts were pledged as collateral to [*4] lenders. (D.I. 1, P 33.) Recognizing losses or establishing reserves on underperforming contracts would have negatively affected the securitization system, so although the payment histories of impaired leases and loans worsened in the years leading up to filing, DVI's loss reserves and level of write-offs for bad credit remained fairly static. (D.I. 1, P 39.) By 1999, DVI began experiencing shortages of capital, so the defendants used irregular financial practices to make ends meet while at the same time investing large amounts of cash in ill-performing markets and non-core businesses. (D.I. 1, P 54.) Defendants O'Hanlon, Garfinkel, and Miller were allegedly the first to implement such practices, as they had access to DVI's record keeping software. Apparently, the other

defendants discovered, ignored, or participated in the practices. (D.I. 1, PP 92-100.)

The plaintiff alleges that, to maintain the appearance of solvency, the defendants injured DVI and its creditors by repurchasing delinquent loans and leases without receiving commensurate value, and transferring funds within DVI's subsidiaries and among select borrowers to disguise underperforming accounts. (D.I. 1, PP 60-68.) Other [*5] irregular practices that the defendants are alleged to have committed include investing substantial amounts of money in consistently unprofitable or non-core businesses, obtaining otherwise-unavailable lines of credit by pledging the same collateral to several lenders, ignoring internal controls and reporting procedures, and disregarding numerous warnings from DVI's outside auditor and the SEC. (*Id.*) The independent auditor resigned in June 2003 after refusing to approve DVI's Form 10-Q for the quarterly period ending March 31, 2003. DVI also began defaulting on its loans in June 2003, and ultimately filed for bankruptcy on August 25, 2003. (D.I. 1, P 57.)

## IV. DISCUSSION

"When a motion under Rule 12 is based on more than one ground, the court should consider the 12(b)(1) challenge first because if it must dismiss the complaint for lack of subject matter jurisdiction, all other defenses and objections become moot." *In Re Corestates Trust Fee Litig.*, 837 F. Supp. 104, 105 (E.D. Pa. 1993), *aff'd* 39 F.3d 61 (3d Cir. 1994). "Standing represents a jurisdictional requirement which remains open to review at all stages of the litigation." *National Org. for Women v. Scheidler*, 510 U.S. 249, 255, 114 S. Ct. 798, 127 L. Ed. 2d 99 (1994). [*6] Therefore, the court will address the issue of standing first.

### A. Standing

Defendant Roberts posits that the causes of action pursued in the complaint are beyond the scope of the remedies contemplated by the statutory predicates cited in the Motion to Authorize Official Committee of Unsecured Creditors to Investigate and Pursue Causes of Action Against Pre-Petition Officers and Directors. In the May 10, 2004 Order approving that motion, however, the Bankruptcy Court authorized the Debtors to "investigate, and, if appropriate, pursue, *any causes of action* of the Debtors' estates against the Defendants." (D.I. 27, Ex. A) (emphasis added). Whether this Order granted to the

Committee greater authority than the Committee requested is immaterial; the court had the power to do so. The plain language of the Bankruptcy Court's Order makes clear that Buckley has standing to assert claims on behalf of DVI's debtors.

Other defendants argue that Buckley cannot bring claims on behalf of the creditors because the Committee had standing as to the debtors only. In support of their argument, the defendants rely on the Supreme Court's decision in _Caplin v. Marine Midland Grace Trust Co._, 406 U.S. 416, 434, 92 S. Ct. 1678, 32 L. Ed. 2d 195 (1972), [*7] wherein the Court held that a trustee in bankruptcy does not have standing to pursue claims on behalf of creditors of the debtor company's estate. In response, Buckley argues that, as trustee, it is empowered to pursue claims on behalf of the debtors' creditors because the Bankruptcy Court confirmed the assignment of the creditors' claims to the trustee under the provisions of the Plan and Confirmation Order, dated November 24, 2004.

While the court acknowledges that, in theory, a bankruptcy trustee can pursue claims that the debtors' creditors assigned to it, a plaintiff must have standing to pursue its claims at the time of filing. _See Minneapolis & St. Louis R.R. Co. v. Peoria & Pekin Union Ry. Co._, 270 U.S. 580, 586, 46 S. Ct. 402, 70 L. Ed. 743 (1926) ("The jurisdiction of the lower court depends upon the state of things existing at the time the suit was brought."). Here, the complaint was filed in August 2004 but the trustee did not obtain an assignment of rights from a subset of creditors until four months later, in December 2004, when the Bankruptcy Court's Plan and Confirmation Order became effective. Moreover, since that Order, Buckley has not sought to supplement the existing complaint.

[*8] The court will not proceed with claims for which the plaintiff obtained standing after the lawsuit was filed. As Judge Longobardi so aptly stated in _Procter & Gamble Co. v. Paragon Trade Brands, Inc._:

> As a general matter, parties should possess rights before seeking to have them vindicated in court. Allowing a subsequent assignment to automatically cure a standing defect would unjustifiably expand the number of people who are statutorily authorized to sue. Parties could

justify the premature initiation of an action by averring to the court that their standing through assignment is imminent. Permitting non-owners and licensees the right to sue, so long as they eventually obtain the rights they seek to have redressed, would enmesh the judiciary in abstract disputes, risk multiple litigation, and provide incentives for parties to obtain assignments in order to expand their arsenal and the scope of litigation. Inevitably, delay and expense would be the order of the day.

917 F. Supp. 305, 310 (D. Del. 1995) (_quoted in Gaia Techs. v. Reconversion Techs._, 93 F.3d 774, 780 (Fed. Cir. 1996), _as amended on rehearing_, [*9] 104 F.3d 1296 (Fed. Cir. 1996)). The court will dismiss, without prejudice, any claims Buckley asserts on behalf of the debtors' creditors.

**B. Breach of Fiduciary Duty Claim**

Delaware law provides that corporate officers and directors owe the corporation a triad of fiduciary duties: loyalty, good faith, and due care. _McMullin v. Beran_, 765 A.2d 910, 917 (Del. 2000). To state a claim for breach of fiduciary duty, a plaintiff may allege that the officers and directors of a company knew or should have known that violations of the law were occurring, that they took no good faith steps to ameliorate the situation, and that the company suffered losses as a result. [2] _In re Caremark Int'l_, 698 A.2d 959, 971 (Del. Ch. 1996) (stating that liability may be based upon either an ill-advised or negligent decision, or an unconsidered failure to act when due attention would arguably have prevented the loss). The Court of Chancery later elaborated on what constitutes such an ill-advised decision in _Guttman v. Huang_, 823 A.2d 492, 507 (Del. Ch. 2003) (listing as an example "that the audit committee had clear [*10] notice of serious accounting irregularities and simply chose to ignore them or, even worse, to encourage their continuation").

2

Delaware law provides that fiduciary duties are owed to a corporation by both officers and directors. _Arnold v. Soc'y for Savings Bancorp, Inc._, 678 A.2d 533, 539 (Del. 1996). Therefore, to the extent that cases cited in this memorandum

refer only to one of these groups, the court will consider them as applicable to both.

Buckley alleges that the defendants either knew or should have known that violations of law were occurring, that they took no good faith steps to ameliorate the situation, and that DVI and its creditors suffered damages. Buckley also alleges that the officer defendants perpetuated an array of irregular accounting practices, of which the director defendants were aware, and which they ignored. All of the director defendants were alleged to be members of DVI's audit committee. Buckley's complaint is consistent with the *Guttman* pleading example, [*11] in that it alleges that the officer defendants eliminated the Criticized Asset Reporting system and manipulated delinquent loans and leases to make them appear profitable. Also, as in *Guttman,* Buckley alleges that the audit committee received eleven warning letters over eight years from their independent auditor, and that the auditor resigned after no action was taken in response to the alert. Buckley further avers that a series of inquiries from the SEC were also ignored by both the audit committee and the board of directors.

Several of the defendants have attempted to analogize the facts in this case to those in *Guttman* because the Court of Chancery viewed that plaintiff's allegations as overly conclusory. In *Guttman,* however, the complaint made sweeping accusations regarding accounting irregularities without discussing how management was expected to be aware of the problem, or even the presence of an audit committee. Here, the court finds that the contents of Buckley's complaint dictate a different result.

The defendants also challenge Buckley's claim for breach of fiduciary duty by disputing many of the substantive contentions. For example, several state that they, [*12] lacked knowledge or notice of the accounting irregularities, that they held their relevant positions for only a portion of the time in which DVI allegedly was put on notice of the irregularities, that they immediately attempted to rectify the situation upon learning of the problem, that the letters sent by DVI's outside auditor or the SEC could not be expected to alert them to the problems, or that the Examiner's Report painted a different picture of the internal workings of DVI. These responses address, however, the substantive merits of Buckley's claim. Because Buckley's allegations are accepted as true for the purposes of these motions,

such factual disputes are not appropriately resolved on motions to dismiss. Rather, the court must focus its consideration on the sufficiency of the complaint.

1. Sufficiency of Pleading

Several of the defendants insist that, because they are not mentioned individually in many of Buckley's allegations, the claims are too broad to proceed. "When group pleading is utilized by a plaintiff 'the identification of the individual sources of statements is unnecessary when the fraud allegations arise from the misstatements or omissions in group-published [*13] documents, such as annual reports, prospectuses, registration statements, press releases or other group-published information that presumably constitute the collective actions of those individuals involved in the day-to-day affairs of the corporation.'" *Tracinda Corp. v. DaimlerChrysler AG,* 197 F. Supp. 2d 42, 85 (D. Del. 2002) (citations and internal quotations omitted). Therefore, group pleading may be sufficient in some circumstances.

Defendant Roberts argues that breach of fiduciary duty claims must satisfy the particularity requirements of Federal Rule of Civil Procedure 9(b). Such an assertion is correct when the allegations of breach of fiduciary duty sound in fraud. *EPlus Group, Inc. v. Panoramic Communs. LLC,* No. 02-7992, 2003 U.S. Dist. LEXIS 10919, 2003 WL 21512229 at *2 (S.D.N.Y. July 2, 2003). However, in the absence of such allegations, Rule 9(b) does not apply. *In re Fruehauf Trailer Corp.,* 250 B.R. 168, 197 (D. Del. 2000) (stating that the heightened pleading requirement generally does not apply to state law claims for breach of fiduciary duty). In *Fruehauf,* Rule 9(b) was not triggered even in the face of multiple allegations that the [*14] defendant knew or should have known that certain representations were false and misleading. Neither was particularized pleading required when the plaintiff's complaint included such statements as "knew or should have known the financial statements . . . misrepresented to System One the Division's financial condition." *In re InaCom Corp.,* No. 00-2426, 2001 Bankr. LEXIS 1297, 2001 WL 1819987 at *3 (Bankr. D. Del. Aug. 7, 2001) (finding the claim did not sound in fraud).

While not all of Buckley's allegations name the involved defendants individually, Buckley did separate the list of defendants into smaller groups who worked together on various committees and boards. Although Buckley frequently refers simply to "defendants" in the

body of the complaint, the parties involved in each alleged practice of bad-faith were identified expressly in the introductory paragraphs of Buckley's complaint, and later, in his factual allegations and claims. (D.I. 1, PP16-28.) The court accepts that Buckley uses the categories of officers and directors merely as substitutes for listing names, rather than using them as sweeping terms to avoid having to associate specific parties to particularized conduct. Wherein [*15] much of the alleged conduct involved collective action and decision making, Buckley has sufficiently identified the small groups within DVI and their roles in approving or participating in each alleged bad-faith practice.

The court rejects Defendant Roberts' assertion that Buckley's allegations sound in fraud. Granted, Buckley describes much of the defendants' conduct as intentional or knowing, however, Buckley's choice of terms, which are also seen in fraud claims, do not transform claims for breach of fiduciary duty into claims based in fraud. In fact, the fiduciary duty claims in Buckley's complaint are very similar in structure to what were deemed acceptable fiduciary duty claims in *Fruehauf* and *InaCom*. Buckley's allegations for breach of fiduciary duty, while they must not be conclusory, need not be pled with the particularity required of fraud claims.

2. Applicability of Business Judgment Rule

The business judgment rule is a presumption that a board's actions are entitled to deference, because it would be overly harsh to condemn such a decision that only in hindsight was poorly conceived. This presumption is rebutted, however, when a plaintiff pleads particularized [*16] facts sufficient to raise a reason to doubt that the action was taken in good faith or on an informed basis. *In re The Walt Disney Co. Deriv. Litig.*, 825 A.2d 275, 286 (Del. Ch. 2003). Such doubt is raised when officers and directors fail to be "active monitors of corporate performance," *Caremark*, 698 A.2d at 968 (providing as an example the replacement of a board of directors following the discovery of large losses caused by phantom trades by a prominent trader). Nor may officers and directors consciously disregard visible "red flags." *See Rattner v. Bidzos*, No. 19700, 2003 Del. Ch. LEXIS 103, 2003 WL 22284323 at * 13 (Del. Ch. Sept. 30, 2003). Neither may officers and directors make decisions "so egregious as to constitute corporate waste." *In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005). The standard for holding officers and directors liable is one of

gross negligence. *Smith v. Van Gorkom*, 488 A.2d 858, 873 (Del. 1985).

In *Smith*, the decision to approve a proposed merger met that standard because it was made solely on the basis of a twenty-minute presentation. On the other end of the spectrum, gross negligence [*17] was not found when directors recommended a merger after consulting financial advisors, meeting several times over a six-week period, and reviewing challenges to the idea. *Rabkin v. Philip A. Hunt Chem. Corp.*, 547 A.2d 963, 970 (Del. Ch. 1986) (defining gross negligence as reckless indifference to, or a deliberate disregard of, the stockholders).

Buckley used language similar to that in the above cases in describing defendants' alleged conduct and its results, including allegations of wasting corporate assets, willfully disregarding warnings, and ceasing to review delinquent accounts. Buckley alleges that DVI's officers and directors acted in bad faith, disguising poorly-performing accounts and ignoring the advice of its outside auditor and the inquiries of the SEC. Buckley has satisfied the *Disney* requirement by pleading particularized facts that raise doubts as to whether the officers and directors were acting in good faith.

3. Effect of Exculpatory Clause

Several defendants argue that the exculpatory clause in DVI's Certificate of Incorporation, which is based on section 102(b)(7) of the Delaware General Corporation Law, bars the claims against them because [*18] it states that no director shall be personally liable to DVI or its stockholders. However, the clause contains exceptions to this protection when a director breaches his duty of loyalty to DVI, or for acts not taken in good faith, involving intentional misconduct, or a knowing violation of law. For example, in *Official Committee of Unsecured Creditors of Integrated Health Serv., Inc. v. Elkins,* such a provision was found not to insulate the directors from liability when they acted with knowing and deliberate indifference by approving a loan program without consideration, deliberation, or advice from an expert. *No. 20228, 2004 Del. Ch. LEXIS 122, 2004 WL 1949290 at *15 (Del. Ch. Aug. 24, 2004).* Similarly in *McCall v. Scott,* defendants were not protected by the exculpatory clause when they acted in bad faith by intentionally ignoring "red flags." *250 F.3d 997, 1001 (6th Cir. 2001)* (finding allegations of "conscious disregard of known risks" to necessarily be conduct undertaken in bad faith).

Buckley's allegations fall into the "bad faith" exception to DVI's Certificate of Incorporation exculpatory clause. Buckley alleges that the defendants here, as was alleged in *Elkins*, [*19] acted with "knowing and deliberate indifference," when they stopped examining delinquent accounts. Further, Buckley alleges that the defendants consciously disregarded "red flags," as in *McCall*, when the defendants paid no attention to the warnings allegedly contained in the auditor's and SEC's letters. Buckley has sufficiently pled breach of the duties of loyalty and good faith. As a result, the Certificate of Incorporation cannot operate to insulate the defendants from a breach of fiduciary duty claim. Consequently, the claim will proceed on the merits.

## C. Deepening Insolvency Claim

To plead insolvency, a plaintiff must aver facts that establish, for pleading purposes, that the corporation had a deficiency of assets below liabilities with no reasonable prospect that the business will succeed, or that it was unable to meet maturing obligations as they fell due in the ordinary course of business. *Production Resources Group, L.L.C. v. NCT Group, Inc.*, 863 A.2d 772, 782 (Del. Ch. 2004).

Buckley alleges that financial practices similar to those employed by the debtors in *Production Resources* occurred at DVI. *Id.* at 783-4. Specifically, [*20] the complaint avers that DVI had great difficulty raising capital, shuffled delinquent accounts to make them appear healthy, and could only obtain advances from its line of credit by erroneously certifying impaired loans and leases. Buckley expressly alleged that DVI became insolvent in June 2003, when it began defaulting on its loan obligations. Again, here, as in *Production Resources*, it can be reasonably inferred that the officers' and directors' alleged conduct caused the insolvency. The court thus concludes that Buckley has sufficiently pled that DVI was in the "zone of insolvency."

### 1. Recognition of Deepening Insolvency Claim

The U. S. Bankruptcy Court for the District of Delaware predicted that, in the absence of an opinion by the Delaware Supreme Court and given the Third Circuit's analysis in *Official Committee of Unsecured Creditors v. R. F. Lafferty & Co.*, Delaware law would likely recognize a claim for deepening insolvency. *In re Oakwood Homes Corp.*, 340 B.R. 510, 531 (Bankr. D. Del. 2006). Although the elements of such a claim have

yet to be enunciated, the Third Circuit acknowledged such a claim when a plaintiff alleges "fraudulent expansion [*21] of corporate debt and prolongation of corporate life." *Official Committee of Unsecured Creditors v. R. F. Lafferty & Co.*, 267 F.3d 340, 347 (3d Cir. 2001). A successful claim for deepening insolvency requires a showing of harm to the corporation because of such fraud. *Oakwood Homes*, 340 B.R. at 534 (also explaining that fraud requires a representation of material fact, falsity, scienter, reliance, and injury). In *Oakwood Homes*, fraud was found when the defendants, acting as the debtors' fiduciaries, misrepresented the sustainability of the company's finances with the intent to induce the debtors into maintaining the *status quo*, because it could be inferred from the complaint that such misrepresentation was with knowledge.

Here, as in *Oakwood Homes*, Buckley pled that the defendants, placed in positions of trust and control within DVI, knowingly misrepresented the state of DVI's financial health with the intent to cause DVI to continue incurring more liabilities than it could repay. The defendants allegedly disguised failing accounts and misrepresented DVI's creditworthiness without justification. Rather than constituting a valid attempt [*22] to restore DVI to solvency, the defendants' conduct is alleged to have fraudulently expanded DVI's corporate debt and prolonged DVI's life. These allegations, as framed, satisfy the pleading standard observed in *Lafferty*.

### 2. Applicability of *In Pari Delicto* Doctrine

The doctrine of *in pari delicto* [3] provides that "a party is barred from recovering damages if his losses are substantially caused by activities the law forbade him to engage in." *Lafferty*, 267 F.3d at 354 (citations omitted). Under this equitable doctrine, when a plaintiff is "standing in the shoes" of the bankrupt corporation, its claim is barred if the defendants' purported wrongdoing is imputed on the bankrupt corporation itself. *Id.* at 354, 358-59.

[3]   *In pari delicto* is Latin for "in equal fault." *Black's Law Dictionary* 806 (8th ed. 2004).

Whether the *in pari delicto* doctrine applies in this case depends on whether the defendants' conduct can be imputed to the debtors and hence to [*23] the Trust, which, under bankruptcy law, stands in the shoes of the debtors. Imputation refers to the attribution of one

person's wrongdoing to another person. Under the law of imputation, courts impute the fraud of an officer to a corporation when the officer commits the fraud (1) in the course of his employment, and (2) for the benefit of the corporation. *Id.* at 358.

The defendants' argue that *in pari delicto* serves as a bar to Buckley's deepening insolvency claim because Buckley stands in the shoes of the debtor corporations, seeking relief from the defendants for damages purportedly caused by the debtors' allegedly fraudulent conduct. (D.I. 29.) To support this argument, Defendants Boyle and Fear state that the allegations buttressing Buckley's deepening insolvency claim satisfy both prongs of the imputation test. In response, Buckley argues that because the *in pari delicto* doctrine is an affirmative defense, the court should not consider the issue on a motion to dismiss. Further, Buckley contends that if the court reached the merits of whether *in pari delicto* is applicable, the court should find imputation inappropriate because the second prong of [*24] the imputation test is not met.

It is generally true that an affirmative defense should not be used to dismiss a plaintiff's complaint under Rule 12(b)(6). *In re Adams Golf, Inc. Secs. Litig.*, 381 F.3d 267, 277 (3d Cir. 2004). That being said, in *Lafferty*, the Third Circuit did affirm a district court's dismissal of a deepening insolvency claim on the basis of the *in pari delicto* doctrine, which the Circuit acknowledged as an affirmative defense. *Lafferty* and *Adams Golf*, however, are not necessarily in conflict. Indeed, dismissal is only appropriate when the plaintiff can prove *no set of facts* that would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957) (emphasis added). In this case, Buckley disputes that the criteria for imputation is met. Specifically, Buckley invokes the adverse interest exception, which provides that fraudulent conduct will not be imputed to the corporation if the fraud was not "for the benefit of the corporation." *Lafferty*, 267 F.3d at 359. As Judge Cowen observed in his *Lafferty* dissent, "an equitable doctrine like *in pari delicto* is highly sensitive to the facts [*25] and readily adapted to achieve equitable results." *Lafferty*, 267 F.3d at 362. Simply put, the court finds it premature to bar Buckley's deepening insolvency claim on *in pari delicto* grounds. While it may eventually come to pass that the defense will prevail, the determination will be made on further development of the facts. After considering the pleadings and the positions of the parties,

the court is not satisfied that Buckley is unable to prove any facts that would entitle the DVI Liquidating Trust to relief for deepening insolvency.

### 3. Applicability of the Business Judgment Rule

In Delaware, there is no general duty to liquidate an insolvent company. *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168 (Del. Ch. 2004). Similar to the application of the business judgment rule in the fiduciary duty context discussed earlier, it would be harsh to judge the actions of corporate officers and directors, in hindsight, for a failed good-faith attempt to bring a company out of insolvency. Allegations of bad faith, however, also make recovery for deepening insolvency possible under Delaware law. *RSL COM Primecall, Inc. v. Beckoff (In re RSL COM Primecall, Inc.)*, Nos. 01-11457 through 01-11469, 03-2176, 2003 Bankr. LEXIS 1635, 2003 WL 22989669 at *8 (Bankr. S.D.N.Y. December 11, 2003). [*26] If bad faith is alleged, prolongation of operations would "smack of self-dealing, constitute a breach of fiduciary duty, and open up recovery under the theory of deepening insolvency." *In re Global Service Group LLC*, 316 B.R. 451, 465 (Bankr. S.D.N.Y. 2004) (requiring a complaint to allege bad faith or fraudulent intent as opposed to mere bad judgment).

As the court has already concluded, Buckley's complaint makes sufficient allegations of bad faith. Buckley stated that, rather than attempting in good faith to revive DVI and avoid liquidation, the defendants disguised the true nature of DVI's finances to obtain more funding with no expectation that such funding would restore DVI to solvency. (D.I. 1, P 68.) One can reasonably infer that such activities extend beyond the mere exercise of poor judgment, deemed insufficient in *Global Service*. The court finds that, based on the pleadings, the business judgment rule does not preclude a deepening insolvency claim against the defendants.

### D. Fraud Claim

To state a claim for fraud, a plaintiff must allege [*27] that a defendant made a false statement, knowing or recklessly assuming it to be true, with the intent that plaintiff act or refrain from acting in reliance, that plaintiff justifiably relied, and that plaintiff suffered damages. *Kronenberg v. Katz*, 872 A.2d 568, 585 n.25 (Del. Ch. 2004). Allegations of fraud must be pled with particularity. Fed. R. Civ. P. 9(b). Provided that a plaintiff alleges sufficiently particularized allegations,

there is no *per se* rule that group pleading cannot satisfy Rule 9(b); otherwise, "sophisticated defrauders" could easily conceal their wrongdoing. *MBIA Ins. Corp. v. Royal Indem. Co.*, 221 F.R.D. 419, 421 (D. Del. 2004). The Third Circuit has stated that plaintiffs must plead the circumstances of the alleged fraud such that defendants may be placed on notice; although stating the "date, place, and time" clearly fulfills this requirement, plaintiffs may use any alternative method of "injecting precision and some measure of substantiation" into the allegations of fraud. *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984).

In *Asbestemps, Inc. v. Diversified Energy* [*28] *Group, Inc.*, allegations that defendants represented a corporation as fiscally sound to persuade another company to provide labor were not made verbatim, nor were the time and place identified, but the court found that fraud was properly pled. No. 87-2623, 1987 U.S. Dist. LEXIS 8082, 1987 WL 16662 (E.D. Pa. Sept. 9, 1987). Plaintiffs need only provide sufficient factual specificity to provide assurance that they have investigated the alleged fraud and reasonably believe that a wrong has occurred. *Tracinda Corp. v. DaimlerChrysler AG*, 197 F. Supp. 2d 42, 54 (D. Del. 2002). For example, even absent allegations with respect to the exact factual context or words, a description of the nature and subject matter of the representation was found to be enough in *CFTC v. American Metal Exch.*, 693 F. Supp. 168, 190 (D.N.J. 1988).

Buckley sufficiently alleges the elements of fraud: that defendants O'Hanlon, Garfinkel, and Miller knowingly misrepresented DVI's financial situation, with the intent to obtain unjustifiable credit, that DVI and its creditors relied on this misinformation, and that it suffered damages to the extent of bankruptcy. As in *CFTC*, Buckley's complaint [*29] describes the nature and subject matter of the alleged fraud by asserting that the three defendants intentionally concealed a number of improper accounting practices, ceased normal account

monitoring practices, and diverted millions of dollars from DVI when DVI could least afford it. Although Buckley does not state specific dates and places regarding the allegedly fraudulent actions, as in *Asbestemps*, Buckley sufficiently explained the role each defendant (or in some instances, the three defendants acting together) played in each allegedly fraudulent practice in enough detail to satisfy the "injecting precision" standard enunciated in *Seville*.

## V. CONCLUSION

Buckley does not have standing to pursue any claims on behalf of the creditors. As such the court will grant the defendants' motions to dismiss to the extent that they seek relief on behalf of the creditors. The court will deny the defendants' motions to dismiss claims brought on behalf of the debtors.

Dated: March 28, 2007

/s/ Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

## ORDER

For the reasons set forth in the court's memorandum issued contemporaneously herewith, IT IS HEREBY ORDERED that:

[*30]  1. The Defendants' Motions to Dismiss (D.I. 23, 25, 26, 28, 30, 32, 34, and 36) are hereby GRANTED IN PART and DENIED IN PART.

2. The Plaintiff's Motion for Leave to File an Omnibus Brief (D.I. 48) is GRANTED.

Dated: March 28, 2007

/s/ Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

# EXHIBIT C

LEXSEE 2000 DEL. CH. LEXIS 144

**ARLENE ASH, NOEL SAITO, KIMBERLY MADAJCZYK and SYDNEY H. DALMAN, Plaintiffs, v. CHARLES W. McCALL, MARK A. PULIDO, RICHARD H. HAWKINS, HEIDI E. YODOWITZ, ALFRED E. ECKERT III, TULLY M. FRIEDMAN, ALTON F. IRBY III, M. CHRISTINE JACOBS, GERALD E. MAYO, JAMES V. NAPIER, DAVID S. POTTRUCK, CARL E. REICHARDT, ALAN SEELENFREUND and JANE E. SHAW, Defendants, and McKESSON HBOC, INC., Nominal Defendant.**

**Civil Action No. 17132**

**COURT OF CHANCERY OF DELAWARE, NEW CASTLE**

*2000 Del. Ch. LEXIS 144*

**March 15, 2000, Date Submitted**
**September 15, 2000, Date Decided**

**SUBSEQUENT HISTORY:**    [*1] Released for Publication by the Court October 13, 2000.

**DISPOSITION:**    Plaintiffs' due care and waste claims are dismissed, and plaintiffs' first and second oversight claims are dismissed without prejudice.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendants filed motion to dismiss, for failure to make Del. Ch. Ct. R. 23.1 pre-suit demand, lack of standing, and failure to plead particularized facts, plaintiffs' derivative suit which asserted failure to exercise due care, waste, and negligent oversight where pre-merger financial improprieties in the records of one party to a merger were disclosed and addressed after the merger.

**OVERVIEW:** Plaintiffs brought a shareholder derivative suit against defendant directors and officers of a corporation created of the merger of two healthcare companies, without first making a Del. Ch. Ct. R. 23.1 pre-suit demand on the board of directors. Plaintiffs filed claims based on accounting improprieties in the pre-merger records of the bought out company, which were disclosed and addressed by the newly constituted board after the merger. The court dismissed the due care and waste claims, which derived from the decision to merge, for plaintiff's failure to demonstrate the futility of a pre-suit demand. A majority of the defendants were not shown to have material self interest in the merger and the defendants' reliance on expert advisors was not shown to be other then valid exercise of business judgment. The court dismissed both of plaintiffs' oversight claims without prejudice. None of the plaintiffs had standing to raise the issue of failure to oversee financial reporting in the years preceding the merger and plaintiffs failed to allege facts to show that defendants' actions to cure the improprieties when they were discovered shortly after the merger were negligent oversight.

**OUTCOME:** Plaintiffs' due care and waste claims were dismissed for failure to make pre-suit demand on defendants. Plaintiffs' oversight claims were dismissed without prejudice, and plaintiffs were granted leave to replead and allege the additional facts necessary to prove the futility of a pre-suit demand and to establish standing.

**CORE TERMS:** merger, accounting, oversight, shareholder, derivative, irregularities, combined, diligence, particularized, pre-merger, stock, subsidiary, good faith, pre-suit, business judgment, reasonable doubt, red flags, earnings, stockholder, fiduciary, audit, board of directors, announced, senior, actual knowledge, duty of care, impropriety, futility, futile, post-merger

**LexisNexis(R) Headnotes**

2000 Del. Ch. LEXIS 144, *1

*Business & Corporate Law > Corporations > Shareholders > Actions Against Corporations > General Overview*
*Civil Procedure > Class Actions > Derivative Actions > Demand Requirement*
[HN1] A shareholder's right to bring a derivative action does not arise until he has made a demand on the board of directors to institute such an action directly, such demand has been wrongfully refused, or until the shareholder has demonstrated, with particularity, the reasons why pre-suit demand would be futile. Del. Ch. Ct. R. 23.1.

*Business & Corporate Law > Corporations > Shareholders > Actions Against Corporations > General Overview*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
[HN2] In considering a motion to dismiss under Del. Ch. Ct. R. 23.1, as in the case of a Del. Ch. Ct. R. 12(b)(6) motion to dismiss, the court confines its attention to the face of the complaint and accepts all well-pled allegations of fact as true. To survive a motion to dismiss under Rule 23.1, however, a plaintiff must plead with particularity the reasons why pre-suit demand would have been futile.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > General Overview*
*Business & Corporate Law > Corporations > Shareholders > Actions Against Corporations > General Overview*
*Civil Procedure > Class Actions > Derivative Actions > Demand Requirement*
[HN3] Pre-suit demand as required in a shareholder derivative suit under Del. Ch. Ct. R. 23.1 is excused if the shareholder alleges, with particularity, facts sufficient to create a reasonable doubt that (1) a majority of the directors are disinterested and independent, or (2) the challenged transaction is otherwise the product of the directors' valid exercise of business judgment.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Defenses > General Overview*
*Business & Corporate Law > Corporations > Shareholders > Actions Against Corporations > General Overview*
[HN4] If a plaintiff can raise a reasonable doubt that a

majority of directors was disinterested or capable of exercising independent business judgment with respect to the transaction in question, the pre-suit demand requirement under Del. Ch. Ct. R. 23.1 is generally excused. A director is considered interested where he receives a personal financial benefit that is not equally shared by the stockholders. A disabling conflict of interest is also said to exist when a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders.

*Business & Corporate Law > Corporations > Shareholders > Actions Against Corporations > General Overview*
[HN5] Conclusory allegations of domination and control are insufficient to excuse pre-suit demand under Del. Ch. Ct. R. 23.1: in the demand futile context a plaintiff charging domination and control of one or more directors must allege particularized facts manifesting a direction of corporate conduct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling. The shorthand shibboleth of "dominated and controlled directors" is insufficient.

*Business & Corporate Law > Corporations > Shareholders > Actions Against Corporations > General Overview*
*Civil Procedure > Judgments > General Overview*
[HN6] Although it is indeed axiomatic that a corporate act cannot be a product of sound business judgment and also constitute waste, allegations of waste must nonetheless comply with Del. Ch. Ct. R. 23.1 demand requirements. To excuse demand on grounds of corporate waste, plaintiffs must allege particularized facts that the consideration received by the corporation was so inadequate that no person of ordinary sound business judgment would deem it worth that which the corporation has paid. Put another way, plaintiffs must show that the merger in question either served no corporate purpose or was so completely bereft of consideration that it effectively constituted a gift.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > General Overview*
[HN7] The relevant time to measure whether a corporate board committed waste is at the time they entered into and approved the transaction.

2000 Del. Ch. LEXIS 144, *1

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > General Overview*
*Business & Corporate Law > Foreign Businesses > General Overview*
[HN8] Substantive due care is a concept that is foreign to the business judgment rule. Due care in the decision making context is process due care--whether the board was reasonably informed of all material information reasonably available at the time it made its decision.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > General Overview*
*Business & Corporate Law > Corporations > Directors & Officers > Scope of Authority > Discretion*
*Business & Corporate Law > Mergers & Acquisitions > Takeovers & Tender Offers > Duties & Liabilities of Directors & Officers*
[HN9] Directors of Delaware corporations quite properly delegate responsibility to qualified experts in a host of circumstances. One circumstance is surely due diligence review of a target company's books and records. To delegate this assignment is not an abdication of duty.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > General Overview*
[HN10] A board of directors is entitled to the presumption that it exercised proper business judgment, including proper reliance on experts. That presumption may be rebutted with particularized facts creating reason to believe that the board's conduct was grossly negligent. That is, plaintiffs must allege particularized facts (in contrast with conclusions) that, if proved, would show that (1) the directors in fact did not rely on the expert, or (2) that their reliance was not in good faith, or (3) that they did not reasonably believe that the experts' advice was within the experts' professional competence, or (4) that the directors were at fault for not selecting experts with reasonable care, or (5) that the issue was so obvious that the board's failure to detect it was grossly negligent regardless of the experts' advice, or (6) that the board's decision was so unconscionable as to constitute waste or fraud.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities >*

*General Overview*
[HN11] Mere allegations that directors made a poor decision--absent some showing of self-dealing or suspect motivation--does not state a cause of action, much less meet the standard for excusing demand. When the challenged transaction was approved by a board composed of a majority of independent, disinterested directors, a heavy burden falls on plaintiffs to avoid pre-suit demand by challenging the directors' fulfillment of their duty of care.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > General Overview*
*Business & Corporate Law > Corporations > Shareholders > Actions Against Corporations > General Overview*
[HN12] In determining whether a shareholder complaint creates any doubt that directors used due care in approving a merger, the court considers whether the directors: (i) informed themselves of available critical information before approving the transaction; (ii) considered expert opinion; (iii) provided all board members with adequate and timely notice of the transaction before the full board meeting and of its purpose; or (iv) inquired adequately into the reasons for or terms of the transaction.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > General Overview*
[HN13] In the oversight context, where the board has not yet made a decision, demand under Del. Ch. Ct. R. 23.1 is excused only when the complaint contains particularized facts creating a reasonable doubt that a majority of the directors would have been independent and disinterested when considering the demand. Directors who are sued for failure to oversee subordinates have a disabling interest for pre-suit demand purposes when the potential for liability is not a mere threat but instead may rise to a substantial likelihood.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > General Overview*
[HN14] Where directors are sued derivatively because they have failed to do something (such as a failure to oversee subordinates), Del. Ch. Ct. R. 23.1 demand

2000 Del. Ch. LEXIS 144, *1

should not be excused automatically in the absence of allegations demonstrating why the board is incapable of considering a demand. Indeed, requiring demand in such circumstances is consistent with the board's managerial prerogatives because it permits the board to have the opportunity to take action where it has not previously considered doing so.

*Business & Corporate Law > Corporations > Shareholders > Actions Against Corporations > Derivative Actions > General Overview*
*Civil Procedure > Class Actions > Derivative Actions > General Overview*
[HN15] *Del. Code Ann. tit. 8, § 327* requires a shareholder plaintiff asserting derivative claims to allege that he was a stockholder of the corporation at the time of the transaction of which he complains. In addition to this statutory requirement, it is also settled law in Delaware that a derivative plaintiff must be a stockholder at the time he commences suit and must maintain such stockholder status throughout the course of the litigation. This is known as the continuous ownership requirement.

*Business & Corporate Law > Corporations > Shareholders > Actions Against Corporations > General Overview*
*Civil Procedure > Class Actions > Derivative Actions > General Overview*
[HN16] It is settled Delaware law that once a plaintiff ceases to be a shareholder, whether by reason of a merger or for any other reason, he loses standing to continue a derivative suit.

*Business & Corporate Law > Mergers & Acquisitions > Mergers > General Overview*
*Contracts Law > Types of Contracts > Choses in Action*
[HN17] *Del. Code Ann. tit. 8, § 259(a)* provides that all rights, privileges, powers and franchises pass to the surviving corporation in the event of a merger. Derivative claims of the merged corporation constitute choses in action that pass to the surviving corporation by operation of *§ 259(a)*.

*Business & Corporate Law > Mergers & Acquisitions > Mergers > General Overview*
*Civil Procedure > Justiciability > Standing > General Overview*

*Civil Procedure > Class Actions > Derivative Actions > General Overview*
[HN18] The two exceptions to the apparently iron-clad rule that a shareholder of a merged entity loses standing to assert pre-merger derivative claims are (i) if the merger itself is the subject of a claim of fraud or (ii) if the merger is in reality merely a reorganization which does not affect plaintiffs ownership in the business enterprise. This second exception to the standing rule does not apply to mergers with outside or pre-existing corporations with substantial assets.

*Business & Corporate Law > Corporations > Shareholders > Actions Against Corporations > General Overview*
*Business & Corporate Law > Mergers & Acquisitions > General Overview*
*Civil Procedure > Class Actions > Derivative Actions > Ownership Requirement*
[HN19] Delaware courts have rejected the U.S. Court of Appeals, Third Circuit's holding that the combination of a direct pre-merger equity interest (in the subsidiary) and a direct but diluted post-merger equity interest (in the surviving corporation) is sufficient to meet the common law continuous ownership requirement necessary to prosecute pre-merger derivative claims. The Third Circuit's view--that the plaintiff shareholders' continuing economic interest in the subsidiary and thereafter in the parent does not give rise to the concern expressed in *Del. Code Ann. tit. 8, § 327*-- is not the law in Delaware.

**COUNSEL:** Pamela S. Tikellis, Robert J. Kriner, Jr., and Timothy R. Dudderar, of CHIMICLES & TIKELLIS LLP, Wilmington, Delaware, Attorneys for Plaintiffs.

Joel Friedlander, of BOUCHARD MARGULES & FRIEDLANDER, Wilmington, Delaware; OF COUNSEL: Samuel R. Miller, of FOLGER LEVIN & KAHN LLP, San Francisco, California, Attorneys for the Former HBOC Outside Directors.

Anthony W. Clark and Paul J. Lockwood, of SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; OF COUNSEL: Jonathan J. Lerner, of SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, New York, New York, and James E. Lyons, of SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, San Francisco, California, Attorneys for McKesson HBOC, Inc.

2000 Del. Ch. LEXIS 144, *1

Alan J. Stone and Jessica Zeldin, of MORRIS, NICHOLS, ARSHT & TUNNELL, Wilmington, Delaware; OF COUNSEL: Karen Steinberg Kennedy, of PAUL, WEISS, RIFKIND, WHARTON & GARRISON, New York, New York, Attorneys for Defendant Charles W. McCall.

Grover C. Brown, of GORDON, FOURNARIS & MAMMARELLA, P.A., [*2] Wilmington, Delaware, Attorney for Defendants Tully M. Friedman, David S. Pottruck, Carl E. Reichardt, Alan Seelenfreund and Jane E. Shaw.

Michael D. Goldman, of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware, Attorney for Defendant Mark A. Pulido.

**JUDGES:** William B. Chandler, Chancellor.

**OPINION BY:** William B. Chandler

**OPINION**

MEMORANDUM OPINION

CHANDLER, Chancellor

Shareholder plaintiffs Arlene Ash, Noel Saito, Kimberly Madajczyk and Sydney H. Dalman assert derivative claims on behalf of McKesson HBOC, Inc. ("McKesson HBOC" or the "Company"), a Delaware corporation, which was formed through the merger of McKesson Corporation ("McKesson") and HBOC & Co. ("HBOC") on January 12, 1999. Approximately 3 1/2 months after McKesson's acquisition of HBOC became effective, McKesson HBOC issued the first of what appears to be three downward revisions of revenues, earnings, net income, and other financial information, for financial years 1996-1998. The complaint generally asserts claims related to these revisions. Pending before me is defendants' motion to dismiss.

Ordinarily, I would summarize here the complaint's allegations. In this instance, however, plaintiffs have filed a complaint [*3] without specifying their causes of action, despite having twice amended it. The complaint does not enumerate specific counts, nor does it present claims in any other readily discernable manner. Although the complaint is generously laden with conclusory allegations that "the facts described herein constitute breaches of directors' duties of good faith, care and loyalty," plaintiffs decline to connect the facts of the complaint with specific claims of wrongdoing.

Plaintiffs' answering brief, however, does suggest several claims, some of which appear to be based on alleged violations of directors' oversight duties, while others are predicated exclusively on alleged fiduciary breaches in connection with McKesson's due diligence investigation of HBOC in the course of the merger process. I will briefly describe plaintiffs' claims now, restating them later with the specificity that I believe necessary to rule on the pending motion.

Generally, plaintiffs allege that the directors of HBOC and McKesson HBOC failed to exercise proper oversight of the companies' financial reporting process so as to prevent accounting improprieties; that the McKesson directors breached their duty of care in the [*4] course of investigating HBOC's books and records before the merger; and, finally, that McKesson's acquisition of HBOC constituted an act of corporate waste.

Twelve of the fourteen individual defendants named in this lawsuit comprised McKesson HBOC's full board of directors when plaintiffs filed their first complaint on April 30, 1999, two days after the Company's first publication of earnings restatements. The remaining two individual defendants were senior executive officers. Defendants have moved to dismiss the complaint in part for lack of standing and otherwise for failure to plead particularized facts warranting exception to the pre-suit demand requirement of Chancery Rule 23.1.

For reasons described more fully below, I grant defendants' motion. I will, however, dismiss plaintiffs' complaint without prejudice, thereby affording plaintiffs an opportunity to gather additional facts and to file a complaint that is legally sufficient.

I. FACTUAL BACKGROUND

*A. The Merger*

HBOC, a Delaware corporation headquartered in Atlanta before the merger, provides computer software and technology solutions to the healthcare industry. McKesson, a Delaware corporation headquartered in San [*5] Francisco, is primarily engaged in the business of healthcare supply management.

2000 Del. Ch. LEXIS 144, *5

Merger discussions between the two companies began in June 1998 when McKesson solicited HBOC's interest in a business combination in order to enter the fast-growing market of software sales to the medical industry. These discussions ripened into due diligence during the first half of July. Shortly thereafter, however, the parties suspended merger talks.

Three months later, in October 1998, discussions resumed when McKesson's Chairman and CEO, Mark Pulido, contacted his counterpart at HBOC, Charles McCall, in order to rekindle interest in a deal. On October 16, McKesson and HBOC announced a definitive merger agreement where McKesson would acquire HBOC in a tax-free, stock-for-stock merger then-valued at approximately $ 14 billion. Under the terms of the agreement, HBOC would merge with a McKesson acquisition subsidiary and HBOC shareholders would receive 0.37 shares of McKesson common stock in exchange for each share of HBOC common stock.

The parties signed the merger agreement on October 18, 1998. On or around November 27, McKesson and HBOC disseminated a joint proxy statement and on January 12, 1999, their [*6] shareholders voted to approve the merger, which became effective on that date. McKesson's name was changed to McKesson HBOC and HBOC, now a wholly owned subsidiary of McKesson HBOC, became the combined Company's health care information technology division.

After the merger, six directors from each pre-merger company comprised the combined Company's board of directors. Five of the six former HBOC directors on the combined Company's board were nonexecutive, outside directors: Alfred E. Eckert III, Alton F. Irby III, M. Christine Jacobs, Gerald E. Mayo, and James V. Napier. The one inside director, Charles W. McCall, was president, CEO, and chairman of HBOC before the merger and chairman of the combined McKesson HBOC, until his removal from the board on June 21, 1999.

Five of the six former McKesson directors on the combined Company's board were also non-executive, outside directors: Tully M. Friedman, David S. Pottruck, Carl E. Reichardt, Alan Seelenfreund, and Jane E. Shaw. Mark A. Pulido, president, CEO, and director of pre-merger McKesson held the same positions at McKesson HBOC after the merger. On June 21, 1999, the Company announced Pulido's resignation.

*B.    McKesson    HBOC's    [*7]    Accounting Restatements*

On April 28, 1999, McKesson HBOC announced that in connection with its year-end audit, DeLoitte & Touche ("DeLoitte"), the Company's auditor, discovered improperly recorded revenue for the financial year ending March 31, 1999. According to Company press releases, DeLoitte discovered the improprieties by mailing surveys to customers that purportedly bought HBOC software products. When DeLoitte compared the results to the Company's books, it became apparent that many sales had been improperly recorded. McKesson HBOC's share price fell by over $ 31, nearly half of its value, on the afternoon of the announcement.

In May 1999, the Company announced that more revisions would be made to earnings. Two months later, with its internal investigations concluded, the Company announced that it would have to make a further restatement covering the two previous financial years to correct for improperly recorded revenue. In all, McKesson HBOC had to disallow $ 327.4 million of revenue and $ 191.5 million of operating income.

All of the earnings overstatements, disclosed by the Company between April and July 1999, are attributable to HBOC. It appears that HBOC began overstating [*8] earnings in 1996 and continued to do so until shortly before the board of the combined McKesson HBOC first disclosed such overstatements on April 28, 1999, approximately 3 1/2 months after the McKesson/HBOC merger closed on January 12, 1999.

The bulk of the accounting irregularities, according to the complaint, stem from the decision of HBOC senior executives (and their subordinates) to book contingent gales as final sales, both before and after the merger with McKesson. These sales remained contingent, say plaintiffs, because they were made containing "side letters" providing for rights of return and, thus, not properly booked as revenue under applicable accounting standards. The complaint also alleges that senior HBOC executives (and their subordinates) backdated sales contracts so that revenues could be falsely reported as having occurred in an earlier period.

*C. Lawsuits Mount and House Cleaning Begins*

Shortly after the first round of earnings restatements, over twenty law firms announced that they had been

retained by McKesson HBOC shareholders to investigate and file class action lawsuits for violations of federal securities laws against the Company and certain of the [*9] individual defendants named in this lawsuit, among others. Defendants report that over seventy-five class action, derivative, and individual lawsuits have been filed in connection with these events at McKesson HBOC. Additionally, the U.S. Attorney for the Northern District of California and the SEC have launched investigations of the Company.

On June 21, 1999, McKesson HBOC announced that its board of directors would fire defendant McCall and remove him as chairman, and that defendant Pulido would tender his resignation as president, director, and CEO. The Company also announced the resignation of defendant Richard H. Hawkins, executive vice president and chief financial officer. Pulido's and Hawkins' resignations became effective July 15, 1999.

The board of directors also fired several senior executives of the Company's information technology subsidiary (formerly HBOC) including Albert Bergonzi (president and chief operating officer), David Held (controller and chief financial officer), Jay Lapine (senior vice president, general counsel, and secretary), and Michael Smeraski (senior vice president of sales). Contemporaneous with these terminations, the board of directors appointed [*10] new executive management for McKesson HBOC; John H. Hammergren and David L. Mahoney, previously executive vice presidents of the Company, were appointed co-CEO's and elected to the board.

### D. The "Red Flags"

Plaintiffs' overarching litigation theory, as articulated in their answering brief, is that "the directors of McKesson, HBOC and McKesson HBOC failed to institute and maintain appropriate financial controls and recommended the merger based upon a recklessly inadequate investigation in the face of clear warnings of accounting improprieties at HBOC." [1]

    1 Plaintiffs' Brief at 1.

These "clear warnings" or "red flags" are the linchpin of plaintiffs' liability theory. Plaintiffs point to four "red flags" that HBOC senior officers and directors, and McKesson's board and management team (presumably in the course of due diligence), allegedly

disregarded with some degree of culpability ranging from inattention to actual knowledge.

The first of these "red flags" occurred in January 1997 when *Bloomberg,* [*11] a financial news company, published a short article questioning HBOC's accounts receivable and near-term growth. Nothing more is alleged about this article.

The second "red flag" occurred three months later in April 1997 when the Center for Financial Research & Analysis, Inc. ("CFRA"), an organization that researches and publishes reports (primarily for institutional investors) relating to financial and accounting issues of public corporations, issued a report on HBOC observing, among other things, that its balance of receivables had surged upward in recent periods. [2] The report was mailed to CFRA clients on or about April 15, 1997.

    2 Complaint Ex. A.

On April 17 and 18, 1997, *The Atlanta Constitution* reported that on April 15, HBOC's stock price had declined nearly 8% on market speculation that the CFRA report criticized HBOC's accounting practices. [3] *The Atlanta Constitution* also reported that several industry analysts, who publicly commented on the CFRA report, expressed doubt that it had [*12] identified any significant problem at HBOC, citing the Company's "strong fundamentals."

    3 Complaint Exs. C and D.

Several analysts took the extraordinary step of publishing special reports contesting the CFRA analysis point by point. An HBOC spokesperson stated that the report "doesn't warrant comment." Following these reassurances, HBOC's stock price rebounded to nearly pre-CFRA report levels.

Indefatigable (and apparently correct), on August 19, 1998, CFRA issued a second report critical of HBOC's revenue recognition procedures. CFRA published this report, the third "red flag," approximately sixteen months after the first report and two months before McKesson and HBOC signed their merger agreement. [4] Based upon a review of HBOC's public filings, CFRA reported, among other things, that HBOC's operations "may be deteriorating, as partially evidenced by a high and generally growing level of receivables relative to revenue." CFRA also observed that cash flows from

operations trailed significantly behind [*13] net income in the first two quarters of calendar year 1998.

#### 4  Complaint Ex. B.

The final alleged "red flag" flew on or around November 13, 1998, when HBOC announced that Jay Gilbertson, chief financial officer, president, and chief operating officer, would leave the company. Plaintiffs argue that "despite this clear signal of financial impropriety neither HBOC, McKesson, nor McKesson HBOC discovered and/or reported the fundamental accounting irregularities that were overstating HBOC's (and thereafter McKesson HBOC's's) sales and revenue." [5]

#### 5  Complaint at P40.

## II. CONTENTIONS OF THE PARTIES

Plaintiffs have not set forth claims, based on the above-summarized facts, with particularity. As noted previously, the complaint does not enumerate specific counts; nor does it present plaintiffs' claims in any other readily discernable [*14] manner. Despite its ambiguity, the complaint, read liberally but fairly, seems to raise four claims.

Plaintiffs' first two claims can be distilled into a due care claim and a waste claim. The due care claim alleges that the directors of McKesson and the directors of HBOC breached their duty of care by failing to inform themselves of all reasonably available material information before deciding to enter into, and recommend, the merger. Put another way, plaintiffs contend that the directors breached their duty of care by failing to detect HBOC's accounting irregularities during the course of due diligence investigations performed in connection with the merger. Although this claim more logically applies to the McKesson directors, plaintiffs seem to insist that it is equally applicable to the HBOC directors.

Plaintiffs assert their waste claim against the McKesson directors. They contend that the McKesson directors' decision to enter into and recommend the merger to McKesson's shareholders constituted an act of corporate waste. That is, plaintiffs contend that the McKesson director's decision to exchange properly valued McKesson shares for overvalued HBOC shares amounts to waste.

Plaintiffs' [*15] second set of claims addresses the less often visited issue of a board's oversight duty, a subset of the duty of care, but also potentially raising issues of directors' good faith. Plaintiffs first contend that the directors of HBOC failed to monitor adequately the company's financial reporting in order to ensure compliance with applicable federal laws and regulations for approximately a two-year period preceding the merger (the "First Oversight Claim"). Plaintiffs next maintain that the directors of McKesson HBOC failed to do the same for a three-and-one-half month period after the merger (the "Second Oversight Claim").

Defendants argue that this action must be dismissed for two reasons. First, and primarily, defendants seek dismissal under Chancery Rule 23.1 on the ground that plaintiffs have not made a pre-suit demand on the board of directors and have not alleged particularized facts establishing that demand would be futile. Second, defendants argue that none of the named derivative plaintiffs have proper standing to assert the First Oversight Claim *(i.e.,* the claim that HBOC directors breached fiduciary duties in failing to uncover and cure accounting irregularities before [*16] the merger).

## III. ANALYSIS

Though all four of plaintiffs' claims generally assert duty of care breaches, I believe it is sensible to analytically separate the due care and waste claims, brought in connection with the merger transaction, from the two oversight claims, which do not challenge a specific board action or decision. I do so primarily because the demand futility analysis for oversight claims differs from demand futility analysis for due care and waste claims.

### A. Demand Futility Standard for the Due Care and Waste Claims

[HN1] A shareholder's right to bring a derivative action does not arise until he has made a demand on the board of directors to institute such an action directly, such demand has been wrongfully refused, or until the shareholder has demonstrated, with particularity, the reasons why pre-suit demand would be futile. [6] Here, plaintiffs contend demand would be futile and, thus, should be excused.

#### 6  Court of Chancery Rule 23.1.

[HN2]

In considering a motion to dismiss under Chancery Rule [*17] 23.1, as in the case of a Rule 12(b)(6) motion to dismiss, the Court confines its attention to the face of the complaint and accepts all well-pled allegations of fact as true. To survive a motion to dismiss under Rule 23.1, however, a plaintiff must plead with particularity the reasons why pre-suit demand would have been futile. [7]

> 7    See id; see also Grimes v. Donald, Del. Supr., 673 A.2d 1207, 1213 (1996).

Plaintiffs' due care and waste claims arise in connection with an affirmative business decision made by a board of directors. Accordingly, I will analyze demand futility under the two-prong test set forth by the Delaware Supreme Court in Aronson v. Lewis. [8] [HN3] Under Aronson, pre-suit demand is excused if the shareholder alleges, with particularity, facts sufficient to create a reasonable doubt that (1) a majority of the directors are disinterested and independent, or (2) the challenged transaction is otherwise the product of the directors' valid exercise of business judgment. [*18] [9]

> 8    Del. Supr., 473 A.2d 805, 814 (1984).
> 9    Id. at 814.

I. Are the Director Defendants Disinterested and Independent?

[HN4] If a plaintiff can raise a reasonable doubt that a majority of directors was disinterested or capable of exercising independent business judgment with respect to the transaction in question, the pre-suit demand requirement is generally excused. A director is considered interested where he receives a personal financial benefit that is not equally shared by the stockholders. [10] A disabling conflict of interest is also said to exist when a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders. [11]

> 10    See Aronson v. Lewis, 473 A.2d at 812.
> 11    Rales v. Blasband, Del. Supr., 634 A.2d 927, 936 (1993).

[*19] In this case, plaintiffs allege that defendants Pulido and McCall, the "masterminds" of the merger, received certain unique benefits upon consummation of the transaction. Specifically, plaintiffs allege Pulido held

1.49 million non-vested options to acquire McKesson common stock as well as 40,000 shares of restricted McKesson common stock. Upon consummation of the merger, these stock options vested and these restrictions lapsed. Moreover, upon consummation of the merger, defendant McCall became entitled to the maximum amount payable under a McKesson bonus plan--$ 47,600.

While not conceding that these facts render Pulido or McCall interested in the merger, defendants observe that the absence of any particularized allegations of fact indicating that any of the remaining ten directors were interested in the merger makes Pulido's and McCall's alleged interest legally irrelevant. Not the case, counter plaintiffs, arguing that Pulido and McCall "dominated" the other directors. Specifically, paragraphs 71 and 72 of the complaint provide:

> 71. "The six former HBOC Directors lack the independence to impartially respond to the within shareholder demand due to their loyalty to, [*20] and domination by, their former Chairman defendant McCall who exerted during his tenure on the Board, and still exerts, such influence and control over these directors."

> 72. "The six former McKesson Directors lack the independence to impartially respond to the within shareholder demand due to their loyalty to, and domination by, defendant Pulido and now also defendant McCall who exerts such significant control and influence over them as to render them unobjective."

Nowhere to be found in the pleadings or plaintiffs' opposition brief, however, are particularized facts supporting the conclusory allegations annexed above. [HN5] Under the very clear guidance of the Aronson Court, conclusory allegations of domination and control are insufficient to excuse pre-suit demand:

> "in the demand futile context a plaintiff charging domination and control of one or more directors must allege particularized facts manifesting a 'direction of corporate

conduct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling.' The shorthand shibboleth of 'dominated and controlled directors' is insufficient." [12]

Plaintiffs have not made [*21] a single factual allegation that ten of twelve board members, all of whom were non-management, outside directors, had any material self-interest in the merger. Nor have they alleged particularized facts that would establish that Pulido or McCall--the two allegedly interested directors--dominated the ten non-management, outside directors, neutralizing their ability to make a good faith judgment with respect to the merger transaction. [13]

> [12]   *Aronson v. Lewis*, 473 A.2d at 816 (quoting *Kaplan v. Centex, Del. Ch., 284 A.2d 119, 123 (1971)*.
> [13]   *See, e.g., Haber v. Bell, Del. Ch., 465 A.2d 353, 358 (1983)* (dismissing suit for failure to make demand where only two of thirteen directors were alleged to have material interest in decision).

In short, plaintiffs have not alleged a single fact in support of their domination theory and, as Delaware courts have repeatedly observed, such assumptions will not be made in the context of pre-suit demand. Consequently, pre-suit demand [*22] is not excused under *Aronson's* first prong based on plaintiffs' unadorned, conclusory allegation that a majority of director defendants' were interested in the merger or not independent of allegedly interested parties). [14]

> [14]   Although McCall's removal and Pulido's resignation from the McKesson HBOC board post-date the filing of the first derivative complaint, these events surely belie plaintiffs naked assertion that McCall and Pulido dominated the board of either the premerger or post-merger companies.

2. Is There a Reasonable Doubt that Approval of the Merger was the Product of a Valid Exercise of Business Judgment?

Under *Aronson's* second prong, the Court must determine whether the complaint raises a reasonable doubt that the "directors exercised proper business judgment in the transaction." [15] In this instance, the second prong of the *Aronson* test addresses the waste

claim (purchase terms) and due care claim (informed decisions). I will first consider the waste claim leveled against [*23] former McKesson directors.

> [15]   *Grobow v. Perot, Del. Supr., 539 A.2d 180, 189 (1988).*

a. The Waste Claim

[HN6] Although it is indeed axiomatic that a corporate act cannot be a product of sound business judgment and also constitute waste, allegations of waste must nonetheless comply with Rule 23.1 demand requirements. To excuse demand on grounds of corporate waste, plaintiffs must allege "particularized facts that the consideration received by the corporation was 'so inadequate that no person of ordinary sound business judgment would deem it worth that which the corporation has paid.'" [16] Put another way, plaintiffs must show that the merger in question either served no corporate purpose or was so completely bereft of consideration that it effectively constituted a gift. [17]

> [16]   *Benerofe v. Cha, 1996 Del. Ch. LEXIS 115, *23*, Del. Ch., C.A. No. 14614, Chandler, V.C. (Sept. 12, 1996) (quoting *Grobow, 539 A.2d at 189*).

[*24]

> [17]   *See In re 3Com Shareholders Litig., 1999 Del. Ch. LEXIS 215, *12*, Del. Ch., C.A. No. 16721, Steele, V.C. (Oct. 25, 1999) (citing *Lewis v. Vogelstein, Del. Ch., 699 A.2d 327, 336 (1997))*.

Paragraph 32 of the complaint states that McKesson acquired HBOC "to enter the fast-growing business of software sales to the healthcare industry." Evidently, plaintiffs concede that the merger had a perfectly sensible corporate purpose.

It is paragraph 28 of the complaint, however, upon which plaintiffs center their waste claim. There, they quote an analyst from Warburg Dillon Read, an investment bank, who shortly after the Company's first round of corrective disclosures, purportedly stated that 'the marketplace is basically valuing HBOC as zero.' [18] On the strength of one analyst's hyperbole, made in some undisclosed and uncited medium, plaintiffs argue that McKesson paid $ 14 billion for something (*i.e.,*HBOC before disclosure of accounting irregularities) that was really worth nothing (*i.e.,* HBOC after disclosure of

accounting irregularities). This, argue plaintiffs, constitutes [*25] waste. I disagree.

18  Complaint P28.

When McKesson exchanged approximately $ 14 billion of its stock for all of HBOC's outstanding stock, the market valued HBOC stock at or around that price. That is, the merger did not appear wasteful when it was entered into, put to a shareholder vote, and approved. The fact that the merger turned out badly or, indeed, abominably for McKesson simply does not and cannot mean that approval of the merger was an act of corporate waste *at the time* the McKesson board entered into it. 19 The facts alleged by plaintiffs do not make out a waste claim and do not demonstrate that the merger was other than a good faith effort to advance corporate interests or the product of a valid business judgment, at the time the board approved the transaction.

19  *See, e.g., Gagliardi v. TriFoods Int'l., Inc., Del. Ch., 683 A.2d 1049, 1051 (1996)* (stating that an "elementary precept of corporation law [holds that] in the absence of facts showing self-dealing or improper motive, a corporate officer or director is not legally responsible to the corporation for losses that may be suffered as a result of a decision that an officer made or that directors authorized in good faith."); *see also Harbor Fin. Partners v. Huizenga, Del. Ch., 751 A.2d 879, 894-895 (1999)*.

[*26] In any event, plaintiffs' argument, in my opinion, fundamentally misapprehends the nature of a waste claim. If Company A exchanges $ 100 for an asset from Company B that Company A believes is worth $ 100, it is not "waste" if it later turns out that Company B's asset was worth only $ 10. Company B may have perpetrated a fraud on Company A or, perhaps, Company A's directors breached their duty of care, but Company A or its directors did not commit "waste."

Plaintiffs are examining a corporate transaction with perfect 20/20 hindsight and declaring that it turned out horribly for McKesson, so horribly that it must be a waste of corporate assets. [HN7] But the relevant time to measure whether the McKesson board committed "waste" is at the time they entered into and approved the transaction. [HN8] To analyze this claim under the waste standard confuses the due care standard with substantive due care--a concept that is foreign to the business

judgment rule. 20 Due care in the decision making context is process due care--whether the board was reasonably informed of all material information reasonably available at the time it made its decision. That is the true nature of plaintiffs' attack on McKesson's [*27] board, to which I turn next.

20  *See Brehm v. Eisner, Del. Supr., 746 A.2d 244 (2000)*.

b. The Due Care Claim

Here lies the heart of the lawsuit against former McKesson directors and, to a lesser extent, former HBOC directors. 21 Plaintiffs contend that the directors missed several "red flags" that should have alerted them to the accounting problems, in the course of full-scale due diligence, before they approved the merger. Plaintiffs then allege that the directors failed to identify the accounting defects, with some degree of mental culpability ranging from actual knowledge to gross recklessness, reckless disregard, just plain recklessness and, finally, gross negligence.

21  I characterize this claim as primarily directed against the McKesson directors because the merger represented something of a windfall to the HBOC shareholders to the extent that the losses borne by HBOC shareholders in connection with the accounting irregularities were serendipitously halved (or thereabout) by virtue of the merger. In other words, because HBOC shareholders received properly valued McKesson stock for their own improperly or, rather, overvalued HBOC stock, and held only a 60% interest in the combined company, as opposed to all of it when the irregularities were disclosed and the stock price plummeted, HBOC shareholders bore only 60% of whatever losses accrued from the accounting irregularities, as opposed to 100%. Former McKesson shareholders, undoubtedly to their chagrin, bore the remaining 40% of the losses. Put more simply, by reducing their ownership interest in the company containing the earnings overstatements from 100% to 60% through the merger, HBOC shareholders reduced their exposure to the overstatements by the same amount.

[*28] The notion that McKesson directors had actual knowledge of HBOC's earnings overstatements

and nonetheless proceeded with the merger finds no support in the amended complaint. Moreover, it is simply illogical to presume that McKesson directors would *knowingly* cause McKesson to acquire a company with significant, undisclosed earnings misstatements. Nothing in the pleadings remotely suggests a reason why McKesson would purposefully buy such a company; nor do the pleadings offer anything by way of explanation--not a single fact or theory that could possibly support such a conclusion. [22]

> [22] Plaintiffs' allegation that HBOC directors proceeded with actual knowledge of accounting irregularities is a more complicated issue. It is more properly addressed in my discussion of plaintiffs' oversight claims, *infra, 2000 Del. Ch. LEXIS 144, *51-56.*

Taking all the facts in the complaint as true, and reading every conceivable inference in plaintiffs' favor, inexorably leads to the conclusion that plaintiffs' claims sound in negligence, [*29] at most. The McKesson board determined that it was in McKesson's strategic interests to enter the healthcare information technology business. It then acted on that objective by pursuing a business combination with HBOC--one of the leading companies in the field. It hired expert accounting and financial advisors to perform due diligence on HBOC--DeLoitte & Touche and Bear Stearns, respectively. After DeLoitte and Bear Stearns completed their due diligence reviews, with the participation of McKesson management, they waived "green flags" to the McKesson board, in effect saying, "This merger is financially and strategically sound." The McKesson directors approved the merger.

Defendants characterize the "red flags" that plaintiffs make so much of as "dated," "obscure," and "inconsequential" relative to the prominent "green flags" given to the directors by the accounting and financial experts who conducted due diligence reviews in advance of the merger. When plaintiffs' "red flags" are juxtaposed with the clean bill of health given by DeLoitte and Bear Stearns after due diligence reviews, the complaint permits one conclusion: that the McKesson directors' reliance on the views expressed [*30] by their advisors was in good faith. What would plaintiffs have the McKesson board do in the course of making an acquisition other than hire a national accounting firm and investment bank to examine the books and records of the target company? Nothing in

the pleadings otherwise casts doubt on the good faith of the McKesson directors. [23]

> [23] If these facts demonstrate anything, it is merely that DeLoitte, Bear Stearns, and McKesson management performed shoddy due diligence. Plaintiffs have not brought claims against any of these parties.

Undaunted by the facts alleged in their own complaint, plaintiffs contend that "there is no authority for defendants' argument that the directors here are entitled to abdicate their duties to their experts." [24] It is, in reality, plaintiffs' argument that is without basis in fact or [HN9] law. Directors of Delaware corporations quite properly *delegate* responsibility to qualified experts in a host of circumstances. [25] One circumstance is surely due diligence review of a [*31] target company's books and records. To delegate this assignment is not an "abdication" of duty. [26]

> [24] Plaintiffs' Brief at 17.
> [25] *8 Del. C. § 141(e).*
> [26] For an excellent description of the due diligence process in the context of a merger, *see generally, A. Lajoux & C. Elson, The Art of M&A Due Diligence* (2000). To conduct due diligence, acquirors typically draw from in-house sources of expertise and from retained outside consultants and advisers. Plaintiffs' Brief at 15.

The complaint here, fairly read, alleges that the McKesson directors were advised by their experts (DeLoitte and Bear Stearns) and that they relied on their expertise in conducting due diligence ancillary to the proposed merger. So the question becomes whether such directors are to be "fully protected" on the basis that they relied in good faith on qualified experts under *8 Del. C. § 141(e).* [HN10] The McKesson board is entitled to the presumption that it exercised proper business judgment, including proper reliance [*32] on experts. Plaintiffs have not rebutted the presumption with particularized facts creating reason to believe that the McKesson board's conduct was grossly negligent. That is, plaintiffs have not alleged particularized facts (in contrast with conclusions), that, if proved, would show that (1) the directors in fact did not rely on the expert, or (2) that their reliance was not in good faith, or (3) that they did not reasonably believe that the experts' advice was within the experts' professional competence, or (4) that the directors were at fault for not selecting experts with reasonable

care, or (5) that the issue (here, alleged accounting deficiencies in HBOC's financial records) was so obvious that the board's failure to detect it was grossly negligent regardless of the experts' advice, or (6) that the board's decision was so unconscionable as to constitute waste or fraud. [27] This complaint is devoid of particularized allegations along these lines and is, therefore, incapable of surviving a motion to dismiss.

> 27 *Brehm v. Eisner, Del. Supr., 746 A.2d 244, 262 (2000).*

[*33] [HN11]

More importantly, this Court has stated on several occasions that mere allegations that directors made a poor decision--absent some showing of self-dealing or suspect motivation--does not state a cause of action, much less meet the standard for excusing demand under the second prong of *Aronson.* [28] When the challenged transaction was approved by a board composed of a majority of independent, disinterested directors, "a heavy burden falls on [plaintiffs] to avoid pre-suit demand" by challenging the directors' fulfillment of their duty of care. [29]

> 28 *See, e.g., Gagliardi, 683 A.2d at 1052* (stating that to "allege that a corporation has suffered a loss as a result of a lawful transaction, within the corporation's powers, authorized by a corporate fiduciary acting in a good faith pursuit of corporate purposes, does not state a claim for relief against that fiduciary no matter how foolish the investment may appear in retrospect.").
> 29 *Grobow, 539 A.2d at 190.*

[*34] [HN12]

In determining whether the complaint creates any doubt that the McKesson directors used due care in approving the merger, the Court considers whether the directors:

> (i) informed themselves of available critical information before approving the transaction; (ii) considered expert opinion; (iii) provided all Board members with adequate and timely notice of the [transaction] before the full Board meeting and of its purpose; or (iv) inquired adequately into the reasons for or terms of [the transaction] .... [30]

Plaintiffs have not alleged facts creating a reasonable doubt that the McKesson directors did not act in accordance with any of these guidelines. Plaintiffs' allegations that directors were less than fully informed of reasonably available material information or that they considered the merger in any other procedurally unsound manner relies entirely on the wisdom of hindsight. The complaint fails to create a reasonable doubt that the informational component of the McKesson directors' decision-making process, measured by the concept of gross negligence, included consideration of all material information reasonably available.

> 30 *Grobow, 539 A.2d at 191.*

[*35] Defendants have also directed the Court's attention to exculpatory charter provisions, enacted under *8 Del. C. § 102(b)(7),* in McKesson's and the combined McKesson HBOC's articles of incorporation. Although the exculpatory provisions serve as adequate independent grounds for dismissing the due care claim, [31] I principally rely on plaintiffs' failure to allege particularized, facts creating a reasonable doubt that the merger, at the time it was entered into, was other than a valid exercise of business judgment.

> 31 To be precise, the plaintiffs' complaint fails to allege adequately either pre-merger or post-merger bad faith or disloyalty by the McKesson or McKesson HBOC boards. Read fairly, this aspect of plaintiffs' complaint, which sounds in negligence and seeks money damages as a remedy, must be dismissed because of the *§ 102(b)(7)* provision. *See In re Frederick's of Hollywood, Inc. Shareholders Litig., 2000 Del. Ch. LEXIS 19, *17-21, Del. Ch., Consol. C.A. No. 15944, Jacobs, V.C. (Jan. 31, 2000); In re Lukens Inc. Shareholders Litig., Del. Ch., 757 A.2d 720, 733-734 (1999).*

[*36] *B. Demand Futility and Standing for Oversight Claims*

The oversight claims do not challenge a director's decision or judgment but, rather, assert that directors failed to properly monitor the corporation they managed. The Delaware Supreme Court modified the demand futility analysis for claims that do not challenge a business decision in *Rales v. Blasband.* [32] [HN13] In the oversight context, where the board has not yet made a

decision, demand is excused only when the complaint contains particularized facts creating a reasonable doubt that a majority of the directors would have been independent and disinterested when considering the demand. [33] Directors who are sued for failure to oversee subordinates have a disabling interest for pre-suit demand purposes when "the potential for liability is not a mere threat but instead may rise to a substantial likelihood." [34]

> 32  Del. Supr., 634 A.2d 927 (1993).
>
> 33  Id. at 934 n.9 ([HN14] stating that "where directors are sued derivatively because they have failed to do something (such as a failure to oversee subordinates), demand should not be excused automatically in the absence of allegations demonstrating why the board is incapable of considering a demand. Indeed, requiring demand in such circumstances is consistent with the board's managerial prerogatives because it permits the board to have the opportunity to take action where it has not previously considered doing so.").

[*37]

> 34  See In re Baxter Int'l., Inc. Shareholders Litig., Del. Ch., 654 A.2d 1268, 1269 (1995) (quoting Rales v. Blasband, 634 A.2d at 936 (internal quotations omitted)).

The odd procedural posture in which this case arises has caused an awkward bifurcation of plaintiffs' oversight claims. Plaintiffs allege that the directors of McKesson HBOC, the parent, and HBOC, now a wholly-owned subsidiary, recklessly disregarded the best interests of the respective companies by failing to monitor and control their accounting and financial reporting practices. Accordingly, plaintiffs have brought two oversight claims: the first against HBOC's board for pre-merger oversight failures (the "First Oversight Claim") and the second against McKesson HBOC's board for post-merger oversight failures (the "Second Oversight Claim").

1. The First Oversight Claim

Plaintiffs' First Oversight Claim targets the HBOC board for pre-merger oversight failures. Although the defendants contest the merits of the First Oversight Claim, they principally argue that the merits need not [*38] and should not be reached because none of the named plaintiffs have standing to bring this claim, predicated on alleged pre-merger fiduciary breaches.

[HN15]  Section 327 of Delaware's General Corporation Law requires a shareholder plaintiff asserting derivative claims to allege that he was a stockholder of the corporation at the time of the transaction of which he complains. [35] In addition to this statutory requirement, it is also settled law in Delaware that a derivative plaintiff must be a stockholder at the time he commences suit and must maintain such stockholder status throughout the course of the litigation. [36] This is known as the continuous ownership requirement.

> 35  8 Del. C. § 327 provides: "In any derivative suit instituted by a stockholder of a corporation, it shall be averred in the complaint that the plaintiff was a stockholder of the corporation at the time of the transaction of which he complains or that his stock thereafter devolved upon him by operation of law."
>
> 36  See e.g., Lewis v. Anderson, Del. Supr., 477 A.2d 1040 (1984).

[*39] None of the four plaintiffs who bring this suit are presently, or were at the time of filing the complaint, shareholders of HBOC. As explained earlier, HBOC became a wholly-owned subsidiary of McKesson in connection with the merger, McKesson was renamed McKesson HBOC, and the now wholly-owned HBOC is simply the Company's information technology subsidiary. For clarity, I will refer to the post-merger HBOC entity as "HBOC Sub."

Nonetheless, two of the four purported representative plaintiffs in this action, Madajczyk and Dalman, contend that they have maintained standing to bring derivative claims against the HBOC board for alleged pre-merger fiduciary breaches because they were shareholders of HBOC before the merger and became shareholders of McKesson HBOC in connection with the merger. Thus, Madajczyk and Dalman insist that their continuing equity interests meet all the statutory and common law continuous ownership requirements for standing.

[HN16] It is settled Delaware law, however, that once a plaintiff ceases to be a shareholder, "whether by reason of a merger or for any other reason," he loses standing to continue a derivative suit. [37] The Delaware Supreme Court definitively set [*40] forth this bright line rule in Lewis v. Anderson and recently reaffirmed it in In re First Interstate Bancorp Consolidated Shareholder Litigation. [38] The plaintiffs have not effectively distinguished either case.

37  *Id. at 1049; see also Kramer v. Western Pac. Indus., Inc., Del. Supr., 546 A.2d 348, 354 (1988).*
38  *Del. Ch., 729 A.2d 851 (1998), aff'd sub nom., Bradley v. First Interstate Bancorp, Del. Supr., 748 A.2d 913 (2000)* (ORDER).

Defendants contend that in *First Interstate* this Court held that the derivative "claims" of a First Interstate Bancorp shareholder "were extinguished" as a result of the stock-for-stock merger with Wells Fargo & Company. This characterization of the *First Interstate* holding is well off the mark. *First Interstate* did not hold that a merger "extinguished" derivative "claims." Such a conclusion is utterly incompatible with *8 Del. C. § 259(a)*. [39] Rather, the *First Interstate* [*41] Court held that barring the applicability of either of two exceptions set forth in *Lewis v. Anderson,* the merger "extinguished" plaintiff's "standing" to assert derivative claims. [40]

39  [HN17] *Section 259(a)* provides that all rights, privileges, powers and franchises pass to the surviving corporation in the event of a merger. Derivative claims of the merged corporation constitute choses in action that pass to the surviving corporation by operation of *§ 259(a).* See Lewis v. Anderson, 477 A.2d at 1044.*
40  *In re First Interstate, 729 A.2d 851, 867.*

[HN18]

The two exceptions to *Lewis v. Anderson's* apparently iron-clad rule that a shareholder of a merged entity loses standing to assert pre-merger derivative claims are (i) if the merger itself is the subject of a claim of fraud or (ii) if the merger is in reality merely a reorganization which does not affect plaintiffs ownership in the business enterprise. [41] In *First Interstate,* plaintiff Bradley argued under the second [*42] exception to the standing rule. The Court rejected this argument holding that "the exception would not apply to mergers with outside or pre-existing corporations with substantial assets." [42] Although plaintiffs here have not argued under this second exception, it would be unavailing for similar reasons given that (1) the McKesson/HBOC merger involved two free-standing companies with substantial assets, and (2) the new, combined entity comprised a mix of assets distinctly different from that of the pre-merger company. This arm's length stock-for-stock transaction between two independent companies cannot be characterized as a corporate reorganization.

41  *Lewis v. Anderson, 477 A.2d at 1046 n.10 (citing Bokat v. Getty Oil Co., Del. Supr., 262 A.2d 246, 249 (1970); Schreiber v. Carney, Del. Ch., 447 A.2d 17 (1982)).*
42  *In re First Interstate, 729 A.2d at 867 (internal quotations omitted) (citing Schreiber v. Carney, 447 A.2d at 22; also citing Bonime v. Biaggini, 1984 Del. Ch. LEXIS 502, Del. Ch., C.A. No. 6925 & 6980, Walsh, V.C. (holding second exception not applicable where merger resulted in a "corporate mix . . . distinctly different from that [of pre-merger company]")).*

[*43] Like the plaintiff Bradley in *First Interstate,* however, plaintiffs in this case ask the Court to follow the Third Circuit's decision in *Blasband v. Rales,* [43] which granted plaintiffs standing under virtually identical circumstances, rather than *Lewis v. Anderson,* which denied standing in circumstances also virtually identical to those here.

43  *971 F.2d 1034 (3rd Cir. 1992).*

Plaintiffs have not explained why they believe I am free to follow *Blasband* and not *Lewis.* The *First Interstate* Court rejected the Third Circuit's reasoning in *Blasband v. Rales* in no uncertain terms. Reading *Lewis v. Anderson* expansively, the *First Interstate* Court held that former First Interstate shareholders lost standing to assert pre-merger derivative claims solely by virtue of the merger. In contrast to *Blasband v. Rales,* the fact that the purported derivative plaintiff maintained a significant, though diluted, economic interest in the combined (Wells Fargo) company after [*44] the stock-for-stock merger had no impact on the *First Interstate* Court's view of the standing issue:

"Finally, plaintiff Bradley asks the Court to follow the Third Circuit's ruling in *Blasband v. Rales, 3rd Cir., 971 F.2d 1034 (1992)* (purporting to apply Delaware law), and a case finding post-merger standing under California law. I decline to do so, as the teaching of the Delaware Supreme Court in *Lewis v. Anderson* is both clear and controlling of my decision." [44]

In a footnote, the *First Interstate* Court described *Blasband* as being inconsistent with the clear holding of

*Lewis v. Anderson.*" [45]

> 44    *In re First Interstate,* 729 A.2d at 868 (footnotes omitted).
> 45   *In re First Interstate,* 729 A.2d at 868 n.18.

During the briefing on this motion, the Delaware Supreme Court's Order affirming *First Interstate* bolstered defendants' reliance on that case and, relatedly, defendants' reliance on their construction of *Lewis v. Anderson* and [*45] *Blasband v. Rales.* Importantly, the Supreme Court's Order concluded that the Court of Chancery correctly determined that plaintiff Bradley had pleaded derivative claims and that "accordingly, [he] lacks standing to assert those claims. *See Lewis v. Anderson, Del. Supr., 477 A.2d 1040 (1984).*" [46]

> 46    *Bradley v. First Interstate Bancorp, Del. Supr.,* 748 A.2d 913 (2000) (ORDER) (emphasis added).

[HN19]

*First Interstate* clearly expressed the Delaware Courts' rejection of the Third Circuit's holding in *Blasband v. Rales* that the combination of a direct pre-merger equity interest (in the subsidiary) and a direct but diluted post-merger equity interest (in the surviving corporation) is sufficient to meet the common law continuous ownership requirement necessary to prosecute pre-merger derivative claims. The Third Circuit's view--that the plaintiff shareholders' continuing economic interest in the subsidiary and thereafter in the parent does not give rise to the concern [*46] expressed in *8 Del. C. § 327*--has been characterized by commentators as "persuasive." [47] Nonetheless, it is not the law in Delaware. Accordingly, the complaint is dismissed to the extent that it purports to assert claims on behalf of former HBOC shareholders (plaintiffs Madajczyck and Dalman) for pre-merger acts or omissions of the HBOC directors.

> 47    *See* D. Wolfe & M. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery,* § 9-2(b)(2)(ii) at 549 (1999). Quite frankly, I also find the Third Circuit's view on this issue persuasive. To be sure, it is not consistent with the Delaware Supreme Court's holding in *Lewis v. Anderson* and, for that reason, I am not free to follow it. Nonetheless, I do not think that a principled economic argument exists for denying standing to a former HBOC shareholder who

continues to hold an equity interest, albeit diluted, in the HBOC subsidiary through the controlling interest of the combined entity, McKesson HBOC. Like the Third Circuit in *Blasband,* I do not understand how the concerns that animate *§ 327* are implicated in stock-for-stock mergers of this kind. Indeed, the Court of Chancery has suggested that former stockholders of the subsidiary who held stock in the parent post-merger should nonetheless have standing to assert derivative claims in exactly this type of situation. *See In re Caremark Derivative Litig., Del. Ch.,* 698 A.2d 959, 972 n.30 (1996). But if this area of Delaware law is to be made consistent with basic economic principles, as well as fundamental principles of equity and fairness, it will have to come from the Delaware Supreme Court.

[*47] Although the complaint--as pleaded regarding the First Oversight Claim--must be dismissed for lack of standing, the dismissal order will be without prejudice for three reasons. First, as presently drafted, the amended complaint does not implicate either of the two exceptions to the standing requirement in the merger context. Nor have plaintiffs argued that the merger was perpetrated merely to deprive the shareholders of standing to bring a derivative action or that the merger was in reality merely a reorganization. [48] Nevertheless, it is conceivable that the plaintiffs might be able to allege, consistent with Rule 11, that the merger was designed in part to thwart shareholder derivative claims arising out of the HBOC board's failure to monitor the company's internal accounting practices. Dismissing the complaint without prejudice will give plaintiffs that opportunity.

> 48    *See Kramer v. Western Pac. Indus., Inc., Del. Supr.,* 546 A.2d 348, 354 (1988) (describing the two exceptions to the rule that a plaintiff must be a shareholder at the time of filing of the suit and must remain a shareholder throughout the litigation).

[*48] Second, plaintiffs have not asserted a double derivative claim on behalf of the parent corporation (McKesson HBOC) to enforce a cause of action (the oversight claim against the directors and management of HBOC) in favor of a related corporation (HBOC Sub). Plaintiffs' counsel tried, during oral argument on the motion to dismiss, to recast this lawsuit as a double

derivative action. Plaintiff Bradley, in *First Interstate*, made a somewhat similar argument, contending that the claims previously held by First Interstate had passed in the merger to the survivor, Wells Fargo, and he was therefore free to pursue them derivatively as a new stockholder of the survivor. The Court of Chancery rejected this argument on the ground that plaintiff Bradley had never purported to satisfy the demand requirements for a derivative suit on behalf of Wells Fargo. The Court did not address, however, whether standing would have been found to exist if such a showing had been made. [49] In any event, the plaintiffs have not adequately pled such a claim at this juncture, not having (apparently) made demand on the boards of the subsidiary company (HBOC Sub) and the parent company (McKesson HBOC). [50] Here, [*49] plaintiffs appear to contend that demand is futile as to both boards. But the plaintiffs have not identified the members of the HBOC Sub board, much less pled explicitly that making a demand on them would be futile. Furthermore, plaintiffs have not named HBOC Sub as a party, also a prerequisite for asserting a double derivative action. [51]

> [49] *See* D. Wolfe & M. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery,* § 9-2(b)(3)(iii) at 96 (2000 Supp.).
> [50] 13 Fletcher Cyclopedia of Corporations, § 5977.
> [51] *Carlton Invs. v. TLC Beatrice Int'l. Holdings, Inc., 1996 Del. Ch. LEXIS 47,* *25, Del. Ch., C.A. No. 13950, Allen, C. (Apr. 16, 1996) ("It is of course well settled that in a standard double derivative action both the parent and subsidiary corporation are indispensable parties.").

Third, and finally, although it is not pleaded in the existing complaint, certain allegations made in the amended complaint and during oral argument on the motion suggest that the current [*50] shareholders of the combined McKesson HBOC may be able to assert a claim for breach of fiduciary duty directly against the directors of the combined company as a result of the directors' decision not to pursue a potential claim against the former directors of HBOC for the (alleged) fraud in connection with HBOC's accounting practices. If the directors of the combined company decided not to pursue this potential claim in a manner that is grossly negligent or self-interested, such decision may itself give rise to a potential claim for breach of the fiduciary duties of care or loyalty. That claim would be separate and distinct from

a claim based on the failure of HBOC's directors to oversee or monitor properly the accounting practices at HBOC before the merger (i.e., the First Oversight Claim). The claim that I am suggesting might be implicated here arose when the board of the combined company refused, conceivably for reasons related to self-interest or lack of information, to pursue a potential claim or asset of the combined company. In any event, this claim is conceivably implicated by the existing pleadings and, regardless of whether or not it would withstand scrutiny on a motion to [*51] dismiss, I think, in the interest of justice, plaintiffs should be afforded an opportunity to amend their existing complaint (if possible) so as to assert it properly. By dismissing the complaint without prejudice, therefore, I afford plaintiffs an opportunity to marshal facts in support of one or more of the alternative theories implicated in the existing pleadings to avoid the impediment of the standing requirements.

### 2. The Second Oversight Claim

With the First Oversight Claim barred on standing grounds, defendants attack the Second Oversight Claim straightforwardly. They argue that the McKesson HBOC board's failure to detect and cure accounting irregularities for a mere 3 1/2 months (from the merger date in January 1999 until the disclosures of accounting irregularities in April 1999) could not possibly constitute oversight violations under the high liability standards set forth in *Graham v. Allis-Chalmers Mfg. Co.* [52] or *In re Caremark Int'l Inc. Derivative Litigation,* [53] the seminal Delaware cases addressing directors' oversight duties. This argument, no doubt, carries some intuitive appeal. It also, however, exposes the awkward bifurcation of the oversight [*52] claims alluded to earlier, which I will now explain in greater detail.

> [52] *Del. Supr., 41 Del. Ch. 78, 188 A.2d 125 (1963).*
> [53] *Del. Ch., 698 A.2d 959 (1996).*

Analysis of the Second Oversight Claim is to a significant extent shaped by my analysis of plaintiffs due care and waste claims brought against the McKesson directors. In analyzing these claims, it is evident that plaintiffs have not alleged facts creating a reasonable doubt that the McKesson directors' decision to acquire HBOC was anything other than a valid exercise of business judgment, made for the good faith purpose of advancing a legitimate corporate interest. It is equally evident, despite the complaint's prolixity, that plaintiffs

have not alleged facts creating a reasonable doubt that McKesson's directors acted on an informed basis or properly relied on the advice of the expert advisors they retained in connection with the due diligence review of HBOC.

Within three months of the McKesson board's recommendation and McKesson [*53] shareholders' approval of the merger, the combined Company's auditor, DeLoitte & Touche, informed the board of HBOC Sub's accounting irregularities. The McKesson HBOC board, comprised of six former McKesson directors and six former HBOC directors, responded to this information by initiating an internal investigation that culminated in a series of sweeping earnings restatements. In addition, the board made sweeping management changes, firing several senior managers and creating a new executive management structure.

In light of these facts, drawn directly from plaintiffs' complaint, it seems ineluctable that McKesson directors became aware of the accounting improprieties after the merger was consummated and immediately took decisive steps to disclose and cure them. These actions do not bespeak faithless or imprudent fiduciaries.

The role played by the six former HBOC directors on the combined Company's board in connection with the disclosure of the accounting irregularities remains somewhat unclear. A modicum of well-pled facts, sprinkled throughout the complaint, could lead to an inference that the HBOC directors might have had knowledge of suspect accounting practices and, therefore, [*54] *potential* accounting irregularities, in advance of the DeLoitte report. [54] If plaintiffs can allege such facts with particularity, which to this point they have not, relief from the demand requirement might be warranted.

> 54    I emphasize the word "potential" because despite having (inconsistently) pled that every named defendant had "actual" knowledge of accounting irregularities and legal violations, plaintiffs have not asserted a single fact that might reasonably support such an allegation.

As recounted more fully above, plaintiffs have alleged well-pled facts that in April 1997 the CFRA published a report questioning HBOC's revenue recognition practices. This report garnered a fair amount of media attention, was the focus of much analyst commentary, and appeared to have some impact, albeit

brief, on HBOC's share price. Although HBOC did not issue an official response, *The Atlanta Constitution* quoted HBOC's director of investor relations as saying "we don't think [the report] warrants comment. [*55] " [55]

> 55    Complaint at P21, Ex. D.

These facts indicate that HBOC, at some organizational level, knew of and responded to public criticism of its accounting practices. Plaintiffs have not, however, alleged facts that HBOC's directors had actual knowledge of these events and, therefore, possessed actual knowledge of potential accounting irregularities. Moreover, I do not, at this point, suggest that HBOC's board had' constructive knowledge of a statement the company's investor relations department issued. In other words, I do not suggest that the mere existence of a statement from HBOC's investor relations department, made in response to the CFRA report, is sufficient to impute knowledge of such statement to the company's board of directors. [56] If plaintiffs can allege particularized facts that might enable this Court to infer that HBOC directors (or perhaps members of HBOC's audit committee) did possess knowledge of facts suggesting potential accounting improprieties (such as knowledge of the CFRA reports) [*56] and took no action to respond to them until they were confronted (three months after the merger) with DeLoitte's audit report, one could argue that the HBOC directors (or the audit committee members) failed to act in good faith. [57] As a result, demand might in turn be excused.

> 56    I leave it to plaintiffs to adduce such facts through various pre-discovery fact-gathering methods they have at their disposal. As the Delaware Supreme Court has repeatedly exhorted, shareholders plaintiffs should use the "tools at hand," most prominently § 220 books and records actions, to obtain information necessary to sue derivatively. *See, e.g., Rales v. Blasband, 634 A.2d at 934-935 n.10; Brehm v. Eisner, 746 A.2d at 249.*
>
> 57    Plaintiffs allege that HBOC had an audit committee in place. In light of the known facts, one would be hard pressed to say that it performed particularly well. Nevertheless, the existence of an audit committee, together with HBOC's retention of Arthur Anderson as its outside auditor to conduct annual audits of the

company's financial reporting, is some evidence that a monitoring and compliance system was in place at HBOC pre-merger. If a properly framed complaint were filed, the interesting question would be whether one could find directors liable on an oversight claim when those directors had retained a reputable independent, outside auditing firm and when the same directors had appointed an audit committee that is charged with overseeing the internal and external auditors? Would these facts support a finding that the directors had "utterly failed to attempt to assure a reasonable reporting system exists" or exhibited a "sustained and systematic failure to exercise reasonable oversight[?]" *Caremark at 971*. Or do such facts indicate the malfunction or breakdown of the compliance system, rather than the absence of, or systematic failure to exercise, reasonable oversight? Without an adequately framed complaint, however, these issues are not properly before the Court. But they illustrate the problem of assessing claims, based on accounting irregularities, under the *Caremark* standard.

[*57] This result presents an awkward circumstance. If HBOC directors possessed knowledge of suspect accounting practices at HBOC *before* the merger, one would think such knowledge might give rise to colorable claims that McKesson, as an acquiror, could assert against HBOC under fraud-based theories or perhaps for breaches of provisions in the parties' merger agreement. McKesson, however, is not asserting such claims.

Although one may speculate as to the reasons behind McKesson's disinclination to take legal action against HBOC and its officers and directors, such speculation is completely idle absent nonconclusory allegations of fact. 58 Nonetheless, if plaintiffs can allege with some particularity facts indicating that HBOC directors had actual knowledge of accounting irregularities, or knowledge of facts indicating potential accounting irregularities, and took no action until confronted with the DeLoitte audit report in early 1999 (after the merger), such facts, to my mind, could possibly excuse demand as to the Second Oversight Claim. In addition, as indicated above, such facts could give rise to claims that McKesson might bring directly attacking the merger seeking rescission [*58] or rescissory damages; or, if McKesson HBOC was unwilling to assert contract-based claims,

shareholders might endeavor to bring those claims derivatively on behalf of McKesson HBOC.

58 Plaintiffs have alleged, in a single conclusory paragraph, that demand was futile because the McKesson HBOC board was faced with an "inherent conflict" that made it unable to respond to the disaster or to bring suit against HBOC for fraud or breach of contract. Second Amended Comp 1., P77. According to the amended complaint, the McKesson HBOC board is evenly split--consisting of six former McKesson directors and six former HBOC directors. As a result, when the accounting improprieties came to light, "one half of the Board's blame was the other half of the Board's cover." P1. Ans. Brief at 9 (Jan. 14, 2000). The notion of a paralyzed board is belied somewhat by the aggressive steps to disclose the problem and to remove certain senior managers. On the other hand, the current board's failure or refusal to pursue potential claims against HBOC's former directors and managers, or against those firms that performed the due diligence, supports the notion of an incapacitated board. But I need not address this issue now, given that plaintiffs will be afforded an opportunity to plead more particular facts about what the HBOC directors knew concerning the accounting improprieties, and when they knew it, in the context of either a direct attack on the current board's failure to pursue the claim or in a double derivative action, as mentioned earlier. Such facts, together with additional facts regarding the board's composition, would assist a court in determining whether the board is structurally unable to make an independent and disinterested judgment regarding the potential claim against HBOC.

[*59] Notwithstanding the present inadequacy of the amended complaint, I am convinced that the course of action most consistent with fairness and equity is to dismiss the Second Oversight Claim without prejudice and to grant plaintiffs leave to replead and allege additional, particularized facts that would support a demand futility determination.

## IV. CONCLUSION

For the reasons set forth in this Memorandum Opinion, I dismiss plaintiffs' due care and waste claims for failure to make demand under Court of Chancery

2000 Del. Ch. LEXIS 144, *59

Rule 23.1. Further, I dismiss the first and second oversight claims, but this dismissal is without prejudice. Using the tools at hand, plaintiffs may seek to develop additional particularized facts in order to allege properly an oversight claim that will meet the demand futility standard and to avoid the standing requirement of Delaware's continuing ownership rule.

An Order has been entered in accordance with this Memorandum Opinion.

ORDER

For the reasons set forth in this Court's Memorandum Opinion entered in this case on this date, it is

ORDERED that plaintiffs' due care and waste claims are dismissed pursuant to Court of Chancery Rule 23.1, and that plaintiffs' first [*60] and second oversight claims are dismissed without prejudice.

William B. Chandler

Chancellor

Dated: September 15, 2000

# EXHIBIT D

LEXSEE 2006 DEL. CH. LEXIS 33

**DAVID B. SHAEV PROFIT SHARING ACCOUNT, Plaintiff, v. C. MICHAEL ARMSTRONG, ALAIN J.P. BELDA, KENNETH J. BAILKIN, GEORGE DAVID, KENNETH T. DERR, JOHN M. DEUTCH, ANN DIBBLE JORDAN, ROBERT I. LIPP, REUBEN MARK, MICHAEL T. MASIN, DUDLEY C. MECUM, RICHARD D. PARSONS, ANDRALL E. PEARSON, JOHN S. REED, ROBERT E. RUBIN, ROBERT B. SHAPIRO, FRANKLIN A. THOMAS, SANFORD I. WEILL, and ARTHUR ZANKEL, Defendants, and CITIGROUP, INC., Nominal Defendant.**

**C.A. No. 1449-N**

**COURT OF CHANCERY OF DELAWARE, NEW CASTLE**

*2006 Del. Ch. LEXIS 33*

**January 26, 2006, Submitted**
**February 13, 2006, Decided**

**NOTICE:**

[*1] THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

**SUBSEQUENT HISTORY:** Affirmed by David B. Shaev Profit Sharing Account v. Armstrong, 2006 Del. LEXIS 596 (Del., Nov. 6, 2006)

**COUNSEL:** Attorneys for the Plaintiff: Carmella P. Keener, Esquire, ROSENTHAL, MONHAIT, GROSS & GODDESS, Wilmington, Delaware; Robert I. Harwood, Esquire, Samuel Rosen, Esquire, WESCHLER HARWOOD LLP, New York, New York.

Attorneys for the Individual Defendants: Jesse A. Finkelstein, Esquire, John D. Hendershot, Esquire, RICHARDS, LAYTON & FINGER, Wilmington, Delaware; Mitchell A. Lowenthal, Esquire, Carmine D. Bocuzzi, Esquire, Tanisha L. Massie, Esquire, CLEARY, GOTTLIEB, STEEN & HAMILTON, LLP, New York, New York.

Attorneys for the Nominal Defendant: David L. Finger, Esquire, FINGER & SLANINA, LLC, Wilmington, Delaware; Richard A. Rosen, Esquire, PAUL, WEISS, RIFKIND, WHARTON & GARRISON, New York, New York.

**JUDGES:** LAMB, Vice Chancellor.

**OPINION BY:** LAMB

**OPINION**

*MEMORANDUM OPINION AND ORDER*

The facts at issue in this case were first sued on two years ago in a case captioned *In re Citigroup Inc. Shareholders Litigation.* [1] In that case, the plaintiffs claimed, among other things, that certain directors of Citigroup either knew or should have known about allegedly fraudulent [*2] relationships between the nominal defendant Citigroup and its clients Enron and Worldcom and, therefore, breached their fiduciary duties in either approving or recklessly failing to discover those links. The court dismissed those claims because the complaint presented a set of "wholly conclusory" allegations devoid of the particularized facts needed to show that the company's board of directors was disqualified from considering a demand under Court of Chancery Rule 23.1. Indeed, all that complaint alleged was that Citigroup had suffered losses due to employee misconduct, and that the board, whether they knew about it or not, ought to be held liable. In dismissing the action, the court observed that the plaintiffs had failed to use the "tools at hand," including a Section 220 books and records demand, before filing suit.

1    *2003 Del. Ch. LEXIS 61 (Del. Ch. June 5, 2003); aff'd sub nom. Rabinovitz v. Shapiro, 839 A.2d 666 (Del. 2003)*(TABLE).

Knowing that the *In re Citigroup* [*3] plaintiffs were admonished by the court for failing to take advantage of their Section 220 rights before bringing their claim, the new plaintiff in this case, David B. Shaev Profit Sharing Account, represented by the same lawyers, has appropriately investigated the Enron and WorldCom transactions through a "books and records" action. Evidently, Shaev has discovered that the individual director defendants had no contemporaneous knowledge of the alleged misconduct by Citigroup employees. Thus, the new derivative complaint is necessarily narrower than the earlier dismissed case, concentrating on the theory that the individual defendants violated their fiduciary duties in failing to detect and stop the improper transactions. Therefore, the plaintiff urges, demand is excused because a majority of the current board faces a substantial likelihood of liability.

After hearing argument on January 26, 2006, the court stated that it would grant the defendants' motion to dismiss. The rationale for the conclusion is summarized in this memorandum opinion. In short, the court agrees to dismiss the action because the new complaint alleges little more than the last complaint-and literally nothing to [*4] suggest that the defendants willfully or recklessly ignored information that would have led to the discovery of the misconduct at issue. Even drawing every reasonable inference in the plaintiff's favor, the most the complaint alleges is some admittedly troubling things happened at Citigroup, that the directors had erected a full panoply of audit systems designed to detect such misconduct, that for some reason the system failed to work, and that damages to Citigroup ensued. Plainly, allegations of this kind do not state a claim for relief under Delaware law. In fact, such a liability regime would be antithetical to the policy of this state. When a board rationally makes a decision, its actions are protected by the business judgment rule. And when a board fails to act, under Delaware law, a claim will survive a motion to dismiss based on Rule 23.1 only if the plaintiff presents well-pleaded facts to suggest a reasonable inference that a majority of the directors consciously disregarded their duties over an extended period of time. The complaint in this case does not nearly satisfy that exacting standard.

I.

Citigroup, a Delaware corporation, is the world's second largest [*5] financial services company by assets, employing 270,000 people in 102 countries. The plaintiff's allegations in this case, however, concern the company's relationships with two of its former clients, the ill fated Enron and WorldCom corporations. Specifically, this case concerns the board of directors' failure to discover certain relationships between Citigroup and those two entities, and thus to prevent the serious financial penalties that Citigroup experienced because of its involvement with what turned out to be fraudulent business practices. In that sense, therefore, the claims in this case do not implicate any specific action by the board of directors, or the approval of any action, but inaction and carelessness. In order to understand these claims the court must necessarily describe the alleged extent of Citigroup's involvement with Enron and WorldCom.

A. The Enron Transactions

The complaint alleges that Citigroup was deeply complicit in an illegal scheme by Enron to boost its profits and profit growth in the late 1990s. In summary, the plaintiff alleges that Citigroup helped structure or finance one or more of Enron's illicit special purpose entities (SPEs), thus allowing [*6] Enron to falsify its financial statements and misrepresent its financial condition by hiding billions of dollars in debt that should have been on Enron's balance sheet. Simultaneously, the complaint alleges that the defendants failed to become aware that Salomon Smith Barney Inc., a wholly owned subsidiary of Citigroup, was issuing extremely positive, false, and misleading analyst reports on Enron, extolling its business success, the strength of its financial condition, and its prospects for strong earnings and revenue growth. The complaint goes on to allege that in return for Citigroup's participation in Enron's various schemes, Citigroup was awarded huge underwriting and consulting fees, interest payments, and commitment fees. The plaintiff additionally alleges that top Citigroup executives were permitted to invest personal funds totaling approximately $ 15 million in the LJM2 partnership, an entity secretly controlled by Enron, and used to engage in illusory transactions to artificially inflate Enron's profits.

B. The WorldCom Transactions

The plaintiff's allegations regarding Citigroup's

involvement with WorldCom implicate research ratings published by Salomon Smith Barney. [*7] From 1998 to 2001, Salomon Smith Barney officially published a five category stock rating system: Buy, Outperform, Neutral, Underperform, or Sell. In reality, the plaintiff alleges, Salomon Smith Barney analysts issued only the three most positive ratings. Indeed, from 1998 through 2000, according to the complaint, Salomon Smith Barney research analysts issued virtually no Sell or Underperform ratings among the more than 1,000 stocks they rated.

At all relevant times, Jack Grubman was Salomon Smith Barney's top telecom research analyst, and was allegedly an important factor in Salomon Smith Barney's success in telecom investment banking. The complaint states that Grubman followed Salomon Smith Barney's "de facto three-category rating system," assigning no Sell ratings, and only two Underperform ratings, in his entire tenure. As to WorldCom in particular, Grubman first awarded the company a Buy rating in June 2000, when the stock was trading at $ 46 a share. He maintained this same rating until April 2002, when the stock had declined to only $ 4 a share, and WorldCom was only three months from bankruptcy. The plaintiff alleges that Grubman's motivation to issue these inflated ratings [*8] was pecuniary gain. By issuing high ratings to Citigroup investment banking clients, the plaintiff argues, Salomon Smith Barney was able to help Citigroup attract investment banking business. Specifically, the plaintiff claims that between October 1997 and February 2002, including two years in which Grubman rated WorldCom a Buy, Salomon Smith Barney advised WorldCom on approximately 23 investment banking deals, collecting $ 107,078,477 in fees. Because Grubman's compensation was determined by his participation in investment banking activities, the complaint alleges that Grubman took advantage of his high ratings to earn an average of approximately $ 20 million in compensation in each year from 1998 to 2001.

C. The Role Of Citigroup's Board

The complaint asserts that the Citigroup board of directors was entirely unaware of the frauds described above throughout the relevant period. With regard to Enron, the complaint states that "with the massive fraud that Citigroup management caused Citigroup to engage and participate in with Enron for a period of years, not one scrap of paper made its way to the Board for review."

[2] Similarly, the plaintiff claims that "notwithstanding [*9] the pervasive culture of misrepresentation in analyst reports at SSB . . . the Board received no material concerning this systematic wrongdoing that reached the highest levels of SSB, and received no material concerning Grubman's relationship with WorldCom." [3] This is crucial, the plaintiff alleges, because the board should have known when it acquired Salomon Smith Barney that the danger of such conflicts was high. "With Citigroup's acquisition of Salomon Smith Barney, Citigroup was to become a financial supermarket,' aggressively pursuing investment and commercial banking business. As a result, the [board] had an obligation to . . . have in place a functioning monitoring system to enable them to ferret out SSB's egregious misconduct. . . ." [4] When they failed to do so, the plaintiff alleges that the board became responsible for the frauds described above.

2 Compl. P 70.
3 Id. at P 98.
4 Id.

D. The Consequences Of The Enron And WorldCom Frauds

In part [*10] due to the above transactions, Citigroup has been forced to pay approximately $ 2.6 billion to settle litigation with investors in WorldCom, $ 2 billion to settle litigation with investors in Enron, and $ 135 million in fines to the Securities and Exchange Commission, New York State, and New York City. In addition, as a result of Enron's bankruptcy filing, Citigroup was forced to write off over $ 600 million in outstanding loans to Enron. In sum, therefore, the complaint alleges that the defendants' purported breaches of fiduciary duty cost Citigroup a total of some $ 5 billion.

II.

On the basis of the facts above, the plaintiff alleges that the individual defendants violated their fiduciary duties to the Citigroup shareholders. Specifically, the complaint alleges that the board lacked procedures to become aware of the described conduct, in violation of their duties to exercise reasonable and prudent supervision over the management, policies, practices, controls, and financial affairs of Citigroup. No materials were created, presented, or disseminated to the board concerning the company's relationship with WorldCom,

nor were materials disseminated concerning Citigroup's transactions [*11] with Enron prior to Enron's bankruptcy. Consequently, Shaev claims, the board received no material contemporaneously with the alleged misconduct that would have enabled Citigroup to avoid paying over $ 5 billion to settle litigation arising from these examples of misconduct. Further, the plaintiff alleges that demand is excused because a majority of the individual defendants were board members during the time of the alleged wrongful conduct, and because there is a substantial likelihood that the members of the board will be held liable for breaching their fiduciary duty of loyalty.

The defendants respond by noting that no well-pleaded facts link the directors to any misconduct. Nor, in their view, did the defendants receive any information that should have alerted them to the well-pleaded employee misconduct within Citigroup. Therefore, the defendants argue that the complaint has failed to plead particularized facts sufficient to establish a breach of fiduciary duty for inaction, and that the plaintiff's claims must be dismissed for failure to satisfy the demand requirement set out by Delaware law and by Court of Chancery Rule 23.1.

**III.**

The general form of fiduciary duty [*12] claims is, by now, well known: shareholders usually bring suit against corporate directors for having approved or acquiesced in an action that the plaintiff alleges is a violation of the directors' fiduciary duties of loyalty and due care. Most notably in *In re Caremark Int'l Inc. Derivative Litigation*, [5] and then in other cases, however, this court has taken cognisance of allegations that the directors failed to act when they otherwise should have done so.

5  *698 A.2d 959 (Del. Ch. 1996).*

In order to bring a derivative claim in Delaware, the plaintiff must either make a pre-suit demand on the board itself, or plead that such demand would be futile. One threshold problem that *Caremark* claims raise is that the usual pleading standard for demand futility, for determining whether the plaintiff ought to be made to ask the board to pursue the suit itself, is semantically inapplicable. As the Supreme Court explained the traditional rule in *Aronson v. Lewis*, [6]

Our view is that [*13] in determining demand futility the Court of Chancery in the proper exercise of its discretion must decide whether, under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment. [7]

6  *473 A.2d 805 (Del. 1984).*
7

   *Id. at 814.*

But in a *Caremark* claim, there is no challenged transaction to test against the business judgment rule. Consequently, in *Rales v. Blasband*, [8] the Supreme Court set out a separate test for demand futility in this limited set of cases. In order to determine whether demand should be excused,

   a court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested [*14] business judgment in responding to a demand. [9]

8  *634 A.2d 927 (Del. 1993).*
9

   *Id. at 934.*

This court has held in the past that the *Rales* test, in reality, folds the two-pronged *Aronson* test into one broader examination. It allows, in other words, a court to determine both whether a corporate board on which demand might be made is disinterested and independent,

2006 Del. Ch. LEXIS 33, *14

and whether a majority of directors face a substantial likelihood of personal liability, because doubt has been created as to whether their actions were products of a legitimate business judgment. [10]

> 10  *Guttman v. Huang, 823 A.2d 492, 501 (Del. Ch. 2003).*

Satisfying the plaintiff's burden in a *Caremark* case is a difficult task. One option for the plaintiff is to plead that the directors on which [*15] demand would be made are not disinterested or independent. [11] Alternatively, a plaintiff can allege that a board violated its fiduciary duty by utterly failing to exercise oversight of the corporation, such as by failing to assure the existence of reasonable information and reporting systems. [12] Concretely, this latter allegation might take the form of facts that show the company entirely lacked an audit committee or other important supervisory structures, [13] or that a formally constituted audit committee failed to meet. And in a closely related type of claim, a *Caremark* plaintiff can plead that "the directors were conscious of the fact that they were not doing their jobs," [14] and that they ignored "red flags" indicating misconduct in defiance of their duties. [15] A claim that an audit committee or board had notice of serious misconduct and simply failed to investigate, for example, would survive a motion to dismiss, even if the committee or board was well constituted and was otherwise functioning. But the one thing that is emphatically not a *Caremark* claim is the bald allegation that directors bear liability where a concededly well-constituted oversight mechanism, having [*16] received no specific indications of misconduct, failed to discover fraud.

> 11  In the context of board inaction, such facts might include allegations that a board of directors is dominated or controlled by key members of management, who the rest of the board unknowingly allowed to engage in self-dealing transactions. The plaintiff in this case, however, makes no allegation that any directors have material interests in the challenged transactions.
> 12  *Caremark, 698 A.2d at 971.*
> 13  *Guttman, 823 A.2d at 507*; other recent Delaware cases support this construction of the *Caremark* pleading requirements. *See e.g., Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart, 833 A.2d 961 (Del. Ch. 2003), aff'd, 845 A.2d 1040 (Del. 2004)* (holding that because the

duty to monitor refers to issues surrounding the corporation and its activities, a board of directors has no duty to monitor the personal affairs of its employees, including the personal affairs of the company's founder with whom it is closely associated; *Rattner v. Bidzos, 2003 Del. Ch. LEXIS 103, *44-45 (Del. Ch. Sept. 30, 2003)* (following *Guttman, 823 A.2d at 507* in holding that a *Caremark* claim fails when it omits to allege particularized facts "regarding the Company's internal financial controls during the Relevant Period," or of "the Board's involvement in the preparation of financial statements and the release of information to the market."); *Seminaris v. Landa, 662 A.2d 1350, 1354-55 (Del. Ch. 1995)* (dismissing a *Caremark* claim because the plaintiff pled insufficient facts to "demonstrate that [the defendants] were grossly negligent in failing to supervise [their] subordinates").

[*17]

> 14  *Guttman, 823 A.2d at 506.*
> 15  *Id. at 507.*

The plaintiff's theory of liability in this case, as set forth in its papers and at oral argument, is simple. The plaintiff concedes that the defendants knew nothing about the challenged transactions, and had erected a full set of supervisory mechanisms to oversee the company. But in the plaintiff's view, only a board violating its fiduciary duties could possibly have remained ignorant of Citigroup's allegedly corrupt relationships with Enron and WorldCom. These transactions were, in the words of plaintiff's counsel, proverbial "elephants in the room," frauds of such "brobdingnagian" [16] enormity that only reckless indifference to fiduciary duty could explain the defendants' now conceded lack of knowledge. Therefore, the plaintiff claims, demand is futile under the test in *Rales.*

> 16  Pl.'s Opposing Br. at 3. Brobdingnag was the land of the giants in Jonathan Swift's *Gulliver's Travels,* but has now simply come to mean "gigantic."

[*18] But these allegations are precisely the type of conclusory statements that do not constitute a *Caremark* claim. The plaintiff conceded at oral argument that Citigroup had a wide range of compliance systems in place, and that they had no reason to believe that these systems were not functioning in a basic sense. Further,

2006 Del. Ch. LEXIS 33, *18

the plaintiff simply does not allege that the board failed to ask questions about risks the company was undertaking or that the audit committee did not vigorously investigate the internal workings of Citigroup. So far as either the plaintiff or the court knows, the defendants did all those things, and still failed to detect the WorldCom and Enron frauds. Nor does the plaintiff allege any particularized facts suggesting that the board was presented with "red flags" alerting it to potential misconduct with regard to Enron and WorldCom. [17] In fact, the complaint includes no allegations that the board or audit committee or any other supervisory mechanism was ever presented with information pointing it towards the suspect relationships.

[17]

Guttman, 823 A.2d at 507. In its reply brief, Shaev emphasizes its allegation that a certain Citigroup employee noted a so-called "franchise risk" to the company rooted in its relationship with Enron. Pl.'s Opposing Br. at 1. But the plaintiff never alleges that this observation was brought to the board's attention and that it was ignored. Nor does the complaint allege that the board failed to investigate risks undertaken by the company in general. In order to show that the board violated some fiduciary duty by inaction, a complaint must do much more than simply say that an employee perceived the company to face risk, even a large risk. It must at least show that the board was faced with risks which it chose not to investigate, or that it blithely abrogated its responsibility to oversee or look for risks. Under that standard, therefore, the additional allegations in the plaintiff's opposing brief do not meet the standard set out in Caremark and its progeny.

[*19] The court accepts, in principle, that a director could be found liable for remaining ignorant of a large fraud occurring in plain sight, even if the director is able to show that the company had established a full set of supervisory controls. In this case, however, all the plaintiff has said is that the Enron and WorldCom relationships turned out to have material consequences. The complaint does not even allege that either of the challenged relationships formed an unusually large part of Citigroup's business while the relationships were ongoing. The well-pleaded facts provide no basis to believe, therefore, that the directors ignored a mammoth fraud. Rather, the facts only show that, as in Caremark itself, the "liability that eventuated in this case was huge." [18] Absent any facts to show that a board's ignorance can only be explained by a breach of fiduciary duty, such as allegations as to the centrality of the fraudulent relationships to the corporation's business, the size of any financial loss is not a sufficient basis on which to rest liability.

[18]  698 A.2d at 971.

[*20] The most that the complaint alleges is that some hypothetical, especially zealous, board might have discovered and stopped the conduct complained of in this case. But Delaware law requires only diligence, not heroism. Boards are expected to erect mechanisms designed to bring misconduct to their attention, and to investigate in good faith when warnings appear. Because the complaint alleges no failing on the part of the Citigroup board as to these obligations, the defendants' motion to dismiss must necessarily be granted for failure to make proper demand.

**IV.**

For the foregoing reasons, the defendants' motion to dismiss is GRANTED.

IT IS SO ORDERED. [19]

[19]    To avoid confusion as to the date of dismissal, the court has vacated the minute order of January 26, 2006 and now enters a new order dismissing the complaint for the reasons discussed in this opinion.

# EXHIBIT E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------x
SYLVIA B. PIVEN, Sylvia B. Piven Trustee
under trust agreement dated April 3, 1973
f/b/o Sylvia B. Piven, derivatively on behalf
of ITT Corporation, et al.,

                                Plaintiffs,   *file in* ➔ 07 Civ. 2878 (CLB)
                                                          07 Civ. 7358 (CLB)

                - against -

STEVEN R. LORANGER, et al.,

                                Defendants.
------------------------------------------------------x

07 Civ. 2878

Consolidated Cases:

*Memorandum and Order*

#26

Brieant, J.

        Before this Court for decision are motions by Defendants to dismiss on various grounds,

the Verified Consolidated Amended Complaint (Doc. 13) which was filed November 13, 2007 in

this shareholders derivative action.  The motions were argued and fully submitted for decision

on January 25, 2008.  Familiarity on the part of the reader must be assumed with respect to the

extensive documentation filed in this case.

        The theory of the Complaint is that breaches of fiduciary duty and other violations of law

by those in charge of the operations of ITT Corporation, an Indiana corporation, had caused

damage to the corporation under circumstances which would support recovery of those damages

from the Directors, certain Managers and others.  The claims arise out of a criminal proceeding in

which ITT pled guilty on March 27, 2007 in the U.S. District Court for the Western District of

Virginia at Roanoke to crimes involving the willful export of United States Defense Military

technology to other countries not entitled to receive it.  In connection with a Plea Agreement

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____

-1-

submitted in evidence, the Corporation agreed to pay $100 million in fines, penalties and forfeitures, and subjected itself to a Deferred Prosecution Agreement with the Government for wilful violation of the International Traffic and Arms Regulations (ITAR) and export of defense articles without a license. The Corporation also agreed to pay for the cost of an independent Monitor and staff, to assure its compliance with the Deferred Prosecution Agreement and Federal law in connection with future military technology sales.    .. ..

*Demand and Refusal*

This Court concludes that on the totality of the facts as presently submitted, demand would be futile. Admissions in open court of a party are substantial evidence. This is not just a situation where "something bad happened." Wilfulness at a fairly high level is conceded in the plea agreement. Other parties in interest have made demand and the Officers and Directors have not sought recovery. More than mere negligence appears to have been involved and the experience of *Oxford Health* relied on to support the motion, hardly appears to be as analogous as claimed.

The Government began its official inquiry in 2001. Top management had considered and rejected voluntary disclosure to the Government in 2000. There appears at least sufficient evidence of conscious avoidance at high levels to prevent dismissal of the claims prior to completion of pre-trial discovery.

## Conclusion

The motions (Docs. 15 and 18) are denied.  Counsel shall now proceed consistently with the Stipulated Order filed by this Court on May 22, 2007.  A status conference with this Court shall be held on June 13, 2008 at 9:30 A.M.  No judgment shall be filed at this time.  See Rule 54 Fed.R.Civ.P.


SO ORDERED.

Dated: White Plains, New York
       April 10, 2008

                              _Charles L. Brieant_
                              Charles L. Brieant, U.S.D.J.

-3-