**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| JERALD KING, Derivatively on behalf of CEPHALON, INC., | ) ) ) | |
| Plaintiff, | ) ) ) | |
| vs. | ) ) ) | |
| FRANK BALDINO, JR., WILLIAM P. EGAN, MARTYN D. GREENACRE, VAUGHN M. KAILIAN, KEVIN E. MOLEY, CHARLES A. SANDERS, GAIL R. WILENSKY, and DENNIS L. WINGER, | ) ) ) ) ) ) ) | CIVIL ACTION NO. 1:08-cv-00054-GMS  **JURY TRIAL DEMANDED** |
| Defendants, | ) ) ) | |
| vs. | ) ) ) | |
| CEPHALON, INC., a Delaware Corporation, | ) ) ) | |
| Nominal Defendant. | ) | |

**TRANSMITTAL AFFIDAVIT OF BRIAN D. LONG, ESQUIRE,**
**IN SUPPORT OF PLAINTIFF'S**
**MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS**

BRIAN D. LONG, being duly sworn, does hereby state as follows:

1.     I am a shareholder in the law firm of Rigrodsky & Long, P.A. ("Rigrodsky & Long") and am admitted to practice law in the State of Delaware. Rigrodsky & Long is one of plaintiff's counsel in the above-referenced action.

2.     I submit this Transmittal Affidavit in support of the accompanying Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Judgment on the Pleadings.

3.    Attached hereto as exhibits are true and correct copies of the following

documents:

Exhibit A    Cephalon Inc.'s ("Cephalon") Form 10-Q Quarterly Report filed
             with the SEC on November 9, 2004; and

Exhibit B    Cephalon's Charter for its Corporate Governance and Nominating
             Committee.

Dated:  May 23, 2008

_Brian D. Long (#4347)_

SWORN TO AND SUBSCRIBED
BEFORE ME this 23rd day of May, 2008.

Notary Public

My Commission Expires: 1-25-10

CARLY E. HOLBROOK
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires January 25, 2010

2

# EXHIBIT A

# EXHIBIT A

# PART 1



# FORM 10-Q

## CEPHALON INC - CEPH

**Filed: November 09, 2004 (period: September 30, 2004)**

Quarterly report which provides a continuing view of a company's financial position

# Table of Contents

10-Q - 10-Q

## PART I

**Item 1.** Consolidated Financial Statements

**ITEM 2.** MANAGEMENT S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

**ITEM 3.** QUANTITATIVE AND QUALITATIVE DISCLOSURE ABOUT MARKET RISK

**ITEM 4.** CONTROLS AND PROCEDURES

## PART II

**ITEM 1.** LEGAL PROCEEDINGS

**ITEM 2.** UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS

**ITEM 5.** OTHER EVENTS

**ITEM 6.** EXHIBITS

SIGNATURES

EX-10.1(A) (EX-10.1(A))

EX-10.1(B) (EX-10.1(B))

EX-10.2 (EX-10.2)

EX-10.3(A) (EX-10.3(A))

EX-10.3(B) (EX-10.3(B))

EX-10.3(C) (EX-10.3(C))

EX-10.3(D) (EX-10.3(D))

EX-10.3(E) (EX-10.3(E))

EX-31.1 (EX-31.1)

EX-31.2 (EX-31.2)

EX-32.1 (EX-32.1)

EX-32.2 (EX-32.2)

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C.  20549

---

# FORM 10-Q

**(Mark One)**

☒    **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the quarterly period ended September 30, 2004**

**OR**

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(D) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from          to**

**Commission File Number   000-19119**

# CEPHALON, INC.
### (Exact Name of Registrant as Specified in its Charter)

| | |
|---|---|
| **Delaware** | **23-2484489** |
| (State or Other Jurisdiction of Incorporation or Organization) | (I.R.S. Employer Identification Number) |
| **145 Brandywine Parkway, West Chester, PA** | **19380-4245** |
| (Address of Principal Executive Offices) | (Zip Code) |

**(610) 344-0200**
(Registrant's Telephone Number, Including Area Code)

**Not Applicable**
(Former Name, Former Address and Former Fiscal Year, If Changed Since Last Report)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes  ☒     No  ☐

Indicate by check mark whether the registrant is an accelerated filer (as defined in Rule 12b-2 of the Exchange Act).  Yes  ☒    No  ☐

Indicate the number of shares outstanding of each of the registrant's classes of common stock, as of the latest practicable date.

| Class | Outstanding as of November 3, 2004 |
|---|---|
| Common Stock, par value $.01 | 57,688,672 Shares |

Source: CEPHALON INC, 10-Q, November 09, 2004

**CEPHALON, INC. AND SUBSIDIARIES**

**INDEX**

Cautionary Note Regarding Forward-Looking Statements

**PART I – FINANCIAL INFORMATION**

Item 1.   Consolidated Financial Statements

Consolidated Balance Sheets –
September 30, 2004 and December 31, 2003

Consolidated Statements of Operations –
Three and nine months ended September 30, 2004 and 2003

Consolidated Statements of Stockholders' Equity –
September 30, 2004 and December 31, 2003

Consolidated Statements of Cash Flows –
Nine months ended September 30, 2004 and 2003

Notes to Consolidated Financial Statements

Item 2.   Management's Discussion and Analysis of Financial Condition and Results of Operations

Item 3.   Quantitative and Qualitative Disclosure about Market Risk

Item 4.   Controls and Procedures

**PART II – OTHER INFORMATION**

Item 1.   Legal Proceedings

Item 2.   Unregistered Sales of Equity Securities and Use of Proceeds

Item 6.   Exhibits

**SIGNATURES**

i

## CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS

In addition to historical facts or statements of current condition, this report and the documents into which this report is and will be incorporated contain forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. Forward-looking statements contained in this report constitute our expectations or forecasts of future events as of the date this report was filed with the SEC and are not statements of historical fact. You can identify these statements by the fact that they do not relate strictly to historical or current facts. Such statements may include words such as "anticipate," "will," "estimate," "expect," "project," "intend," "should," "plan," "believe," "hope," and other words and terms of similar meaning in connection with any discussion of, among other things, future operating or financial performance, strategic initiatives and business strategies, regulatory or competitive environments, our intellectual property and product development. In particular, these forward-looking statements include, among others, statements about:

- our dependence on sales of PROVIGIL® (modafinil) tablets [C-IV], ACTIQ® (oral transmucosal fentanyl citrate) [C-II] and GABITRIL® (tiagabine hydrochloride) in the United States and the market prospects and future marketing efforts for these products, including with respect to any new indications for such products;
- any potential expansion of the authorized uses of our existing products;
- our anticipated scientific progress in our research programs and our development of potential pharmaceutical products including our ongoing or planned clinical trials, the timing and costs of such trials and the likelihood or timing of revenues from these products, if any;
- the timing and predictability of regulatory approvals;
- our ability to adequately protect our technology and enforce our intellectual property rights and the future expiration of patent and/or regulatory exclusivity on certain of our products;
- our ability to realize the anticipated benefits of our acquisition of CIMA LABS INC.;
- our future cash flow, our ability to service or repay our existing debt and our ability to raise additional funds, if needed, in light of our current and projected level of operations; and
- other statements regarding matters that are not historical facts or statements of current condition.

Any or all of our forward-looking statements in this report and in the documents we have referred you to may turn out to be wrong. They can be affected by inaccurate assumptions we might make or by known or unknown risks and uncertainties. Therefore, you should not place undue reliance on any such forward-looking statements. The factors that could cause actual results to differ from those expressed or implied by our forward-looking statements include, among others:

- the acceptance of our products by physicians and patients in our current markets and new markets;
- our ability to obtain regulatory approvals of our product candidates or of expanded indications for certain of our existing products;
- scientific or regulatory setbacks in our research programs, clinical trials, or manufacturing activities for our product candidates or our existing products;
- unanticipated cash requirements to support current operations, expand our business or incur capital expenditures;
- the inability to adequately protect our key intellectual property rights, including as a result of an adverse adjudication with respect to the PROVIGIL litigation;
- the loss of key management or scientific personnel;
- the activities of our competitors in the industry, including the filing of Abbreviated New Drug Applications (ANDAs) with a Paragraph IV certification for any product containing modafinil or the entry of a generic competitor to ACTIQ;
- the loss of one or more key customers of CIMA or the inability to obtain regulatory approval of OraVescent® fentanyl;
- market conditions in the biotechnology industry that make raising capital or consummating acquisitions difficult, expensive or both; and

ii

Source: CEPHALON INC, 10-Q, November 09, 2004

- enactment of new government laws, regulations, court decisions, regulatory interpretations or other initiatives that are adverse to us or our interests.

We do not intend to update publicly any forward-looking statement, whether as a result of new information, future events or otherwise, except as required by law. We discuss in more detail the risks that we anticipate in the section included in Part I, Item 2 hereof and entitled "Certain Risks Related to our Business." This discussion is permitted by the Private Securities Litigation Reform Act of 1995.

iii

**PART I - FINANCIAL INFORMATION**
  Item 1. Consolidated Financial Statements

## CEPHALON, INC. AND SUBSIDIARIES

### CONSOLIDATED BALANCE SHEETS

| (In thousands, except share data) | September 30, 2004 (Unaudited) | December 31, 2003 |
|---|---|---|
| **ASSETS** | | |
| **CURRENT ASSETS:** | | |
| Cash and cash equivalents | $ 605,992 | $ 1,115,699 |
| Investments | 204,534 | 39,464 |
| Receivables, net | 136,503 | 86,348 |
| Inventory, net | 71,466 | 61,249 |
| Deferred tax asset | 69,481 | 57,972 |
| Other current assets | 27,664 | 9,198 |
| Total current assets | 1,115,640 | 1,369,930 |
| PROPERTY AND EQUIPMENT, net | 224,523 | 126,442 |
| GOODWILL | 363,912 | 298,769 |
| INTANGIBLE ASSETS, net | 412,216 | 326,445 |
| DEBT ISSUANCE COSTS, net | 27,429 | 35,250 |
| DEFERRED TAX ASSET, net | 129,216 | 168,506 |
| OTHER ASSETS | 25,877 | 56,314 |
| | $ 2,298,813 | $ 2,381,656 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| **CURRENT LIABILITIES:** | | |
| Current portion of long-term debt | $ 9,403 | $ 9,637 |
| Accounts payable | 40,330 | 28,591 |
| Accrued expenses | 131,254 | 99,038 |
| Current portion of deferred revenues | 1,042 | 422 |
| Total current liabilities | 182,029 | 137,688 |
| LONG-TERM DEBT | 1,287,320 | 1,409,417 |
| DEFERRED REVENUES | 1,592 | 1,736 |
| DEFERRED TAX LIABILITIES | 86,251 | 45,665 |
| OTHER LIABILITIES | 17,862 | 16,780 |
| Total liabilities | 1,575,054 | 1,611,286 |
| COMMITMENTS AND CONTINGENCIES | — | — |
| **STOCKHOLDERS' EQUITY:** | | |
| Preferred stock, $.01 par value, 5,000,000 shares authorized, 2,500,000 shares issued, and none outstanding | — | — |
| Common stock, $.01 par value, 200,000,000 shares authorized, 57,690,229 and 55,842,510 shares issued, and 57,380,965 and 55,533,682 shares outstanding | 577 | 558 |
| Additional paid-in capital | 1,161,570 | 1,052,059 |
| Treasury stock, 309,064 and 308,828 shares outstanding, at cost | (13,706) | (13,692) |
| Accumulated deficit | (473,223) | (321,305) |
| Accumulated other comprehensive income | 48,541 | 52,750 |
| Total stockholders' equity | 723,759 | 770,370 |
| | $ 2,298,813 | $ 2,381,656 |

The accompanying notes are an integral part of these consolidated financial statements.

1

Source: CEPHALON INC, 10-Q, November 09, 2004

CEPHALON, INC. AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF OPERATIONS
(Unaudited)

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| (In thousands, except per share data) | 2004 | 2003 | 2004 | 2003 |
| REVENUES: | | | | |
| Sales | $ 253,594 | $ 184,877 | $ 698,975 | $ 482,745 |
| Other revenues | 8,373 | 5,166 | 17,451 | 20,822 |
| | 261,967 | 190,043 | 716,426 | 503,567 |
| COSTS AND EXPENSES: | | | | |
| Cost of sales | 33,782 | 22,584 | 89,599 | 65,283 |
| Research and development | 67,683 | 44,541 | 198,208 | 117,336 |
| Selling, general and administrative | 76,204 | 63,533 | 243,908 | 183,685 |
| Depreciation and amortization | 13,784 | 10,991 | 36,927 | 32,558 |
| Impairment charge | — | — | 30,071 | — |
| Acquired in-process research and development | 185,700 | — | 185,700 | — |
| | 377,153 | 141,649 | 784,413 | 398,862 |
| INCOME (LOSS) FROM OPERATIONS | (115,186) | 48,394 | (67,987) | 104,705 |
| OTHER INCOME AND EXPENSE | | | | |
| Interest income | 4,804 | 2,962 | 11,639 | 8,137 |
| Interest expense | (5,176) | (6,218) | (16,888) | (22,574) |
| Debt exchange expense | (28,230) | — | (28,230) | — |
| Charge on early extinguishment of debt | (1,352) | (9,816) | (2,313) | (9,816) |
| Other income (expense), net | (642) | (522) | (2,444) | 1,789 |
| | (30,596) | (13,594) | (38,236) | (22,464) |
| INCOME (LOSS) BEFORE INCOME TAXES | (145,782) | 34,800 | (106,223) | 82,241 |
| INCOME TAX EXPENSE | (19,464) | (12,528) | (45,695) | (29,608) |
| NET INCOME (LOSS) | $ (165,246) | $ 22,272 | $ (151,918) | $ 52,633 |
| * BASIC INCOME (LOSS) PER COMMON SHARE (Note 11) | $ (2.94) | $ 0.40 | $ (2.71) | $ 0.94 |
| * DILUTED INCOME (LOSS) PER COMMON SHARE (Note 11) | $ (2.94) | $ 0.37 | $ (2.71) | $ 0.90 |
| WEIGHTED AVERAGE NUMBER OF COMMON SHARES OUTSTANDING | 56,178 | 55,573 | 56,065 | 55,510 |
| WEIGHTED AVERAGE NUMBER OF COMMON SHARES OUTSTANDING-ASSUMING DILUTION | 56,178 | 64,552 | 56,065 | 64,497 |

* Prior period income per common share is restated for adoption of guidance from EITF 03-6.

The accompanying notes are an integral part of these consolidated financial statements.

2

Source: CEPHALON INC, 10-Q, November 09, 2004

# CEPHALON, INC. AND SUBSIDIARIES

## CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY

| (In thousands, except share data) | Comprehensive Income | Total | Preferred Stock Shares | Amount | Common Stock Shares | Amount | Additional Paid-in Capital | Treasury Stock Shares | Amount | Accumulated Deficit | Accumulated Other Comprehensive Income |
|---|---|---|---|---|---|---|---|---|---|---|---|
| BALANCE JANUARY 1, 2003 | | $ 842,585 | — | $ — | 55,425,341 | $ 554 | $ 1,034,337 | 272,857 | $ (11,989) | $ (405,163) | $ 25,046 |
| Net income | $ 83,858 | 83,858 | | | | | | | | 83,858 | |
| Foreign currency translation gain | 28,995 | | | | | | | | | | |
| Unrealized investment losses | (1,291) | | | | | | | | | | |
| Other comprehensive income | 27,704 | 27,704 | | | | | | | | | 27,704 |
| Comprehensive income | $ 111,562 | | | | | | | | | | |
| Sale of warrants associated with convertible subordinated notes | | 178,315 | | — | | | 178,315 | | — | — | — |
| Purchase of Convertible Hedge associated with convertible subordinated notes | | (258,584) | | | | | (258,584) | | | | |
| Tax benefit from the purchase of Convertible Hedge | | 90,500 | | | | | 90,500 | | | | |
| Stock options exercised | | 4,528 | | — | 299,056 | 3 | 4,525 | | — | | |
| Tax benefit from the exercise of stock options | | 944 | | | | | 944 | | | | |
| Restricted stock award plan | | 1,394 | | | 99,025 | 1 | 1,393 | | | | |
| Employer contributions to employee benefit plan | | 829 | | — | 18,588 | — | 829 | | — | | |
| * Treasury stock acquired | | (1,703) | | | | | | 35,971 | (1,703) | | |
| BALANCE DECEMBER 31, 2003 | | 770,370 | — | — | 55,842,510 | 558 | 1,052,059 | 308,828 | (13,692) | (321,305) | 52,750 |
| Net Loss | $ (151,918) | (151,918) | | | | | | | | (151,918) | |
| Foreign currency translation loss | (3,022) | | | | | | | | | | |
| Unrealized investment losses | (1,187) | | | | | | | | | | |
| Other comprehensive loss | (4,209) | (4,209) | | | | | | | | | (4,209) |
| Comprehensive income | $ (156,127) | | | | | | | | | | |
| Issuance of common stock upon conversion of convertible notes | | 105,122 | | — | 1,518,169 | 15 | 105,107 | | — | | |
| Tax effect upon conversion of convertible notes | | (11,288) | | | | | (11,288) | | | | |
| Stock options exercised | | 8,794 | | — | 328,875 | 4 | 8,790 | | — | | |
| Tax benefit from the exercise of stock options | | 3,109 | | | | | 3,109 | | | | |
| Restricted stock award plan | | 3,793 | | | 675 | — | 3,793 | | | | |
| * Treasury stock acquired | | (14) | | — | | — | | 236 | (14) | | |
| BALANCE SEPTEMBER 30, 2004 (Unaudited) | | $ 723,759 | — | $ — | 57,690,229 | 577 | 1,161,570 | 309,064 | $ (13,706) | $ (473,233) | $ 48,541 |

\* Acquisition of treasury stock represents the dollar value of shares withheld from vesting of restricted stock grants as consideration for the employee's required tax withholding.

The accompanying notes are an integral part of these consolidated financial statements.

3

CEPHALON, INC. AND SUBSIDIARIES

CONSOLIDATED STATEMENTS OF CASH FLOWS
(Unaudited)

| (In thousands) | Nine Months Ended September 30, | |
| --- | --- | --- |
| | 2004 | 2003 |
| CASH FLOWS FROM OPERATING ACTIVITIES: | | |
| Net (loss) income | $ (151,918) | $ 52,633 |
| Adjustments to reconcile net (loss) income to net cash provided by operating activities: | | |
| Deferred income taxes | 11,853 | 15,227 |
| Tax benefit from exercise of stock options | 3,109 | 3,100 |
| Debt exchange expense | 28,230 | — |
| Tax effect on conversion of convertible notes | (11,288) | — |
| Depreciation and amortization | 39,327 | 32,558 |
| Amortization of debt issuance costs | 6,420 | 6,837 |
| Stock-based compensation expense | 3,793 | 1,765 |
| Non-cash charge on early extinguishment of debt | 2,313 | 3,615 |
| Pension curtailment | (4,214) | — |
| Loss on disposals of property and equipment | 430 | — |
| Impairment charge | 30,071 | — |
| Acquired in-process research and development | 185,700 | — |
| Increase (decrease) in cash due to changes in assets and liabilities, net of effect of acquistion: | | |
| Receivables | (40,085) | (12,394) |
| Inventory | (4,504) | (2,328) |
| Other assets | 18,122 | 1,193 |
| Accounts payable, accrued expenses and deferred revenues | 12,018 | 6,339 |
| Other liabilities | 2,225 | (2,784) |
| Net cash provided by operating activities | 131,602 | 105,761 |
| CASH FLOWS FROM INVESTING ACTIVITIES: | | |
| Purchases of property and equipment | (27,283) | (28,983) |
| Investments in non-marketable securities | — | (32,975) |
| Acquisition of CIMA, net of cash acquired | (482,521) | — |
| Acquisition of intangible assets | (308) | — |
| Purchases of investments | (169,741) | (87,643) |
| Sales of investments | 76,653 | 136,481 |
| Net cash used for investing activities | (603,200) | (13,120) |
| CASH FLOWS FROM FINANCING ACTIVITIES: | | |
| Proceeds from exercises of common stock options | 8,794 | 3,391 |
| Acquisition of treasury stock | (14) | (125) |
| Principal payments on and retirements of long-term debt | (45,924) | (200,757) |
| Net proceeds from issuance of convertible subordinated notes | — | 727,085 |
| Proceeds from sale of warrants | — | 178,315 |
| Purchase of Convertible Hedge | — | (258,584) |
| Net cash provided by (used for) financing activities | (37,144) | 449,325 |
| EFFECT OF EXCHANGE RATE CHANGES ON CASH AND CASH EQUIVALENTS | (965) | 4,078 |
| NET INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS | (509,707) | 546,044 |
| CASH AND CASH EQUIVALENTS, BEGINNING OF PERIOD | 1,115,699 | 486,097 |

Source: CEPHALON INC, 10-Q, November 09, 2004

| | | | | |
|---|---|---|---|---|
| CASH AND CASH EQUIVALENTS, END OF PERIOD | $ | 605,992 | $ | 1,032,141 |

Supplemental disclosures of cash flow information:
Non-cash investing and financing activities:

| | | | | |
|---|---|---|---|---|
| Capital lease additions | $ | 2,222 | $ | 733 |
| Tax benefit from the purchase of Convertible Hedge | | | | 90,500 |
| Conversion of convertible notes into common stock | | 78,250 | | — |

The accompanying notes are an integral part of these consolidated financial statements.

4

Source: CEPHALON INC, 10-Q, November 09, 2004

CEPHALON, INC. AND SUBSIDIARIES
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
(Unaudited)
*Amounts in thousands, except per share data*

## 1.    BASIS OF PRESENTATION

The accompanying unaudited consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America for interim financial information and with the instructions to Form 10-Q and Article 10 of Regulation S-X. Accordingly, they do not include all of the information and footnote disclosures required by accounting principles generally accepted in the United States of America for complete financial statements. In the opinion of management, all adjustments (consisting only of normal recurring accruals) considered necessary for a fair presentation have been included. These financial statements should be read in conjunction with the consolidated financial statements and notes thereto included in our Annual Report on Form 10-K, filed with the Securities and Exchange Commission, which includes audited financial statements as of December 31, 2003 and 2002 and for each of the three years in the period ended December 31, 2003. The results of our operations for any interim period are not necessarily indicative of the results of our operations for any other interim period or for a full year.

### Reclassifications

Certain reclassifications of prior year amounts have been made to conform with the current year presentation.

## 2.    ACQUISITION OF CIMA LABS INC.

On August 12, 2004, we completed our acquisition of the outstanding shares of capital stock of CIMA LABS INC (CIMA). With this acquisition, we control the rights to OraVescent fentanyl, a pain relief product candidate currently in Phase 3 clinical trials. OraVescent fentanyl is a tablet that utilizes an enhanced absorption transmucosal drug delivery technology developed by CIMA that we anticipate will provide for rapid onset of pain relief. We believe that this delivery technology will be more appealing and will enable greater market penetration than has been the case with ACTIQ. Further, we plan to pursue a broader label for OraVescent fentanyl than currently exists for ACTIQ, including treatment of breakthrough pain in opioid-tolerant patients with conditions other than cancer. Success in this program may enable the product to reach several million more patients. OraVescent fentanyl is protected by a pharmaceutical composition patent that extends until 2019.

The purchase price of $514.1 million, $482.5 million net of cash acquired (or $409.4 million net of cash, cash equivalents and investments), consists of $500.1 million for all outstanding shares of CIMA at $34.00 per share and $14.0 million in direct transaction costs. The acquisition was funded from Cephalon's existing cash and short-term investments. In connection with the acquisition, CIMA used $18.8 million of their own funds to purchase all outstanding employee stock options, whether or not vested or exercisable, for an amount equal to $34.00 less the exercise price for such option.

The following table summarizes the estimated fair values of assets acquired and liabilities assumed at the date of acquisition. The final purchase price allocation will differ from that presented below due to adjustments

5

primarily for items such as additional transaction costs and the final assessment of deferred taxes and valuation allowances.

|  | At August 12, 2004 |
|---|---|
| Cash and cash equivalents | $ 31,604 |
| Available-for-sale investments | 73,169 |
| Receivables | 10,673 |
| Inventory | 6,224 |
| Deferred tax asset, net | 22,221 |
| Other current assets | 560 |
| Property, plant and equipment | 82,474 |
| Intangible assets | 113,100 |
| Acquired in-process research and development | 185,700 |
| Goodwill | 63,909 |
| Total assets acquired | 589,634 |
| Current liabilities | (33,097) |
| Deferred tax liability | (42,412) |
| Total liabilities assumed | (75,509) |
| Net assets acquired | $ 514,125 |

Of the $113.1 million of acquired intangible assets, $70 million was assigned to the DuraSolv technology with an estimated useful life of 14 years, $32.7 million was assigned to the OraSolv technology with a weighted average estimated useful life of approximately 6 years, and $10.4 million was assigned to the developed OraVescent technology with an estimated useful life of 15 years. The $63.9 million of goodwill was assigned to the U.S. pharmaceutical segment. In accordance with SFAS 142, goodwill is not amortized, but will be subject to a periodic assessment for impairment by applying a fair-value-based test. None of this goodwill is expected to be deductible for income tax purposes.

We allocated $185.7 million of the purchase price to in-process research and development projects. In-process research and development (IPR&D) represents the valuation of acquired, to-be-completed research projects. At the acquisition date, CIMA's ongoing research and development initiatives were primarily involved with the development and commencement of Phase 3 clinical trials of OraVescent fentanyl, and several other minor ongoing research and development projects. At the acquisition date, CIMA had spent approximately $5.6 million on the OraVescent in-process research and development project, and expected to spend an additional $18.2 million to complete all phases of the research and development. We expect to complete our OraVescent fentanyl Phase 3 clinical trials and submit an NDA for approval of this product in 2006. The estimated revenues for the in-process projects are expected to be recognized from 2006 through 2019.

The value assigned to purchased in-process technology was determined by estimating the costs to develop the acquired technology into commercially viable products, estimating the resulting net cash flows from the projects, and discounting the net cash flows to their present value. The revenue projections used to value the in-process research and development were, in some cases, reduced based on the probability of developing a new drug, and considered the relevant market sizes and growth factors, expected trends in technology, and the nature and expected timing of new product introductions by us and our competitors. The resulting net cash flows from such projects are based on management's estimates of cost of sales, operating expenses, and income taxes from such projects. The rates utilized to discount the net cash flows to their present value were based on estimated cost of capital calculations. Due to the nature of the forecast and the risks associated with the projected growth and profitability of the developmental projects, discount rates of 28 percent were considered appropriate for the in-process research and development. These discount rates were commensurate with the projects' stage of development and the uncertainties in the economic estimates described above.

If these projects are not successfully developed, the sales and profitability of the combined company may be adversely affected in future periods. Additionally, the value of other acquired intangible assets may become impaired. We believed that the foregoing assumptions used in the in-process research and development analysis were reasonable at the time of the acquisition. No assurance can be given, however, that the underlying assumptions used to estimate expected project sales, development costs or profitability, or the events associated with such projects, will transpire as estimated. At the date of acquisition, the development of these projects had not yet reached technological feasibility,

6

Source: CEPHALON INC, 10-Q, November 09, 2004

and the research and development in progress had no alternative future uses. Accordingly, these costs were charged to expense in the third quarter of 2004.

The results of operations for CIMA have been included in our consolidated statements since the acquisition date of August 12, 2004.

The following unaudited pro forma information shows the results of the our operations for the nine months ended September 30, 2004 and 2003 as though the acquisition had occurred as of the beginning of the periods presented:

| | For the nine months ended September 30, | |
|---|---|---|
| | 2004 | 2003 |
| Total revenues | $ 753,004 | $ 558,849 |
| Net income (loss) | $ (170,649) | $ 52,617 |
| Basic and diluted net loss per common share: | | |
| Before cumulative effect of accounting change | $ (3.04) | $ 0.94 |
| Net income (loss) | $ (3.04) | $ 0.90 |

The pro forma results have been prepared for comparative purposes only and are not necessarily indicative of the actual results of operations had the acquisition taken place as of the beginning of the periods presented, or the results that may occur in the future. Furthermore, the pro forma results do not give effect to all cost savings or incremental costs that may occur as a result of the integration and consolidation of the acquisition.

## 3.   STOCK-BASED COMPENSATION

We account for stock option plans and restricted stock award plans using the intrinsic value method prescribed in Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees." Compensation cost for stock options, if any, is measured as the excess of the quoted market price of the stock at the date of grant over the amount an employee must pay to acquire the stock. Restricted stock awards are recorded as compensation cost over the requisite vesting periods based on the market value on the date of grant. We have opted to disclose only the provisions of Statement of Financial Accounting Standards (SFAS) 123, "Accounting for Stock-Based Compensation," and SFAS 148, "Accounting for Stock-Based Compensation – Transition and Disclosure — An Amendment to FASB Statement No. 123," as they pertain to financial statement recognition of compensation expense attributable to option grants. As such, no compensation cost has been recognized for our stock option plans. If we had elected to recognize compensation cost based on the fair value of granted stock options as prescribed by SFAS 123 and SFAS 148, the pro forma income (loss) and income (loss) per share amounts would have been as follows:

(Our previously reported earnings per share have been restated as required by EITF Issue No. 03-6. See Note 11.)

| | For the three months ended September 30, | | For the nine months ended September 30, | |
|---|---|---|---|---|
| | 2004 | 2003 | 2004 | 2003 |
| | | Restated | | Restated |
| Net income (loss), as reported | $ (165,246) | $ 22,272 | $ (151,918) | $ 52,633 |
| Add: Stock-based compensation expense included in net income, net of related tax effects | 792 | 200 | 2,314 | 568 |
| Deduct: Total stock-based employee compensation expense determined under fair value based method for all awards, net of related tax effects | (8,517) | (8,008) | (23,312) | (23,641) |
| Pro forma net income (loss) | $ (172,971) | $ 14,464 | $ (172,916) | $ 29,560 |
| | | | | |
| Earnings (loss) per share: | | | | |
| Basic income (loss) per share, as reported | $ (2.94) | $ 0.40 | $ (2.71) | $ 0.94 |
| Basic income (loss) per share, pro forma | $ (3.08) | $ 0.26 | $ (3.08) | $ 0.52 |
| | | | | |
| Diluted income (loss) per share, as reported | $ (2.94) | $ 0.37 | $ (2.71) | $ 0.90 |
| Diluted income (loss) per share, pro forma | $ (3.08) | $ 0.25 | $ (3.08) | $ 0.52 |

7

## 4.   RECENT ACCOUNTING PRONOUNCEMENTS

In addition to the recent accounting pronouncements disclosed in our Annual Report on Form 10-K for the year ended December 31, 2003, the following should be considered.

On March 31, 2004, the Financial Accounting Standards Board (FASB) issued an Exposure Draft, "Share-Based Payment," that addressed the accounting for share-based payment transactions in which an enterprise receives employee services in exchange for (a) equity instruments of the enterprise or (b) liabilities that are based on the fair value of the enterprise's equity instruments or that may be settled by the issuance of such equity instruments. The proposed Statement would eliminate the ability to account for share-based compensation transactions using APB Opinion No. 25, "Accounting for Stock Issued to Employees," and generally would require instead that such transactions be accounted for using a fair-value-based method. The proposed standard's original effective date would have applied to awards that are granted, modified, or settled in cash in fiscal years beginning after December 15, 2004. On October 13, 2004, the FASB decided to delay the effective date of its proposed standard to interim or annuals periods beginning after June 15, 2005. The FASB is expected to issue a final standard by December 31, 2004.

In March 2004, the FASB's Emerging Issues Task Force (EITF) reached consensus on Issue 03-6. This Issue is intended to clarify what is a participating security for purposes of applying SFAS 128, "Earnings Per Share." The Issue also provides further guidance on how to apply the two-class method of computing earnings per share (EPS) once it is determined that a security is participating, including how to allocate undistributed earnings to such a security. We adopted this Issue in the second quarter of 2004 and determined that our 3.875% convertible subordinated notes were participating securities as defined by this Issue. Although as of September 30, 2004 there are no longer any of the 3.875% convertible notes outstanding, net income (loss) used for basic and diluted income (loss) per share is allocated to the common shares using a ratio of weighted average common shares outstanding and weighted average participating securities, using the if-converted method. Our previously reported earnings per share have been restated as required by EITF Issue 03-6. There was no effect on our basic EPS for 2003 for the three months ended September 30 and a decrease of $0.01 per share for nine months ended September 30. The effect on our diluted EPS for 2003 was a decrease of $0.01 per share for the three and nine months ended September 30.

In September 2004, the EITF issued reached consensus on Issue 04-8, "Accounting Issues Related to Certain Features of Contingently Convertible Debt and the Effects on Diluted Earnings per Share." This Issue requires the inclusion of convertible shares for contingently convertible debt in the calculation of diluted EPS using the if-converted method, regardless of whether the contingency has been met. The Issue is effective for periods ending after December 15, 2004 and requires the restatement of previously reported EPS. We are examining possible transactions involving our Zero Coupon Convertible Notes that could cause these notes to not be considered contingently convertible debt for purposes of EITF 04-8. If we do not restructure, retire, redeem or exchange these notes prior to December 31, 2004, this Issue will require us to include an additional 12.9 million shares in the calculation of diluted EPS for 2004 and the portion of 2003 for which the convertible debt was outstanding.

## 5.   INVENTORY, NET

Inventory consisted of the following:

|  | September 30, 2004 | December 31, 2003 |
|---|---|---|
| Raw materials | $ 24,256 | $ 23,647 |
| Work-in-process | 9,443 | 10,295 |
| Finished goods | 37,767 | 27,307 |
|  | $ 71,466 | $ 61,249 |

8

In addition to the inventory listed above, we are incurring costs associated with producing supplies of NUVIGIL, a follow-on compound to PROVIGIL currently in Phase 3 clinical trials. As this is a second generation version of a currently FDA-approved product, we have capitalized these costs with the expectation of receiving future regulatory approval to market the product. At September 30, 2004, we had $16.3 million of costs reflected in other current assets. If we do not receive approval to market the product or if we should use these supplies for research purposes or if it becomes probable that the product will expire before it can be sold, we will expense these costs at that point in time.

## 6. INTANGIBLE ASSETS, NET

Other intangible assets consisted of the following:

| | Estimated Useful Lives | September 30, 2004 | | | December 31, 2003 | | |
|---|---|---|---|---|---|---|---|
| | | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount | Gross Carrying Amount | Accumulated Amortization | Net Carrying Amount |
| Developed technology acquired from Lafon | 10-15 years | $ 132,000 | $ 27,133 | $ 104,867 | $ 132,000 | $ 19,733 | $ 112,267 |
| Trademarks/tradenames acquired from Lafon | 15 years | 16,000 | 2,933 | 13,067 | 16,000 | 2,133 | 13,867 |
| GABITRIL product rights | 9-15 years | 115,990 | 27,088 | 88,902 | 116,585 | 21,055 | 95,530 |
| Novartis CNS product rights | 10 years | 41,641 | 15,615 | 26,026 | 41,641 | 12,492 | 29,149 |
| ACTIQ marketing rights | 10 years | 75,465 | 21,794 | 53,671 | 75,465 | 16,056 | 59,409 |
| Modafinil marketing rights | 10 years | 9,296 | 1,862 | 7,434 | 9,469 | 1,142 | 8,327 |
| DuraSolv technology acquired from CIMA | 14 years | 70,000 | 609 | 69,391 | — | — | — |
| OraSolv technology acquired from CIMA | 6 years | 32,700 | 655 | 32,045 | — | — | — |
| OraVescent technology acquired from CIMA | 15 years | 10,400 | 85 | 10,315 | — | — | — |
| Other product rights | 5-14 years | 14,406 | 7,908 | 6,498 | 14,341 | 6,445 | 7,896 |
| | | $ 517,898 | $ 105,682 | $ 412,216 | $ 405,501 | $ 79,056 | $ 326,445 |

Intangible assets are amortized over their estimated useful economic life using the straight-line method. Amortization expense was $9.7 million and $8.3 million for the three months ended September 30, 2004 and 2003, respectively, and $26.5 million and $24.8 million for the nine months ended September 30, 2004 and 2003, respectively. Estimated amortization expense of intangible assets for each of the next five fiscal years, is approximately $44.0 million.

## 7. LONG-TERM DEBT

Long-term debt consisted of the following:

| | September 30, 2004 | December 31, 2003 |
|---|---|---|
| 2.5% convertible subordinated notes due December 2006 | $ 522,030 | $ 600,920 |
| 3.875% convertible subordinated notes due March 2007 | — | 43,000 |
| Zero Coupon convertible subordinated notes first putable June 2008 | 375,000 | 375,000 |
| Zero Coupon convertible subordinated notes first putable June 2010 | 375,000 | 375,000 |
| Due to Abbott Laboratories | 5,411 | 6,725 |
| Mortgage and building improvement loans | 9,884 | 10,354 |
| Capital lease obligations | 3,395 | 2,289 |
| Other | 6,003 | 5,766 |
| Total debt | 1,296,723 | 1,419,054 |
| Less current portion | (9,403) | (9,637) |
| Total long-term debt | $ 1,287,320 | $ 1,409,417 |

9

Source: CEPHALON INC, 10-Q, November 09, 2004

**2.5% Convertible Subordinated Notes**

In July 2004, a holder of our 2.5% convertible subordinated notes approached us, and we agreed, to exchange $78.3 million of these outstanding notes for 1,518,169 shares of our common stock. We recognized debt exchange expense of $28.2 million in the third quarter of 2004 relating to these early exchanges in accordance with SFAS No. 84, "Induced Conversion of Convertible Debt." We also recognized the tax effect of this exchange of $11.3 million as a reduction of additional paid-in capital and as a tax benefit in our statement of operations for the nine months ended September 30, 2004.

**3.875% Convertible Subordinated Notes**

In March 2004 and August 2004, we repurchased for cash $10.0 million (at a price of 109.5% of the face amount) and $33.0 million (at a price of 104% of the face amount), respectively, of the 3.875% convertible subordinated notes in private transactions. As a result, during the nine months ended September 30, 2004, we recognized $2.3 million in our financial statements as a charge on early extinguishment of debt, as follows:

| | Principal Amount | Premium | Write-off of unamortized debt issuance costs | Total charge on early extinguishment of debt |
|---|---|---|---|---|
| 3.875% convertible subordinated notes repurchased in March 2004 | $ 10,000 | $ 950 | $ 11 | $ 961 |
| 3.875% convertible subordinated notes repurchased in July 2004 | 33,000 | 1,320 | 32 | 1,352 |
| | $ 43,000 | $ 2,270 | $ 43 | $ 2,313 |

**8. LEGAL PROCEEDINGS**

On March 28, 2003, we filed a patent infringement lawsuit in U.S. District Court in New Jersey against Teva Pharmaceuticals USA, Inc., Mylan Pharmaceuticals Inc., Ranbaxy Pharmaceuticals Inc., and Barr Laboratories, Inc. based upon the abbreviated new drug applications (ANDAs) filed by each of these companies seeking FDA approval to market a generic version of modafinil. The lawsuit claims infringement of our U.S. Patent No. RE37516, which covers the pharmaceutical compositions and methods of treatment with the form of modafinil contained in PROVIGIL. Defendants Barr, Mylan and Ranbaxy have asserted counterclaims for non-infringement and/or patent invalidity. This lawsuit is currently in the discovery phase and we expect that the trial will begin sometime in 2005. On May 26, 2004, we also filed a patent infringement lawsuit in U.S. District Court in New Jersey against Sandoz Inc. based upon their ANDA for a generic equivalent of modafinil. Discovery on this action has not yet commenced. We intend to vigorously defend the validity, and prevent infringement, of this patent.

On September 7, 2004, we announced that we had received subpoenas from the U.S. Attorney's Office in Philadelphia requesting generally relating to our sales and promotional practices for PROVIGIL, ACTIQ and GABITRIL. We are cooperating with the investigation and are providing documents to the Government. In addition, we have engaged in ongoing discussions with the Attorney General in Pennsylvania regarding recent media reports of

10

instances of abuse and diversion of ACTIQ. We have had similar discussions with the Office of the Attorney General in Connecticut; in September 2004, we received a voluntary request for information from the Office of the Connecticut Attorney General asking us to provide information generally relating to our sales and promotional practices for our U.S. products. We have agreed to comply with this voluntary request. These matters may involve the bringing of criminal charges and fines, and/or civil penalties. We cannot predict or determine the outcome of these matters or reasonably estimate the amount or range of amounts of any fines or penalties that might result from an adverse outcome. However, an adverse outcome could have a material adverse effect on our financial position, liquidity and results of operations.

We are a party to certain other litigation in the ordinary course of our business, including, among others, U.S. patent interference proceedings, European patent oppositions, and matters alleging employment discrimination, product liability and breach of commercial contract. We are vigorously defending ourselves in all of the actions against us and do not believe these matters, even if adversely adjudicated or settled, would have a material adverse effect on our financial condition, results of operations or cash flows.

## 9.    INVESTMENT IN MDS PROTEOMICS INC.

In January 2003, we purchased from MDS Proteomics Inc. (MDSP), a privately-held Canadian company and a subsidiary of MDS Inc., a $30.0 million convertible note due 2010 and entered into a five-year research agreement focused on accelerating the clinical development of our pipeline of small chemical compounds. Recently, MDSP determined to change its business model to focus upon the provision of services to the pharmaceutical and biotechnology industries, which it believes can lead to nearer term revenue and profitability.

On July 29, 2004, MDSP completed its reorganization under Canada's Companies Creditors' Arrangement Act and changed its name to Protana Inc. As part of the reorganization, we agreed to terminate our research agreement with Protana and cancel the $30.0 million convertible note we held in return for shares of Class A Preferred Stock and Common Stock of Protana. In light of the restructuring of Protana and the uncertain business prospects for the company, we determined that the carrying value of our investment was fully impaired and we recorded an impairment charge of $30.1 million, which included transaction costs, in our second quarter of 2004 results of operations. We did not record a tax benefit for this impairment charge since the realization of this deduction for tax purposes is not considered probable.

## 10.    COMPREHENSIVE INCOME (LOSS)

Our total comprehensive income (loss) is as follows:

|  | Three months ended September 30, | | Nine months ended September 30, | |
| --- | --- | --- | --- | --- |
|  | 2004 | 2003 | 2004 | 2003 |
| Net income (loss) | $ (165,246) | $ 22,272 | $ (151,918) | $ 52,633 |
| Foreign currency translation adjustment | 3,588 | 2,597 | (3,022) | 14,907 |
| Unrealized investment (losses) gains | 227 | (572) | (1,187) | (1,003) |
| Other comprehensive (loss) income | 3,815 | 2,025 | (4,209) | 13,904 |
| Comprehensive income (loss) | $ (161,431) | $ 24,297 | $ (156,127) | $ 66,537 |

## 11.    EARNINGS PER SHARE (EPS)

We compute income per common share in accordance with SFAS No. 128, "Earnings Per Share." Basic income per common share is computed based on the weighted average number of common shares outstanding during

11

the period. Diluted income per common share is computed based on the weighted average shares outstanding and the dilutive impact of common stock equivalents outstanding during the period. The dilutive effect of employee stock options and restricted stock awards is measured using the treasury stock method. The dilutive effect of convertible notes is measured using the "if-converted" method. Common stock equivalents are not included in periods where there is a loss, as they are anti-dilutive. Because of the inclusion of the restricted convertibility terms of the Zero Coupon Convertible Subordinated Notes, our diluted income per common share calculation does not give effect to the dilution from the conversion of the notes until our share price exceeds the 120% conversion price premium.

In addition, we adopted the guidance from the EITF's Issue 03-6 in the second quarter of 2004. Under the guidance, we must apply the two-class method of computing EPS and allocate undistributed earnings to participating securities. We determined that our 3.875% convertible subordinated notes were participating securities as these notes contained a provision that stated that if we distributed cash to all or substantially all of our common stock holders, whether by dividend or otherwise, the holders were entitled to such distribution as if they had converted their notes into shares. Although as of September 30, 2004 there are no longer any of the 3.875% convertible notes outstanding, net income (loss) used for basic and diluted income (loss) per share is allocated to the common shares using a ratio of weighted average common shares and weighted average participating securities for the period outstanding, using the if-converted method. Our previously reported earnings per share have been restated as required by EITF Issue 03-6.

The following is a reconciliation of net income (loss) and weighted average common shares outstanding for purposes of calculating basic and diluted income (loss) per common share:

| | Three months ended September 30, | | Nine months ended September 30, | |
|---|---|---|---|---|
| | 2004 | 2003 Restated | 2004 | 2003 Restated |
| **Basic income (loss) per share computation:** | | | | |
| Numerator: | | | | |
| Net income (loss) used for basic income per common share | $ (165,246) | $ 22,272 | $ (151,918) | $ 52,633 |
| Net income used for basic income per participating security | — | 242 | — | 678 |
| | $ (165,246) | $ 22,514 | $ (151,918) | $ 53,311 |
| Denominator: | | | | |
| Weighted average shares used for basic income (loss) per common share | 56,178 | 55,573 | 56,065 | 55,510 |
| Weighted average shares of participating securities | 214 | 611 | 422 | 724 |
| **Basic income (loss) per common share:** | $ (2.94) | $ 0.40 | $ (2.71) | $ 0.94 |
| **Diluted income (loss) per share computation:** | | | | |
| Numerator: | | | | |
| Net income (loss) used for basic income per common share | $ (165,246) | $ 22,272 | $ (151,918) | $ 52,633 |
| Interest on convertible subordinated notes (net of tax) | | 2,049 | | 6,359 |
| Net income (loss) used for diluted income per common share | $ (165,246) | $ 24,321 | $ (151,918) | $ 58,992 |
| Denominator: | | | | |
| Weighted average shares used for basic income (loss) per common share | 56,178 | 55,573 | 56,065 | 55,510 |
| Effect of dilutive securities: | | | | |
| Employee stock options and restricted stock awards | — | 1,571 | — | 1,579 |
| Convertible subordinated notes | | 7,408 | | 7,408 |
| Weighted average shares used for diluted income (loss) per common share | 56,178 | 64,552 | 56,065 | 64,497 |
| **Diluted income (loss) per common share:** | $ (2.94) | $ 0.37 | $ (2.71) | $ 0.90 |

12

Source: CEPHALON INC, 10-Q, November 09, 2004

The following reconciliation shows the shares excluded from the calculation of diluted income (loss) per common share as the inclusion of such shares would be anti-dilutive:

| | Three months ended September 30, | | Nine months ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2004 | 2003 | 2004 | 2003 |
| **Weighted average shares excluded:** | | | | |
| Employee stock options | 7,728 | 5,674 | 2,305 | 5,698 |
| Convertible subordinated notes | 19,753 | 13,730 | 20,497 | 7,702 |
| | 27,481 | 19,404 | 22,802 | 13,400 |

The potential impact of the Zero Coupon Convertible Notes on the calculation of diluted shares is described in the table below:

| | Principal amount | Conversion price per share | Resulting conversion shares | 120% conversion price |
| --- | --- | --- | --- | --- |
| Zero Coupon notes first putable June 2008 | $ 375,000 | $ 59.50 | 6,303 | $ 71.40 |
| Zero Coupon notes first putable June 2010 | 375,000 | $ 56.50 | 6,637 | $ 67.80 |
| | $ 750,000 | | 12,940 | |

At the end of each period, SFAS 128 requires that we use the if-converted method to determine the dilutive impact of the 2008 Notes and the 2010 Notes. Since the terms of these notes include restrictions which prevent the holder from converting the notes until our share price exceeds the 120% Conversion Price, there will be no impact of these notes on the total diluted shares figure for a particular reporting period unless our stock price exceeds the 120% Conversion Price on the last day of that reporting period. If that occurs, the 2008 Notes and the 2010 Notes will increase the total diluted shares figure by 6.3 million shares and 6.6 million shares, respectively, for both that current reporting period and the corresponding year-to-date reporting period. Under the if-converted method, we must recalculate this analysis each quarter to determine if the diluted shares from the 2008 Notes and 2010 Notes should be included in our diluted shares figures. However, in September 2004, the FASB's Emerging Issues Task Force reached consensus on Issue 04-8, "Accounting Issues Related to Certain Features of Contingently Convertible Debt and the Effects on Diluted Earnings per Share" effective for periods ending after December 15, 2004. Assuming we do not restructure, retire, redeem or exchange our Zero Coupon Convertible Notes, this issue requires us to include the additional 12.9 million shares related to our Zero Coupon Convertible Notes in the calculation of diluted EPS, regardless of whether the contingency has been met.

We purchased Convertible Note Hedges and sold Warrants which, in combination, have the effect of reducing the dilutive impact of the Zero Coupon Convertible Notes by increasing the effective conversion price for these Notes, from our perspective, to $72.08. SFAS 128, however, requires us to analyze the impact of the Convertible Note Hedges and Warrants on diluted EPS separately. As a result, the purchase of the Convertible Note Hedge is excluded because its impact will always be anti-dilutive. SFAS 128 further requires that the impact of the sale of the Warrants be computed using the treasury stock method. For example, using the treasury stock method, if the average price of our stock during the period ended September 30, 2004 had been $72.08, $80.00 or $90.00, the shares from the Warrants to be included in diluted EPS would have been zero, 1.0 million and 2.1 million shares, respectively. The total number of shares that could potentially be included under the Warrants is 12.9 million. Since the average share

13

Source: CEPHALON INC, 10-Q, November 09, 2004

price of our stock during the three months ended September 30, 2004 did not exceed the Conversion Price of $72.08, there was no impact of these Warrants on diluted shares or diluted EPS during that period.

## 12.    SEGMENT AND SUBSIDIARY INFORMATION

Although we have significant sales, manufacturing, and research operations conducted by several subsidiaries located throughout the United States and Europe, including our latest acquisition of CIMA, Cephalon management makes operating decisions and assesses performance based on a single pharmaceutical segment. CIMA's operations consist of contract manufacturing and research and development of pharmaceutical products which we have aggregated into our single operational segment for reporting purposes.

As required by SFAS 131, "Disclosure about Segments of an Enterprise and Related Information," revenue and long-lived asset information summarized by geographic region is provided below:

Revenues:

|  | Three months ended September 30, | | Nine months ended September 30, | |
|---|---|---|---|---|
|  | 2004 | 2003 | 2004 | 2003 |
| United States | $ 228,239 | $ 155,507 | $ 614,009 | $ 402,574 |
| Europe | 33,728 | 34,536 | 102,417 | 100,993 |
| Total | $ 261,967 | $ 190,043 | $ 716,426 | $ 503,567 |

Long-lived assets:

|  | September 30, 2004 | December 31, 2003 |
|---|---|---|
| United States | $ 652,062 | $ 474,112 |
| Europe | 531,111 | 537,614 |
| Total | $ 1,183,173 | $ 1,011,726 |

## 13.    PENSIONS AND OTHER POSTRETIREMENT BENEFITS

We have a defined benefit pension plan for current employees and a postretirement benefit plan for employees who retired prior to 2003 at our French subsidiaries.  These plans are noncontributory and are not funded; benefit payments are funded from operations.

A summary of the components of net periodic benefit costs is as follows:

|  | Pension Benefits For the three months ended September 30, | | Pension Benefits For the nine months ended September 30, | |
|---|---|---|---|---|
|  | 2004 | 2003 | 2004 | 2003 |
| Service cost | $ 113 | $ 94 | $ 346 | $ 270 |
| Interest cost | 82 | 73 | 250 | 209 |
| Recognized actuarial gain | (62) | | (189) | |
| Change in benefit obligation | $ 133 | $ 167 | $ 407 | $ 479 |

14

| | Other Benefits For the three months ended September 30, | | Other Benefits For the nine months ended September 30, | |
|---|---|---|---|---|
| | 2004 | 2003 | 2004 | 2003 |
| Service cost | $ 8 | $ 94 | $ 23 | $ 270 |
| Interest cost | 21 | 64 | 63 | 185 |
| Amortization of prior improvements | — | (59) | — | (171) |
| Recognized actuarial gain | (9) | (1) | (28) | (3) |
| Recognized gain due to plan curtailment | — | — | (4,240) | — |
| Change in benefit obligation | $ 20 | $ 98 | $ (4,182) | $ 281 |

In the first quarter of 2004, we cancelled postretirement health care benefits at Cephalon France for employees not yet retired. This resulted in a gain of $4.2 million, which has been recognized as an offset to net periodic benefits costs for the three months ended March 31, 2004 and the nine months ended September 30, 2004.

15

Source: CEPHALON INC, 10-Q, November 09, 2004

## ITEM 2.   MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

Management's Discussion and Analysis of Financial Condition and Results of Operations (MD&A) is intended to provide information to assist you in better understanding and evaluating our financial condition and results of operations. We recommend that you read this MD&A in conjunction with our consolidated financial statements included in Item 1 of this Quarterly Report on Form 10-Q, as well as our Annual Report on Form 10-K for the year ended December 31, 2003.

### EXECUTIVE SUMMARY

Cephalon is an international biopharmaceutical company dedicated to the discovery, development and marketing of innovative products to treat sleep disorders, neurological disorders, cancer and pain. In addition to conducting an active research and development program, we market three products in the United States and numerous products in various countries throughout Europe. Our three biggest products in terms of product sales, PROVIGIL, ACTIQ and GABITRIL, comprised approximately 90% of our worldwide net sales for the nine months ended September 30, 2004. We market PROVIGIL, ACTIQ and GABITRIL in the United States through our approximately 500-person sales force.

Our corporate and research and development headquarters are in West Chester, Pennsylvania, and we have offices in Utah, Minnesota, France, the United Kingdom, Germany and Switzerland. We operate manufacturing facilities in France for the production of modafinil, which is the active drug substance in PROVIGIL, Salt Lake City, Utah, for the production of ACTIQ for worldwide distribution and sale, and Eden Prairie and Brooklyn Park, Minnesota, for the production of orally disintegrating versions of drugs for pharmaceutical company partners.

Our future success is highly dependent on obtaining and maintaining patent protection for our products and technology. With respect to PROVIGIL, we have filed patent infringement suits against five generic companies. Depending on the results of the litigation, we could face generic competition as early as December 2005. For ACTIQ, the patents covering the previous and current formulations are set to expire as early as May 2005 and September 2006, respectively. As a result of the License and Supply Agreement we entered into with Barr Laboratories, Inc. in July 2004, we could face generic competition from Barr prior to September 2006 if we receive FDA approval of CIMA's OraVescent fentanyl before this date. See "Acquisition of CIMA LABS INC." below. The loss of patent protection on any of our existing products, whether by third-party challenge, invalidation or circumvention or by patent expiration, would materially impact our results of operations.

As part of our business strategy, in the future we expect to consider and, as appropriate, consummate acquisitions of other technologies, products and businesses. Over the past few years, we also have pursued a strategy of both broadening the range of clinical uses that are approved by regulatory authorities and seeking new and improved formulations of our currently marketed products. Our efforts resulted in approvals in 2003 of an expanded indication for PROVIGIL in Germany, and in 2004 of expanded indications for PROVIGIL in the United States, the United Kingdom, France, Austria and Switzerland. For the remainder of 2004 and into 2005, we have a number of ongoing and planned clinical trials, including Phase 3 clinical trials of NUVIGIL™, a single isomer of PROVIGIL, in narcolepsy, obstructive sleep apnea/hypopnea syndrome (OSA/HS) and shift work sleep disorder (SWSD), clinical trials of PROVIGIL and ACTIQ in pediatric patients, and a Phase 3 clinical program evaluating GABITRIL for the treatment of generalized anxiety disorder (GAD). In November 2004, we plan to file an sNDA with the FDA for a sugar-free formulation of ACTIQ. We also anticipate filing an sNDA for PROVIGIL in attention deficit/hyperactivity disorder (ADHD) in late 2004, an NDA for NUVIGIL in early 2005 and an NDA for OraVescent fentanyl in the second half of 2005. With respect to our Phase 2 clinical trials evaluating the use of GABITRIL in treating insomnia, we have determined that the data from these trials was less robust than the GABITRIL GAD data and, for that reason, do not plan to initiate a Phase 3 program for GABITRIL in treating insomnia at this time.

We also have devoted significant resources to the development of therapeutics to treat neurological and oncological disorders. In the neurology area, we have a program with H. Lundbeck A/S to evaluate a molecule, CEP-1347, that has entered into an 800-patient Phase 2/3 clinical trial for the treatment of patients with early stage Parkinson's disease. In the cancer area, we have a program with a molecule, CEP-701, and are currently conducting

16

Phase 2 clinical trials in patients suffering from prostate cancer and acute myeloid leukemia (AML). We also are conducting a Phase 1/2 program with another molecule, CEP-7055, to evaluate safety and tolerability and to gather preliminary evidence of efficacy in patients with treatment refractory tumors. In the pharmaceutical industry, the regulatory approval for the sale of new pharmaceutical products remains highly uncertain because the majority of therapeutic candidates fail to show the human safety and efficacy necessary for regulatory approval and successful commercialization. In addition, these efforts require substantial time, effort and financial resources. Our success in developing and commercializing these product candidates, or new or improved formulations of existing products, will be a significant factor in our future success.

We have significant levels of indebtedness outstanding, the majority of which consists of convertible notes with stated conversion prices or restricted conversion prices higher than our stock price as of the date of this filing. Of our outstanding convertible notes, as of the filing date of this report, $521.7 million in aggregate principal amount outstanding matures in 2006.

The rate of our future growth and our ability to generate sufficient cash flows from operations to service and repay our indebtedness ultimately will depend, in large part, on our ability to maintain patent protection on our existing products and successfully acquire or develop new products and new indications for our existing products.

**Acquisition of CIMA LABS INC.**

On August 12, 2004, we completed our acquisition of CIMA LABS INC. Under the Agreement and Plan of Merger dated November 3, 2003, we acquired each outstanding share of CIMA common stock for $34.00 per share in cash. The total cash paid to CIMA shareholders in the transaction was approximately $482.5 million, net of CIMA's existing cash on hand, or $409.4 million, net of CIMA's cash, cash equivalents and investments. As a result of the acquisition, we obtained the rights to CIMA's OraVescent fentanyl product candidate, which is currently in Phase 3 clinical trials for the treatment of breakthrough cancer pain in opioid-tolerant patients. OraVescent fentanyl utilizes an enhanced absorption transmucosal drug delivery technology that we believe may facilitate the rapid onset of pain relief in such patients. We are targeting approval of this product by the FDA for late 2006.

CIMA also develops and manufactures orally disintegrating tablets using its proprietary technologies, OraSolv® and DuraSolv®, which allow an active drug ingredient to be formulated into a new, orally disintegrating dosage form that quickly disintegrates in the mouth without chewing or the need for water. CIMA enters into collaborative agreements with pharmaceutical companies to develop products based on its oral drug delivery technologies. It currently manufactures for its partners, including AstraZeneca, Organon and Wyeth, three prescriptions and four over-the-counter pharmaceutical brands incorporating either the OraSolv or DuraSolv technologies. Revenues from these arrangements consist of net sales of manufactured product to partners, product development and licensing fees and royalties.

CIMA has facilities in Eden Prairie and Brooklyn Park, Minnesota, which house its executive offices, manufacturing facility, research and product development center and warehouse space. As of December 31, 2003, CIMA had 273 full-time employees.

To secure FTC clearance of the CIMA acquisition, we entered into a license and supply agreement with Barr Laboratories, Inc. whereby we agreed to license to Barr our U.S. rights to any intellectual property related to ACTIQ. The license to ACTIQ will become effective upon the earliest to occur of (i) final FDA approval of OraVescent fentanyl, (ii) September 5, 2006, if we have not received either (A) an approvable letter from FDA for the sugar free formulation of ACTIQ by July 1, 2005 (or final FDA approval within 180 days of such approvable letter) or (B) a pediatric extension for ACTIQ or (iii) February 3, 2007, if we have received a pediatric extension for ACTIQ. As we currently expect to receive both a pediatric extension for ACTIQ prior to September 2006 and FDA approval for the sugar-free formulation of ACTIQ within the timeframe agreed upon with the FTC, we anticipate that the Barr license will be effective upon OraVescent fentanyl approval. Under the agreement, Barr also may receive a license to the sugar-free formulation of ACTIQ under development; this license would become effective upon OraVescent fentanyl approval by the FDA or if the sugar-free approval timelines described above are not achieved. In November 2004, we plan to file an sNDA with the FDA requesting approval for the sugar-free formulation of ACTIQ, and we anticipate final FDA approval of this formulation in mid-2005.

17

Under the license and supply agreement, we also agreed to transfer to Barr our technological know-how and intellectual property related to ACTIQ and to sell to Barr, for period of up to three years, a generic form of ACTIQ for resale in the United States if Barr is unable to manufacture an FDA-approved generic version of ACTIQ by the date the license takes effect. In addition, we have agreed to forbear from asserting any remaining patent rights in ACTIQ against other parties beginning on the earlier of August 3, 2007 or six months following the effective date of Barr's license.

## RECENT ACCOUNTING PRONOUNCEMENTS

On March 31, 2004, the FASB issued an Exposure Draft, Share-Based Payment, that addressed the accounting for share-based payment transactions in which an enterprise receives employee services in exchange for (a) equity instruments of the enterprise or (b) liabilities that are based on the fair value of the enterprise's equity instruments or that may be settled by the issuance of such equity instruments. The proposed Statement would eliminate the ability to account for share-based compensation transactions using APB Opinion No. 25, Accounting for Stock Issued to Employees, and generally would require instead that such transactions be accounted for using a fair-value-based method. The proposed standard's original effective date would have applied to awards that are granted, modified, or settled in cash in interim or annual periods beginning January 1, 2005. On October 13, 2004, the FASB decided to delay the effective date of its proposed standard for interim or annuals periods beginning June 15, 2005. The FASB is expected to issue its final standard before December 31, 2004.

In March 2004, the FASB's Emerging Issues Task Force (EITF) reached consensus on Issue 03-6. This Issue is intended to clarify what is a participating security for purposes of applying SFAS 128, "Earnings Per Share." The Issue also provides further guidance on how to apply the two-class method of computing earnings per share (EPS) once it is determined that a security is participating, including how to allocate undistributed earnings to such a security. We adopted this Issue in the second quarter of 2004 and determined that our 3.875% convertible subordinated notes were participating securities as defined by this Issue. Although as of September 30, 2004 there are no longer any of the 3.875% convertible notes outstanding, net income (loss) used for basic and diluted income (loss) per share is allocated to the common shares using a ratio of weighted average common shares outstanding and weighted average participating securities, using the if-converted method. Our previously reported earnings per share have been restated as required by EITF Issue 03-6. There was no effect on our basic EPS for 2003 for the three months ended September 30 and a decrease of $0.01 per share for nine months ended September 30. The effect on our diluted EPS for 2003 was a decrease of $0.01 per share for the three and nine months ended September 30.

In September 2004, the EITF issued reached consensus on Issue 04-8, "Accounting Issues Related to Certain Features of Contingently Convertible Debt and the Effects on Diluted Earnings per Share." This Issue requires the inclusion of convertible shares for contingently convertible debt in the calculation of diluted EPS using the if-converted method, regardless of whether the contingency has been met. The Issue is effective for periods ending after December 15, 2004 and requires the restatement of previously reported EPS. We are examining possible transactions involving our Zero Coupon Convertible Notes that could cause these notes to not be considered contingently convertible debt for purposes of EITF 04-8. If we do not restructure, retire, redeem or exchange these notes prior to December 31, 2004, this Issue will require us to include an additional 12.9 million shares in the calculation of diluted EPS for 2004 and the portion of 2003 for which the convertible debt was outstanding.

## RESULTS OF OPERATIONS
*(Dollar amounts in thousands)*

*CIMA LABS INC.* —On August 12, 2004, we completed our acquisition of CIMA. The following table shows the effect of CIMA on our results of operations for the period August 13 to September 30, 2004 for which we have no comparable amounts in our 2003 results of operations:

18

Source: CEPHALON INC, 10-Q, November 09, 2004

**For the period August 13 through September 30, 2004:**

| | | |
|---|---:|---|
| Sales | $ | 5,224 |
| Other revenues | | 5,389 |
| | | 10,613 |
| Costs and expenses: | | |
| Cost of sales | | 4,577 |
| Research and development | | 3,338 |
| Selling, general and administrative | | 1,673 |
| Depreciation and amortization | | 1,802 |
| Acquired in-process research and development costs | | 185,700 |
| | | 197,090 |
| Other income and expense: | | |
| Interest income | | 255 |
| Other income (expense), net | | (13) |
| | | 242 |
| Loss before income taxes | $ | (186,235) |

*Sales*— In the United States, we sell our products to pharmaceutical wholesalers. Decisions made by these wholesalers and their customers regarding the levels of inventory they hold (and thus the amount of product they purchase) can materially affect the level of our sales in any particular period and thus may not necessarily correlate to the number of prescriptions written for our products as reported by IMS Health Incorporated. We attempt to minimize these fluctuations, both by providing, from time to time, discounts to our customers to stock normal amounts of inventory and by canceling orders if we believe a particular customer is speculatively buying inventory in anticipation of possible price increases. However, we do not have any agreements, understandings or business practices under which we extend incentives based on levels of inventory held by wholesalers. We estimate that wholesaler inventories as of September 30, 2004 for all three of our products were within a normal range. However, we do not have access to the actual inventory levels of our products held by our wholesalers or their customers.

At the beginning of 2004, we consolidated our two former U.S. sales forces into a single unit that now details all three products to a broader group of physicians, including primary care physicians (e.g. internists, general practitioners and family practitioners). In addition, we recently expanded this combined force to approximately 500 persons. We believe this substantially larger sales force, coupled with focused marketing efforts designed to educate physicians and communicate the benefits of our products, contributed to the increases in total sales for the three and nine months ended September 30, 2004.

*Three months ended September 30, 2004 compared to three months ended September 30, 2003:*

| | For the three months ended September 30, | | | |
|---|---:|---:|---:|---:|
| Sales: | 2004 | 2003 | Change | % Change |
| PROVIGIL | $ 101,978 | $ 79,746 | $ 22,232 | 28% |
| ACTIQ | 102,694 | 65,451 | 37,243 | 57% |
| GABITRIL | 24,624 | 17,243 | 7,381 | 43% |
| Other | 24,298 | 22,437 | 1,861 | 8% |
| Total sales | 253,594 | 184,877 | 68,717 | 37% |
| Total other revenues | 8,373 | 5,166 | 3,207 | 62% |
| Total revenues | $ 261,967 | $ 190,043 | $ 71,924 | 38% |

*Sales*— In addition to our larger sales force presence, other factors which contributed to the increase in sales are summarized as follows:

19

Source: CEPHALON INC, 10-Q, November 09, 2004

- Sales of PROVIGIL increased 28% in the third quarter of 2004 as compared to 2003. U.S. prescriptions for PROVIGIL increased by 37%, according to IMS Health. In January, the FDA granted an expanded U.S. label for PROVIGIL, which is now indicated to improve wakefulness in patients with excessive sleepiness associated with obstructive sleep apnea and shift work sleep disorder, as well as narcolepsy. Additionally, domestic prices increased approximately 8% from period to period.

- Sales of ACTIQ increased 57% as compared to the same period last year. U.S. prescriptions for ACTIQ increased by 22%, according to IMS Health. In addition, domestic prices increased approximately 5% from period to period.

- Sales of GABITRIL increased 43% as compared to the same period last year. U.S. prescriptions for GABITRIL increased by 43%, according to IMS Health. An increase in domestic prices of approximately 6% period over period also contributed to higher sales recorded in 2004.

- Other sales consist of (1) sales of other products and certain third party products in various international markets, principally in France and (2) sales of products manufactured by CIMA and sold to its pharmaceutical partners. The most significant sales in this other sales category are SPASFON® (phloroglucinol) and FONZYLANE® (buflomedil).

*Other Revenues*—The increase in other revenues of 62% from period to period is primarily due to the inclusion of product development and licensing fees and royalties earned by CIMA. This additional revenue was partially offset by a decrease in partner reimbursements on both our CEP-7055 program and our CEP-1347 program and a reduction in earnings recognized under our collaboration agreement with Novartis Pharma AG. The level of other revenue recognized from period to period may continue to fluctuate based on the status and activity of each related project and terms of each collaboration agreement. Therefore, past levels of other revenues may not be indicative of future levels.

| | For the three months ended September 30, | | | |
| | 2004 | 2003 | Change | % Change |
|---|---|---|---|---|
| Costs and expenses: | | | | |
| Cost of sales | $ 33,782 | $ 22,584 | $ 11,198 | 50% |
| Research and development | 67,683 | 44,541 | 23,142 | 52% |
| Selling, general and administrative | 76,204 | 63,533 | 12,671 | 20% |
| Depreciation and amortization | 13,784 | 10,991 | 2,793 | 25% |
| Acquired in-process research and development costs | 185,700 | — | 185,700 | —% |
| | $ 377,153 | $ 141,649 | $ 235,504 | 166% |

*Cost of Sales*— The cost of sales was approximately 13% of net sales for the third quarter of 2004 and 12% of net sales for the third quarter of 2003. The increase is primarily due to higher costs related to other products sold in France and to CIMA's cost of sales for which there is no comparable data and for which the cost percentage to sales is higher than existing Cephalon products.

*Research and Development Expenses*—Research and development expenses increased $23.1 million, or 52%, in the third quarter of 2004 as compared to the third quarter of 2003. Approximately $12.8 million of this increase is due to clinical research costs associated with increased headcount necessary to support increased clinical activities and with costs incurred with our Phase 3 studies of NUVIGIL started in the fourth quarter of 2003. Expenses of $4.0 million were incurred in 2004 to develop new or improve current production processes for our currently marketed products and products in development as well as producing material for our clinical trials. CIMA costs of $3.3 million also contributed to the increase.

*Selling, General and Administrative Expenses*—Selling, general and administrative expenses increased $12.7 million, or 20%, in the third quarter of 2004 as compared to the third quarter of 2003. Of this increase, $8.3 million is a result of the expansion of our U.K. and U.S. field sales forces and an additional $1.7 million is due to CIMA. Of the

20

remaining increase, a portion is due (1) to higher administrative expenses associated with an increase in headcount, (2) costs associated with complying with the requirements of the Sarbanes-Oxley Act, and (3) higher accruals for bonus expenses resulting from a shift from a stock option-based plan to a cash-based performance incentive plan for most employees.

*Depreciation and Amortization Expenses*—Depreciation and amortization expenses increased by $2.8 million, or 25%, in the third quarter of 2004 as compared to the third quarter of 2003. Depreciation expense increased period over period primarily as a result of increased capital investments in software, building and laboratory improvements at our West Chester location, increased spending on manufacturing equipment at our Salt Lake City location and the acquisition of property, plant and equipment from CIMA. Amortization expense increased due to the amortization of technology, trademark and marketing rights acquired from CIMA.

*Acquired in-process research and development*— In connection with our acquisition of CIMA, we allocated approximately $185.7 million of the purchase price to in-process research and development projects. At the acquisition date, CIMA's ongoing research and development initiatives was primarily involved with the development and commencement of Phase 3 clinical trials of OraVescent fentanyl, and several other minor ongoing research and development projects. These costs were charged to expense in the third quarter of 2004 since, at the date of acquisition, the development of these projects had not yet reached technological feasibility, and the research and development in progress had no alternative future uses.

| Other income and expense: | For the three months ended September 30, | | Change | % Change |
| --- | --- | --- | --- | --- |
| | 2004 | 2003 | | |
| Interest income | $ 4,804 | $ 2,962 | $ 1,842 | 62% |
| Interest expense | (5,176) | (6,218) | 1,042 | (17)% |
| Debt exchange expense | (28,230) | — | (28,230) | —% |
| Charge on early extinguishment of debt | (1,352) | (9,816) | 8,464 | (86)% |
| Other income (expense), net | (642) | (522) | (120) | 23% |
| | $ (30,596) | $ (13,594) | $ (17,002) | 125% |

*Other Income and Expense*— Total other income and expense, net, decreased $17 million, or 125%, in the third quarter of 2004 from the third quarter of 2003. The decrease was attributable to the following factors:

- Interest income increased by $1.8 million in the third quarter of 2004 due to higher investment returns partially offset by lower average investment balances.

- Interest expense decreased by $1.0 million due primarily to a decrease in interest and amortization expense as a result of the July 2004 exchange of $78.3 million of our 2.5% convertible subordinated notes into 1,518,169 shares of our common stock.

- In July 2004, a holder of our 2.5% convertible subordinated notes approached us, and we agreed, to exchange $78.3 million of these outstanding notes into 1,518,169 shares of our common stock. We recognized debt exchange expense of $28.2 million in the third quarter of 2004 relating to this exchange in accordance with SFAS No. 84, "Induced Conversion of Convertible Debt."

- In August 2004, we repurchased for cash $33.0 million (at a price of 104% of the face amount) of our 3.875% convertible subordinated notes in a private transaction. As a result, during the three months ended September 30, 2004, we recognized $1.4 million in our financial statements as a charge on early extinguishment of debt. In July 2003, we redeemed for cash all of the $174.0 million outstanding 5.25% notes at a redemption price of 103.15% per $1,000 aggregate principal amount of notes, and we purchased $12.0 million of the 3.875% notes from one of the holders in a private transaction at a price of 106% of the face amount of the notes. As a result, during the third quarter of 2003, $9.8 million was recognized in our financial statements as a charge on early extinguishment of debt.

21

Source: CEPHALON INC, 10-Q, November 09, 2004

| | For the three months ended September 30, | | | |
| | 2004 | 2003 | Change | % Change |
|---|---|---|---|---|
| Income tax expense | $ (19,464) | $ (12,528) | $ (6,936) | 55% |

*Income Taxes*— We recognized $19.5 million of income tax expense in the third quarter of 2004 and $12.5 million of income tax expense in the third quarter of 2003 based on an overall estimated annual effective tax rate of approximately 39.5% in 2004 and 36% in 2003. No tax benefit was recorded for the $185.7 million charge for in-process research and development expense recognized in the third quarter of 2004. We recorded a tax benefit and a reduction of additional paid in capital of $11.3 million for the $28.3 debt exchange expense recognized upon conversion of $78.3 million of our 2.5% convertible subordinated notes in the third quarter of 2004.

*Nine months ended September 30, 2004 compared to nine months ended September 30, 2003:*

| | For the nine months ended September 30, | | | |
| | 2004 | 2003 | Change | % Change |
|---|---|---|---|---|
| Sales: | | | | |
| PROVIGIL | $ 299,292 | $ 205,058 | $ 94,234 | 46% |
| ACTIQ | 258,480 | 164,316 | 94,164 | 57% |
| GABITRIL | 72,031 | 44,473 | 27,558 | 62% |
| Other | 69,172 | 68,898 | 274 | —% |
| Total sales | 698,975 | 482,745 | 216,230 | 45% |
| Total other revenues | 17,451 | 20,822 | (3,371) | (16)% |
| Total revenues | $ 716,426 | $ 503,567 | $ 212,859 | 42% |

*Sales*—In addition to our larger sales force presence, other factors which contributed to the increase in sales are summarized as follows:

- Sales of PROVIGIL increased 46% as compared to the same period last year. U.S. prescriptions for PROVIGIL increased by 35%, according to IMS Health. In January, the FDA granted an expanded U.S. label for PROVIGIL, which is now indicated to improve wakefulness in patients with excessive sleepiness associated with obstructive sleep apnea and shift work sleep disorder, as well as narcolepsy. The period-to-period change was also impacted by lower sales recorded in the first quarter of 2003 as a result of the depletion of inventory levels at certain wholesalers. Additionally, domestic price increases of approximately 8% period over period contributed to higher 2004 sales.

- Sales of ACTIQ increased 57% as compared to the same period last year. U.S. prescriptions for ACTIQ increased by 40%, according to IMS Health. In addition, domestic prices increased approximately 7% from period to period.

- Sales of GABITRIL increased 62% as compared to the same period last year. U.S. prescriptions for GABITRIL increased by 44%, according to IMS Health. An increase in domestic prices of approximately 9% period over period also contributed to higher sales recorded in 2004.

- Other sales consist of (1) sales of other products and certain third party products in various international markets, principally in France and (2) sales of products manufactured by CIMA and sold to its pharmaceutical partners. The most significant sales in this other sales category are SPASFON® (phloroglucinol) and FONZYLANE® (buflomedil).

22

Source: CEPHALON INC, 10-Q, November 09, 2004

*Other Revenues*— The decrease in other revenues of 16% from period to period is primarily due to a decrease in partner reimbursements on both our CEP-7055 program and our CEP-1347 program and a reduction in earnings recognized under our collaboration agreement with Novartis Pharma AG. This decrease was partially offset by the inclusion of product development and licensing fees and royalties reflected by CIMA. The level of other revenue recognized from period to period may continue to fluctuate based on the status and activity of each related project and terms of each collaboration agreement. Therefore, past levels of other revenues may not be indicative of future levels.

| Costs and expenses: | For the nine months ended September 30, | | Change | % Change |
| | 2004 | 2003 | | |
| --- | --- | --- | --- | --- |
| Cost of sales | $ 89,599 | $ 65,283 | $ 24,316 | 37% |
| Research and development | 198,208 | 117,336 | 80,872 | 69% |
| Selling, general and administrative | 243,908 | 183,685 | 60,223 | 33% |
| Depreciation and amortization | 36,927 | 32,558 | 4,369 | 13% |
| Impairment charge | 30,071 | | 30,071 | —% |
| Acquired in-progress research and development costs | 185,700 | | 185,700 | —% |
| | $ 784,413 | $ 398,862 | $ 385,551 | 97% |

*Cost of Sales*— The cost of sales was approximately 13% of net sales for the nine months ended September 30, 2004 and 14% of net sales for the nine months ended September 30, 2003. The decrease is due to cost savings realized from our transfer of U.S. ACTIQ manufacturing from Abbott Laboratories to our Salt Lake City facility beginning in June 2003, partially offset by higher costs related to other products sold in France and to CIMA's cost of sales for which there is no comparable data and for which the cost percentage to sales is higher than existing Cephalon products.

*Research and Development Expenses*—Research and development expenses increased $80.9 million, or 69%, in the nine months ended September 30, 2004 as compared to the nine months ended September 30, 2003. Approximately $57.1 million of this increase is due to clinical research costs associated with increased headcount necessary to support increased clinical activities and with (1) additional clinical studies initiated in 2004 to explore the utility of GABITRIL beyond its current indication, (2) costs incurred with Phase 3 clinical programs of PROVIGIL in Pediatric ADHD which began in late 2003, and (3) costs incurred with our Phase 3 studies of NUVIGIL which began in the fourth quarter of 2003. We also incurred during the nine months ended September 30, 2004 (1) $5.7 million for the production of MYOTROPHIN in support of a Phase 3 study being performed by certain physicians, (2) $6.3 million to develop new or improve current production processes for our currently marketed products and products in development as well as producing material for our clinical trials, (3) $3.3 million of costs incurred by CIMA, and (4) $1.2 million is for a milestone payment due to a third-party under a GABITRIL license agreement. Of the remaining increase, a portion is due to higher accruals for bonus expenses resulting from a shift from a stock option-based plan to a cash-based performance incentive plan.

*Selling, General and Administrative Expenses*—Selling, general and administrative expenses increased $60.2 million, or 33%, in the nine months ended September 30, 2004 as compared to the nine months ended September 30, 2003. Of this increase, $43.6 million is a result of the expansion of our U.K. and U.S. field sales forces, additional product promotional expenses and an increased number of educational programs and $1.7 million is due to CIMA. Of the remaining increase, a portion is due (1) to higher administrative expenses associated with an increase in headcount, (2) costs associated with complying with the requirements of the Sarbanes-Oxley Act, and (3) higher accruals for bonus expenses resulting from a shift from a stock option-based plan to a cash-based performance incentive plan for most employees. These increases were partially offset by the recognition of a gain of $4.2 million in the nine months ended September 30, 2004 as a result of retiree medical benefit changes for current employees at Cephalon France.

*Depreciation and Amortization Expenses*—Depreciation and amortization expenses increased by $4.4 million, or 13%, in the nine months ended September 30, 2004 as compared to the nine months ended September 30, 2003. Depreciation expense increased period over period primarily as a result of increased capital investments in

23

software, building and laboratory improvements at our West Chester location, increased spending on manufacturing equipment at our Salt Lake City location and the acquisition of property, plant and equipment from CIMA. Amortization expense increased due to the amortization of technology, trademark and marketing rights acquired from CIMA.

*Impairment charge*—During 2004, we recorded an impairment charge of $30.1 million for the write-off of our investment in MDS Proteomics Inc.

*Acquired in-process research and development*— In connection with our acquisition of CIMA, we allocated approximately $185.7 million of the purchase price to in-process research and development projects. At the acquisition date, CIMA's ongoing research and development initiatives was primarily involved with the development and commencement of Phase 3 clinical trials of OraVescent fentanyl, and several other minor ongoing research and development projects. These costs were charged to expense in the third quarter of 2004 since, at the date of acquisition, the development of these projects had not yet reached technological feasibility, and the research and development in progress had no alternative future uses.

| | For the nine months ended September 30, | | | |
| | 2004 | 2003 | Change | % Change |
|---|---|---|---|---|
| Other income and expense: | | | | |
| Interest income | $ 11,639 | $ 8,137 | $ 3,502 | 43% |
| Interest expense | (16,888) | (22,574) | 5,686 | (25)% |
| Debt exchange expense | (28,230) | — | (28,230) | —% |
| Charge on early extinguishment of debt | (2,313) | (9,816) | 7,503 | (76)% |
| Other income (expense), net | (2,444) | 1,789 | (4,233) | (237)% |
| | $ (38,236) | $ (22,464) | $ (15,772) | 70% |

*Other Income and Expense*— Total other income and expense, net, decreased $15.8 million, or 70%, in the nine months ended September 30, 2004 from the nine months ended September 30, 2003. The decrease was attributable to the following factors:

- Interest income increased by $3.5 million in the nine months ended September 30, 2004 due to higher average investment balances as average investment returns remained relatively constant period to period.

- Interest expense decreased by $5.7 million due primarily to:

  - a decrease in interest and amortization expense of $5.5 million as a result of the July 2003 redemption of our 5.25% convertible subordinated notes,
  - a decrease in interest expense of $0.8 million on our 2.5% convertible subordinated notes due to the July 2004 exchange of $78.3 million of the outstanding notes into 1,518,169 shares of our common stock
  - an increase in amortization expense of $2.0 million associated with debt issuance costs from the June 2003 sale of our Zero Coupon Convertible Subordinated Notes.

- In July 2004, a holder of our 2.5% convertible subordinated notes approached us, and we agreed, to exchange $78.3 million of these outstanding notes into 1,518,169 shares of our common stock. We recognized debt exchange expense of $28.2 million in the third quarter of 2004 relating to this exchange in accordance with SFAS No. 84, "Induced Conversion of Convertible Debt."

- In March 2004 and August 2004, we repurchased for cash $10.0 million (at a price of 109.5% of the face amount) and $33.0 million (at a price of 104% of the face amount), respectively, of the 3.875% convertible subordinated notes in private transactions. As a result, during the nine months ended September 30, 2004, we recognized $2.3 million in our financial statements as a charge on early

24

# EXHIBIT A

# PART 2

- extinguishment of debt. In July 2003, we redeemed for cash all of the $174.0 million outstanding 5.25% notes at a redemption price of 103.15% per $1,000 aggregate principal amount of notes and we purchased $12.0 million of the 3.875% notes from one of the holders in a private transaction at a price of 106% of the face amount of the notes. As a result, during the third quarter of 2003, $9.8 million was recognized in our financial statements as a charge on early extinguishment of debt.

- Other income decreased by $4.2 million in the nine months ended September 30, 2004 compared to the same period last year primarily due to the recording of a $4.1 million gain on the increase in the fair value of a foreign currency derivative instrument in the nine months ended September 30, 2003.

|  | For the nine months ended September 30, | | | |
|  | 2004 | 2003 | Change | % Change |
|---|---|---|---|---|
| Income tax expense | $ (45,695) | $ (29,608) | $ (16,087) | 54% |

*Income Taxes*— We recognized $45.7 million of income tax expense in the nine months ended September 30, 2004 and $29.6 million of income tax expense in the nine months ended September 30, 2003 based on an overall estimated annual effective tax rate of approximately 39.5% in 2004 and 36% in 2003. We did not record a tax benefit on the impairment charge of $30.1 million recognized in the second quarter of 2004 since the realization of this deduction for tax purposes is not considered probable. No tax benefit was recorded for the $185.7 million charge for in-process research and development expense recognized in the third quarter of 2004. We recorded a tax benefit and a reduction of additional paid-in capital of $11.3 million for the $28.3 debt exchange expense recognized upon conversion of $78.3 million of our 2.5% convertible subordinated notes in the third quarter of 2004.

## LIQUIDITY AND CAPITAL RESOURCES

Cash, cash equivalents and investments at September 30, 2004 were $810.5 million, representing 35% of total assets. Working capital, which is calculated as current assets less current liabilities, was $933.6 million at September 30, 2004.

*Net Cash Provided by Operating Activities*

Net cash provided by operating activities was $131.6 million for the nine months ended September 30, 2004 as compared to $105.8 million for 2003. The increase is primarily a result of our sales growth, in addition to net changes in cash flow resulting from decreases in accounts payable, accrued expenses partially offset by an increase in trade receivables.

*Net Cash Used for Investing Activities*

Net cash used for investing activities was $603.2 million for the nine months ended September 30, 2004 as compared to $13.1 million for 2003. The change is primarily due to the acquisition of CIMA in August 2004 for $482.5 million, net of cash acquired (or $409.4 million, net of cash, cash equivalents and investments acquired) and the increase of purchases of available-for-sale investments in order to benefit from rising interest rates on longer term investments. These increases of net cash used for investing activities were partially offset by the purchase of non-marketable securities totaling $33.0 million in 2003, which included securities of MDS Proteomics Inc. (MDSP), a privately-held Canadian company. The carrying value of the investment in MDSP was written off as an impairment charge in the second quarter of 2004.

*Net Cash Provided by (Used for) Financing Activities*

Net cash used for financing activities was $37.1 million for the nine months ended September 30, 2004, as compared to net cash provided by financing activities of $449.3 million in 2003. The change is primarily the result of net proceeds of $727.1 million received in 2003 from the sale of zero coupon convertible subordinated notes. Concurrent with the private placement of the notes, we purchased a convertible note hedge for $258.6 million and sold warrants for $178.3 million.

25

Source: CEPHALON INC, 10-Q, November 09, 2004

During both comparable periods, convertible subordinated notes were repurchased or redeemed (amounts in thousands):

| | | | | |
|---|---|---|---|---|
| 3.875% convertible subordinated notes | March 2004 | Repurchase | $ | 10,000 |
| 3.875% convertible subordinated notes | August 2004 | Repurchase | | 33,000 |
| | | | $ | 43,000 |
| | | | | |
| 5.25% convertible subordinated notes | March 2003 | Repurchase | $ | 2,000 |
| 5.25% convertible subordinated notes | April 2003 | Repurchase | | 7,000 |
| 5.25% convertible subordinated notes | July 2003 | Redemption | | 174,000 |
| 3.875% convertible subordinated notes | July 2003 | Repurchase | | 12,000 |
| | | | $ | 195,000 |

The volume of exercises of common stock options increased in the first half of 2004 as compared to the same period in 2003. The extent and timing of option exercises are primarily dependent upon the market price of our common stock and general financial market conditions, as well as the exercise prices and expiration dates of the options.

**Outlook**

*Overview*

Cash, cash equivalents and investments at September 30, 2004 were $810.5 million. In August 2004, we completed our acquisition of CIMA and paid $482.5 million in cash, net of CIMA's existing cash on hand, (or $409.4 million, net of CIMA's cash, cash equivalents and investments) to CIMA shareholders to complete the transaction. We expect to use our remaining cash, cash equivalents and investments for working capital and general corporate purposes, including the acquisition of businesses, products, product rights, or technologies, the payment of contractual obligations, including scheduled interest payments on our convertible notes, and/or the purchase, redemption or retirement of our convertible notes. At this time, we cannot accurately predict the effect of certain developments on the rate of sales growth in 2005 and beyond, such as the degree of market acceptance and exclusivity of our products, the impact of competition, the effectiveness of our sales and marketing efforts and the outcome of our current efforts to develop new products and formulations of our existing products and to demonstrate the utility of our products in indications beyond those already included in the FDA approved labels. However, we expect that sales of our three most significant marketed products, PROVIGIL, ACTIQ and GABITRIL, in combination with other revenues, should allow us to continue to generate profits and positive cash flows from operations in the near term.

Based on our current level of operations and projected sales of our products combined with other revenues and interest income, we also believe that we will be able to service our existing debt and meet our capital expenditure and working capital requirements in the near term. However, we cannot be sure that our anticipated revenue growth will be realized or that we will continue to generate significant positive cash flow from operations. We may need to obtain additional funding for future significant strategic transactions, to repay our outstanding indebtedness or for our future operational needs, and we cannot be certain that funding will be available on terms acceptable to us, or at all.

*Products*

Analysis of prescription data for our products in the United States indicates that physicians elected to prescribe PROVIGIL, GABITRIL and ACTIQ to treat a number of indications outside of their labeled indications. Our strategy for PROVIGIL and GABITRIL has been to broaden the ranges of clinical uses that are approved by the FDA and European regulatory agencies to include many of the currently prescribed uses. In January 2004, we received approval from the FDA to expand the label for PROVIGIL to include improving wakefulness in patients with excessive sleepiness associated with SWSD and OSA/HS. In the first quarter of 2004, we launched PROVIGIL for these new indications with an expanded sales force of approximately 500 persons. In April 2004, we announced that we had received marketing approval in the United Kingdom to expand the label of PROVIGIL to include the

26

Source: CEPHALON INC, 10-Q, November 09, 2004

treatment of excessive sleepiness in patients with chronic pathological conditions, including narcolepsy, OSA/HS and moderate to severe SWSD. We believe that the addition of these new indications, coupled with a larger sales force, is having a meaningful and positive impact on PROVIGIL sales in 2004.

Continued sales growth of PROVIGIL beyond the December 2005 expiration of orphan drug exclusivity depends, in part, on our maintaining protection on the modafinil particle-size patent through its expiration beginning in 2014. See "—Legal Proceedings" below. If we complete clinical studies of PROVIGIL in pediatric patients that are agreeable to the FDA, the FDA could grant us a six-month extension of our current exclusivity and of the particle-size patent.

Our sales of ACTIQ also depend on our existing patent protection for the approved compressed powder formulation, which expires in the U.S. in September 2006, and for the previous formulation of ACTIQ, which expires in May 2005. See "—Legal Proceedings" below. If we complete clinical studies in pediatric patients that are agreeable to the FDA, the FDA could grant us six months of exclusivity beyond the September 2006 compressed powder patent expiration. However, even with this additional exclusivity, Barr's license to the ACTIQ patents could become effective as early as the launch of OraVescent fentanyl (expected in late 2006), and in no event later than February 3, 2007. The entry of Barr with a generic form of ACTIQ beginning in late 2006 or early 2007 could significantly and negatively impact future ACTIQ sales.

*Clinical Studies*

We anticipate continuing to incur significant expenditures related to conducting clinical studies to develop new pharmaceutical products and to explore the utility of our existing products in treating disorders beyond those currently approved in their respective labels. We have commenced a Phase 3 program for NUVIGIL in OSA/HS, SWSD and narcolepsy and expect to file an NDA with the FDA in early 2005. In August 2004, we announced positive results of a Phase 3 program that showed that proprietary, once-daily dosage forms of modafinil improved symptoms of ADHD in children and adolescents; we anticipate filing a sNDA with the FDA in late 2004. With respect to GABITRIL, we have initiated a Phase 3 clinical program evaluating GABITRIL for the treatment of GAD. During the third quarter of 2004, we completed a Phase 2 program with GABITRIL for the treatment of insomnia and have determined not to pursue a Phase 3 program for GABITRIL in treating insomnia at this time. With respect to new product candidates, we are enrolling patients in Phase 3 clinical trials of OraVescent fentanyl for the treatment of breakthrough cancer pain; and we expect to continue in 2004 and 2005 our Phase 2/3 studies of CEP-1347 for the treatment of Parkinson's Disease. We also are continuing clinical development of CEP-701 and CEP-7055 for treatment of certain malignancies. In the future, we expect to continue to incur significant expenditures to fund research and development activities, including clinical trials, for our other product candidates, and for improved formulations for our existing products. We may seek to mitigate the risk in our research and development programs by seeking sources of funding for a portion of these expenses through collaborative arrangements with third parties. However, we intend to retain a portion of the commercial rights to these programs and, as a result, we still expect to spend significant funds on our share of the cost of these programs, including the costs of research, preclinical development, clinical research and manufacturing.

*Manufacturing, Selling and Marketing Efforts*

We also expect to continue to incur significant expenditures associated with manufacturing, selling and marketing our products. In 2004, we purchased 19 acres of land adjacent to our current facilities in Salt Lake City for approximately $2 million and began a nearly $70 million capital expansion that will be substantially completed by late 2006 and that will increase our ACTIQ capacity and provide us with flexibility to manufacture other products.

*Indebtedness*

We have significant indebtedness outstanding, consisting principally of indebtedness on convertible subordinated notes. The following table summarizes the principal terms of our convertible subordinated notes outstanding as of September 30, 2004:

27

| Security | Aggregate Principal Balance Outstanding (in millions) | | Conversion Price | | Other |
|---|---|---|---|---|---|
| 2.5% Convertible Subordinated Notes due December 2006 | $ | 521.8 | $ | 81.00 * • | Redeemable on or after December 20, 2004 at our option at a redemption price of 100% of the principal amount redeemed. |
| Zero Coupon Convertible Notes due June 2033, first putable June 15, 2008 | $ | 375.0 | $ | 59.50 * • | Redeemable on June 15, 2008 at either option of holder or us at a redemption price of 100.25% of the principal amount redeemed. |
| Zero Coupon Convertible Notes due June 2033, first putable June 15, 2010 | $ | 375.0 | $ | 56.50 * • | Redeemable on June 15, 2010 at either option of holder or us at a redemption price of 100.25% of the principal amount redeemed. |

---

* Stated conversion prices as per the terms of the notes. However, each convertible note contains certain terms restricting a holder's ability to convert the notes, including that a holder may only convert if the closing price of our stock on the day prior to conversion is higher than $71.40 or $67.80 with respect to the 2008 notes or the 2010 notes, respectively. For a more complete description of these notes, including the convertible note hedge strategy we entered into when we sold the notes and the related potential impact of the notes and hedge strategy on the calculation of earnings per share, see Notes 1 and 10 to our consolidated financial statements included in Item 8 of our Form 10-K for the fiscal year ended December 31, 2003.

The annual interest payments on the $1,271.8 million of convertible notes outstanding as of September 30, 2004 are $13.0 million, payable at various dates throughout the year. In the future, we may agree to exchanges of the notes for shares of our common stock or debt, or may determine to use a portion of our existing cash on hand to purchase, redeem or retire all or a portion of the outstanding convertible notes. In January 2003, we entered into an interest rate swap agreement with a financial institution relating to our 2.5% convertible notes in the aggregate notional amount of $200.0 million. Although we exchanged $78.3 million of these notes in July 2004 for 1,518,169 shares of our common stock, the interest rate swap remains at $200.0 million. Under the swap, we agreed to pay a variable interest rate on this $200.0 million notional amount equal to LIBOR-BBA + .29% in exchange for the financial institution's agreement to pay a fixed rate of 2.5%. The variable interest rate is re-calculated at the beginning of each quarter. Effective October 1, 2004, the interest rate is 2.265%. We also agreed to provide the financial institution with cash collateral to support our obligations under the agreement. The current collateral amount is $3.0 million and is recorded in Other Assets in our consolidated balance sheet.

*Acquisition Strategy*

As part of our business strategy, we plan to consider and, as appropriate, make acquisitions of other businesses, products, product rights or technologies. Our cash reserves and other liquid assets may be inadequate to consummate these acquisitions and it may be necessary for us to raise substantial additional funds in the future to complete these transactions. In addition, as a result of our acquisition efforts, we are likely to experience significant charges to earnings for merger and related expenses (whether or not our efforts are successful) that may include transaction costs, closure costs or acquired in-process research and development charges.

In February 2004, we filed with the SEC a $1.0 billion universal shelf registration statement covering the issuance and sale from time to time, of common and preferred stock, debt securities and warrants. While we have no current plans to access the capital markets, the shelf registration statement would allow us to expediently access capital markets periodically in the future.

*Legal Proceedings*

On March 28, 2003, we filed a patent infringement lawsuit in U.S. District Court in New Jersey against Teva Pharmaceuticals USA, Inc., Mylan Pharmaceuticals Inc., Ranbaxy Pharmaceuticals Inc., and Barr Laboratories, Inc. based upon the ANDAs filed by each of these companies seeking FDA approval to market a generic equivalent of

28

---

modafinil. The lawsuit claims infringement of our U.S. Patent No. RE37516, which covers the pharmaceutical compositions and methods of treatment with the form of modafinil contained in PROVIGIL. Defendants Barr, Mylan and Ranbaxy have asserted counterclaims for non-infringement and/or patent invalidity. This litigation is currently in the discovery phase and we expect that the trial will begin sometime in 2005. On May 26, 2004, we also filed a patent infringement lawsuit in U.S. District Court in New Jersey against Sandoz Inc. based upon their ANDA for a generic equivalent of modafinil. Discovery on this action has not yet commenced. We intend to vigorously defend the validity, and prevent infringement, of this patent. However, these efforts will be both expensive and time consuming and, ultimately, may not be successful.

On September 7, 2004, we announced that we had received subpoenas from the U.S. Attorney's Office in Philadelphia requesting generally relating to our sales and promotional practices for PROVIGIL, ACTIQ and GABITRIL. We are cooperating with the investigation and are providing documents to the Government. In addition, we have engaged in ongoing discussions with the Attorney General in Pennsylvania regarding recent media reports of instances of abuse and diversion of ACTIQ. We have had similar discussions with the Office of the Attorney General in Connecticut; in September 2004, we received a voluntary request for information from the Office of the Connecticut Attorney General asking us to provide information generally relating to our sales and promotional practices for our U.S. products. We have agreed to comply with this voluntary request. These matters may involve the bringing of criminal charges and fines, and/or civil penalties. We cannot predict or determine the outcome of these matters or reasonably estimate the amount or range of amounts of any fines or penalties that might result from an adverse outcome. However, an adverse outcome could have a material adverse effect on our financial position, liquidity and results of operations.

We are a party to certain other litigation in the ordinary course of our business, including, among others, U.S. patent interference proceedings, European patent oppositions, and matters alleging employment discrimination, product liability and breach of commercial contract. We are vigorously defending ourselves in all of the actions against us and do not believe these matters, even if adversely adjudicated or settled, would have a material adverse effect on our financial condition, results of operations or cash flows.

*Other*

We may experience significant fluctuations in quarterly results based primarily on the level and timing of:

- product sales and cost of product sales;
- inventory stocking or destocking practices of our large customers;
- achievement and timing of research and development milestones;
- collaboration revenues;
- cost and timing of clinical trials;
- marketing and other expenses; and
- manufacturing or supply disruptions.

## CRITICAL ACCOUNTING POLICIES AND ESTIMATES

Our consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States of America. Preparation of these statements requires management to make judgments and estimates. Some accounting policies have a significant impact on amounts reported in these financial statements. In addition to the item listed below, a summary of significant accounting policies and a description of accounting policies that are considered critical may be found in our Item 7 of our Annual Report on Form 10-K for the year ended December 31, 2003 in the "Critical Accounting Policies and Estimates" section and the "Recent Accounting Pronouncements" section.

We capitalize inventory costs associated with marketed products and certain products prior to regulatory approval and product launch, based on management's judgment of probable future commercial use and net realizable value. We could be required to expense previously capitalized costs related to pre-approval or pre-launch inventory upon a change in such judgment, due to a denial or delay of approval by regulatory bodies, a delay in commercialization, or other potential factors. Conversely, our gross margins may be favorably impacted if some or all of the related production costs were expensed prior to the product being available for commercial sale. We are

29

Source: CEPHALON INC, 10-Q, November 09, 2004

incurring costs associated with producing supplies of NUVIGIL, a follow-on compound to PROVIGIL currently in Phase 3 clinical trials. As this is a second generation version of a currently FDA-approved product, we have capitalized these costs with the expectation of receiving future regulatory approval to market the product. At September 30, 2004, we had $16.3 million of costs reflected in other current assets.

30

CERTAIN RISKS RELATED TO OUR BUSINESS

*You should carefully consider the risks described below, in addition to the other information contained in this report, before making an investment decision. Our business, financial condition or results of operations could be harmed by any of these risks The risks and uncertainties described below are not the only ones we face. Additional risks not presently known to us or other factors not perceived by us to present significant risks to our business at this time also may impair our business operations*

**A significant portion of our revenues is derived from U.S. sales of our three largest products, and our future success will depend on the continued acceptance and growth of these products.**

For the nine months ended September 30, 2004, approximately 90% of our worldwide net sales were derived from sales of PROVIGIL, ACTIQ and GABITRIL. We cannot be certain that these products will continue to be accepted in their markets. Specifically, the following factors, among others, could affect the level of market acceptance of PROVIGIL, ACTIQ and GABITRIL:

- a change in the perception of the healthcare community of their safety and efficacy, both in an absolute sense and relative to that of competing products;
- the effectiveness of our sales and marketing efforts, particularly with respect to our efforts in 2004 directed to general practitioners for the indications approved for PROVIGIL in January 2004;
- any unfavorable publicity regarding these products or similar products;
- the price of the product relative to other competing drugs or treatments;
- any changes in government and other third-party payer reimbursement policies and practices; and
- regulatory developments affecting the manufacture, marketing or use of these products.

Any material adverse developments with respect to the sale or use of PROVIGIL, ACTIQ and GABITRIL could significantly reduce our product revenues and have a material adverse effect on our ability to generate net income and positive net cash flow from operations.

**We may be unsuccessful in our efforts to expand the number and scope of authorized uses of PROVIGIL or GABITRIL, which would significantly hamper sales and earnings growth.**

Even with the approval in January 2004 of a broader label for PROVIGIL, the markets for the approved indications of PROVIGIL and GABITRIL remain relatively small. Analysis of prescription data indicates that a significant portion of product sales of these products, as well as for ACTIQ, is derived from the use of these products outside of their labeled indications. We believe that the growth of PROVIGIL and GABITRIL will be greater if we are able to further expand the approved indications for these products.

To this end, we have completed the Phase 3 clinical trials of proprietary formulations of modafinil for the treatment of ADHD in children and expect to file an sNDA with the FDA in late 2004. We also have initiated a Phase 3 clinical program evaluating GABITRIL for the treatment of GAD. We do not know whether these current or future studies will demonstrate safety and efficacy, or if they do, whether we will succeed in receiving regulatory approval to market these products for these or other disorders. If the results of some of these additional studies are negative or adverse, this could undermine physician and patient comfort with the product, limit its commercial success, and diminish its acceptance. Even if the results of these studies are positive, the impact on sales of these products may be minimal unless we are able to obtain FDA and foreign medical authority approval to expand the authorized uses of this product. FDA regulations limit our ability to communicate the results of additional clinical studies to patients and physicians without first obtaining regulatory approval for any expanded uses.

31

Source: CEPHALON INC, 10-Q, November 09, 2004

**We may not be able to maintain adequate protection for our intellectual property or market exclusivity for certain of our products and, therefore, competitors may develop competing products, which could result in a decrease in sales and market share, cause us to reduce prices to compete successfully and limit our commercial success.**

We place considerable importance on obtaining patent protection for new technologies, products and processes. To that end, we file applications for patents covering the compositions or uses of our drug candidates or our proprietary processes. The patent positions of pharmaceutical and biotechnology companies can be highly uncertain and involve complex legal, scientific and factual questions. To date, no consistent policy has emerged regarding breadth of claims in such companies' patents. Accordingly, the patents and patent applications relating to our products, product candidates and technologies may be challenged, invalidated or circumvented by third parties and might not protect us against competitors with similar products or technology. Patent disputes in our industry are frequent and can preclude commercialization of products. If we ultimately engage in and lose any such disputes, we could be subject to competition or significant liabilities, we could be required to enter into third party licenses or we could be required to cease using technology or product in dispute. In addition, even if such licenses are available, the terms of any license requested by a third party could be unacceptable to us.

*PROVIGIL*

The U.S. composition of matter patent for modafinil expired in 2001. We own U.S. and foreign patent rights that expire between 2014 and 2015 covering pharmaceutical compositions and uses of modafinil and, more specifically, covering certain particle sizes of modafinil contained in the pharmaceutical composition. Ultimately, these patents might be found invalid as the result of a challenge by a third party, or a potential competitor could develop a competing product or product formulation that avoids infringement of these patents. To date, the FDA has accepted five ANDAs, for pharmaceutical products containing modafinil. Each of these ANDAs contained a Paragraph IV certification in which the ANDA applicant certified that the U.S. particle-size modafinil patent covering PROVIGIL either is invalid or will not be infringed by the ANDA product. On March 28, 2003, we filed a patent infringement lawsuit in U.S. District Court in New Jersey against Teva Pharmaceuticals USA, Inc., Mylan Pharmaceuticals Inc., Ranbaxy Pharmaceuticals Inc., and Barr Laboratories, Inc. based upon the ANDAs filed by each of these companies with the FDA. The lawsuit claims infringement of our U.S. Patent No. RE37516. Defendants Barr, Mylan and Ranbaxy have asserted counterclaims for non-infringement and/or patent invalidity. This litigation is currently in the discovery phase, and we expect that the trial will begin sometime in 2005. On May 26, 2004, we also filed a patent infringement lawsuit in U.S. District Court in New Jersey against Sandoz Inc. based upon their ANDA for a generic equivalent of modafinil. Discovery on this action has not yet commenced. While we intend to vigorously defend the validity of this patent and prevent infringement, these efforts will be both expensive and time consuming and, ultimately, may not be successful.

In early 2004, Barr and Ranbaxy each announced the receipt of tentative FDA approval for their respective generic versions of PROVIGIL. If the court finds the particle-size patent is invalid or not infringed, Barr and Ranbaxy could begin selling their modafinil-based products upon the expiration of our FDA orphan drug exclusivity, currently in December 2005, which would significantly and negatively impact revenues from PROVIGIL. We do not know whether the ANDAs filed by Teva, Mylan and Sandoz have been, or will be, tentatively approved by the FDA.

If we complete clinical studies of PROVIGIL in pediatric patients that are acceptable to the FDA, the FDA could grant us a six-month extension of our orphan drug exclusivity (to June 2006) and six months of exclusivity beyond the 2014 expiration of the particle-size patent term.

*ACTIQ*

With respect to ACTIQ, we hold an exclusive license to a U.S. patent covering the currently approved compressed powder pharmaceutical composition and methods for administering fentanyl via this composition that is set to expire in September 2006. Corresponding patents in foreign countries are set to expire between 2009 and 2010. Our patent protection with respect to the ACTIQ formulation we sold prior to June 2003 will expire in May 2005. If we complete an additional clinical study in pediatric patients that is agreeable to the FDA, the FDA could grant us six months of exclusivity beyond the September 2006 compressed powder patent expiration. However, even with this additional exclusivity, Barr's license to the ACTIQ patents under the license and supply agreement could become effective as early as the launch of OraVescent fentanyl (expected in late 2006), and in no event later than February 3, 2007. The entry of Barr with a generic form of ACTIQ could significantly and negatively impact future ACTIQ sales.

32

*GABITRIL*

With respect to GABITRIL, there are three U.S. composition-of-matter patents covering the currently approved product: a patent claiming tiagabine, the active drug substance in GABITRIL; a patent claiming crystalline tiagabine hydrochloride monohydrate and its use as an anti-epileptic agent; and a patent claiming anhydrous crystalline tiagabine hydrochloride and processes for its preparation. These patents currently are set to expire in 2011, 2012 and 2017, respectively. There also is a pharmaceutical composition patent covering the currently approved product and processes for its preparation, which is set to expire in 2016. Supplemental Protection Certificates based upon corresponding foreign patents covering this product are set to expire in 2011. Ultimately, these patents might be found invalid as the result of a challenge by a third party, or a potential competitor could develop a competing product or product formulation that avoids infringement of these patents.

We also rely on trade secrets, know-how and continuing technological advancements to support our competitive position. Although we have entered into confidentiality and invention rights agreements with our employees, consultants, advisors and collaborators, these parties could fail to honor such agreements or we could be unable to effectively protect our rights to our unpatented trade secrets and know-how. Moreover, others could independently develop substantially equivalent proprietary information and techniques or otherwise gain access to our trade secrets and know-how. In addition, many of our scientific and management personnel have been recruited from other biotechnology and pharmaceutical companies where they were conducting research in areas similar to those that we now pursue. As a result, we could be subject to allegations of trade secret violations and other claims.

**Manufacturing, supply and distribution problems may create supply disruptions that could result in a reduction of product sales revenue and an increase in costs of sales, and damage commercial prospects for our products.**

The manufacture, supply and distribution of pharmaceutical products, both inside and outside the United States, is highly regulated and complex. We, and the third parties we rely upon for the manufacturing and distribution of our products, must comply with all applicable regulatory requirements of the FDA and foreign authorities, including current Good Manufacturing Practice regulations. In addition, we must comply with all applicable regulatory requirements of the Drug Enforcement Administration and analogous foreign authorities for certain of our products that contain controlled substances. The facilities used to manufacture, store and distribute our products also are subject to inspection by regulatory authorities at any time to determine compliance with regulations. These regulations are complex, and any failure to comply with them could lead to remedial action, civil and criminal penalties and delays in production or distribution of material.

We predominately depend upon single sources for the manufacture of both the active drug substances contained in our products and for finished commercial supplies. For example:

- PROVIGIL: Our manufacturing facility in France is the sole source of the active drug substance modafinil. With respect to finished commercial supplies of PROVIGIL, we currently have two qualified manufacturers, DSM Pharmaceuticals, in Greenville, North Carolina, and Patheon, Inc., in Ontario, Canada.

- ACTIQ: Our U.S. facility in Salt Lake City, Utah, is the sole source for the worldwide manufacture of ACTIQ.

- GABITRIL: Abbott Laboratories manufactures finished commercial supplies of GABITRIL for the U.S. market (through at least October 2005) and Sanofi-Synthelabo manufactures GABITRIL for non-U.S. markets (through January 2005). We have identified a third party manufacturer for the future worldwide production of the active drug substance tiagabine and finished commercial supplies of GABITRIL. We are in the process of qualifying this manufacturer with appropriate U.S. and European regulatory authorities.

- Other Products: Certain of our products are manufactured at our facilities in France, with the remaining products manufactured by single source third parties. CIMA also manufactures products at its Minnesota facilities for certain of its pharmaceutical company partners.

33

Source: CEPHALON INC, 10-Q, November 09, 2004

The process of changing or adding a manufacturer or changing a formulation requires prior FDA and/or European medical authority approval and is very time-consuming. If we are unable to manage this process effectively or if an unforeseen event occurs at any facility, we could face supply disruptions that would result in significant costs and delays, undermine goodwill established with physicians and patients, damage commercial prospects for our products and adversely affect operating results. We also rely on third parties to distribute our products, perform customer service activities and accept and process product returns.

**As our products are used commercially, unintended side effects, adverse reactions or incidents of misuse may occur that could result in additional regulatory controls, adverse publicity and reduced sales of our products.**

During research and development, the use of pharmaceutical products, such as ours, is limited principally to clinical trial patients under controlled conditions and under the care of expert physicians. The widespread commercial use of our products could identify undesirable or unintended side effects that have not been evident in our clinical trials or the relatively limited commercial use to date. In addition, in patients who take multiple medications, drug interactions could occur that can be difficult to predict. Additionally, incidents of product misuse, product diversion or theft may occur, particularly with respect to products such as ACTIQ and PROVIGIL, which contain controlled substances. These events, among others, could result in adverse publicity that harms the commercial prospects of our products or lead to additional regulatory controls that could limit the circumstances under which the product is prescribed or even lead to the withdrawal of the product from the market. In particular, ACTIQ has been approved under regulations concerning drugs with certain safety profiles, under which the FDA has established special restrictions to ensure safe use. Any violation of these special restrictions could lead to the imposition of further restrictions or withdrawal of the product from the market.

**We face significant product liability risks, which may have a negative effect on our financial performance.**

The administration of drugs to humans, whether in clinical trials or commercially, can result in product liability claims whether or not the drugs are actually at fault for causing an injury. Furthermore, our products may cause, or may appear to have caused, adverse side effects (including death) or potentially dangerous drug interactions that we may not learn about or understand fully until the drug has been administered to patients for some time. As our products are used more widely and in patients with varying medical conditions, the likelihood of an adverse drug reaction, unintended side effect or incidence of misuse may increase. Product liability claims can be expensive to defend and may result in large judgments or settlements against us, which could have a negative effect on our financial performance. The costs of product liability insurance have increased dramatically in recent years, and the availability of coverage has decreased. Nevertheless, we maintain product liability insurance in amounts we believe to be commercially reasonable. Any claims could easily exceed our coverage limits. Even if a product liability claim is not successful, the adverse publicity and time and expense of defending such a claim may interfere with our business.

**Our activities and products are subject to significant government regulations and approvals, which are often costly and could result in adverse consequences to our business if we fail to comply.**

We currently have a number of products that have been approved for sale in the United States, foreign countries or both. All of our approved products are subject to extensive continuing regulations relating to, among other things, testing, manufacturing, quality control, labeling, and promotion. The failure to comply with any rules and regulations of the FDA or any foreign medical authority, or the post-approval discovery of previously unknown problems relating to our products, could result in, among other things:

- fines, recalls or seizures of products;
- total or partial suspension of manufacturing or commercial activities;
- non-approval of product license applications;
- restrictions on our ability to enter into strategic relationships; and
- criminal prosecution.

On September 7, 2004, we announced that we had received subpoenas from the U.S. Attorney's Office in Philadelphia requesting generally relating to our sales and promotional practices for PROVIGIL, ACTIQ and GABITRIL. We are cooperating with the investigation and are providing documents to the Government. In addition, we have engaged in ongoing discussions with the Attorney General in Pennsylvania regarding recent media reports of instances of abuse

34

and diversion of ACTIQ. We have had similar discussions with the Office of the Attorney General in Connecticut; in September 2004, we received a voluntary request for information from the Office of the Connecticut Attorney General asking us to provide information generally relating to our sales and promotional practices for our U.S. products. We have agreed to comply with this voluntary request. These matters may involve the bringing of criminal charges and fines, and/or civil penalties. We cannot predict or determine the outcome of these matters or reasonably estimate the amount or range of amounts of any fines or penalties that might result from an adverse outcome. However, an adverse outcome could have a material adverse effect on our financial position, liquidity and results of operations.

It is both costly and time-consuming for us to comply with these inquiries and regulations. Additionally, incidents of adverse drug reactions, unintended side effects or misuse relating to our products could result in additional regulatory controls or restrictions, or even lead to withdrawal of a product from the market.

With respect to our product candidates and for new therapeutic indications for our existing products, we conduct research, preclinical testing and clinical trials, each of which requires us to comply with extensive government regulations. We cannot market these product candidates or these new indications in the United States or other countries without receiving approval from the FDA or the appropriate foreign medical authority. The approval process is highly uncertain and requires substantial time, effort and financial resources. Ultimately, we may never obtain approval in a timely manner, or at all. Without these required approvals, our ability to substantially grow revenues in the future could be adversely affected.

In addition, because PROVIGIL and ACTIQ contain active ingredients that are controlled substances, we are subject to regulation by the DEA and analogous foreign organizations relating to the manufacture, shipment, sale and use of the applicable products. These regulations also are imposed on prescribing physicians and other third parties, making the storage, transport and use of such products relatively complicated and expensive. With the increased concern for safety by the FDA and the DEA with respect to products containing controlled substances and the heightened level of media attention given to this issue, it is possible that these regulatory agencies could impose additional restrictions on marketing or even withdraw regulatory approval for such products. In addition, adverse publicity may bring about a rejection of the product by the medical community. If the DEA, FDA or a foreign medical authority withdrew the approval of, or placed additional significant restrictions on the marketing of any of our products, our product sales and ability to promote our products could be substantially affected.

**We may be unable to repay our substantial indebtedness and other obligations.**

As of September 30, 2004, we had $1,296.7 million of indebtedness outstanding, including $1,272.0 million outstanding under convertible notes with stated conversion prices or restricted conversion prices higher than our stock price as of the date of this filing. Of our convertible notes outstanding as of the filing date of this report, $521.8 million matures in 2006. There are no restrictions on our use of our existing cash, cash equivalents and investments, and we cannot be sure that these funds will be available or sufficient in the future to enable us to repay our indebtedness. In the future, these factors, among other things, could make it difficult for us to service, repay or refinance our indebtedness or to obtain additional financing, or limit our flexibility and make us more vulnerable in the event of a downturn in our business. Unless we are able to generate cash flow from operations that, together with our available cash on hand, is sufficient to repay our indebtedness, we will be required to raise additional funds. Because the financing markets may be unwilling to provide funding to us or may only be willing to provide funding on terms that we would consider unacceptable, we may not have cash available or be able to obtain funding to permit us to meet our repayment obligations, thus adversely affecting the market price for our securities.

**Our internal control over financial reporting may not be considered effective, which could result in possible regulatory sanctions and a decline in our stock price.**

Section 404 of the Sarbanes-Oxley Act of 2002 requires us to furnish a report on our internal controls over financial reporting beginning with our Annual Report on Form 10-K for the year ending December 31, 2004. This internal control report will contain an assessment by our management of the effectiveness of our internal control over financial reporting (including the disclosure of any material weakness) and a statement that our independent auditors have attested to and reported on management's evaluation of such internal controls. The Sarbanes-Oxley Act requires, among other things, that we maintain effective disclosure controls and procedures and

35

internal controls over financial reporting. We are currently reviewing and documenting our internal control processes and procedures and have begun testing such controls. Ultimately, our internal control over financial reporting may not be considered effective if, among others things:

- any material weakness in our internal controls over financial reporting exist; or
- we fail to remediate assessed deficiencies.

For example, as previously disclosed, during the preparation of our financial statements for the period ended September 30, 2004, we discovered that a clerical error made during the second quarter of 2004 resulted in cost of sales related to our manufacturing operations in France being understated by $2.5 million on a pre-tax basis. Our independent registered public accountants have advised our management that this condition, as it existed at June 30, 2004, constituted a material weakness in internal financial controls over cost of sales and inventory valuation. We have implemented procedures that we believe will fully and effectively remediate this deficiency in our internal controls over financial reporting over cost of sales and inventory valuation in France as of the end of the third quarter of 2004.

Due to the number of controls to be examined, the complexity of the project, and the subjectivity involved in determining the effectiveness of controls, we cannot be certain that all of our controls will be considered effective by management or, if considered effective by our management, that our auditors will agree with such assessment.

If we are unable to assert that our internal control over financial reporting is effective, or if our auditors are unable to attest that our management's report is fairly stated or they are unable to express an opinion on our management's evaluation, we could be subject to regulatory sanctions or lose investor confidence in the accuracy and completeness of our financial reports, either of which could have an adverse effect on the market price for our securities.

**Our product sales and related financial results will fluctuate, and these fluctuations may cause our stock price to fall, especially if investors do not anticipate them.**

A number of analysts and investors who follow our stock have developed models to attempt to forecast future product sales and expenses, and have established earnings expectations based upon those models. These models, in turn, are based in part on estimates of projected revenue and earnings that we disclose publicly. Forecasting future revenues is difficult, especially when we only have a few years of commercial history and when the level of market acceptance of our products is changing rapidly. Forecasting is further complicated by the difficulties in estimating both existing stocking levels at pharmaceutical wholesalers and retail pharmacies and the timing of their purchases to replenish these stocks. As a result, it is likely that our revenues will fluctuate significantly, which may not meet with market expectations and which also may adversely affect our stock price. There are a number of other factors that could cause our financial results to fluctuate unexpectedly, including:

- cost of product sales;
- achievement and timing of research and development milestones;
- collaboration revenues;
- cost and timing of clinical trials and regulatory approvals;
- marketing and other expenses;
- manufacturing or supply disruptions; and
- costs associated with the operations of recently-acquired businesses and technologies.

**The efforts of government entities and third party payers to contain or reduce the costs of health care may adversely affect our sales and limit the commercial success of our products.**

In certain foreign markets, pricing or profitability of pharmaceutical products is subject to various forms of direct and indirect governmental control, including the control over the amount of reimbursements provided to the patient who is prescribed specific pharmaceutical products. For example, we are aware of governmental efforts in France to limit or eliminate reimbursement for some of our products, which could impact revenues from our French operations.

36

Source: CEPHALON INC, 10-Q, November 09, 2004

In the United States, there have been, and we expect there will continue to be, various proposals to implement similar controls. The commercial success of our products could be limited if federal or state governments adopt any such proposals. In addition, in the United States and elsewhere, sales of pharmaceutical products depend in part on the availability of reimbursement to the consumer from third party payers, such as government and private insurance plans. These third party payers increasingly challenge the prices charged for pharmaceutical products and seek to limit reimbursement levels offered to consumers for such products. These third party payers could focus their cost control efforts on our products, especially with respect to prices of and reimbursement levels for products prescribed outside their labeled indications. In these cases, their efforts could negatively impact our product sales and profitability.

**We experience intense competition in our fields of interest, which may adversely affect our business.**

Large and small companies, academic institutions, governmental agencies and other public and private research organizations conduct research, seek patent protection and establish collaborative arrangements for product development in competition with us. Products developed by any of these entities may compete directly with those we develop or sell.

The conditions that our products treat, and some of the other disorders for which we are conducting additional studies, are currently treated with many drugs, several of which have been available for a number of years or are available in inexpensive generic forms. With respect to PROVIGIL, and, if approved, NUVIGIL, there are several other products used for the treatment of excessive sleepiness or narcolepsy in the United States, including methylphenidate products such as RITALIN® by Novartis, and in our other territories, many of which have been available for a number of years and are available in inexpensive generic forms. If we are successful in obtaining FDA approval of modafinil for the treatment of ADHD in children and adolescents, we will face competition from stimulants such as RITALIN® by Novartis, STRATERRA® by Eli Lilly, and CONCERTA® by McNeil Consumer, as well as from amphetamines such as DEXDERINE® by GlaxoSmithKline and ADDERALL® by Shire. With respect to ACTIQ, we face competition from numerous short- and long-acting opioid products, including three products—Johnson & Johnson's DURAGESIC®, Purdue Pharmaceutical's OXYCONTIN® and MS-CONTIN®—that dominate the market as well as Purdue's PALLADONE® which was approved in September 2004. We also anticipate that we will face at least one generic competitor to ACTIQ beginning in late 2006 or early 2007. In addition, we are aware of numerous other companies developing other technologies for rapidly delivering opioids to treat breakthrough pain, including transmucosal, transdermal, nasal spray and inhaled delivery systems, among others, that will compete against ACTIQ and, if approved, OraVescent fentanyl. For example, in September 2003, Johnson & Johnson filed an NDA with the FDA for E-Trans®, a battery-powered transdermal patch that allows on-demand delivery of fentanyl with rapid absorption. With respect to GABITRIL, there are several products, including NEURONTIN® (gabapentin) by Pfizer, used as adjunctive therapy for the partial seizure market. Some are well-established therapies that have been on the market for several years while others have recently entered the partial seizure marketplace. In addition, several treatments for partial seizures are available in inexpensive generic forms. If we are successful in our efforts to expand the label of GABITRIL to include anxiety disorders, we will face significant competition from well-established Selective Serotonin Reuptake Inhibitor (SSRI) products such as Paxil®, Effexor XR® and Lexapro®. For all of our products, we need to demonstrate to physicians, patients and third party payers that the cost of our products is reasonable and appropriate in the light of their safety and efficacy, the price of competing products and the related health care benefits to the patient.

Many of our competitors have substantially greater capital resources, research and development staffs and facilities than we have, and substantially greater experience in conducting clinical trials, obtaining regulatory approvals and manufacturing and marketing pharmaceutical products. These entities represent significant competition for us. In addition, competitors who are developing products for the treatment of neurological or oncological disorders might succeed in developing technologies and products that are more effective than any that we develop or sell or that would render our technology and products obsolete or noncompetitive. Competition and innovation from these or other sources, including advances in current treatment methods, could potentially affect sales of our products negatively or make our products obsolete. Furthermore, we may be at a competitive marketing disadvantage against companies that have broader product lines and whose sales personnel are able to offer more complementary products than we can. Any failure to maintain our competitive position could adversely affect our business and results of operations.

37

Source: CEPHALON INC, 10-Q, November 09, 2004

**We plan to consider and, as appropriate, make acquisitions of technologies, products and businesses, which may subject us to a number of risks and/or result in us experiencing significant charges to earnings that may adversely affect our stock price, operating results and financial condition.**

As part of our efforts to acquire businesses or to enter into other significant transactions, we conduct business, legal and financial due diligence with the goal of identifying and evaluating material risks involved in the transaction. Despite our efforts, we ultimately may be unsuccessful in ascertaining or evaluating all such risks and, as a result, we might not realize the intended advantages of the acquisition. We also must consolidate and integrate the operations of an acquired business with our business. Integration efforts often take a significant amount of time, place a significant strain on our managerial, operational and financial resources and could prove to be more difficult and expensive than we predicted. If we fail to realize the expected benefits from acquisitions we may consummate in the future, whether as a result of unidentified risks, integration difficulties, regulatory setbacks or other events, our business, results of operations and financial condition could be adversely affected.

In our acquisition of CIMA, we secured rights to CIMA's product development candidate, OraVescent fentanyl, as well as its existing drug delivery business. We estimated a value for OraVescent fentanyl by making certain assumptions about, among other things, the likelihood and timing of OraVescent fentanyl approval and the potential market for the product. This estimated value of OraVescent fentanyl comprised a significant portion of the total consideration we paid to CIMA shareholders. Ultimately, our assumptions may prove to be incorrect, which could cause us to fail to realize the anticipated benefits of the CIMA transaction.

In addition, we have experienced, and will likely continue to experience, significant charges to earnings related to our efforts to consummate acquisitions. For transactions that ultimately are not consummated, these charges may include fees and expenses for investment bankers, attorneys, accountants and other advisers in connection with our efforts. Even if our efforts are successful, we may incur as part of a transaction substantial charges for closure costs associated with the elimination of duplicate operations and facilities and acquired in-process research and development charges. In either case, the incurrence of these charges could adversely affect our results of operations for particular quarterly or annual periods.

**The failure to successfully operate and manage CIMA LABS could negatively impact our results of operations.**

The operation of CIMA LABS following our August 2004 acquisition involves a number of risks and presents financial, managerial and operational challenges, including:

- diversion of management attention from our existing business and operations;

- difficulty with integration of personnel, and accounting, financial reporting, internal control and other systems; and

- increased operations that may be difficult to manage, especially since we have limited experience operating in operating a drug delivery business.

In light of these challenges, we may not be able to successfully manage the operations and personnel of CIMA. Customer dissatisfaction, manufacturing, supply, or distribution problems associated with the products that utilize CIMA's technology and intense competition in the filed of drug delivery technology could cause CIMA's pharmaceutical business to underperform relative to our expectations, which could have a material adverse effect on our business. We also could experience financial or other setbacks if CIMA's business has problems or liabilities of which we were not aware or that are substantially greater than we anticipated based on our evaluation of the business prior to the acquisition. Currently, a significant majority of CIMA's revenues are derived from only three customers. The loss of any one of these customers, or a decline in the market acceptance of the products we develop and manufacture for them, could significantly impact revenues from the CIMA business.

38

Source: CEPHALON INC, 10-Q, November 09, 2004

**The results and timing of our research and development activities, including future clinical trials, are difficult to predict, subject to potential future setbacks and, ultimately, may not result in viable pharmaceutical products, which may adversely affect our business.**

In order to sustain our business, we focus substantial resources on the search for new pharmaceutical products. These activities include engaging in discovery research and process development, conducting preclinical and clinical studies and seeking regulatory approval in the United States and abroad. In all of these areas, we have relatively limited resources and compete against larger, multinational pharmaceutical companies. Moreover, even if we undertake these activities in an effective and efficient manner, regulatory approval for the sale of new pharmaceutical products remains highly uncertain because the majority of compounds discovered do not enter clinical studies and the majority of therapeutic candidates fail to show the human safety and efficacy necessary for regulatory approval and successful commercialization.

Preclinical testing and clinical trials must demonstrate that a product candidate is safe and efficacious. The results from preclinical testing and early clinical trials may not be predictive of results obtained in subsequent clinical trials, and these clinical trials may not demonstrate the safety and efficacy necessary to obtain regulatory approval for any product candidates. A number of companies in the biotechnology and pharmaceutical industries have suffered significant setbacks in advanced clinical trials, even after obtaining promising results in earlier trials. For ethical reasons, certain clinical trials are conducted with patients having the most advanced stages of disease and who have failed treatment with alternative therapies. During the course of treatment, these patients often die or suffer other adverse medical effects for reasons that may not be related to the pharmaceutical agent being tested. Such events can have a negative impact on the statistical analysis of clinical trial results.

The completion of clinical trials of our product candidates may be delayed by many factors, including the rate of enrollment of patients. Neither we nor our collaborators can control the rate at which patients present themselves for enrollment, and the rate of patient enrollment may not be consistent with our expectations or sufficient to enable clinical trials of our product candidates to be completed in a timely manner or at all. In addition, we may not be permitted by regulatory authorities to undertake additional clinical trials for one or more of our product candidates. Even if such trials are conducted, our product candidates may not prove to be safe and efficacious or receive regulatory approvals. Any significant delays in, or termination of, clinical trials of our product candidates could impact our ability to generate product sales from these product candidates in the future.

**Our research and development and marketing efforts are often dependent on corporate collaborators and other third parties who may not devote sufficient time, resources and attention to our programs, which may limit our efforts to develop and market potential products.**

Because we have limited resources, we have entered into a number of collaboration agreements with other pharmaceutical companies, including H. Lundbeck A/S with respect to our research efforts in Parkinson's Disease, and with a number of marketing partners for our products in certain countries outside the United States. In some cases, our collaboration agreements call for our partners to control:

- the supply of bulk or formulated drugs for use in clinical trials or for commercial use;
- the design and execution of clinical studies;
- the process of obtaining regulatory approval to market the product; and/or
- marketing and selling of an approved product.

In each of these areas, our partners may not support fully our research and commercial interests because our program may compete for time, attention and resources with the internal programs of our corporate collaborators. As such, our program may not move forward as effectively, or advance as rapidly, as it might if we had retained complete control of all research, development, regulatory and commercialization decisions. We also rely on some of these collaborators and other third parties for the production of compounds and the manufacture and supply of pharmaceutical products. Additionally, we may find it necessary from time to time to seek new or additional partners to assist us in commercializing our products, though we might not be successful in establishing any such new or additional relationships.

39

Source: CEPHALON INC, 10-Q, November 09, 2004

**The price of our common stock has been and may continue to be highly volatile, which may make it difficult for holders to sell our common stock when desired or at attractive prices.**

The market price of our common stock is highly volatile, and we expect it to continue to be volatile for the foreseeable future. For example, from January 1, 2003 through September 30, 2004 our common stock traded at a high price of $60.98 and a low price of $36.91. Negative announcements, including, among others:

- adverse regulatory decisions;
- disappointing clinical trial results;
- disputes and other developments concerning patent or other proprietary rights with respect to our products; or
- operating results that fall below the market's expectations

could trigger significant declines in the price of our common stock. In addition, external events, such as news concerning economic conditions, our competitors, changes in government regulations impacting the biotechnology or pharmaceutical industries or the movement of capital into or out of our industry, also are likely to affect the price of our common stock, regardless of our operating performance.

**A portion of our revenues and expenses is subject to exchange rate fluctuations in the normal course of business, which could adversely affect our reported results of operations.**

Historically, a portion of our revenues and expenses has been earned and incurred, respectively, in currencies other than the U.S. dollar. For the nine months ended September 30, 2004, approximately 14% of our revenues were denominated in currencies other than the U.S. dollar. We translate revenues earned and expenses incurred into U.S. dollars at the average exchange rate applicable during the relevant period. A weakening of the U.S. dollar would, therefore, increase both our revenues and expenses. Fluctuations in the rate of exchange between the U.S. dollar and the euro and other currencies may affect period-to-period comparisons of our operating results. Historically, we have not hedged our exposure to these fluctuations in exchange rates.

**We are involved, or may become involved in the future, in legal proceedings that, if adversely adjudicated or settled, could materially impact our financial condition.**

As a biopharmaceutical company, we are or may become a party to litigation in the ordinary course of our business, including, among others, matters alleging employment discrimination, product liability, patent or other intellectual property rights infringement, patent invalidity or breach of commercial contract. In general, litigation claims can be expensive and time consuming to bring or defend against and could result in settlements or damages that could significantly impact results of operations and financial condition. We currently are vigorously defending ourselves against certain litigation matters. While we currently do not believe that the settlement or adverse adjudication of these lawsuits would materially impact our results of operations or financial condition, the final resolution of these matters and the impact, if any, on our results of operations, financial condition or cash flows could be material.

**Our customer base is highly concentrated.**

Our principal customers are wholesale drug distributors. These customers comprise a significant part of the distribution network for pharmaceutical products in the United States. Three large wholesale distributors control a significant share of the market. For the nine months ended September 30, 2004, these wholesaler customers, Cardinal Health, Inc., McKesson Corporation and AmerisourceBergen Corporation, in the aggregate, accounted for 87% of our worldwide net sales. The loss or bankruptcy of any of these customers could materially and adversely affect our results of operations and financial condition.

**Our dependence on key executives and scientists could impact the development and management of our business.**

We are highly dependent upon our ability to attract and retain qualified scientific, technical and managerial personnel. There is intense competition for qualified personnel in the pharmaceutical and biotechnology industries, and we cannot be sure that we will be able to continue to attract and retain the qualified personnel necessary for the development and management of our business. Although we do not believe the loss of one individual would materially harm our business, our research and development programs and our business might be harmed by the loss

40

of the services of multiple existing personnel, as well as the failure to recruit additional key scientific, technical and managerial personnel in a timely manner. Much of the know-how we have developed resides in our scientific and technical personnel and is not readily transferable to other personnel. While we have employment agreements with our key executives, we do not ordinarily enter into employment agreements with our other key scientific, technical and managerial employees. We do not maintain "key man" life insurance on any of our employees.

**We may be required to incur significant costs to comply with environmental laws and regulations, and our related compliance may limit any future profitability.**

Our research and development activities involve the controlled use of hazardous, infectious and radioactive materials that could be hazardous to human health and safety or the environment. We store these materials, and various wastes resulting from their use, at our facilities pending ultimate use and disposal. We are subject to a variety of federal, state and local laws and regulations governing the use, generation, manufacture, storage, handling and disposal of these materials and wastes, and we may be required to incur significant costs to comply with related existing and future environmental laws and regulations.

While we believe that our safety procedures for handling and disposing of these materials comply with foreign, federal, state and local laws and regulations, we cannot completely eliminate the risk of accidental injury or contamination from these materials. In the event of an accident, we could be held liable for any resulting damages, which could include fines and remedial costs. These damages could require payment by us of significant amounts over a number of years, which could adversely affect our results of operations and financial condition.

**Anti-takeover provisions may delay or prevent changes in control of our management or deter a third party from acquiring us, limiting our stockholders' ability to profit from such a transaction.**

Our board of directors has the authority to issue up to 5,000,000 shares of preferred stock, $0.01 par value, of which 1,000,000 have been reserved for issuance in connection with our stockholder rights plan, and to determine the price, rights, preferences and privileges of those shares without any further vote or action by our stockholders. Our stockholder rights plan could have the effect of making it more difficult for a third party to acquire a majority of our outstanding voting stock.

We are subject to the anti-takeover provisions of Section 203 of the Delaware General Corporation Law, which prohibits us from engaging in a "business combination" with an "interested stockholder" for a period of three years after the date of the transaction in which the person becomes an interested stockholder, unless the business combination is approved in a prescribed manner. The application of Section 203 could have the effect of delaying or preventing a change of control of Cephalon. Section 203, the rights plan, and certain provisions of our certificate of incorporation, our bylaws and Delaware corporate law, may have the effect of deterring hostile takeovers, or delaying or preventing changes in control of our management, including transactions in which stockholders might otherwise receive a premium for their shares over then-current market prices.

41

Source: CEPHALON INC, 10-Q, November 09, 2004

## ITEM 3.  QUANTITATIVE AND QUALITATIVE DISCLOSURE ABOUT MARKET RISK

We are exposed to foreign currency exchange risk related to operations conducted by our European subsidiaries that have transactions, assets, and liabilities denominated in foreign currencies that are translated into U.S. dollars for consolidated financial reporting purposes.  Historically, we have not hedged any of these foreign currency exchange risks.  For the nine months ended September 30, 2004, an average 10% weakening of the U.S. dollar relative to the currencies in which our European subsidiaries operate would have resulted in an increase of $10.2 million in reported total revenues and a corresponding increase in reported expenses.  This sensitivity analysis of the effect of changes in foreign currency exchange rates does not assume any changes in the level of operations of our European subsidiaries.

In January 2003, we entered into an interest rate swap agreement with a financial institution, relating to our 2.5% convertible subordinated notes, in the aggregate notional amount of $200.0 million. Although we exchanged $78.3 million of these notes in July 2004 for 1,518,169 shares of our common stock, the interest rate swap remains at $200.0 million. We pay interest under the swap based on the 3-month LIBOR-BBA rate plus 29 basis points, adjusted quarterly. Effective October 1, 2004, the interest rate is 2.265%.  At inception, we recognized a premium on the value of the bonds of $2.2 million that we will amortize and recognize as interest expense over the remaining term of the notes.  We also recognize adjustments to interest expense based on changes in the fair values of the bonds and the swap agreement each quarter. If LIBOR increases or decreases by 100 basis points, our annual interest expense would change by $2.0 million.  Changes in interest rates and the price and volatility of our common stock would also affect the fair values of the notes and the swap agreement, resulting in adjustments to interest expense.

Except for the interest rate swap agreement described above, our exposure to market risk for a change in interest rates relates to our investment portfolio, since all of our outstanding debt is fixed rate. Our investments are classified as short-term and as "available for sale." We do not believe that short-term fluctuations in interest rates would materially affect the value of our securities.

## ITEM 4.  CONTROLS AND PROCEDURES

(a)     **Evaluation of Disclosure Controls and Procedures**

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures as of the end of the period covered by this report. Based on that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures as of the end of the period covered by this report have been designed and are functioning effectively to provide reasonable assurance that the information required to be disclosed by us in reports filed under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. We believe that a controls system, no matter how well designed and operated, cannot provide absolute assurance that the objectives of the controls system are met, and no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within a company have been detected.

(b)     **Change in Internal Control over Financial Reporting**

As previously disclosed, during the preparation of our financial statements for the period ended September 30, 2004, we discovered that a clerical error made during the second quarter of 2004 resulted in cost of sales related to our manufacturing operations in France being understated by $2.5 million on a pre-tax basis. We communicated this error to our audit committee and independent registered public accountants. Although there was no impact on full year financial results, we chose to restate second quarter results. Our independent registered public accountants have advised our management that this condition, as it existed at June 30, 2004, constituted a material weakness in internal financial controls over cost of sales and inventory valuation. We have implemented procedures that we believe will fully and effectively remediate this deficiency in our internal controls over financial reporting over cost of sales and inventory valuation in France as of the end of the third quarter of 2004. Our management believes that these additional procedures, together with those existing before, when appropriately applied, are effective to identify errors of this nature. Other than these additional procedures, there have been no changes in our internal control over financial

42

reporting during our most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

43

Source: CEPHALON INC, 10-Q, November 09, 2004

PART II
OTHER INFORMATION

## ITEM 1. LEGAL PROCEEDINGS

The information required by this Item is incorporated by reference to footnote 8 of the Consolidated Financial Statements included in Part I, Item 1 of this Report.

## ITEM 2. UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS

*Equity Securities Sold During the Period.* On July 7, 2004, a holder of our 2.5% convertible subordinated notes approached us, and we agreed, to exchange in a private transaction $78.3 million of these outstanding notes for 1,518,169 shares of our common stock. The exchange was made in reliance on the exemption from the registration requirements of the Securities Act of 1933 afforded by Section 3(a)(9) thereof. Based on interpretations of the staff of the Division of Corporation Finance of the SEC, we believe that the shares of common stock issued by us in this transaction may be offered for resale, resold or otherwise transferred by the holder without compliance with the registration requirements of the Securities Act.

*Purchases of Equity Securities by the Company and Affiliated Purchasers.* During the third quarter of 2004, we repurchased $33.0 million principal amount of our 3.875% convertible subordinated notes due March 2007. Prior to the repurchases, a total of $33.0 million principal amount of the 3.875% Notes were outstanding. The 3.875% Notes were convertible, at the holder's option, into shares of our common stock at a price of $70.36 per share. The following table sets forth information regarding our repurchases of the 3.875% Notes.

### ISSUER PURCHASES OF EQUITY SECURITIES

| Period | Total Principal Amount of 3.875% Notes Purchased | Average Price Paid Per $1,000 Principal Amount of the 3.875% Notes | Total Principal Amount of 3.875% Notes Purchased as Part of Publicly Announced Plans or Programs | Approximate Dollar Value of 3.875% Notes that May Yet Be Purchased Under the Plans or Programs |
|---|---|---|---|---|
| July 1 – July 31, 2004 | | — | — | — |
| August 1 – August 31, 2004 | $ 33,000,000(1) | $ 1,040(2) | — | — |
| September 1 – September 30, 2004 | | | — | — |
| Total | $ 33,000,000 | $ 1,040 | — | — |

(1) The total principal amount of these 3.875% Notes was convertible into 469,016 shares of the Company's common stock as of the date of repurchase.
(2) On an "as converted" basis, the average purchase price paid per share of common stock issuable upon conversion of the 3.875% Notes was $73.17.

## ITEM 5. OTHER EVENTS

*Ratios of Earnings to Fixed Charges*

Our deficiency of earnings available to cover fixed charges for the years ended December 31, 1999, 2000, 2001, and for the nine months ended September 30, 2004, was $82.8 million, $102.8 million, $61.1 million, and $106.2 million, respectively. Since earnings were insufficient to cover fixed charges for the years ended December 31, 1999, 2000, 2001, and for the nine months ended September 30, 2004, we are unable to provide ratios of earnings to fixed charges for each respective period.

44

Source: CEPHALON INC, 10-Q, November 09, 2004

Our ratio of earnings to fixed charges for the years ended December 31, 2002 and 2003 was 2.57x and 4.18x, respectively.

## ITEM 6. EXHIBITS

| Exhibit No. | Description |
|---|---|
| 10.1(a) | License & Supply Agreement between Cephalon, Inc. and Barr Laboratories, Inc. dated July 7, 2004. (1) |
| 10.1(b) | Amendment No. 1 to License & Supply Agreement between Cephalon, Inc. and Barr Laboratories, Inc. dated July 9, 2004. |
| 10.2 | Decision and Order of the Federal Trade Commission in the matter of Cephalon, Inc. and CIMA LABS INC. dated August 9, 2004. |
| 10.3(a)+ | Cephalon, Inc. 2000 Equity Compensation Plan—Form of Employee Non-Qualified Stock Option. |
| 10.3(b)+ | Cephalon, Inc. 2004 Equity Compensation Plan—Form of Employee Restricted Stock Grant Term Sheet. |
| 10.3(c)+ | Cephalon, Inc. 2004 Equity Compensation Plan—Form of Non-Employee Director Non-Qualified Stock Option. |
| 10.3(d)+ | Cephalon, Inc. 2004 Equity Compensation Plan—Form of Employee Non-Qualified Stock Option. |
| 10.3(e)+ | Cephalon, Inc. 2004 Equity Compensation Plan—Form of Employee Incentive Stock Option. |
| 31.1 | Certification of Frank Baldino, Jr., Chairman and Chief Executive Officer of the Company, as required pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2 | Certification of J. Kevin Buchi, Senior Vice President and Chief Financial Officer of the Company, as required pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1* | Certification of Frank Baldino, Jr., Chairman and Chief Executive Officer of the Company, as required pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 32.2* | Certification of J. Kevin Buchi, Senior Vice President and Chief Financial Officer of the Company, as required pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |

+   Compensation plans and arrangements for executives and others.

*   This exhibit shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, or otherwise subject to the liability of that section. Further, this exhibit shall not be deemed to be incorporated by reference in any document filed under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended.

(1) Portions of the Exhibit have been omitted and have been filed separately pursuant to an application for confidential treatment filed with the Securities and Exchange Commission pursuant to Rule 24b-2 under the Securities Exchange Act of 1934, as amended.

45

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**CEPHALON, INC.**
(Registrant)

November 9, 2004

By   <u>FRANK BALDINO, JR.</u>
     Frank Baldino, Jr., Ph.D.
     Chairman and Chief Executive Officer
     (Principal executive officer)

By   <u>J. KEVIN BUCHI</u>
     J. Kevin Buchi
     Senior Vice President and Chief Financial Officer
     (Principal financial and accounting officer)

46

Source: CEPHALON INC, 10-Q, November 09, 2004

# EXHIBIT B

CEPHALON, INC.

**CHARTER OF THE**
**CORPORATE GOVERNANCE AND NOMINATING COMMITTEE**

I.   **Purpose**

The purpose of the Corporate Governance and Nominating Committee (the "Committee") is to:

- identify individuals qualified to become members of the Board of Directors of the Company (the "Board");
- recommend to the Board for selection as director nominees individuals qualified to become Board members;
- develop and recommend to the Board a set of effective corporate governance principles and policies applicable to the Company; and
- oversee the review and evaluation of the Board.

II.   **Structure and Membership**

1. <u>Number</u>.  The Committee shall consist of such number of directors as the Board shall from time to time determine, but in no event less than three.

2. <u>Independence</u>.  The Committee shall consist of such number of "independent" members as required by the applicable rules of the NASDAQ, but in no event shall the Committee consist of less than a majority of "independent" members. The term "independent" shall be as defined in the NASDAQ rules and regulations.

3. <u>Chair</u>.  Unless the Board elects a Chair of the Committee, the Committee shall elect a Chair by majority vote.

4. <u>Compensation</u>.  The compensation of the Committee members shall be as determined by the Board.

5. <u>Selection, Removal and Term</u>.  Members of the Committee shall be appointed by the Board, upon the recommendation of the Committee, at the annual organizational meeting of the Board.  The Board may remove members of the Committee from such Committee, with or without cause.  Members shall serve until their successors are duly elected and qualified or until their earlier death, resignation or removal.

6. <u>Subcommittees</u>.  The Committee may form and delegate authority to one or more subcommittees when appropriate.

7. <u>Report to the Board</u>. The Committee shall promptly inform the Board of the actions taken or issues discussed at its meetings. This will generally take place at the first Board meeting following a Committee meeting.

## III.    Meetings

1. <u>Frequency and Notice</u>. The Committee shall meet at least two (2) times annually, or more frequently as circumstances dictate. Any member of the Committee may call a meeting of the Committee upon due notice to each other member at least twenty-four (24) hours prior to the meeting.

2. <u>Quorum</u>. A majority of the members of the Committee shall constitute a quorum. If a quorum is present, a majority of the members shall decide any question brought before the Committee.

3. <u>Unanimous Written Consents</u>. Unless the Committee by resolution determines otherwise, the Committee may take any action required or permitted to be taken by it without a meeting if all members of the Committee consent thereto in writing.

## IV.    Authority and Responsibilities

1. <u>Board and Committee Membership</u>

- *Selection of Director Nominees* – The Committee shall be responsible for (i) identifying individuals qualified to become Board members and (ii) recommending to the Board the persons to be nominated by the Board for election as directors at the annual meeting of stockholders and the persons to be appointed by the Board to fill any vacancies on the Board.
- *Composition* – The Committee shall be responsible for reviewing the composition and size of the Board as a whole to ensure that the Board has the appropriate experience, expertise and perspective.
- *Search Firms* – The Committee shall have the authority to retain and terminate any search firms to be used to identify director nominees, including authority to approve the search firm's fees and other retention terms. The Committee is empowered, without further action by the Board, to cause the Company to pay the compensation of any search firm engaged by the Committee.
- *Selection of Committee Members* – The Committee shall be responsible for recommending to the Board the directors to be appointed to each committee of the Board.

2. Corporate Governance

- *Corporate Governance Principles* – The Committee shall develop and recommend to the Board a set of corporate governance principles applicable to the Company. The Committee shall, from time to time as it deems appropriate, review and reassess the adequacy of such principles and recommend any changes deemed appropriate to the Board for approval.
- *Other Matters* – The Committee shall generally advise the Board as a whole on corporate governance matters.

3. Evaluation of the Board and its Committees

- *Regular Evaluation* – The Committee shall be responsible for overseeing an evaluation of the Board on a regular basis, but not less than every two (2) years, to determine whether it and its committees (including this Committee) are functioning effectively. The Committee shall determine the nature of the evaluation, supervise the conduct of the evaluation and prepare an assessment of and recommendations to improve the performance of the Board and its committees, to be discussed with the Board.

4. Succession Planning

- *Executives* – Succession planning for Company executives shall be the responsibility of the Compensation Committee of the Board of Directors.
- *Board Members* – The Committee shall plan for continuity on the Board as existing Board members retire or rotate off the Board.

5. Conflicts of Interest

- *Review Other Directorships and Affiliations* – In connection with the Company's filing of its Annual Report on Form 10-K, the Committee shall review directorships, consulting arrangements and other business relationships involving the Company's directors as reported in the directors' questionnaires for possible conflicts of interest.
- *Address Conflict of Interest Situations* – The Committee shall identify, analyze and, if possible, resolve actual and potential conflicts of interest a Board member has or may have.
- *Waivers of Company Codes of Conduct* – The Committee shall review and approve any waivers of such codes relating to officers or directors of the Company.

6. <u>Other Matters</u>

- *Charter and Bylaws* – The Committee shall review periodically the Company's Certificate of Incorporation, and all amendments thereto, and Bylaws and recommend any proposed changes to the Board for approval.
- *Charter of the Committee* – The Committee, on an annual basis, shall review and reassess the adequacy of this Charter and recommend any proposed changes to the Board for approval.
- *Independent Advisors* – The Committee shall have the exclusive authority, at the expense of the Company and without management approval, to retain such independent consulting, legal, accounting and other advisors as it shall deem appropriate.
- *Investigations* – The Committee shall have the authority to conduct or authorize investigations into any matters within the scope of its responsibilities as it shall deem appropriate, including the authority to request any officer, employee or advisor of the Company to meet with the Committee.
- *Corporate Contributions* – The Committee, on an annual basis, shall review the appropriateness of contributions made by the Company.
- *Other* – The Committee shall have authority for such other matters as assigned or delegated to it by the Board from time to time.
- *Disclosure of Charter* – This Charter will be made available on the Company's website at www.cephalon.com.

<u>Adopted:</u> February 6, 2003
<u>Amended and Restated:</u> October 18, 2005