IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JERALD KING, Derivatively on Behalf of CEPHALON, INC., | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) C.A. No. 1:08-cv-00054-GMS ) |
| FRANK BALDINO, JR., WILLIAM P. EGAN, MARTYN D. GREENACRE, VAUGHN M. KAILIAN, KEVIN E. MOLEY, CHARLES A. SANDERS, GAIL R. WILENSKY, and DENNIS L. WINGER, | ) ) **JURY TRIAL DEMANDED** ) ) ) ) ) |
| Defendants, | ) ) |
| and | ) ) |
| CEPHALON, INC., A Delaware Corporation, | ) ) |
| Nominal Defendant. | ) |

**REPLY MEMORANDUM IN SUPPORT OF MOTION OF
DEFENDANTS FOR JUDGMENT ON THE PLEADINGS**

Michael P. Kelly (#2295)
Daniel M. Silver (#4758)
McCarter & English, LLP
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, DE 19801
Phone:  302.984.6301
Fax:  302.984.2493
mkelly@mccarter.com
dsilver@mccarter.com

ME1 7479246v.1

|  |  |
|---|---|
|  | Steven B. Feirson |
|  | Michael L. Kichline |
|  | Michael J. Newman |
|  | Dechert LLP |
|  | Cira Centre |
|  | 2929 Arch Street |
|  | Philadelphia, PA 19104 |
|  | Phone:  215.994.4000 |
|  | Fax:  215.994.2222 |
| June 23, 2008 | Attorneys for Defendants |

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION .................................................................................................... 1

II. ARGUMENT ............................................................................................................ 3

    A. Plaintiff Fails To Plead A *Caremark* Claim ............................................... 3

        1. Plaintiff fails to plead factual allegations showing individualized *Caremark* liability for Directors ............................................... 4

        2. Plaintiff's pleadings are insufficient, as a matter of law, to show that the Board "consciously" ignored its oversight of Cephalon ............... 5

            a. The agreement-in-principle is insufficient, as a matter of law, to show that the Board "consciously" ignored misconduct ........................................................................................ 5

            b. Off-label Actiq use is insufficient, as a matter of law, to show that the Board "consciously" ignored misconduct ............... 6

    B. Judgment Must Be Entered Against Plaintiff For Failure To Make Demand On The Board ....................................................................................... 9

        1. Plaintiff cannot meet the extraordinarily heavy burden of pleading that a majority of the Board faces a "substantial likelihood of [*Caremark*] liability" .............................................................................. 10

        2. Plaintiff should have made demand on the Board .................................. 12

III. CONCLUSION ....................................................................................................... 13

ME1 7479246v.1

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Bell Atl. Corp. v. Twombly*,
    127 S. Ct. 1955 (U.S. 2007) ................................................................................... passim

*Brennan v. Cephalon, Inc.*,
    Civ. A. No. 04-3241 (NLH), 2007 U.S. Dist. LEXIS 33991 (D.N.J. May 8, 2007) ........... 8

*Buckley v. O'Hanlon*, C.A.,
    No. 04-04-955 (GMS), 2007 U.S. Dist. LEXIS 22211 (D. Del Mar. 28, 2007) ................. 4

*Buckman Co. v. Plaintiffs' Legal Comm.*,
    531 U.S. 341 (2001) ........................................................................................................ 7

*Daily Income Fund, Inc. v. Fox*,
    464 U.S. 523 (1984) ........................................................................................................ 9

*Kanter v. Barella*,
    489 F.3d 170 (3d Cir. 2007) ............................................................................................ 4

*In re SFBC Int'l, Inc. Sec. & Derivative Litig.*,
    495 F. Supp. 2d 477 (D.N.J. 2007) ................................................................................ 11

### STATE CASES

*Aronson v. Lewis*,
    473 A.2d 805 (Del. 1984) ........................................................................................... 1, 9

*Brehm v. Eisner*,
    746 A.2d 244 (Del. 2000) ...................................................................................... passim

*Brehm v. Eisner*,
    906 A.2d 27 (Del. 2006) ................................................................................................. 6

*In re Caremark Int'l Derivative Litig.*,
    698 A.2d 959 (Del. Ch. 1996) ............................................................................... passim

*Carlton Invs. v. TLC Beatrice Int'l Holdings*,
    Civ. A. No. 13950, 1997 Del. Ch. LEXIS 86 (Del. Ch. May 30, 1997) ........................ 13

*David B. Shaev Profit Sharing Account v. Armstrong*,
    C.A. No. 1449-N, 2006 Del. Ch. LEXIS 33 (Del. Ch. Feb. 13, 2006) ............................ 5

*Desimone v. Barrows*,
    924 A.2d 908 (Del. Ch. 2007) ....................................................................................... 10

ME1 7479246v.1

*Globis Ptnrs., L.P. v. Plumtree Software, Inc.*,
    C.A. No. 1577-VCP, 2007 Del. Ch. LEXIS 169 (Del. Ch. Nov. 30, 2007) ................10, 14

*Grobow v. Perot*,
    539 A.2d 180 (Del. 1988) ................................................................................................12

*Jacobs v. Yang*,
    C.A. No. 206-N, 2004 Del. Ch. LEXIS 117 (Del. Ch. Aug. 2, 2004) ..............................12

*Kindt v. Lund*,
    Civ. A. No. 17751-NC, 2003 Del. Ch. LEXIS 62 (Del. Ch. May 30, 2003) ....................13

*Levine v. Smith*,
    591 A.2d 194 (Del. 1991) ................................................................................................13

*Pogostin v. Rice*,
    480 A.2d 619 (Del. 1984) ..................................................................................................9

*Saito v. McCall*,
    Civ. A. No. 17132-NC, 2004 Del. Ch. LEXIS 205 (Del. Ch. Dec. 20, 2004).............10, 11

*Seminaris v. Landa*,
    662 A.2d 1350 (Del. Ch. 1995).................................................................................10, 12

*Stone v. Ritter*,
    911 A.2d 362 (Del. 2006) .......................................................................................*passim*

*White v. Panic*,
    793 A.2d 356 (Del. Ch. 2000)...........................................................................................6

*Zapata Corp. v. Maldonado*,
    430 A.2d 779 (Del. 1981) ................................................................................................13

### DOCKETED CASES

*Piven v. Loranger*,
    No. 07-2878 (S.D.N.Y. April, 10 2008) ..........................................................................11

### FEDERAL STATUTES

59 Fed. Reg. 59,820, 59,821 (Nov. 18, 1994)................................................................................7

### MISCELLANEOUS

8 Del. C. §141(c)..........................................................................................................................13

Federal Rule of Civil Procedure 23.1 ...................................................................................10, 12

I.  **INTRODUCTION**

Plaintiff tries mightily to distract attention from the heavy legal burdens placed on litigants who endeavor to make out a *Caremark* claim while at the same time seeking to avoid the demand requirements of Delaware law.

Courts have routinely recognized that a *Caremark* claim is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *In re Caremark Int'l Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996). And, courts have repeatedly cautioned that demand should rarely be excused because "directors, rather than shareholders, manage the business and affairs of the corporation." *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984), overruled on other grounds by *Brehm v. Eisner*, 746 A.2d 244, 253-54 (Del. 2000).

Layered on top of these already substantial legal burdens is the additional requirement established by the recent United States Supreme Court decision in the *Twombly* case. *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955 (U.S. 2007). *Twombly* requires that plaintiffs not just plead factual allegations sufficient to make out a cause of action, but they must do so in a way that permits the court to find that such a claim is both "plausible" and is constructed with real legal and factual "heft." *Id*.

Here, when the hyperbole is set aside, Plaintiff relies on two allegations to attempt to meet these burdens: (1) the Cephalon agreement-in-principle with the government, which will encompass a substantial payment to the government and a plea to one misdemeanor count; and (2) the extent of off-label use of Actiq.

With respect to the first, Plaintiff ignores the fact that the mere existence of a corporate settlement does not in any way establish potential liability for the directors, the required targets of any *Caremark* claim. *See*, *e.g.*, *Stone v. Ritter*, 911 A.2d 362 (Del. 2006). Since corporations

1

employ hundreds, and in this case thousands of people, it is obvious that just because some people in a company may have done something wrong does not mean that the members of the Board did anything wrong. Here, as laid out in the Complaint, the Board caused the Company to cooperate with the government in its investigation, considered the findings of that investigation, and then responsibly resolved the issues presented. These actions establish the Board's fulfillment of its fiduciary duty.

With respect to the second point – the off-label use allegation – it, too, is unavailing for Plaintiff. It is widely recognized that a substantial number of pharmaceutical products have significant off-label use. Not surprisingly, Plaintiff does not plead that such use is unusual. In fact, he pleads just the opposite. He alleges that: "[t]he market for off-label use often vastly exceeds the approved FDA use." (Compl. ¶22.) Thus, off-label use is not proof of misconduct sufficient to both demonstrate a *Caremark* claim and excuse Plaintiff's failure to make a demand.

In the end, Plaintiff asks this Court to do here what the Delaware courts have done only once before: excuse demand in a *Caremark* case. Plaintiff has not met his most fundamental obligation – to specify what each board member consciously disregarded that should have caused him or her to act differently than he or she did. Nor has Plaintiff met the additional burden of demonstrating why he should be excused from doing what is required of any stockholder who believes there is something wrong – make a demand on the Board. That is especially the case here, as it is undisputed that the Company has disinterested directors and can easily and appropriately deal with a proper demand.

The right answer here is for this Court to dismiss the Complaint with prejudice. To do anything else would be to extend *Caremark* jurisprudence far beyond its current contours. At an

ME1 7479246v.1

absolute minimum, Delaware law requires that Plaintiff make a demand on the Board if he wishes to continue. The Company's response to the demand then could be evaluated by Plaintiff and, if necessary, reviewed by this Court. If appropriate, it would stand. If inappropriate, it would be overturned. There is simply no reason to proceed with this litigation as presented by the current complaint.

## II.     ARGUMENT[1]

### A.     Plaintiff Fails To Plead A *Caremark* Claim.

Plaintiff fundamentally misunderstands the extraordinarily high level of substance required by current pleading standards for the claim he alleges. To move beyond the pleading stage, Plaintiff must meet his pleading burdens under both *Caremark* and *Twombly*. *Caremark* establishes *what* substantive requirements must be pled to state a cause of action, and *Twombly* sets out the additional standard of *how* that cause of action must be pled.

To meet his *Caremark* burden, Plaintiff must state what the directors did wrong. He must lay out either that: "(a) the directors utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." *Stone*, 911 A.2d at 370.[2]

*Twombly* dictates how a plaintiff must plead a cause of action, setting the standard of persuasion that a plaintiff must meet to survive the pleading stage. A complaint must possess enough legal and factual "heft" to persuade a court that the cause of action is "plausible," not

---

[1]  On June 4, 2008, this Court granted Defendants leave to file five additional pages in their Reply Brief.

[2]  Plaintiff focuses his allegations on the second prong. (*See* Compl. ¶ 35(b)).

merely "conceivable." *Twombly*, 127 S. Ct. at 1974. This Complaint clearly lacks sufficient relevant, factually-specific allegations going to either the what or the how of the supposed violations in this case. Hence, Plaintiff fails to meet both his *Caremark* and *Twombly* burdens.

> **1.    Plaintiff fails to plead factual allegations showing individualized *Caremark* liability for Directors.**

Plaintiff employs generalized, overwrought language to try to convince this Court of wrongdoing. (*See, e.g.*, Pl. Mem. at 4 ("Defendants sitting back idly and with unwavering indolence observing and permitting illegal, life-threatening conduct to flourish under their watch . . . .")). Such conclusory allegations, however, are insufficient to meet the pleading burdens established by *Caremark* and *Twombly*. Importantly, Plaintiff's pleadings fail to distinguish between individual directors when asserting liability. Most accusations are vaguely aimed at the Board as a whole instead of individual directors. (*See, e.g.*, Compl. ¶35b ("[D]irectors knew of the violations of law, took no steps in an effort to prevent or remedy the situation, and that failure to take any action for such an inordinate amount of time resulted in substantial corporate losses.")) This is insufficient; Delaware and federal law demand individualized allegations to show individualized liability. *See*, *e.g.*, *Kanter v. Barella*, 489 F.3d 170, 180 (3d Cir. 2007) (A complaint is insufficient when it "fails to allege specific actions by any of the defendants [or] assert knowledge of alleged wrongdoings.").[3]

---

[3]    In attempting to excuse this deficiency, Plaintiff erroneously asserts that group pleading is appropriate in this case, citing the case *Buckley v. O'Hanlon,* C.A., No. 04-04-955 (GMS), 2007 U.S. Dist. LEXIS 22211 (D. Del Mar. 28, 2007). Though this Court noted in *Buckley* that "group pleading *may* be sufficient in *some* circumstances," *id*. at *13 (emphasis added), this Court limited its use to the situation where "the fraud allegations arise from the misstatements or omissions in group-published documents . . . that presumably constitute the collective actions of those individuals involved in the day-to-day affairs of the corporation." *Id.* (citation omitted). *Buckley*, accordingly, was not a *Caremark* case; rather, it concerned public disclosures on which the entire Board signed

4

> 2.  **Plaintiff's pleadings are insufficient, as a matter of law, to show that the Board "consciously" ignored its oversight of Cephalon.**

Plaintiff attempts to avoid his obligation to make individualized allegations against specific board members by asserting that the Board, as a whole, "consciously failed" to oversee the Company because it was made aware of misconduct at Cephalon and ignored it. To support his *Caremark* claim, Plaintiff alleges that the Board ignored "red flags" that supposedly informed it of misconduct at the Company. *David B. Shaev Profit Sharing Account v. Armstrong*, C.A. No. 1449-N, 2006 Del. Ch. LEXIS 33 (Del. Ch. Feb. 13, 2006). The allegations that Plaintiff relies upon to establish these "red flags" are neither sufficiently specific nor relevant to meet the heavy burdens imposed by *Caremark* and *Twombly*.

> a.  **The agreement-in-principle is insufficient, as a matter of law, to show that the Board "consciously" ignored misconduct.**

Plaintiff attributes great legal significance to the Company's agreement-in-principle with the Department of Justice to plead guilty to a single federal misdemeanor violation of the Federal Food, Drug and Cosmetic Act and to pay $425 million to settle all federal and related state Medicaid claims. (Compl. ¶32.) By itself, however, the agreement-in-principle does nothing to show that the Board "consciously failed" to oversee Cephalon.

To plead a *Caremark* claim, Plaintiff must make factual allegations showing that the **Board**, not the Company, has committed wrongdoing. Nothing in the agreement-in-principle alleges **Board** misconduct. There are thousands of Cephalon employees, performing a wide range of jobs all over the world. The Board is simply not responsible for the actions of each and every one of these employees. Delaware law makes clear that the Board cannot be held liable

---

off. Here, in contrast, there is no reliance on group-published documents, and *Buckley* is inapplicable.

5

just because an employee may have acted inappropriately and exposed the Company to liability. *In re Caremark*, 698 A.2d at 968. Likewise, a corporate fine is insufficient to establish **Board** liability. As the Delaware Supreme Court has held, "equat[ing] a bad outcome with bad faith" is not enough to plead a *Caremark* claim. *Stone*, 911 A.2d at 373. This, though, is exactly what Plaintiff attempts to do. Thus, the agreement-in-principle does not support a plausible claim of *Caremark* liability.

A board of directors cannot face liability when it appropriately responds to perceived threats. *See White v. Panic*, 793 A.2d 356 (Del. Ch. 2000). On the face of the Complaint, it is apparent that the Board (1) cooperated fully with the Department of Justice in its investigation; (2) as a result of that investigation became aware of a problem; and (3) decided to settle with the Justice Department when it became apparent that such a course was in the best interests of the Company. Far from supporting *Caremark* liability, the pleadings show that the Board responsibly acted in Cephalon's best interests. *See Brehm v. Eisner*, 906 A.2d 27, 73 (Del. 2006) (holding that a director does not breach his fiduciary duty when he acts in the best interests of the company). Accordingly, the agreement-in-principle with the Department of Justice is legally insufficient to show that the **Board** did anything wrong.

          b.      **Off-label Actiq use is insufficient, as a matter of law, to show that the Board "consciously" ignored misconduct.**

Plaintiff also mistakenly asserts that off-label Actiq use shows that the Board "consciously failed" to oversee the Company. Plaintiff readily concedes that "[t]he market for off-label use often vastly exceeds the approved FDA use" (Compl. ¶22), and that, in general, the Food and Drug Administration Modernization Act does allow pharmaceutical companies to disseminate some information about off-label use to doctors. (Compl. ¶25.)

6

The truth is that the off-label market is vast because off-label prescriptions by physicians, which lead to off-label use by patients, is an "accepted" and "necessary" practice in the pharmaceutical and medical fields. *See Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 250 (2001) ("'[O]ff-label' usage . . . is an accepted and necessary corollary of the FDA's mission to regulate in this area without directly interfering with the practice of medicine."). Even the FDA has noted that off-label use is constructive: "'unlabeled' uses may be appropriate and rational in certain circumstances, and may, in fact reflect approaches to drug therapy that have been extensively reported in medical literature . . . . Valid new uses for drugs already on the market are often first discovered through serendipitous observations and therapeutic innovations . . . ." 12 FDA Drug Bulletin 4-5 (1982) (cited in 59 Fed. Reg. 59,820, 59,821 (Nov. 18, 1994)). Plaintiff fails to include any factual allegations showing that the extent of off-label use of Actiq informed the Board of misconduct at Cephalon.

The Complaint instead shows that, far from ignoring anything, Cephalon carefully monitored off-label use. Plaintiff constructs his entire case out of the contents of two *Wall Street Journal* articles, one of which (Compl. ¶30) makes clear, "When Cephalon receives a report of a doctor prescribing the drug off-label -- for example, via a call or letter from a patient -- it sends a letter to that doctor reminding him or her that Actiq is only for cancer pain . . . . The company has sent more than 3,300 such letters[.]" *See Wall Street Journal* article, November 3, 2006, attached as Exhibit 1 to the Silver Declaration filed herewith.

Moreover, it was to be expected that Actiq's off-label use numbers would rise over time. The active ingredient in Actiq is Fentanyl, an opioid that has been on the market since the 1960s. Actiq merely provides a new delivery system for a drug that doctors have widely prescribed for decades. As the medical community, over time, became aware of Actiq and comfortable with its

7

delivery system, physicians (not surprisingly) chose to prescribe it for the same ailments for which they have prescribed Fentanyl for the forty-plus years that it has been on the market.

For example, off-label prescriptions of Fentanyl-based drugs are commonly made to treat headaches. The other article relied upon by Plaintiff (Compl. ¶31) notes that "48% of the drugs used to treat headaches are used off label, so using Actiq for migraines isn't unusual." *See Wall Street Journal* article, November 21, 2006, attached as Exhibit 2 to the Silver Declaration filed herewith. Moreover, the article quotes another expert as saying that "Actiq is an effective 'rescue' drug for patients with bad migraines who don't respond to other treatment." *Id*.

Plaintiff alleges that increasing levels of off-label prescriptions of Actiq necessarily must have informed the Board that illegal marketing practices were occurring at Cephalon, but his own pleadings more plausibly suggest the opposite. Because of the prevalence of off-label prescriptions across the medical community, and the fact that Actiq's active ingredient, Fentanyl, has been prescribed for over forty years, off-label Actiq use is not and was not a "red flag." Absent the existence of legally-sufficient "red flags," Plaintiff fails to meet his *Caremark* and *Twombly* pleading burdens.[4]

---

[4]   Plaintiff also claims that a purportedly-improper marketing strategy and the Brennan audit were additional "red flags" that support *Caremark* liability. With regard to the first, Plaintiff offers no facts to suggest that the Board was involved with the marketing shift, allegedly instituted in 2000, or that the marketing shift was improper. Also, it is inconceivable that a single strategy, rolled out in 2000, would continue to exert powerful influence over Actiq sales six years later. It is more plausible that the medical community's growing comfort with a new delivery system for a commonly-used drug exerted an ongoing (and positive) effect on sales. Therefore, Plaintiff derives no "heft" from this argument.

Plaintiff's assertion about the Brennan audit is similarly weak. Again, Plaintiff's assertion lacks factual support. As *Brennan* makes clear, Brennan passed on his audit to his superiors, who forwarded it to Cephalon's Director of Quality Assurance. *See Brennan v. Cephalon, Inc.*, Civ. A. No. 04-3241 (NLH), 2007 U.S. Dist. LEXIS 33991, *18 (D.N.J. May 8, 2007). Plaintiff makes no allegations that the Board saw or should

8

### B. Judgment Must Be Entered Against Plaintiff For Failure To Make Demand On The Board.

Even if Plaintiff had adequately pled *Caremark* liability, this Court would still be required to enter judgment for the Defendants on the additional ground that Plaintiff did not make demand on the Board and failed to plead factual allegations excusing demand as futile. Delaware law places a heavy legal burden on plaintiffs who choose not to make demand on a board of directors because deciding whether to pursue litigation is an essential corporate decision best left to directors. *See Aronson*, 473 A.2d at 811; *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 540 (1984). Plaintiff attempts to excuse his failure to make demand on the Board by arguing that the Directors are liable for the underlying claim, and are therefore unable to assess a demand with disinterest.[5] To do this, Plaintiff must show that the majority of the Individual Directors face a "substantial likelihood of liability." *See Stone*, 911 A.2d at 367. Plaintiff's Complaint fails to meet this burden.

---

have seen this audit. The facts surrounding this audit suggest only that Cephalon had a functioning compliance program, and they are insufficient to plausibly show that the Board faces *Caremark* liability.

[5] Plaintiff also argues that, for the purposes of demand futility, the Board is "interested" because of "the pendency of regulatory inquiries by the Attorneys General of Massachusetts and Connecticut and a Congressional investigation." (Pl. Mem. at 17.) Plaintiff pleads no factual allegations suggesting that the Directors are the focus of the remaining government inquiries. Indeed, the Board is not, and never has been, the focus of any investigations into Cephalon. Moreover, this argument explicitly links demand futility to investigations that have yet to be resolved – the type of bootstrapping that Delaware law clearly forecloses. *Pogostin v. Rice*, 480 A.2d 619, 625 (Del. 1984) (Plaintiffs may not "bootstrap allegations of futility, based on claims of directorial participation in and liability for the wrongs alleged."), overruled on other grounds by *Brehm*, 746 A.2d at 253-54.

**1.    Plaintiff cannot meet the extraordinarily heavy burden of pleading that the Board faces a "substantial likelihood of [*Caremark*] liability."**

To excuse his failure to make demand on the Board, Plaintiff must make particularized factual allegations showing that the Directors' likelihood of liability is "substantial."[6] This "substantial likelihood" standard is an even higher burden of persuasion than the "plausibility" standard set out in *Twombly*. For a court to find that a director faces a substantial likelihood of liability, that director's alleged conduct must be "egregious." *Seminaris v. Landa*, 662 A.2d 1350, 1354 (Del. Ch. 1995). Delaware courts acknowledge that "[this] standard is difficult to meet." *Globis Ptnrs., L.P. v. Plumtree Software, Inc.*, Civ. A. No. 1577-VCP, 2007 Del. Ch. LEXIS 169, *20 (Del. Ch. Nov. 30, 2007).

Moreover, because Plaintiff bases his assertion of demand futility on an underlying *Caremark* claim, he faces the heaviest possible burden here: "[T]o predicate a substantial likelihood of director liability on [a *Caremark* claim], a plaintiff must plead the existence of facts suggesting that the board *knew* that internal controls were inadequate, that the inadequacies could leave room for illegal or materially harmful behavior, and that the board *chose* to do nothing about the control deficiencies that it knew existed." *Desimone v. Barrows*, 924 A.2d 908, 940 (Del. Ch. 2007) (emphasis added). It is extraordinarily difficult for a plaintiff to successfully plead demand futility based on a substantial likelihood of *Caremark* liability. In fact, Delaware courts have excused demand due to a substantial likelihood of *Caremark* liability only once.[7]

---

[6]    Federal Rule of Civil Procedure 23.1 mandates that a derivative plaintiff "state with particularity" the reasons for not making a demand on the board of directors.

[7]    *See Saito v. McCall*, Civ. A. No. 17132-NC, 2004 Del. Ch. LEXIS 205 (Del. Ch. Dec. 20, 2004). *Saito* concerned, in part, the knowledge possessed by a post-merger board of directors about accounting irregularities at one of the pre-merger companies. The court

Implicitly admitting that he faces an almost insurmountable legal hurdle, Plaintiff cites no Delaware cases to support his substantial likelihood of liability argument. Instead, Plaintiff relies on *In re SFBC*, a case from the District of New Jersey. *In re SFBC Int'l, Inc. Sec. & Derivative Litig.*, 495 F. Supp. 2d 477, 479 (D.N.J. 2007). There, factual allegations showed that the company, which tested products for pharmaceutical companies, conducted this testing in an "egregiously unethical manner," and that the "flagrant and reprehensible wrongdoing" created life-threatening danger for a broad range of people. *Id*. at 486. Noting that the company received at least seven citations for violations of FDA regulations and was cited over eighty times by local authorities for building code violations (at the corporate headquarters) over a six-year period, the court held "that it is inconceivable that a board of directors properly performing its functions would not have known about the wrongdoing." *Id*. at 487.

The defendant-directors in *SFBC* faced a substantial likelihood of liability because they took no action in the face of numerous government citations. In comparison, the Complaint indicates that the Cephalon Board appropriately responded to the government investigations, cooperating with authorities and actively dealing with the results. Plaintiff fails to provide even a hint of the "egregious" conduct necessary to provide the legal foundation for a substantial likelihood of liability. *See*, *e.g.*, *Stone*, 911 A.2d 362.[8]

---

held that the alleged facts showed that the board of directors was made aware of potential problems at one of the pre-merger companies, but did nothing about it for several months after the merger. The inclusion of factual allegations actually showing board knowledge distinguishes *Saito* from this case.

[8] In contrast, the court in *Piven v. Loranger*, No. 07-2878 (S.D.N.Y. April 10, 2008), held that demand would have been futile because the pleadings showed that (1) willfulness at a high level was conceded in the company's plea agreement with the Government; and (2) management had considered and rejected voluntary disclosure to the Government in 2000, a full year before an official Government inquiry began. The court noted that "[t]here appears at least sufficient evidence of conscious avoidance at high levels to

11

### 2. Plaintiff should have made demand on the Board.

In any event, Plaintiff could have, and should have, made demand on the Board. As has been briefed at length in Defendants' opening memorandum, none of the Board members are interested or lack independence. (Defs. Mem. § I.C.) The Directors are not rendered interested by their compensation, *Grobow v. Perot*, 539 A.2d 180, 188 (Del. 1988) ("[W]ithout more, [director compensation] do[es] not establish any financial interest."), overruled on other grounds by *Brehm*, 746 A.2d at 253-54, or because they are named as defendants in the Complaint. *Jacobs v. Yang*, C.A. No. 206-N, 2004 Del. Ch. LEXIS 117, at *25 n.31 (Del. Ch. Aug. 2, 2004) (Demand is not futile "merely because directors would be suing themselves. . . . To so hold would eviscerate the demand requirement of Rule 23.1."). And, as has been stated above, none of the Directors are rendered interested due to a substantial likelihood of *Caremark* liability. Finally, there are no factual allegations making a plausible case that the Directors are not independent, because the Board is not dominated or controlled by any one Director. *See Seminaris*, 662 A.2d at 1353 (An independent director can base a decision on "the corporate merits of the subject before the board rather than extraneous considerations or influences."). None of the high standards required to wrest the essential corporate right of deciding whether to engage in litigation exist to justify taking that decision away from the Board, and this Court should follow well-established law and refuse to do so.

Even assuming for the sake of argument that some of the Board members were interested or lacked independence, there were and are multiple ways the Board still could have adequately

---

prevent dismissal of the claims prior to completion of pre-trial discovery." *Id.* Here, Plaintiff fails to offer any factual allegations suggesting that the Board had awareness of or participated in any misconduct. Plaintiff's pleadings as to the agreement-in-principle are therefore plainly insufficient to establish that the Board faces a substantial likelihood of *Caremark* liability.

12

and fairly considered a demand. *See Levine v. Smith*, 591 A.2d 194, 214 (Del. 1991) ("[T]here is obviously no prescribed procedure that a board must follow" in responding to a demand.). For example, special litigation committees ("SLCs") are valid ways for a board of directors to assess demand, even where some members of the board may be tainted by interest. *See* 8 Del. C. §141(c); *see also Zapata Corp. v. Maldonado*, 430 A.2d 779, 786 (Del. 1981) (holding that an independent board committee may investigate and assess a demand even where there is an "interest taint of the board majority").

Here, Vaughn Kalian, an outside director, joined the Board in 2005, several years after the level of Actiq sales supposedly "sky-rocketed" and a year after the Justice Department's investigation of Cephalon began. Similarly, outside director Kevin Moley joined the Board even later, in 2006. Either of these directors could have led a SLC to consider a demand. Alternatively, the Board could have added a new board member to head up such an SLC. *See*, *e.g.*, *Carlton Invs. v. TLC Beatrice Int'l Holdings*, Civ. A. No. 13950, 1997 Del. Ch. LEXIS 86 (Del. Ch. May 30, 1997). The Board could also have hired an outside consultant or lawyer to assess the demand with the agreement that they would abide by the outsider's decision. *See*, *e.g.*, *Kindt v. Lund*, Civ. A. No. 17751-NC, 2003 Del. Ch. LEXIS 62 (Del. Ch. May 30, 2003). In short, there were a number of ways the Board, in whole or in part, could have properly considered a demand, if only they had been given that opportunity.

## III.    CONCLUSION

Plaintiff is attempting to construct a case that merges two of the heaviest legal burdens under Delaware corporate law. *Caremark* is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *In re Caremark*, 698 A.2d 967. Under *Twombly*, this "difficult theory" must be made out "plausibly." *Twombly*, 127 S. Ct.

13

1955.  Compounding his burden, Plaintiff bases his demand futility argument on a substantial likelihood of liability, a standard which is indisputably "difficult to meet."  *Globis Ptnrs.*, 2007 Del. Ch. LEXIS 169 at *20.  When that liability is based on an underlying *Caremark* claim, as it is here, the standard is virtually impossible to satisfy.  Plaintiff's allegations do not meet these enormous burdens.  Therefore, Defendants respectfully request that Court should grant their Motion for Judgment on the Pleadings, or at a minimum, require Plaintiff to make a proper demand on the Board.

Dated: Wilmington, DE
June 23, 2008

Respectfully submitted,

/s/ Daniel M. Silver
Michael P. Kelly (#2295)
Daniel M. Silver (#4758)
McCarter & English, LLP
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, DE 19801
Phone: 302.984.6300
Fax: 302.984.2493
mkelly@mccarter.com
dsilver@mccarter.com

Steven B. Feirson
Michael L. Kichline
Michael J. Newman
Dechert LLP
Cira Centre, 2929 Arch Street
Philadelphia, PA 19104
Phone: 215.994.4000
Fax: 215.994.2222

*ATTORNEYS FOR THE DEFENDANTS DR. FRANK BALDINO, JR., WILLIAM P. EGAN, MARTYN D. GREENACRE, GAIL R. WILENSKY, VAUGHN M. KAILIAN, CHARLES A. SANDERS, DENNIS L. WINGER, KEVIN E. MOLEY, AND CEPHALON, INC.*