IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JERALD KING, Derivatively on Behalf of CEPHALON, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 1:08-cv-00054-GMS |
| FRANK BALDINO, JR., WILLIAM P. EGAN, MARTYN D. GREENACRE, VAUGHN M. KAILIAN, KEVIN E. MOLEY, CHARLES A. SANDERS, GAIL R. WILENSKY, and DENNIS L. WINGER, | ) ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants, | ) ) | |
| and | ) ) | |
| CEPHALON, INC., A Delaware Corporation, | ) ) ) | |
| Nominal Defendant. | ) | |

## DECLARATION PURSUANT TO 28 U.S.C. §1746

The declarant, Daniel M. Silver, deposes and states as follows under penalty of perjury:

1.  I am an attorney duly admitted to practice before this Court and am an associate at McCarter & English, LLP, counsel herein for defendants Dr. Frank Baldino, Jr., William P. Egan, Martyn D. Greenacre, Gail R. Wilensky, Vaughn M. Kailian, Charles A. Sanders, Dennis L. Winger and Kevin E. Moley, and nominal Defendant Cephalon, Inc. ("Cephalon").

ME1 7478936v.1

2.	I submit this Declaration in support of the Reply Memorandum in Support of the Motion of Defendants for Judgment on the Pleadings ("Memorandum"), and to place before the Court certain documents relevant to this Memorandum.

3.	Attached hereto as Exhibit 1 is a true and correct copy of an article from the *Wall Street Journal*, written by John Carreyrou on November 3, 2006.

4.	Attached hereto as Exhibit 2 is a true and correct copy of an article from the *Wall Street Journal*, written by John Carreyrou on November 21, 2006.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 23rd day of June, 2008.

/s/ Daniel M. Silver
Daniel M. Silver (#4758)
McCarter & English, LLP
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, DE 19801
(302) 984-6331
dsilver@mccarter.com

ME1 7478936v.1

# EXHIBIT 1

2 of 2 DOCUMENTS

Copyright 2006 Factiva, a Dow Jones and Reuters Company
All Rights Reserved

Dow Jones Factiva

(Copyright (c) 2006, Dow Jones & Company, Inc.)

THE WALL STREET JOURNAL.
The Wall Street Journal

November 3, 2006 Friday

SECTION: Pg. A1

LENGTH: 2422 words

HEADLINE: Potent Product: Narcotic 'Lollipop' Becomes Big Seller Despite FDA Curbs --- Actiq Is Only for Cancer Pain But Cephalon Pitches It To Many Types of Doctors --- 'Like the Most Delicious Candy'

BYLINE: By John Carreyrou

BODY:

While pregnant with her second child three years ago, Tiare Frontera suffered from bad migraines. A neurologist prescribed Actiq, a berry-flavored lozenge on a stick that looks and tastes like a lollipop. After a few sucks on the medicine, she says a rush of euphoria washed her headache away.

Soon, Mrs. Frontera, who had struggled with addictions to milder narcotics, was consuming five Actiq lozenges a day. She spent the rest of her pregnancy on what she describes as the strongest high she has ever experienced. When she gave birth, her baby son was cranky and wouldn't sleep. Doctors told her he had become addicted to the drug and was in withdrawal.

Mrs. Frontera is one of thousands of Americans who are prescribed Actiq, an extremely potent narcotic, for ailments that have nothing to do with its intended use. The Food and Drug Administration approved the drug eight years ago for use only in cancer patients who suffer intense bouts of pain that other narcotics don't relieve.

In the first half of this year, oncologists, or cancer doctors, accounted for only 1% of the 187,076 Actiq prescriptions filled at retail pharmacies in the U.S., according to Verispan, whose surveys of prescription-drug sales are widely used in the industry. Data gathered from a network of doctors by research firm ImpactRx between June 2005 and October 2006 suggest that more than 80% of patients who use the drug don't have cancer. Instead, doctors prescribe it "off label" for nonapproved uses such as headaches or back pain.

Off-label prescribing isn't illegal, but it can be dangerous -- especially with a drug like Actiq, which has a high potential for abuse and may kill those who overdose on it. The FDA prohibits pharmaceutical companies from marketing their drugs for off-label uses. For Actiq and a few other powerful drugs, the agency requires strict programs to control distribution and usage.

Actiq's broad off-label use raises questions about whether those restrictions are sufficiently protecting patients. "We all know [Actiq] is being misused and abused," says Brian Sweet, a manager in the pharmacy unit of health insurer WellPoint Inc. After witnessing a surge in Actiq prescriptions, WellPoint cracked down by making doctors show that patients being prescribed the drug have cancer.

Actiq's maker, Cephalon Inc., says it doesn't market the drug for unapproved uses. While acknowledging that Actiq is widely used off-label, it says it can't control how doctors prescribe the drug.

Potent Product: Narcotic 'Lollipop' Becomes Big Seller Despite FDA Curbs --- Actiq Is Only for Cancer Pain But Cephalon Pitches It To Many Types of Doctors --- 'Like the Most Delicious

Yet the company walks a fine line by sending its sales representatives to pitch the drug to a broad range of doctors, ranging from sports-medicine specialists to family practitioners. It gives these doctors coupons for free samples. Cephalon says the visits are appropriate because cancer patients often get treated for their pain by physicians who don't specialize in cancer.

Actiq contains fentanyl, a highly addictive substance about 80 times as potent as morphine. Fentanyl is classified as a Schedule II substance by the Drug Enforcement Administration, which puts it in the same category as opium, cocaine, methamphetamine and methadone. Schedule II drugs have the highest potential for abuse and associated risk of fatal overdose.

Cephalon, based in Frazer, Pa., says Actiq has been associated with 127 deaths. Two of them involved children who confused the drug for candy. Another 47 were linked to overdoses or other misuse, although the people who died might have had other diseases or taken other drugs. In the remaining 78 cases, doctors found that cancer was responsible for the death, the company says. Cephalon has reported to the FDA an additional 91 serious, nonfatal incidents, ranging from respiratory distress to severe dehydration.

The U.S. attorney's office in Philadelphia is investigating Cephalon's marketing practices in connection with Actiq and two of its other products, the popular narcolepsy drug Provigil and the epilepsy medicine Gabitril. No charges have been filed.

Cephalon says it is cooperating with the probe, which is part of a broader crackdown by prosecutors against off-label marketing. In August, the Justice Department fined Schering-Plough Corp. $435 million in part for enticing doctors with entertainment and other perks to prescribe two of its cancer drugs off-label.

Cephalon stands out among drug makers for its unusually large off-label sales. Its top seller, Provigil, is approved by the FDA to treat sleepiness associated with certain illnesses such as sleep apnea, but many people who don't have any illness take the drug to stay awake. Analysts estimate about 80% of Provigil prescriptions are off-label. Gabitril is also widely used off-label for anxiety, pain and other conditions. Under FDA pressure, Cephalon last year curtailed its marketing of the epilepsy drug because it was causing seizures in patients without the disease, and sales dropped 23%.

Founded in 1987 by a former DuPont Co. scientist named Frank Baldino Jr., Cephalon expects revenue to exceed $1.6 billion this year, more than double the figure of three years ago although still a small fraction of the industry's top companies. Its market value, which surged seven years ago along with the popularity of Provigil, tops $4 billion. Dr. Baldino earned $2.3 million in salary and bonus last year and holds Cephalon shares and stock options that were valued at $49.6 million as of the end of last year.

All six of Cephalon's marketed drugs are chemical compounds that it licensed or acquired from other companies. Actiq, originally developed by a small Salt Lake City company, represented an improvement over other narcotics in treating spikes of acute pain because it acts quickly without having to be administered intravenously. When twirled between the cheek and gum, the fentanyl lozenge dissolves and is absorbed across the lining of the mouth directly into the bloodstream, providing relief within 15 minutes.

Actiq had sales of $15 million in 2000, when Cephalon acquired it. By last year, sales had grown to $412 million, making it Cephalon's No. 2 drug. In the first nine months of this year, sales jumped to $471 million. Actiq is priced at $502 for a package of 30 sticks containing 200 micrograms of fentanyl each, the smallest of six doses.

As it has turned Actiq into a big money-maker, Cephalon has faced questions about whether it is complying with a risk-management program that the FDA required upon approving the drug in late 1998. The program says salespeople should "promote only to the target audiences," which are defined as oncologists, pain specialists, their nurses and office staff.

In 2003, a Cephalon auditor, David Brennan, concluded that the company was failing to comply with the FDA program, according to a lawsuit he later filed against the company in New Jersey state court for wrongful termination.

An important provision of the program says Actiq's maker should report to the FDA every quarter whether "groups of physicians (such as a particular specialty)" who represent "potential off-label usage greater than 15%" are prescribing the drug. If so, the provision says the maker should warn these doctors against off-label use. Mr. Brennan's lawsuit says that means Cephalon must act if all noncancer medical specialties together account for more than 15% of prescriptions.

Cephalon interprets the provision differently. It says it only needs to act if any individual specialty exceeds 15% of the total -- and then only if it can be shown that doctors in that specialty are prescribing Actiq inappropriately. Cephalon

Potent Product: Narcotic 'Lollipop' Becomes Big Seller Despite FDA Curbs --- Actiq Is Only for Cancer Pain But Cephalon Pitches It To Many Types of Doctors --- 'Like the Most Delicious

notes that it is difficult to prove a prescription is inappropriate since cancer patients may visit many types of doctors to treat their pain. It believes the 15% clause has yet to be triggered. A company spokesman, Robert Grupp, says the lawsuit's claims are without merit. The FDA declined to comment.

According to Verispan data for the first half of 2006, two specialties exceed 15% of Actiq prescriptions: anesthesiologists at 29.5% and physical medicine and rehabilitation specialists at 16%. The data show oncologists and pain specialists account for less than 3% of prescriptions. Cephalon doesn't dispute the data.

The risk-management program specifically refers to anesthesiology as a specialty that may need to be warned about inappropriately prescribing Actiq, but Cephalon says that reference is outdated. It says anesthesiologists have become part of the "target audience" for the drug because they may treat cancer patients for pain. Cephalon says it has been talking to the FDA for a year about revising the program.

After Mr. Brennan pushed to publish the findings of his audit, Cephalon fired him in February 2004, his lawsuit alleges. Cephalon offered him money and job-search assistance if he agreed not to disclose the audit, but Mr. Brennan refused, the suit says. Mr. Grupp declined to discuss Mr. Brennan's dismissal but noted that he is "a former disgruntled employee."

Mr. Brennan has been interviewed twice by investigators working for the U.S. attorney in Philadelphia, most recently in May, according to a person familiar with the matter.

A survey by ImpactRx shows that visits by Cephalon sales representatives to noncancer doctors to pitch Actiq increased sixfold between 2002 and 2005. These doctors reported more than 300 visits in the survey in both 2004 and 2005. Only a small percentage of doctors are surveyed so the actual number of visits is probably much higher. Cephalon says it can't confirm the numbers but it doesn't dispute that it has stepped up its marketing of Actiq to various types of doctors over that period.

Stephen Leighton, a general practitioner in Winston-Salem, N.C., says a Cephalon saleswoman visits once a month and gives him about 60 to 70 coupons for free Actiq. Patients can trade each coupon for six Actiq sticks. Dr. Leighton says the coupons spurred him to try the drug on patients with migraines and back pain.

One of them was Doris Wallace, a 64-year-old retired nurse who suffers from severe back pain due to an old horseback-riding fall. Ms. Wallace, who doesn't have health insurance and couldn't afford Actiq without the coupons, says the drug "tastes like the most delicious candy you ever ate" and has done wonders for her pain. At the height of her use, she was consuming 24 Actiq sticks a month.

The positive experience of patients like Ms. Wallace has led Dr. Leighton to prescribe Actiq more widely for different types of pain. Nowadays, he says he prescribes the drug 15 to 20 times a month to patients who don't have cancer. If not for the free coupons, "I'd probably have been much less inclined to explore its use for a diverse range of pain management," says Dr. Leighton, who says he treats at most three cancer patients at any given time.

Dr. Leighton says he thinks the FDA-approved usage of Actiq is too narrow. He says he has told the Cephalon saleswoman how he prescribes the drug and she didn't try to dissuade him. Mr. Grupp of Cephalon says Dr. Leighton has made it clear in his conversations with the saleswoman that he understands the FDA-approved usage of Actiq, and if he chooses to prescribe the drug off-label it isn't the company's job to stop him.

Mr. Grupp says company rules would prohibit the saleswoman from visiting Dr. Leighton only if he never prescribed the drug for cancer pain. "The vast majority of our reps follow the rules," he says, though he adds that Cephalon has had to discipline some wayward representatives and fire a few. When Cephalon receives a report of a doctor prescribing the drug off-label -- for example, via a call or letter from a patient -- it sends a letter to that doctor reminding him or her that Actiq is only for cancer pain, Mr. Grupp says. The company has sent more than 3,300 such letters, he says.

Earlier this year, Dr. Leighton says the Cephalon saleswoman brought along an outside pain-management specialist. Over lunch, Dr. Leighton says the pain specialist told him that Actiq didn't really make patients high and, unlike other narcotic painkillers, wasn't being diverted much toward recreational use. Cephalon declined to comment on the conversation.

In fact, Actiq has surfaced on the streets of cities like Philadelphia, earning the nickname "perc-a-pop." Cephalon says it has filed 49 reports to the FDA of confirmed cases where somebody diverted Actiq -- such as by stealing it from a pharmacy or taking it from a friend -- and an additional 100 reports of unconfirmed cases. Most are the result of

Potent Product: Narcotic 'Lollipop' Becomes Big Seller Despite FDA Curbs --- Actiq Is Only for Cancer Pain But Cephalon Pitches It To Many Types of Doctors --- 'Like the Most Delicious

pharmacy break-ins and need to be put in the context of the more than 200 million sticks of Actiq that have been sold, Mr. Grupp says.

Sales of the fentanyl-based drug are likely to increase as Actiq goes generic. In late September, Barr Pharmaceuticals Inc. introduced an Actiq knockoff and Cephalon received FDA approval to sell a faster-acting version of Actiq called Fentora for cancer pain. Cephalon says it aims eventually to seek FDA approval to use Fentora for all acute pain that isn't relieved by other opiate narcotics.

Mrs. Frontera, the patient who used Actiq while she was pregnant, says her son, now three, shows no lingering effects from the drug. Mrs. Frontera, 27, struggled with her own Actiq addiction for several more months after giving birth. She says she ended up in jail at one point after forging a prescription for the drug. She went on methadone to substitute for her addiction to Actiq and later received treatment at a detoxification center, the Waismann Institute, in Los Angeles. Now she lives in San Luis Obispo, Calif.

"It makes me angry that it was prescribed to me," she says of Actiq. "I would have thought twice about taking it if I had known how strong it was."

Philip Delio, the neurologist who prescribed Actiq to Mrs. Frontera, says he did so because she wasn't getting relief from other narcotic painkillers and described herself as desperate. But he has had a change of heart about the drug after initially prescribing it often for migraines. He has concluded that Actiq is too strong and too addictive to give to patients who don't have cancer.

Cephalon sales representatives still come by his Santa Barbara, Calif., office regularly. But Dr. Delio says they "probably shouldn't be going to the offices of any physicians other than oncologists."

---

Online Today: WSJ.com subscribers can read the full FDA risk-management program for Actiq, at WSJ.com/OnlineToday.



**Diverse Market**
Many noncancer doctors prescribe Actiq. Top prescribers in the first half of 2006 among 187,076 prescriptions filled at retail pharmacies:

- Anesthesiologists: 29.5%
- Physical medicine and rehabilitation: 16.3%
- General practitioners/family medicine: 13.3%
- Internal medicine: 7.8%
- Neurologists: 5.7%
- Nurse practitioners: 5.3%

Source: Verspan

Potent Product: Narcotic 'Lollipop' Becomes Big Seller Despite FDA Curbs --- Actiq Is Only for Cancer Pain But Cephalon Pitches It To Many Types of Doctors --- 'Like the Most Delicious



Tiare Frontera



**Successful Treatment**
Sales of Cephalon's narcotic drug Actiq:

[Bar chart showing sales from 2000 to '06, with scale $0 to $500 million. Legend: First three quarters; Full year]

Note: Cephalon acquired Anesta Corp., Actiq's developer, in October 2000.
Sources: Cephalon; Anesta

License this article from Dow Jones Reprint Service

License this article from Dow Jones Reprint Service

**NOTES:**
PUBLISHER: Dow Jones & Company, Inc.

**LOAD-DATE:** November 4, 2006

# EXHIBIT 2

1 of 2 DOCUMENTS

Copyright 2006 Factiva, a Dow Jones and Reuters Company
All Rights Reserved

# Dow Jones Factiva

(Copyright (c) 2006, Dow Jones & Company, Inc.)

# THE WALL STREET JOURNAL.

The Wall Street Journal

November 21, 2006 Tuesday

**SECTION:** Pg. B1

**LENGTH:** 1481 words

**HEADLINE:** Cephalon Used Improper Tactics to Sell Drug, Probe Finds

**BYLINE:** By John Carreyrou

**BODY:**

FROM SETTING unrealistically high sales quotas to pushing larger prescriptions at higher doses, drug maker Cephalon Inc. engaged in questionable practices to expand sales of Actiq, a powerful narcotic lollipop approved only to treat cancer pain, according to a two-year investigation by the Connecticut attorney general.

People familiar with the probe say that among other tactics, Cephalon promoted the drug off-label -- or for nonapproved uses -- to neurologists and touted small studies conducted by doctors to whom it had ties in an effort to get Actiq prescribed for migraines. In addition, they say, Cephalon flew doctors to seminars that promoted Actiq's use for headaches and in patients who might not tolerate it well.

Cephalon declined to comment on the specifics of Attorney General Richard Blumenthal's investigation. Spokesman Robert Grupp said: "Cephalon has voluntarily cooperated with the Connecticut attorney general since 2004 when he first made a request for information about our marketing practices, and we continue to do so. Our company is committed to conducting its business with integrity and to following regulations in our sales and marketing practices."

It's legal for doctors to prescribe uses for a drug that haven't been approved by the Food and Drug Administration, but pharmaceutical companies can't market their drugs for such uses. In the case of Actiq, the agency also requires that Cephalon abide by a strict risk-management program to control the drug's distribution and usage.

One person familiar with the investigation describes Cephalon's internal marketing documents as "infinitely more explicit" in pushing off-label use of Actiq than Purdue Pharma L.P. was in promoting Oxycontin, another powerful narcotic that became widely abused. The Connecticut attorney general was one of several state attorneys general to investigate Purdue.

Mr. Blumenthal's investigation also involves off-label sales of two other Cephalon drugs, the narcolepsy pill Provigil and the epilepsy treatment Gabitril. Cephalon is also being investigated by the U.S. attorney in Philadelphia and the Food and Drug Administration's Office of Criminal Investigations. Like Mr. Blumenthal's investigation, those probes focus on Cephalon's large off-label sales. The U.S. attorney and the FDA declined to comment.

Mr. Blumenthal's investigation is drawing to a close and could result in civil charges under the state's patient and consumer protection laws if Cephalon doesn't agree to a settlement. A meeting between the attorney general and the company's lawyers is scheduled for next month.

If Cephalon opts to settle the case out of court, Mr. Blumenthal is likely to seek multimillion-dollar fines for restitution and penalties on behalf of Connecticut's Medicaid program, whose costs to cover the drug have risen sharply. The

attorney general would also likely force the company to adopt a reform program. "We want them to change the way they do business," Mr. Blumenthal says.

Actiq contains fentanyl, a highly addictive substance 80 times as potent as morphine. Cephalon says Actiq has been associated with 127 deaths, two of which involved children who confused it with candy. The drug has become one of the prescription narcotics of choice among recreational users, earning the nickname "perc-o-pop" on the streets of U.S. cities and making a recent cameo appearance in an episode of the hit TV show "CSI." In the first nine months of this year, Actiq sales reached $471 million.

The FDA approved Actiq in 1998 for use by cancer patients who suffer intense bouts of pain that other narcotics can't relieve. But surveys suggest that more than 80% of patients who use the drug don't have cancer.

The trigger for Mr. Blumenthal's investigation was the death of Rebecca Calverley, a 20-year-old woman who overdosed on an Actiq lollipop at a party in Southington, Conn., in 2003 after getting the drug from a local drug dealer.

Mr. Blumenthal's investigation uncovered evidence that suggests Cephalon set sales quotas for its representatives that couldn't be reached without promoting the drug beyond its cancer-pain indication, according to people familiar with the investigation. Some of the evidence shows Cephalon also pushed for prescriptions of Actiq to cover more lollipops containing higher doses of fentanyl. Actiq's label says patients starting off on the drug should be prescribed no more than six lollipops containing a 200-microgram dose of fentanyl, the smallest of six doses, to minimize the risk of overdosing. Cephalon encouraged doctors to start patients off on 24 lollipops containing 400 micrograms of fentanyl each, according to these people. The higher dose costs more and brings in more revenue.

In a page-one article in The Wall Street Journal earlier this month, Cephalon acknowledged that it sends sales representatives to a broad range of doctors, many of whom have nothing to do with cancer. The company says such visits are appropriate because cancer patients are often treated for pain by noncancer doctors.

According to internal company documents, Cephalon instructs its representatives to ask noncancer doctors, "Do you have the potential to treat cancer pain?" Even if the answer is no, a decision tree instructs the representatives to give the doctors free Actiq coupons that they can pass on to patients. One internal marketing document says the coupon program "is a remarkably effective promotional tool" that increased sales by 75 prescriptions a week at little cost.

Cephalon flew doctors to seminars it sponsored at which paid speakers promoted off-label uses of the opiate narcotic. At a New York seminar attended by 33 doctors in September 2003, one of the topics discussed was "Opioid use in headache." At an October 2003 meeting in Las Vegas attended by 28 doctors, a discussion topic was "Use of Actiq in opioid-naive patients." Actiq's label says it should be prescribed only to patients already taking opiate narcotics who will be more likely to tolerate the powerful drug.

Mr. Grupp declined to comment on the seminars. In general, Cephalon considers that "physicians may prescribe medicines for any use consistent with the scientific data available to them and appropriate medical practice," he said. "The decision to prescribe 'off label' is theirs and theirs alone."

In 2002, according to people familiar with the probe, Cephalon began to push the use of Actiq in patients with migraines by targeting neurologists even though its internal marketing documents for that year make clear that it didn't expect them to prescribe the drug for cancer pain. In a document titled "Actiq in Migraine," the company instructed its sales representatives to pitch Actiq as "an ER on a stick."

Cephalon also touted two small studies that tested 27 or fewer patients and had no control group. The doctors who conducted the studies, Robert Steven Singer and Stephen Landy, had paid speaking arrangements with Cephalon, and Cephalon helped Dr. Landy with the study he conducted, according to the people close to Mr. Blumenthal's probe.

Dr. Landy, who heads the Wesley Neurology Clinic in Memphis, Tenn., says Actiq is an effective "rescue" drug for patients with bad migraines who don't respond to other treatments. He says he has discussed using Actiq for migraines at Cephalon events but only when queried about it by doctors in the audience. Dr. Landy won't say how much Cephalon paid him for speaking. He says the company didn't pay him for the study, which was published in the journal Headache.

Dr. Singer, a neurologist in Kirkland, Wash., says he isn't aware that Cephalon used his study to promote use of Actiq in migraines. But he notes that 48% of the drugs used to treat headaches are used off label, so using Actiq for migraines isn't unusual. He declines to say how much Cephalon paid him to speak.

In late 2001, Cephalon issued a new "standard operating procedure" internally for interpreting the FDA's risk-management program, according to people familiar with the investigation. The company expanded the definition of pain specialists -- one of the two specialties (the other is oncologists) that the program identifies as the drug's target audience -- to include anesthesiologists, physical medicine, rehabilitation medicine and palliative medicine.

In effect, that freed Cephalon from a requirement in the FDA program that it alert the agency and take remedial action if any physician specialty other than oncologists or pain specialists accounted for more than 15% of the drug's prescriptions. Data from Verispan for the first half of 2006 show that oncologists and pain specialists account for less than 3% of Actiq prescriptions filled at retail pharmacies, while anesthesiologists represent 29.5% of prescriptions.



**Sales Scrutiny**
Sales of Cephalon's narcotic drug Actiq, in millions

Note: Cephalon acquired Anesta Corp., Actiq's developer, in October 2000.

Sources: Cephalon; Anesta

License this article from Dow Jones Reprint Service

License this article from Dow Jones Reprint Service

**NOTES:**
PUBLISHER: Dow Jones & Company, Inc.

**LOAD-DATE:** November 22, 2006